# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARK MEADOWS,<br>606 Wind Flower Drive<br>Sunset, SC 29685,<br><br>*Plaintiff*,<br><br>v.<br><br>NANCY PELOSI, in her official<br>capacity as Speaker of the United States<br>House of Representatives,<br>1236 Longworth House Office Building<br>Washington, DC 20515;<br><br>BENNIE G. THOMPSON, in his official<br>capacity as Chair of the Select Committee<br>to Investigate the January 6th Attack on the<br>United States Capitol,<br>2466 Rayburn House Office Building<br>Washington, DC 20515;<br><br>ELIZABETH L. CHENEY, in her official<br>capacity as Vice Chair of the Select<br>Committee to Investigate the January 6th<br>Attack on the United States Capitol,<br>416 Cannon House Office Building<br>Washington, DC 20515;<br><br>ADAM B. SCHIFF, in his official<br>capacity as a member of the United States<br>House of Representatives,<br>2309 Rayburn House Office Building<br>Washington, DC 20515;<br><br>JAMIE B. RASKIN, in his official<br>capacity as a member of the United States<br>House of Representatives,<br>2242 Rayburn House Office Building<br>Washington, D.C 20515;<br><br>SUSAN E. LOFGREN, in her official<br>capacity as a member of the United States | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:21-cv-3217 (CJN) |

House of Representatives,                                )
1401 Longworth House Office Building                     )
Washington, DC 20515;                                    )
                                                         )
ELAINE G. LURIA, in her official                         )
capacity as a member of the United States               )
House of Representatives,                                )
412 Cannon House Office Building                         )
Washington, DC 20515;                                    )
                                                         )
PETER R. AGUILAR, in his official                        )
capacity as a member of the United States               )
House of Representatives,                                )
109 Cannon House Office Building                         )
Washington, DC 20515;                                    )
                                                         )
STEPHANIE MURPHY, in her official                        )
capacity as a member of the United States               )
House of Representatives,                                )
1710 Longworth House Office Building                     )
Washington, DC 20515;                                    )
                                                         )
ADAM D. KINZINGER, in his official                       )
capacity as a member of the United States               )
House of Representatives,                                )
2245 Rayburn House Office Building                       )
Washington, DC 20515;                                    )
                                                         )
SELECT COMMITTEE TO                                      )
INVESTIGATE THE JANUARY 6TH                              )
ATTACK ON THE UNITED STATES                              )
CAPITOL,                                                 )
Longworth House Office Building                          )
Washington, DC 20515,                                    )
                                                         )
                                                         )
                      *Defendants*.                      )
_____                      )

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiff, the Honorable Mark Meadows ("Mr. Meadows"), a private citizen who

previously served as a Member of Congress and subsequently as Chief of Staff to the President of

the United States, brings this complaint for declaratory and injunctive relief to invalidate and prohibit the enforcement of two overly broad and unduly burdensome subpoenas from a select committee of the U.S. House of Representatives (the "Select Committee") issued in whole or part without legal authority in violation of the Constitution and laws of the United States.

2.      The Select Committee wrongly seeks to compel both Mr. Meadows and a third-party telecommunications company to provide information to the Select Committee that the Committee lacks lawful authority to seek and to obtain. The Select Committee acts absent any valid legislative power and threatens to violate longstanding principles of executive privilege and testimonial immunity that are of constitutional origin and dimension. Without intervention by this Court, Mr. Meadows faces the harm of both being illegally coerced into violating the Constitution and having a third party involuntarily violate Mr. Meadows rights and the requirements of relevant laws governing records of electronic communications. Only this Court can prevent these grave harms.

3.      For months, Mr. Meadows consistently sought in good faith to pursue an accommodation with the Select Committee whereby it could obtain relevant, non-privileged information in a manner consistent with legal precedent. While the Committee and Mr. Meadows engaged over a period of time in an effort to achieve such reasonable accommodation, the Select Committee adamantly refused to recognize the immunity of present and former senior White House aides from being compelled to appear before Congress and likewise refused to recognize a former president's claims of Executive Privilege and instructions to Mr. Meadows to maintain such privilege claims in addressing the Select Committee's inquiries.

4.      In his diligent attempts to reach an accommodation with the Select Committee, Mr. Meadows produced thousands of documents the Select Committee insisted were relevant to its inquiry.

5.      The current President of the United States, through counsel, purported to waive the former President's claims of privilege and immunity.  He did so without knowing the content and scope of the privileged information Mr. Meadows would, in theory, provide to the Select Committee. But as Justice Kavanaugh recently explained, "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

6.      As a result, Mr. Meadows, a witness, has been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension and having to either risk enforcement of the subpoena issued to him, not merely by the House of Representatives, but through actions by the Executive and Judicial Branches, or, alternatively, unilaterally abandoning the former president's claims of privileges and immunities. Thus, Mr. Meadows turns to the courts to say what the law is.

**PARTIES**

7.      Plaintiff Mark Meadows served as Chief of Staff to President Donald J. Trump from March 31, 2020 until January 20, 2021. Mr. Meadows is currently a senior partner at the Conservative Partnership Institute in Washington, D.C. Mr. Meadows previously served as a Republican member of the U.S. House of Representatives, representing North Carolina's 11th Congressional District, from January 3, 2013 to March 30, 2020.

8.      Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

9.      Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the Select Committee to Investigate the January 6th Attack on the United States Capitol. Subpoenas challenged herein were issued with his authority as Chair.

10.      Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

11.      Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

12.      Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

13.      Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

14.      Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

15.     Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

16.     Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

17.     Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

18.     Defendant Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee") is a select committee created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

20.     This Court has personal jurisdiction over Speaker Pelosi because she sponsored H. Res. 503 and oversaw its passage in the House. She also approved and ratified the issuance of the Meadows and Verizon Subpoenas from Washington, D.C.

21.     This Court has personal jurisdiction over Chairman Thompson because he presides over the Select Committee and issued the Meadows and Verizon Subpoenas from his office address in Washington, D.C.

22.     This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam

D. Kinzinger because they serve as members of the Select Committee that issued the Meadows and Verizon Subpoenas from Washington, D.C.

23.     This Court has personal jurisdiction over the Select Committee because it is located and operates in Washington, D.C.

24.     Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in Washington, D.C.

## RELEVANT FACTS

25.     Mr. Meadows served as Chief of Staff to President Donald J. Trump for the period following the 2020 Presidential Election up to the Inauguration of President Joseph R. Biden, Jr., on January 20, 2021.

26.     In a well-known event on January 6, 2021, a large group of protestors in Washington, D.C., entered the U.S. Capitol, breached security, and disrupted the counting of Electoral College votes until order was restored. The U.S. Department of Justice has charged nearly 700 individuals in connection with the activities on January 6th.

**A.     Authority and Purposes of the Select Committee**

27.     Earlier this year, Congress considered establishing a "National Commission to Investigate the January 6 Attack on the United States Capital Complex."

28.     Chairman Thompson introduced H.R. 3233 on May 14, 2021. H.R. 3233 would have established the Commission for four "purposes":

> a.     "To investigate and report upon the facts and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement in the National Capitol Region and other instrumentality of government, as well as the influencing factors that fomented such attack on American representative democracy while engaged in a constitutional process."

7

b.     "To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies, in a manner that is respectful of ongoing law enforcement activities and investigations regarding the domestic terrorist attack upon the Capitol, regarding the facts and circumstances surrounding such terrorist attack and targeted violence and domestic terrorism relevant to such terrorist attack."

c.     "To build upon the investigations of other entities and avoid unnecessary duplication by reviewing the findings, conclusions, and recommendations of other Executive Branch, congressional, or independent bipartisan or non-partisan commission investigations into the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack, including investigations into influencing factors related to such terrorist attack."

d.     "To investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism, including to prevent domestic terrorist attacks against American democratic institutions, improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans, and strengthen the security and resilience of the Nation and American democratic institutions against domestic terrorism."

29.     The Commission would have included a bipartisan group of ten members: (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minority leader of the House of Representatives"; (5) "two members . . . appointed by the majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate." Because Democrats control both chambers in the current Congress, the Commission would have included five members appointed by Democrats and five members appointed by Republicans.

30.     The House passed H.R. 3233 on May 19, 2021.

31.     The Senate considered a cloture motion to proceed on H.R. 3233 on May 28, 2021. The motion failed by a vote of 54 yeas and 35 nays.

32.     After a failed attempt to establish a bipartisan commission, on June 28, 2021, Speaker Pelosi introduced H. Res. 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol." Two days later, the House passed H. Res. 503 on a near party-line vote of 222 yeas and 190 nays. Only two Republicans, Reps. Cheney and Kinzinger, voted in favor of H. Res. 503.

33.     H. Res. 503 sets forth the "purposes" of the Select Committee:

    a.     "To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government, as well as the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process."

    b.     "To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack."

    c.     "To build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack."

34.     H. Res. 503 establishes three "functions" of the Select Committee: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

35.     Subsection (c) of Section 4 describes three categories of "corrective measures": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future

acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

36.    H. Res. 503 provides that "[t]he Select Committee may not hold a markup of legislation."

37.    The Select Committee's investigation is led by Chief Investigative Counsel Timothy J. Heaphy, former United States Attorney for the Western District of Virginia, and Senior Investigative Counsel John Wood, former United States Attorney for the Western District of Missouri. The Select Committee reportedly has more than a dozen former federal prosecutors on staff. *See* Michael S. Schmidt & Luke Broadwater, *In Scrutinizing Trump and His Allies, Jan. 6 Panel Adopts Prosecution Tactics*, N.Y. Times (Feb. 5, 2022) https://www.nytimes.com/2022/02/05/us/politics/january-6-committee.html.

38.    According to the Committee on House Administration, the Select Committee has contracted with several private firms that provide services to law enforcement and assist with criminal forfeiture. *See* Comm. H. Admin., 117th Cong., Committee Report from December 2021, https://cha.house.gov/sites/democrats.cha.house.gov/files/2021-December-SCj6-CHA%20Activity%20Report.

39.    Since the passage of H. Res. 503, Speaker Pelosi and members of the Select Committee have made countless public statements explaining the purposes of the Select Committee, including but not limited to improper purposes such as law enforcement and exposure for its own sake.

10

40.     In an interview on December 29, 2021, Rep. Kinzinger stated, "We'll be able to have out on the public record anything Justice Department needs maybe in . . . pursuit of [a potential criminal prosecution of former President Trump]." Zachary Cohen & Annie Grayer, *January 6 committee says it would make criminal referrals if 'appropriate,' but that could be a long way off*, CNN (Dec. 21, 2021), https://www.cnn.com/2021/12/21/politics/january-6-committee-criminal-referrals/index.

41.     Chairman Thompson noted on October 24, 2021, "obviously we are pursuing evidence" leading to "former President Trump or anyone else." *Transcript: Rep. Bennie Thompson on "Face the Nation"*, CBS News (Oct. 24, 2021), https://www.cbsnews.com/news/transcript-rep-bennie-thompson-on-face-the-nation-october-24-2021/. Chairman Thompson also tweeted on January 6, 2022, "We have been working diligently to bring justice to [those responsible for Jan. 6]." Bennie Thompson (@BennieGThompson), Twitter, (Jan. 6, 2022 8:31 AM), https://twitter.com/BennieGThompson/status/1479083311163232258.

42.     During a meeting of the Select Committee, Rep. Schiff explained that "exposing all the malefactors and bloodshed that went on here is really important." Mary Clare Jalonick, *Capitol riot committee has interviewed 250 people so* far, Associated Press (Dec. 2, 2021), https://apnews.com/article/steve-bannon-donald-trump-elections-capitol-siege-36b68bd9e0c701fea8e6b11f00292604. Rep. Schiff also tweeted on November 12, 2021, "We will expose those responsible for Jan 6. No one is above the law." Adam Schiff (@RepAdamSchiff), Twitter (Nov. 12, 2021, 4:54 PM), https://twitter.com/RepAdamSchiff/status/1459278425118625794. And again on December 13, 2021, Rep. Schiff tweeted with respect to Mr. Meadow's confidential documents: "All of it is

damning. All of it must be exposed." Adam Schiff (@RepAdamSchiff), Twitter (Dec. 13, 2021 8:23 PM), https://twitter.com/RepAdamSchiff/status/1470564973764136960.

43.     Rep. Raskin has also implied a law enforcement purpose of the investigation when he stated on multiple occasions that no privilege (attorney-client nor executive) "operate[s] to shield participants in a crime from an investigation into a crime**.**" Hugo Lowell, *Capitol panel to investigate Trump call to Willard hotel in hours before attack*, Guardian (Dec. 27, 2021), https://www.theguardian.com/us-news/2021/dec/27/capitol-attack-panel-investigate-trump-call-willard-hotel-before-assault. *See also* Jamie Raskin (@RepRaskin), Twitter (Dec. 2, 2021, 5:40 PM), https://twitter.com/RepRaskin/status/1466537815185891329 ("Exec. privilege doesn't cover criminal misconduct, like insurrections or coups . . . .").

44.     Rep. Luria said during an interview on December 14, 2021 that "the evidence will speak for itself." "[T]hat's exactly why we're conducting this investigation to find out all the facts" and "hold people accountable who are responsible." Interview with Rep. Elaine Luria, *New Day*, CNN (Dec. 14, 2021), https://transcripts.cnn.com/show/nday/date/2021-12-14/segment/05.

45.     During her press conference following the passage of H. Res. 503, Speaker Pelosi explained that "the next step for us has always been to seek and to find the truth**."** *See* Nancy Pelosi, Speaker, U.S. House of Representatives, Transcript of Pelosi Weekly Press Conference Today (Jul. 1, 2021).

46.     Rep. Cheney stated during the Select Committee's only hearing on July 27, 2021, "If those responsible are not held accountable, and if Congress does not act responsibly, this will remain a cancer on our Constitutional Republic." *The Law Enforcement Experience on January 6th*, 117th Cong. (2021) (statement of Liz Cheney, Member, Select Committee to Investigate the January 6th Attack on the U.S. Capitol).

47.     Rep. Lofgren, in a July 28, 2021 interview, stated that the Select Committee and its staff are "unified with one mission to uncover the truth." *House Select Committee Hears Compelling Testimony On The Capitol Attack*, NPR (July 28, 2021), https://www.npr.org/2021/07/28/1021600405/house-select-committee-hears-compelling-testimony-on-the-capitol-attack.

48.     The experience of some individuals who have appeared before the Select Committee advances the notion that the purpose of the Select Committee exceeds that which it purported in its authorizing resolution. Kash Patel, former Department of Defense Chief of Staff, stated that during his December interview with the Select Committee, the investigators "spent less time talking about Jan. 6 and more time talking about Afghanistan, Somalia, and other matters." John Solomon, *Key witness: Jan. 6 panel spent more time asking about Afghan withdrawal than Capitol attack*, Just the News (Dec. 22, 2021), https://justthenews.com/government/congress/key-witness-jan-6-panel-spent-more-time-asking-about-afghan-withdrawal-capitol.

49.     Further, many statements from members of the Select Committee indicate they have already made their decision with respect to former President Trump and his associates' roles in the events of January 6.

50.     Chairman Thompson made clear his view when—prior to his appointment as chair of the Select Committee—Rep. Thompson filed a civil action against former President Trump, his attorney, and others, in which he accused them of "conspir[ing] to incite an assembled crowd to march upon and enter the Capitol of the United States for the common purpose of disrupting, by the use of force, intimidation and threat, the approval by Congress of the count of votes cast by members of the Electoral College as required by Article II, Section 1 of the United States Constitution." *See* Compl., *Thompson v. Trump*, No. 1:21-cv-400 (D.D.C. Feb. 16, 2021).

51.     Rep. Raskin stated in an interview, "[T]his was a coup orchestrated by the president against the vice president and against the Congress." He threatened, "Trump will get his comeuppance" because "he's a one-man crime wave" who is "guilty as sin." Dean Obeidallah, *"Trump will get his comeuppance": Rep. Jamie Raskin promises consequences for Jan. 6*, Salon (Feb. 13, 2022) https://www.salon.com/2022/02/13/trump-will-get-his-comeuppance-rep-jamie-raskin-promises-consequences-for-jan-6/.

52.     In the same interview, Rep. Raskin alleged that Mr. Meadows specifically was committing "all the obstruction and roadblocks thrown up with the entourage around Donald Trump." *Id.*

**B.     Composition of the Select Committee**

53.     H. Res. 503 provides that "[t]he chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." Section 3(b)(1) of H. Res. 8 provides that, "[d]uring the One Hundred Seventeenth Congress, the chair of a standing committee. . . , upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee."

54.     In contrast to H.R. 3233, which contemplated an evenly balanced Commission, H. Res. 503 instructs the Speaker to appoint thirteen members to the Select Committee, only five of which "shall be appointed after consultation with the minority leader."

55.     Speaker Pelosi appointed Chairman Thompson, the original sponsor of H.R. 3233, to serve as chair of the Select Committee and appointed six additional Democrat members: Reps.

Lofgren, Schiff, Aguilar, Murphy (FL), Raskin, and Luria. She also appointed Republican Rep. Cheney without any designation of position. 167 Cong. Rec. H3597 (2021).

56.     House Minority Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, consistent with H. Res. 503: Rep. Jim Banks of Indiana to serve as Ranking Member and Reps. Rodney Davis of Illinois, Jim Jordan of Ohio, Kelly Armstrong of North Dakota, and Troy Nehls of Texas to serve as additional minority members.

57.     Speaker Pelosi did not appoint Rep. Banks to serve as Ranking Member, nor did she appoint any other of Minority Leader McCarthy's recommended minority members. In a public statement, she acknowledged that her refusal to appoint the members recommended by the Minority Leader was an "unprecedented decision." Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2.

58.     Instead, Speaker Pelosi appointed Rep. Kinzinger—the only other Republican who voted in favor of H. Res. 503—and left four vacancies. *See* 167 Cong. Rec. H3885 (2021).

59.     On September 2, 2021, Chairman Thompson announced in a press release that "he has named Representative Liz Cheney (R-WY) to serve as the Vice Chair of the Select Committee." *See* Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair (Sept. 2, 2021), https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair. H. Res. 503 does not mention a vice chair, much less authorize the chair to appoint a vice chair. *See generally* H. Res. 503, 117th Cong. (2021).

60.     House Rule XI(2)(d) instructs that a committee chair shall designate "[a] member of the majority party . . . as vice chair of the committee." Rep. Cheney is a member of the Republican Conference of the House of Representatives, and thus not a member of the current majority party.

61.     The official letterhead of the Select Committee indicates that Rep. Thompson is "Chairman" and lists the other members, including Reps. Cheney and Kinzinger, without designation. *See, e.g.*, **Ex. A**. The Select Committee's website provides a list of its members, including Thompson as Chair, but no other members receive designation. See Membership, Select Comm.   to   Investigate   the   Jan.   6   Attack   on   the   U.S.   Capitol, https://january6th.house.gov/about/membership (last visited Feb. 17, 2022).

62.     H. Res. 503 provides, "The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions."

63.     The Select Committee has no ranking minority member.

C.     **Activities of the Select Committee**

64.     Since its inception in July 2021, the Select Committee has held only one public hearing. During that hearing, the Select Committee heard testimony from officers of the U.S. Capitol Police and D.C. Metropolitan Police Departments who were present at the Capitol on January 6, 2021.  The Select Committee has, however, gathered a substantial amount of documents and testimony from private individuals and entities and leaked that information to the press.

65.     The Select Committee has issued more than one hundred wide-ranging subpoenas for documents and the testimony of witnesses. It has also demanded records and sent preservation notices to social media companies, telecommunications companies, and banking entities. A recent press release suggests that the Select Committee has interviewed more than 550 individuals. *See*

Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Select Committee Demands Information on Efforts to Send False "Alternate Electors" to Congress and Otherwise Interfere with Election Certification (Feb. 15, 2021), https://january6th.house.gov/news/press-releases/select-committee-demands-information-efforts-send-false-alternate-electors.

66.     At least twenty-five individuals and corporations have filed civil actions challenging subpoenas issued by the Select Committee. And unlike the many subpoenas published on the Select Committee's website, many of the subpoenas challenged in court were issued covertly to third parties who hold individuals' cellular and/or banking data.

67.     The Select Committee has also issued what it describes as "sweeping" demands for presidential records. *See* Press Release, Bennie G. Thompson, Chairman, Select Committee to Investigate the January 6th Attack on the United States Capitol, Select Committee Issues Sweeping Demand for Executive Branch Records (Aug. 25, 2021).

68.     After the Select Committee issued a demand for records held by the National Archives and Records Administration ("NARA") and seven other Executive Branch agencies, former President Trump asserted executive privilege over some of the documents in NARA's custody, pursuant to the procedures set forth in the Presidential Records Act of 1978. *See* Compl. Ex. 5, *Trump v. Thompson*, No. 1:21-cv-2769 (D.D.C. 2021).

69.     President Biden, through counsel, then instructed NARA to release the documents requested by the Select Committee on the grounds that President Biden wishes to waive executive privilege over the subpoenaed records in question. *See* Second Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/13/second-letter-from-

dana-a-remus-counsel-to-the-president-to-david-ferriero-archivist-of-the-united-states-dated-october-8-2021/. He therefore purported to direct the premature release of presidential records which Congress had no inherent or statutory authority to obtain, and which President Biden and his Administration had no inherent or statutory authority to release.

70.     Following a months-long legal battle during which former President Trump challenged President Biden's superior authority to waive privilege, NARA released at least some of the requested presidential records to the Select Committee on January 19, 2022. Nevertheless, Justice Kavanaugh explained in the course of the litigation that "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

**D.     The Select Committee's Meadows Subpoena**

71.     On September 23, 2021, the Select Committee served a subpoena on Mr. Meadows (the "Meadows Subpoena"). **Ex. A**.

72.     The Meadows Subpoena includes a sweeping set of document requests that relate to his tenure as White House Chief of Staff, including the following twenty-seven categories:

a.     "Communications referring or relating in any way to plans, efforts, or discussions regarding challenging, decertifying, overturning, or contesting the results of the 2020 Presidential election."

b.     "All documents and communications concerning the role of the Vice President as the Presiding Officer in the certification of the votes of the electoral college."

c.     "From November 3, 2020, through January 20, 2021, all documents and communications referring or relating to the 2020 election results sent or transmitted between White House officials and officials of state or local governments."

18

d.      "From November 3, 2020, through January 6, 2021, all documents and communications referring or relating to actual or potential court decisions, deliberations, or processes involving challenges to the 2020 Presidential election."

e.      "All recordings, transcripts, notes (including electronic and hand-written notes), summaries, memoranda of conversation, readouts, or other documents memorializing communications between you and President Trump and/or Members of Congress on January 6, 2021, relating or referring in any way to the attack on the Capitol."

f.      "All documents that refer or relate to efforts, plans, or attempts by President Trump to activate the National Guard on January 6, 2021."

g.      "From November 3, 2020, through January 19, 2021, all documents and communications concerning the resignation of any White House personnel or any politically appointed personnel of any Federal department or agency (including the resignation of any member of the President's Cabinet) and mentioning or referring (explicitly or implicitly) to the 2020 Presidential election or the events of January 6, 2021."

h.      "All documents and communications relating to planned protests, marches, public assemblies, allies, or speeches in Washington, DC, on November 14, 2020, December 12, 2020, or January 5, 2021, or January 6, 2021."

i.      "All documents and communications related to security of the Capitol or other Federal facilities on January 5, 2021, and January 6, 2021."

j.      "From December 1, 2020, through January 20, 2021, any documents and communications involving White House personnel and any Member of Congress, referring or relating to (a) civil unrest, violence, and/or attacks at the Capitol; (b) challenging, overturning, or questioning the validity of the 2020 election results; (c) the counting of the electoral college vote on January 6, 2021; or (d) appealing or challenging the decisions of courts related to the 2020 Presidential election."

k.      "All documents and communications related to social media information monitored, gathered, reviewed, shared, or analyzed by White House personnel on January 6, 2021."

l.      "All documents and communications related to any plan for the President to march or walk to the Capitol on January 6, 2021. This request includes any such documents or communications related to a decision not to march or walk to the Capitol on January 6, 2021."

m.      "From November 3, 2020, to January 20, 2021, all documents and communications reporting, summarizing, or detailing the voting returns and election results of the 2020 Presidential election."

n.      "All documents and communications related to Donald Trump's response or reaction to the election results of the 2020 Presidential election, including but not limited to any planned public remarks."

o.      "All documents and communications regarding a November 9, 2020, memorandum from Attorney General William Barr concerning investigation of voter fraud allegations."

p.      "From November 3, 2020, through January 20, 2021, all documents provided to you or Donald Trump reviewing, assessing, or reporting on the security of election systems in the United States."

q.      "From November 3, 2020, through January 20, 2021, all documents and communications provided to Donald Trump regarding purported election irregularities, election-related, fraud, or other election related malfeasance."

r.      "From April 1, 2020, through January 20, 2021, all documents and communications provided to you or Donald Trump referring to a stolen election, stealing the election, or a 'rigged' election."

s.      "From November 3, 2020, through January 20, 2021, all documents and communications related to the Twenty-Fifth Amendment to the U.S. Constitution."

t.      "Any documents and communications relating to instructions to stop or delay preparation for the transition of administrations."

u.      "All communications between White House personnel and General Services Administration (GSA) Administrator Emily Murphy or other GSA officials relating to 'ascertainment' under the Presidential Transition Act. This includes but is not limited to communications discussing the recognition of Joseph Biden as the winner of the 2020 Presidential election."

v.      "All documents and communications concerning the potential invocation of the Insurrection Act."

w.      "From November 3, 2020, through January 20, 2021, all documents and communications related to martial law."

x.      "All documents and communications concerning the use of Federal law enforcement or military personnel during voting or vote counting in the 2020 Presidential election."

y.      "Any documents and communications relating to foreign influence in the United States 2020 Presidential election through social media narratives and disinformation."

z.      "All documents and communications related to the January 3, 2021, letter from ten former Defense Secretaries warning of use of the military in election disputes."

aa.     "All documents and communications to or from the United States Secret Service concerning individuals in attendance at the January 6 rally in body armor, ballistic helmets, radio equipment, and 'military grade' backpacks."

73.     The Meadows Subpoena directed Mr. Meadows to produce all responsive documents by October 7, 2021 at 10 AM, only two weeks after its issuance.

74.     The Meadows Subpoena also demanded that Mr. Meadows appear for a deposition to provide testimony at 2 PM on October 15, 2021.

**E.      Mr. Meadows's Efforts to Accommodate**

75.     On October 6, former President Trump sent a letter to Mr. Meadows instructing him to maintain executive privilege in connection with any response to the Meadows Subpoena. The letter specifically instructed Mr. Meadows that he should

(a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning his official duties in response to the Subpoena; and (c) not provide any testimony concerning his official duties in response to the Subpoena.

76.     Having served as both a Member of Congress and White House Chief of Staff, Mr. Meadows understands the importance of the Separation of Powers and of the accommodations process that has traditionally been used to try to resolve disputes over executive privilege. He therefore endeavored to find an accommodation that would allow him to provide information to the Select Committee without violating clear precedent from the Department of Justice and former President Trump's claims of executive privilege.

77.     To that end, Mr. Meadows informed the Select Committee, through counsel, on October 7 that he would likely require additional time to respond to the subpoena. **Ex. B**. He also

noted that many of the records responsive to the Select Committee's subpoena were no longer in his custody and control but were instead among the Presidential records held at NARA.

78.     In seeking to compel a deposition on October 15, the Select Committee offered Mr. Meadows no opportunity to review any of the "thousands of pages of records" already produced by other sources, many of which were potentially relevant to the Select Committee's inquiry into Mr. Meadows.

79.     Mr. Meadows promptly took steps to clarify the scope of the issues raised by the subpoena.

80.     On October 11, Mr. Meadows, through counsel, sent a letter to White House Counsel Dana Remus seeking to clarify the position of the current White House. **Ex. C**. Among other things, Mr. Meadows noted the longstanding position of the Executive Branch, reflected in Attorney General opinions and opinions of the Office of Legal Counsel at the U.S. Department of Justice, that current and former senior White House aides like Mr. Meadows are immune from compelled congressional testimony. *See, e.g.*, *Testimonial Immunity Before Congress of the Former Counsel to the President*, O.L.C. slip op., at *2 (May 20, 2019) ("*Testimonial Immunity Before Congress*"); *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007).

81.     In discussions through counsel in October, the White House declined either to affirm or depart from its traditional position. Although the White House Counsel's Office engaged in conversations with Mr. Meadows regarding the subpoena process, it declined to formally respond to Mr. Meadows's letter or to make any official representations regarding the White House's views on executive privilege or testimonial immunity.

82.     Despite the need to maintain executive privilege and concerns about the breadth of the subpoena, Mr. Meadows continued to pursue the possibility of an accommodation that would allow the Select Committee to obtain non-privileged information.

83.     On October 12, Mr. Meadows, through counsel, asked the Select Committee to identify topics of inquiry on which he might be able to provide useful non-privileged information.

84.     On October 25, without any negotiation over a possible accommodation, Chairman Thompson demanded full compliance with the subpoena under threat of contempt. Ignoring the offers of accommodation from Mr. Meadows, he wrote: "It now appears that Mr. Meadows may still believe that his appearance cannot be compelled and that his testimony is privileged. Given the impasse, the Select Committee must proceed and insist, pursuant to the subpoena, that Mr. Meadows produce all responsive documents by November 5, 2021, and appear for testimony on November 12, 2021." **Ex. D**.

85.     Despite the Committee's complete refusal to accommodate Mr. Meadows's concerns regarding executive privilege and his duty to preserve long-held Executive Branch positions, Mr. Meadows remained willing to pursue accommodation.

86.     On November 3, he reiterated his position in a letter to the Select Committee, informing it that he was "willing to explore with the Select Committee whether, outside the confines of the subpoena, an accommodation could be reached by which he might be able to answer, under agreed upon and appropriate circumstances, a limited set of questions that would further a valid legislative purpose within the scope of the Select Committee's inquiry." **Ex. E**.

87.     In another letter through counsel on November 3, Mr. Meadows explained to the Select Committee that he was working diligently to ensure any documents responsive to the

subpoena were either produced to the Select Committee or in the possession of the Archivist of

the United States pursuant to the Presidential Records Act of 1978. **Ex. F**.

88.     On November 5, the Committee responded with overtures of a compromise but no

offer. **Ex. G**. Instead, it provided a list of topics it believed did not "implicate any cognizable claim

of executive privilege" and on which it intended to question Mr. Meadows. That list consisted of:

> 1)     Messaging to or from the White House, Trump reelection campaign,
> party officials, and others about purported fraud, irregularities, or malfeasance in
> the November 2020 election. This includes, but is not limited to, Mr. Trump's and
> others frequent use of the "Stop the Steal" slogan, even after lawsuits,
> investigations, public reporting, discussions with agency heads, and internally
> created documents revealed that there had not been widespread election fraud
>
> 2)     White House officials' understanding of purported election-related
> fraud, irregularities, or malfeasance in the November 2020 election.
>
> 3)     Efforts to pressure federal agencies, including the Department of
> Justice, to take actions to challenge the results of the presidential election, advance
> allegations of voter fraud, interfere with Congress's count of the Electoral College
> vote, or otherwise overturn President Biden's certified victory. This includes, but
> is not limited to, Mr. Trump's and others' efforts to use the Department of Justice
> to investigate alleged election-related conduct, file lawsuits, propose that state
> legislatures take election-related actions, or replace senior leadership. It also
> includes similar efforts at other agencies such as the Department of Homeland
> Security, the Department of Defense, and, among others, the Cybersecurity and
> Infrastructure Security Agency.
>
> 4)     Efforts to pressure state and local officials and entities, including
> state attorneys general, state legislators, and state legislatures, to take actions to
> challenge the results of the presidential election, advance unsubstantiated
> allegations of voter fraud, interfere with Congress's count of the Electoral College
> vote, de-certify state election results, appoint alternate slates of electors, or
> otherwise overturn President Biden's certified victory. This includes, but is not
> limited to, an Oval Office meeting with legislators from Michigan, as well as a
> January 2, 2021 call with, among others, state officials, members of Congress, Mr.
> Trump, and Mr. Meadows.
>
> 5)     Theories and strategies regarding Congress and the Vice President's
> (as President of the Senate) roles and responsibilities when counting the Electoral
> College vote. This includes, but is not limited to, the theories and/or understandings
> of John Eastman, Mark Martin, former Vice President Pence, and others.

6)      Efforts to pressure former Vice President Pence, members of his staff, and members of Congress to delay or prevent certification of the Electoral College vote. This includes, but is not limited to, meetings between, or including, the former Vice President, Mr. Trump, aides, John Eastman, members of Congress, and others.

7)      Campaign-related activities, including efforts to count, not count, or audit votes, as well as discussions about election-related matters with state and local officials. This includes, but is not limited to, Mr. Meadows' travel to Georgia to observe vote counting, as well as his or Mr. Trump's communications with officials and employees in the Georgia Secretary of State's Office. This also includes similar activities related to state and local officials in Michigan, Wisconsin, Nevada, Arizona, and Pennsylvania.

8)      Meetings or other communications involving people who did not work for the United States government. This includes, but is not limited to, an Oval Office meeting on December 18, at which Mr. Trump, Michael Flynn, Patrick Byrne, and others discussed campaign-related steps that Mr. Trump purportedly could take to change the outcome of the November 2020 election and remain in office for a second term, such as seizing voting machines, litigating, and appointing a special counsel. It also includes communications with organizers of the January 6 rally like Amy Kremer of Women for America First.

9)      Communications and meetings with members of Congress about the November 2020 election, purported election fraud, actual or proposed election-related litigation, and election-related rallies and/or protests. This includes, but is not limited to, a December 21, 2021 meeting involving Mr. Trump, members of his legal team, and members of the House and Senate, during which attendees discussed objecting to the November 2020 election's certified electoral college votes as part of an apparent fight "against mounting evidence of voter fraud."

10)     Efforts by federal officials, including White House staff, Mr. Trump, the Trump reelection campaign, and members of Congress to plan or organize rallies and/or protests in Washington, D.C. related to the election, including, but not limited to, the January 6 rally on the Ellipse.

11)     Advance knowledge of, and any preparations for, the possibility of violence during election-related rallies and/or protests in Washington, D.C.

12)     Events in the days leading up to, and including, January 6. This includes, but is not limited to, campaign-related planning and activities at the Willard Hotel, planning and preparation for Mr. Trump's speech at the Ellipse, Mr. Trump and other White House officials' actions during and after the attack on the U.S. Capitol, and contact with members of Congress, law enforcement, the Department of Defense, and other federal agencies to address or respond to the attack.

13)     The possibility of invoking martial law, the Insurrection Act, or the 25th Amendment based on election-related issues or the events in the days leading up to, and including, January 6.

14)     The preservation or destruction of any information relating to the facts, circumstances, and causes relating to the attack of January 6th, including any such information that may have been stored, generated, or destroyed on personal electronic devices.

15)     Documents and information, including the location of such documents and information, that are responsive to the Select Committee's subpoena. This includes, but is not limited to, information stored on electronic devices that Mr. Meadows uses and has used.

16)     Topics about which Mr. Meadows has already spoken publicly. This includes, but is not limited to, Mr. Meadows' February 11, 2021, appearance on the Ingraham Angle show to discuss the January 6 attack on the U.S. Capitol, Mr. Trump's reactions to the attack, and the National Guard.

89.     Notwithstanding Chairman Thompson's suggestion that this list implicated no "cognizable claim of executive privilege," it expressly includes, among other things, communications with the Vice President, two Oval Office meetings, White House officials' understanding of election security, and Mr. Meadows's conversations with the President.

90.     Chairman Thompson also asserted that this list was "non-exclusive and may be supplemented" but assured Mr. Meadows that the Select Committee did not intend to "seek information from [him] unrelated to the 2020 election and what led to and occurred on January 6."

91.     The letter then requested that Mr. Meadows provide his "input on the topics" contained in the list no later than November 8, three days after the letter was sent.

92.     Mr. Meadows promptly responded on November 8 and sought clarification of the Committee's position in two respects: (1) whether the Committee was open to Mr. Meadows providing written responses to interrogatories from the Select Committee in which he would

clearly articulate the basis for any assertion of executive privilege; and (2) whether the Committee would be amenable to narrowing the topics of inquiry. **Ex. H**.

93.     On November 9, Chairman Thompson responded with a letter criticizing Mr. Meadows for not setting forth his privilege objections in writing and stating that "it appears that the accommodation process has reached its natural conclusion," notwithstanding Mr. Meadows's continued efforts to define the contours of an accommodation. **Ex. I**.

94.     On November 10, Mr. Meadows responded to point out that he had, in fact, offered written explanations of his positions on multiple occasions but that the Select Committee had repeatedly refused in favor of live testimony with no opportunity for written responses. **Ex. J**.

95.     On November 11, Chairman Thompson responded by baselessly accusing Mr. Meadows of failing to negotiate in good faith and, in keeping with his previous positions, stated that "there is no valid legal basis for Mr. Meadows' continued resistance to the Select Committee's subpoena. As such, the Select Committee expects Mr. Meadows to produce all responsive documents and appear for deposition testimony tomorrow, November 12, 2021, at 10:00 a.m." **Ex. K**.

96.     The same day—the day before the Select Committee's scheduled deposition—Mr. Meadows received a letter from the Deputy Counsel to the President informing him that President Biden had determined that would not assert executive privilege with respect to certain categories of testimony or documents. **Ex. L**.

97.     Consistent with his prior representations to the Select Committee, Mr. Meadows did not appear for a deposition on November 12.

98.     Despite the previous breakdown in negotiations, Mr. Meadows continued his attempts to reach an agreement with the Select Committee.

99.     On November 19, Mr. Meadows sent a letter to the Select Committee clearly communicating a list of topics on which he would be willing to provide responses to written interrogatories. **Ex. M**. He also noted that his "expectation would be that, after working through this written process and after further consultation with counsel for the Select Committee, Mr. Meadows could agree outside of compulsion by subpoena to appear voluntarily for a deposition within the parameters established through the initial process."

100.    On November 22, the Monday before the Thanksgiving holiday, Chairman Thompson again rejected Mr. Meadows's proposal to begin the accommodation process with written interrogatories and reiterated his accusation that Mr. Meadows was not negotiating in good faith. **Ex. N**. He demanded that Mr. Meadows produce all responsive documents by Friday, November 26—the day after Thanksgiving—and that he appear for a new deposition the following Monday, November 29, at 10 AM. Chairman Thompson refused to commit to avoiding questions that plainly implicate privilege, stating only that Select Committee intended to "*begin* by asking questions address obviously non-privileged topics." (Emphasis added.) While couched as an "accommodation," Chairman Thompson's letter required Mr. Meadows to produce the same information demanded by the subpoena in the same manner demanded by the subpoena with no respect for executive privilege.

101.    Believing that the Select Committee would act as it had promised, Mr. Meadows agreed to appear for a deposition. Such deposition would necessarily be voluntary—that is, not subject to the Select Committee's compulsion and was expressly agreed to as such. It would also be limited in scope to those matters the Select Committee believed to be outside the scope of privilege. Counsel would be present for the deposition and able to assert claims of executive privilege where appropriate, and Mr. Meadows's counsel would also have the opportunity at least

three business days in advance to review any documents the Select Committee intended to show or question Mr. Meadows about during the deposition. **Ex. O**.

102.    The same day that Mr. Meadows agreed to appear before the Select Committee for a voluntary deposition, his counsel made a generous initial document production to the Select Committee. **Ex. P**. On that day, Mr. Meadows's counsel provided the Select Committee non-privileged emails and other documents potentially responsive to the subpoena, which were obtained from Mr. Meadows's personal Gmail account. This initial production consisted of 1,139 documents and 6,836 total pages, along with a privilege log for any documents withheld. Mr. Meadows's counsel also explained that it was in the process of reviewing Mr. Meadows's personal text messages, which were forthcoming but delayed due to technical issues in retrieving this information.

103.    The Select Committee accepted Mr. Meadows's offer to provide a voluntary deposition on December 8, 2021 at 10 AM, on the condition that Mr. Meadows produce all documents responsive to the subpoena by December 3, 2021. **Ex. Q**. The Select Committee also agreed to provide Mr. Meadows's counsel the documents it expected to show or question Mr. Meadows about during the deposition.

104.    Mr. Meadows's counsel worked diligently to produce all responsive, non-privileged documents to the Select Committee by December 3, which it did. On December 3, Mr. Meadows's counsel produced 2,319 text messages and metadata from his personal cell phone to the Select Committee and provided a privilege log for any withheld text messages. Mr. Meadows also produced 20 more documents recovered from Mr. Meadows's personal computer. **Ex. R**.

**F.      The Select Committee's Verizon Subpoena**

105.     Mr. Meadows believed that the Select Committee would act in good faith and in accordance with their agreement that he appear for a voluntary deposition on issues outside the scope of executive privilege, until on December 4, 2021 he was blindsided by a letter from Verizon Wireless, the carrier for his previous personal cell phone. **Ex. S**. The letter references a cell phone registered to Meadows for Congress that was used by Mr. Meadows as his personal cell phone during his tenure as White House Chief of Staff. It is also the same cell phone from which Mr. Meadows's counsel had reviewed and produced records to the Select Committee on December 3.

106.     The letter from Verizon Wireless relayed the fact that it had received a subpoena ("Verizon Subpoena") from the Select Committee requesting certain phone records. Verizon noted that it would comply with the subpoena by producing the records unless it received "a court document challenging the subpoena by December 15, 2021."

107.     The Verizon Subpoena, issued by the Select Committee on November 22, 2021, instructs Verizon to produce subscriber information and cell phone data associated with Mr. Meadows's personal cell phone number. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. The cell phone data requested could include all calls, text messages, and other records of communications associated with that phone number. This data can be used for historic cell site analysis. The Verizon Subpoena requested all Mr. Meadows's personal cell phone data for four months: October 1, 2020 to January 31, 2021.

108.     The breadth and invasiveness of the Verizon Subpoena also appeared to Mr. Meadows more like a criminal investigation, not a legislative fact-finding mission. It seeks private data used to track a person's communications and location, information that would bear on a

criminal investigation into that individual, not on potential legislation to be passed by Congress. It also requests this data for a period more than three months prior to January 6, the ostensible focus of the Committee's supposed legislative recommendations.

109.    Public reports indicate that the Select Committee has issued subpoenas to collect the phone data of more than one hundred individuals. *See* Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over 100 subpoenas for phone records*, CNN (Dec. 7, 2021) https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-records/index.html. This type of investigation to analyze the location and communication, with the clear intent to determine possible coordination between individuals, is reminiscent of a criminal investigation, not legislative oversight.

110.    In his decision not to appear for the deposition, Mr. Meadows also considered the December 2 statement of Chairman Thompson that those who appear before his Select Committee and invoke their Fifth Amendment privilege against self-incrimination are "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty*, RealClear Politics, Dec. 2, 2021, https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_th ompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html.

111.    Therefore, on December 7, 2021, counsel for Mr. Meadows provided formal notice to the Select Committee that in light of the Verizon Subpoena and Chairman Thompson's comments, Mr. Meadows must withdraw his offer to appear voluntarily for a deposition. **Ex. T**. Counsel offered, again, that the Select Committee propound written interrogatories on Mr. Meadows, such that he would be able to produce a clear record of his answers to certain questions while asserting appropriate privileges.

112.    In an apparent attempt to deflect from their own role in Mr. Meadows's decision not to appear, members of the Select Committee wrongly suggested that Mr. Meadows declined to appear before the Select Committee because former President Trump was angry about Mr. Meadows's newly released book. *See, e.g.*, 167 Cong. Rec. H7645 (daily ed. Dec. 14, 2021) (statement of Rep. Raskin).

113.    The House of Representatives voted to refer Mr. Meadows to the Department of Justice for contempt of congress on December 14, 2021.

114.    During the floor debate in the House, Chairman Thompson accused Mr. Meadows of being "part of a coverup" of January 6. *Id.* at H7785. Rep. Cheney read Mr. Meadows's private text messages aloud before making an unmistakable accusation that Mr. Meadows knew former President Trump "through action or inaction, corruptly sought to obstruct or impede Congress' official proceeding to count electoral votes." *Id.* at H7786. Rep. Lofgren also read Mr. Meadows's text messages on the House floor, *id.* at H7788, as did Reps. Schiff, *id.* at H7791, Aguilar, *id.*, and Luria, *id.* at H7792. And in the weeks following the vote, Mr. Meadows's private text messages dominated the news cycle, as the Select Committee intended.

115.    The Select Committee is the only plausible source of these leaked communications. Aside from counsel, only the Select Committee and its members possess the Mr. Meadows's confidential production of emails and text messages.  And neither Mr. Meadows nor his counsel has provided these records to the press.

116.    Mr. Meadows has insisted the Select Committee maintain the confidentiality of his communications. *See* **Ex. R**.

117.    The Select Committee and its members have not relented in their media campaign against Mr. Meadows and other Trump advisors. On February 16, 2022, two undisclosed people—

presumably from the Select Committee—leaked details to the Washington Post about Mr. Meadows's private communications. *See* Jacqueline Alemany, et al., *Texting through an insurrection*, Wash. Post (Feb. 16, 2022), https://www.washingtonpost.com/politics/interactive/2022/texting-insurrection/.

118.   As recently as March 24, 2022, the Select Committee leaked to the press twenty-nine text messages between Mr. Meadows and Virginia ("Ginni') Thomas, a conservative public figure and the wife of Supreme Court Justice Clarence Thomas. Bob Woodward & Robert Costa, *Virginia Thomas urged White House chief to pursue unrelenting efforts to overturn the 2020 election*, texts show, Wash. Post (Mar. 24, 2022), https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-meadows-texts/. Democrats wasted no time, using this opportunity to call for Justice Thomas's resignation. Giulia Carbonaro, *Ilhan Omar Says Clarence Thomas Needs to Be Impeached Over Wife's Texts*, Newsweek (Mar. 25, 2022), https://www.newsweek.com/ilhan-omar-says-clarence-thomas-needs-impeached-over-wife-texts-1691809.

119.   These recent efforts by the Select Committee show the Select Committee's true motives. Its objectives are not as set forth in H. Res. 503. Rather, it is clear that the Select Committee and its members are pursuing Mr. Meadows in an effort to expose and embarrass their partisan rivals for political gain.

### REASONS WHY THE SUBPOENAS ARE INVALID

**A.     The Subpoenas Are Not Validly Issued by a Duly Authorized Committee.**

120.   The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5

of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021).

121.    Speaker Pelosi has appointed only nine members to the Select Committee: seven Democrats and two Republicans. None of these members was appointed from the selection of five GOP congressman put forth by Minority Leader Kevin McCarthy.

122.    Authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

123.    Congress' failure to act in accordance with its own rules is judicially cognizable. *Yellin v. United States*, 374 U.S. 109, 114 (1963). This is particularly significant where a person's fundamental rights are involved.

124.    Speaker Pelosi failed to appoint members consistent with the authorizing resolution of the Select Committee. Pelosi has appointed only nine members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).

125.    Further, of those nine members Speaker Pelosi has appointed, none of them was appointed after consultation with the minority member, as is required by the authorizing resolution. H. Res. 503 § 2(a), 117th Cong. (2021).

126.    Thus, the Select Committee as it currently stands—and stood at the time it issued the subpoenas in question—has no authority to conduct business because it is not a duly constituted Select Committee. Chairman Thompson's subpoenas are invalid and unenforceable.

127.    Chairman Thompson derives the authority to issue subpoenas solely from § 5(c)(6) of the Select Committee's authorizing statute, but this authority is qualified, not absolute. The Select Committee chairman may not order the taking of depositions without consultation with the ranking minority member of the Select Committee.

128.    As the Select Committee has no ranking minority member, Chairman Thompson failed to make the requisite consultation before issuing the subpoena that compelled Mr. Meadows to appear for a deposition. The ordering of Mr. Meadows's deposition runs afoul of the Select Committee's authorizing resolution, making it invalid and unenforceable.

129.    The Select Committee and its members are amenable to suit for their *ultra vires* actions in issuing and enforcing the Meadows Subpoena. *See Clark v. Libr. of Cong.*, 750 F.2d 89 (D.C. Cir. 1984); *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305 (D.D.C. 2020).

**B.      The Select Committee Did Not Issue the Subpoenas to Further a Valid Legislative Purpose.**

130.    Congress has no freestanding power to investigate and issue subpoenas. Instead, its investigative powers are ancillary to its legislative authority. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020). Because of this tie between the investigative and legislative powers, Congress may only issue subpoenas that serve a valid legislative purpose.

131.    The legislative purpose inquiry analyzes whether a particular subpoena serves a valid purpose, not whether an investigation as a whole serves a valid purpose. *See id.* at 2031.

132.    Though there may be legitimate purposes for the Select Committee's investigation, the Meadows Subpoena extends far beyond the scope of any legitimate legislative purpose.

133.    The Supreme Court has emphasized the need for specificity in Congress's stated legislative purpose. *See id.* at 2036. And in cases concerning the President, whom Mr. Meadows

advised, "it is 'impossible' to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims." *Id.* at 2036.

134.    The Select Committee has failed to consider or recommend any draft legislation related to the topics provided in the Meadows Subpoena, nor has it provided any explanation for how its requests to Mr. Meadows would further any specific legislative end.

135.    The Select Committee included one stated legislative purpose in the Meadows Subpoena: to "recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations." This statement could not conceivably be more impermissibly "vague" and "loosely worded." *Watkins v. United States*, 354 U.S. 178, 201 (1957). It is exactly the type of authority the Supreme Court criticized in *Watkins*, where a committee tried "in essence, to define its own authority, to choose the direction and focus of its activities." *Id.* at 205.

136.    The subpoena seeks Executive Branch deliberative material, information both temporally and logically disconnected from the events of January 6, and information that is irrelevant to any conceivable legislation. The Select Committee seeks to "radiate outward infinitely to any topic thought to be related in some way" to January 6. *Id.* at 204. The requested information has no bearing on any contemplated legislation.

137.    One need only look to "[t]he authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves" to see the Select Committee's true purpose. *Watkins*, 354 U.S. at 209.

138.    Any generalized purported legislative purpose for Mr. Meadows's testimony is entirely pretextual and unsupported by the statements and actions of members of the Select Committee. The subpoenas are relevant only to serve the purpose that members of the Select

Committee have stated time and again: to engage in ad-hoc law enforcement and expose possible wrongdoings of their political adversary. *See supra* ¶¶ 26-39. Neither are permissible.

139. A desire to "expose for the sake of exposure" cannot sustain a congressional subpoena. *Id.* at 200. Publicizing information with the goal of satiating public interest is not a valid legislative purpose.

140. Mr. Meadows provided the Select Committee thousands of documents it could have reviewed and attempted to legislate on, but instead its members have waged a public campaign against Mr. Meadows, exposing his private documents for purposes of exploitation, self-aggrandizement, and political gain. None of these constitutes a legitimate legislative end.

141. The Select Committee made its goals abundantly clear during the December 14, 2021 House floor debate when its members took turns reading aloud Mr. Meadows's text messages. *See supra* ¶ 101. Their goal that day was not to legislate—as it so rarely is—but rather to expose Mr. Meadows's private communications and frame the narrative that President Trump and his advisors engaged in wrongdoing.

142. And the Select Committee's attempts to expose Mr. Meadows are ongoing. The Washington Post article published February 12, 2022 clearly indicates the Select Committee and its staff have no interest in legislating, but rather seek to leak private communications between Mr. Meadows, his friends, co-workers, and even an attorney. Such efforts are intended only to expose and embarrass Mr. Meadows and others, while condemning the Republican party as a whole. *See* Jacqueline Alemany, et al., *Texting through an insurrection*, Wash. Post (Feb. 16, 2022), https://www.washingtonpost.com/politics/interactive/2022/texting-insurrection/ ("The messages also serve as a stark contrast to the swell of GOP efforts over the past year to play down the danger of the Capitol riot and discredit the work of the committee.").

143.    Nor are law enforcement and the punishment of perceived legal wrongs valid legislative purposes. "Congress may not issue a subpoena for the purpose of 'law enforcement,' because 'those powers are assigned under our Constitution to the Executive and the Judiciary.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). To the extent Congress seeks to use subpoenas to investigate and punish perceived criminal wrongdoing, it unconstitutionally intrudes on the prerogatives of the Executive Branch.

144.    The statements and actions of members of the Select Committee show the true goals of their investigation are to provide "justice" and "hold [] accountable" former President Trump and those who advised him. *See* Bennie Thompson (@BennieGThompson), Twitter, (Jan. 6, 2022 8:31 AM), https://twitter.com/BennieGThompson/status/1479083311163232258; Stephanie Murphy (@RepStephMurphy), Twitter (Jan. 10, 2021 12:44 PM) . *See also supra* ¶¶ 26-39.

145.    But the Select Committee's law enforcement initiative was most evident at a Select Committee meeting when Rep. Cheney recited—nearly verbatim—the elements of criminal obstruction. *Compare* 167 Cong. Rec. H7786 (daily ed. Dec. 14, 2021) (statement of Rep. Cheney) ("Did Donald Trump, through action or inaction, corruptly seek to obstruct or impede Congress' official proceeding to count electoral votes?"), *with* 18 U.S.C. § 1505.

146.    Congress has exceeded its authority to issue subpoenas by failing to offer any explanation as to how Mr. Meadows's testimony may further their legislative interests, and any pretextual legislative purpose has been controverted by the statements and actions of the Select Committee.

**C.**    **The Select Committee Seeks to Use an Excessively Broad Third-Party Subpoena to Obtain Personal Cell Phone Data.**

147.    The Verizon Subpoena also seeks information unrelated to any potential legislation.

148.    The Verizon Subpoena seeks Mr. Meadows's cell phone metadata, despite the fact that he has already provided the Select Committee with his responsive text messages, emails, and the metadata attached thereto.

149.    The only additional information that could be gleaned by the Verizon Subpoena is either privileged or concerns Mr. Meadows's internet protocol and data-connection detail records.

150.    Mr. Meadows's location and IP records dating back to the October 1, 2020 would not serve to inform any valid legislative action. There is simply no way that kind of granular information about a senior Executive official could serve Congress in the permissible execution of its constitutional functions.

151.    The subpoena is also sufficiently broad to sweep in privileged details regarding Mr. Meadows's communications with his attorneys and his communications and actions as a senior Executive official.

152.    Further, the Verizon Subpoena would capture cellular data that does not "pertain to presidential activities on or around January 6th, or surrounding the election and its aftermath." *Trump v. Thompson*, 20 F.4th 10, 43 (D.C. Cir. 2021). In fact, a subpoena for cellular data of a personal phone inherently involves data that is "strictly personal." *See id*.

153.    In addition to seeking information that could not possibly bear on the passage of any law, the Verizon Subpoena represents a novel and sweeping vision of Congressional investigative authority.

154.    The Select Committee has taken it upon itself to subpoena a third-party corporation in order to ascertain the precise location of the White House Chief of Staff over a more-than-four-

month period. This subpoena represents an attempt to extend Congressional fact-finding authority beyond even the powers of the Executive Branch, which cannot obtain this kind of information without a warrant. And it does so with barely a perfunctory attempt at identifying a legislative purpose.

**D.    The Select Committee Cannot Obtain Records under the Verizon Subpoena Consistent with the Stored Communications Act.**

155.    The Stored Communications Act prohibits the Select Committee from obtaining the subpoenaed records from Verizon.

156.    To the extent the Select Committee is seeking production of the contents of communications, that request is prohibited under Section 2702(a)(1) of Title 18.

157.    The Stored Communications Act generally provides that "a person or entity providing electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

158.    Verizon is "a person or entity providing electronic communication service to the public" within the meaning of the Stored Communications Act.

159.    The Select Committee qualifies as "any person or entity" within the meaning of the Stored Communications Act.

160.    Section 2702(a)(1) therefore prohibits knowing disclosure of "the contents of a communication" stored by Verizon to the Select Committee absent an express statutory exception outlined in Section 2702(b).

161.    None of the statutory exceptions in Section 2702(b) applies to the Select Committee's subpoena.

162.    To the extent the Select Committee is seeking production of non-communication records and information, that request is prohibited under Section 2702(c) of Title 18.

163.    The Stored Communications Act provides that "[a] provider described in [Section 2702(a)] may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2))" if one of seven criteria is met.

164.    Mr. Meadows is "a subscriber to or customer of [Verizon's] service" within the meaning of the Stored Communication Act.

165.    The Select Committee cannot obtain the subpoenaed records under Section 2702(c)(1) because disclosure would not be "as otherwise authorized in section 2703." 18 U.S.C. § 2702(c)(1). Specifically, on information and belief, the Select Committee has not obtained and cannot obtain "a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction," as would be required to obtain records "in electronic storage in an electronic communications system for one hundred days or less." Id. § 2703(a). Nor has the Select Committee provided Mr. Meadows with "prior notice" and obtained either (i) "an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena" or (ii) "a court order," as would be required to obtain records "in electronic storage . . . for more than one hundred and eighty days." Id. § 2703(a), (b)(1).

166.    The Select Committee does not have lawful consent to obtain the subpoenaed records. See id. § 2702(c)(2).

167.    The Select Committee does not constitute or represent "a law enforcement agency" within the meaning of the Stored Communications Act. Id. § 2702(c)(7).

41

168.     The Select Committee may represent a "governmental entity" but, on information and behalf, have not shown and cannot demonstrate "in good faith" "that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." Id. § 2702(c)(4), (6).

169.     No other exception in Section 2702(c) would authorize the Select Committee to obtain the subpoenaed records.

**E.     The Subpoenas Violate the Separation of Powers by Infringing Upon Executive Privilege.**

170.     The Select Committee's subpoena to Mr. Meadows unlawfully seeks information covered by executive privilege and improperly attempts to compel testimony by a senior Executive Branch official.

171.     During his time as Chief of Staff, Mr. Meadows was among the most senior Executive Branch officials and his communications and deliberations were covered by executive privilege.

172.     That privilege reaches Mr. Meadows's communications "in the course of preparing advice for the President," *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) and any materials that reveal his or other executive officials' predecisional deliberative processes. See *Army Times Publ'g Co. v. Department of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993).

173.     The subpoena served on Mr. Meadows clearly seeks information protected by executive privilege.

174.     Among other things, the subpoena expressly requests summaries of Mr. Meadows's conversations with the President, records of his conversations with other senior executive officials, and the contents of advice provided to the President by his senior advisors.

175.    Throughout the course of negotiations regarding potential accommodations, the Select Committee has repeatedly clarified that the subpoena seeks privileged information.

176.    Most notably, the Select Committee provided Mr. Meadows with a list of topics for his deposition, informing him that it believed these topics did not "implicate any cognizable claim of executive privilege." That list expressly included Mr. Meadows's conversations with the President, his communications with the Vice President, two Oval Office meetings, and White House Officials' deliberations regarding election security. *See* **Ex. G**, November 5, 2021 Letter from Chairman Bennie Thompson to counsel for Mr. Meadows.

177.    Mr. Meadows's conversations with the President, Vice President, and other senior executive officials are covered by executive privilege, as is any information regarding executive officials' deliberative processes regarding election security.

178.    The subpoena's twenty-seven demands also demand substantial amounts of privileged information not specifically enumerated here.

179.    Despite Mr. Meadows's good faith attempts to negotiate with the Select Committee to provide relevant, nonprivileged information, the Select Committee has insisted on pursuing the full breadth of information identified in the subpoena.

180.    When a congressional committee uses its subpoena power to seek information covered by executive privilege, the subpoena will only be enforced where "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Select Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974).

181.    The information sought by the Select Committee is not demonstrably critical to its functions as it is not relevant to any legislative purpose and could be obtained from alternative sources.

182.    As alleged previously, the information is not relevant to a valid legislative purpose.

183.    Additionally, the vast majority of the information sought by the Select Committee could be obtained from other sources. Very little, if any, of the information sought by the Select Committee is in Mr. Meadows's sole possession. Much of it could obtained via subpoenas to individuals outside the Executive Branch or individuals who lie farther from the core of executive privilege.

184.    The subpoena also purports to compel Mr. Meadows to appear and give testimony regarding the topics identified therein.

185.    The Select Committee has confirmed that its subpoena violates the Separation of Powers by seeking and obtaining a purported "waiver" of executive privilege from President Biden.  That purported waiver, however, does not vitiate Mr. Meadows's assertion of privilege at the direction of former President Trump.  "A former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim*."  *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

## F.    The Subpoenas Violate the Separation of Powers by Infringing Upon the Longstanding Testimonial Immunity for Senior Advisors to the President.

186.    Senior executive officials are immune from such compelled testimony because of their close relationship to the President and attending importance with respect to the operation of the executive and relationship between the branches of government. *Immunity of the Assistant to*

*the President*, 38 Op. O.L.C. 5, 1 (2014); *Immunity of the Former Counsel*, 31 Op. O.L.C. 191, 191 (2007); *Assertion of executive privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999); *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996).

187.   Because Mr. Meadows as Chief of Staff at the White House was so inextricably involved in the President's decision-making, "[s]ubjecting [him] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of executive privilege*, 23 Op. O.L.C. at 5.

188.   Despite Mr. Meadows's role as Chief of Staff, the Select Committee, both implicitly in its subpoena and explicitly in its letters to Mr. Meadows, has rejected any claim of testimonial immunity, demanded that Mr. Meadows appear for testimony, and threatened to refer him for contempt of Congress if he declines.

189.   This demand and the attending threat contravene Mr. Meadows's testimonial immunity as a senior executive official.

## G.   Compelled Production under the Verizon Subpoena Would Violate the Fourth Amendment.

190.   The Verizon Subpoena instructs Verizon to produce subscriber information and cell phone data associated with the phone number previously used by Mr. Meadows.

191.   On December 5, 2021, Mr. Meadows received a letter dated December 2 from Verizon Security Subpoena Compliance notifying him of its duty to comply with the subpoena. The letter provided that Verizon would comply with the subpoena unless it "receives a court document challenging the subpoena by December 15, 2021."

192.     This cell phone number was used by Mr. Meadows as his personal cell phone during his tenure as White House Chief of Staff.

193.     The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata.

194.     The cell phone data requested includes all calls, text messages, and other records of communications associated with that phone number.

195.     This data can be used for historic cell site analysis.

196.     The requested data covers four full months: October 1, 2020 through January 31, 2021.

197.     Mr. Meadows produced to the Select Committee on December 3, 2021 content, including metadata, from this cell phone that was responsive to his September 23, 2021 subpoena.

198.     Mr. Meadows has a reasonable expectation of privacy in his personal cell phone data.

199.     The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

200.     The fact that a third party at least temporarily stores a person's cell phone data does not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

201.    The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoenas untethered from any valid legislative purpose. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946) .

202.    If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. Mr. Meadows has not provided his consent for Verizon to produce his cell phone data to the Select Committee. And for the reasons discussed *infra*, the Select Committee's subpoenas are invalid.

203.    A congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power. See *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2040 (2020).

204.    The Select Committee's subpoena to both Verizon and Mr. Meadows are so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee. *See McPhaul v. United States*, 364 U.S. 372, 381 (1960). The subpoena to Verizon, in particular, contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights.

205.    For the Select Committee to subpoena Verizon for all Mr. Meadows's personal cell phone data over the course of four months is entirely unreasonable. Such a request is so broad both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose.

206.    Likewise, the Select Committee's subpoena seeking Mr. Meadows's documents and testimony throughout the course of his entire tenure as White House Chief of Staff is overly broad. The request is overly broad with respect both to the timeframe and the subject matters in question. It exceeds any authorized purpose of the Select Committee.

207.    As the subpoenas in question exceed the lawfully authorized purpose of the Select Committee, full compliance with such subpoenas would violate Mr. Meadows's Fourth Amendment protection against unlawful search and seizure. The subpoenas are thus invalid and unenforceable.

## H.    Compelled Production of Cell Phone Data under the Verizon Subpoena Would Violate the First Amendment.

208.    The subpoena of Mr. Meadows's private cell phone data violates his right to free association and chills the exercise of free speech rights.

209.    The Committee's subpoena of Verizon identifies Mr. Meadows's personal cell phone number and requests the data associated with it—data which Mr. Meadows has already provided with respect to his responsive documents.

210.    Additionally, Mr. Meadows used his personal phone to engage in protected advocacy and other speech, including privileged speech with his attorneys and spouse.

211.    Mr. Meadows also used his personal phone to engage in private conversations with friends and family.

212.    All of these associational and expressive activities are protected by the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d 1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179 (D.C. Cir. 2003).

213.    The Committee has no legitimate purpose for seeking the protected information demanded by the subpoena. Mr. Meadows has already provided the Committee with the substance and metadata of his responsive emails and text messages. Additional information will not meaningfully aid the Committee in any valid pursuit.

214.     Even if had a valid reason to seek protected information, the Committee has put in place no safeguards to protect Mr. Meadows's rights. It provided Mr. Meadows with no notice of the subpoena and has provided him with no opportunity to assert claims of privilege or other legal protections over the demanded information. It also has no provisions for a taint team or analogous filter for privileged information. The entirety of the demanded information, including that which is constitutionally or otherwise protected, will be turned over to the Committee to do with as it pleases.

215.     The Verizon subpoena is also a clear effort to chill the speech of the Committee Member's political adversaries.

216.     The body that issued this subpoena is composed of 9 members, 7 of whom belong to the political party that opposed the President under which Mr. Meadows served.

217.     As noted above, the subpoena served no substantive purpose in the Committee's investigation—it will not turn up any new relevant information.

218.     Allowing an entirely partisan select committee of Congress to subpoena the personal cell phone data of executive officials would work a massive chilling of current and future Executive Branch officials' associational and free speech rights

219.     The Committee's asserted interest is insufficient and its alternative means of obtaining this information are too obvious to justify such a drastic chilling of speech

## PRAYER FOR RELIEF

Wherefore, Plaintiff asks the Court to enter judgment in his favor and against Defendants and to order the following relief:

        a.      A declaratory judgment that the Meadows Subpoena and the Verizon Subpoena are ultra vires, unlawful, and unenforceable;

        b.      A declaratory judgment that the Meadows Subpoena and the Verizon Subpoena serve no valid legislative purpose and exceed the Select Committee's Constitutional authority;

        c.      A declaratory judgment that compliance with the Verizon Subpoena would violate the Stored Communications Act;

        d.      A declaratory judgment that the Meadows Subpoena improperly compels testimony of a senior executive official;

        e.      A declaratory judgment that the Verizon Subpoena violates Mr. Meadows First Amendment rights;

        f.      A declaratory judgment that the Verizon Subpoena violates Mr. Meadows Fourth Amendment rights;

        g.      In the alternative, an order modifying the Meadows Subpoena and the Verizon Subpoena to seek only unprivileged information that does not infringe on Mr. Meadows's constitutional rights;

        h.      In the alternative, a declaration that Mr. Meadows may validly assert executive privilege over communications and deliberations related to his service of the President;

i.      An injunction quashing the Meadows Subpoena and the Verizon Subpoena and prohibiting their enforcement by Defendants;

j.      An injunction prohibiting Defendants from imposing sanctions for noncompliance with the Meadows Subpoena and/or the Verizon Subpoena;

k.      An injunction prohibiting Defendants from inspecting, using, maintaining, or disclosing any information obtained as a result of the Meadows Subpoena and/or the Verizon Subpoena;

l.      An award in favor of Plaintiff for his reasonable expenses, including attorneys' fees and costs, incurred as a result of the Meadows Subpoena and Verizon Subpoena; and

m.      Any and all other relief that the Court deems just and proper.

Dated: April 1, 2022

Respectfully submitted,
MARK MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I certify that, on April 1, 2022, a copy of the foregoing was filed on the Court's CM/ECF system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III