EXHIBIT G

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

One Hundred Seventeenth Congress
Select Committee to Investigate the January 6th Attack on the United States Capitol

November 5, 2021

Mr. George Terwilliger III
McGuire Woods LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006

Dear Mr. Terwilliger,

The Select Committee to Investigate the January 6th Attack ("Select Committee") is in receipt of your letters dated November 3, 2021, regarding the subpoena for documents and testimony served on your client, Mark R. Meadows (the "subpoena"). In your letter regarding deposition testimony, you suggest that Mr. Meadows maintains a "good faith" belief that he cannot appear before the Select Committee to answer any questions and, instead, proposes unspecified accommodations. In your letter regarding the production of documents, you said that there are "no documents to produce to the Select Committee" because you "are not aware at this time of any documents that are responsive to the Select Committee's subpoena and maintained in Mr. Meadows's custody or control."

Per the Select Committee's October 25, 2021 letter, the responsive date for Mr. Meadows to produce documents has been extended until November 5 and his deposition is scheduled for November 12. For the reasons that follow, the Select Committee cannot agree to further postponements.

*First*, regarding documents, you suggest that Mr. Meadows does not have any documents to produce, despite indicating, via telephone, earlier this week that you have gathered documents and continue to review them for responsiveness. If Mr. Meadows has responsive documents but believes that they are covered by an applicable privilege, please provide a privilege log that specifically identifies each document and each privilege that he believes applies so that the Select Committee can evaluate whether any additional actions are appropriate. As explained in the Select Committee's October 25, 2021 letter, categorical claims of executive privilege are improper and Mr. Meadows must assert any claim of executive privilege narrowly and specifically. *See, e.g.*, *In re Sealed Case (Espy)*, 121 F.3d 729 (D.C. Cir. 1997); *Comm. on Oversight & Gov't Reform v. Holder*, No. 12-cv-1332, 2014 WL 12662665, at *2 (D.D.C. Aug. 20, 2014) (rejecting a "blanket" executive-privilege claim over subpoenaed documents). We also note that the Select Committee has received information suggesting that Mr. Meadows regularly communicated by text and verbally on his private cell phone when conducting government and campaign business. We expect that a number of those communications are

Mr. George Terwilliger III
Page 2

likely records covered and protected by the Presidential Records Act. We ask that you identify for us the current location of Mr. Meadows's cell phone and whether Mr. Meadows supplied his texts and other relevant cell phone records to the Archives.

*Second*, with respect to Mr. Meadows's deposition, the Select Committee appreciates your apparent willingness to seek an accommodation and have Mr. Meadows appear to testify before the Select Committee. To that end, we will provide further information about the topics we intend to develop with Mr. Meadows during the deposition. We have already identified some of those topics and articulated why they do not implicate executive privilege. *See* our October 25, 2021 letter.

After reviewing that letter and those topics, you indicated in a November 2 telephone conference with staff that Mr. Meadows may assert executive privilege with respect to even those areas and disagreed the Select Committee's position that those areas would be outside of any recognized privilege.

Despite this significant disagreement over the scope of executive privilege, we write today in a continued effort to reach an accommodation with Mr. Meadows. More specifically, we identify below the areas that we will seek to develop during Mr. Meadows' deposition. At present, the Select Committee plans to question Mr. Meadows about his knowledge, actions, and communications, including communications involving Mr. Trump and others, with respect to the following:

(1) Messaging to or from the White House, Trump reelection campaign, party officials, and others about purported fraud, irregularities, or malfeasance in the November 2020 election. This includes, but is not limited to, Mr. Trump's and others frequent use of the "Stop the Steal" slogan, even after lawsuits, investigations, public reporting, discussions with agency heads, and internally created documents revealed that there had not been widespread election fraud.

(2) White House officials' understanding of purported election-related fraud, irregularities, or malfeasance in the November 2020 election.

(3) Efforts to pressure federal agencies, including the Department of Justice, to take actions to challenge the results of the presidential election, advance allegations of voter fraud, interfere with Congress's count of the Electoral College vote, or otherwise overturn President Biden's certified victory. This includes, but is not limited to, Mr. Trump's and others' efforts to use the Department of Justice to investigate alleged election-related conduct, file lawsuits, propose that state legislatures take election-related actions, or replace senior leadership. It also includes similar efforts at other agencies such as the Department of Homeland Security, the Department of Defense, and, among others, the Cybersecurity and Infrastructure Security Agency.

Mr. George Terwilliger III
Page 3

(4) Efforts to pressure state and local officials and entities, including state attorneys general, state legislators, and state legislatures, to take actions to challenge the results of the presidential election, advance unsubstantiated allegations of voter fraud, interfere with Congress's count of the Electoral College vote, de-certify state election results, appoint alternate slates of electors, or otherwise overturn President Biden's certified victory. This includes, but is not limited to, an Oval Office meeting with legislators from Michigan, as well as a January 2, 2021 call with, among others, state officials, members of Congress, Mr. Trump, and Mr. Meadows.

(5) Theories and strategies regarding Congress and the Vice President's (as President of the Senate) roles and responsibilities when counting the Electoral College vote. This includes, but is not limited to, the theories and/or understandings of John Eastman, Mark Martin, former Vice President Pence, and others.

(6) Efforts to pressure former Vice President Pence, members of his staff, and members of Congress to delay or prevent certification of the Electoral College vote. This includes, but is not limited to, meetings between, or including, the former Vice President, Mr. Trump, aides, John Eastman, members of Congress, and others.

(7) Campaign-related activities, including efforts to count, not count, or audit votes, as well as discussions about election-related matters with state and local officials. This includes, but is not limited to, Mr. Meadows' travel to Georgia to observe vote counting, as well as his or Mr. Trump's communications with officials and employees in the Georgia Secretary of State's Office. This also includes similar activities related to state and local officials in Michigan, Wisconsin, Nevada, Arizona, and Pennsylvania.

(8) Meetings or other communications involving people who did not work for the United States government. This includes, but is not limited to, an Oval Office meeting on December 18, at which Mr. Trump, Michael Flynn, Patrick Byrne, and others discussed campaign-related steps that Mr. Trump purportedly could take to change the outcome of the November 2020 election and remain in office for a second term, such as seizing voting machines, litigating, and appointing a special counsel. It also includes communications with organizers of the January 6 rally like Amy Kremer of Women for America First.

(9) Communications and meetings with members of Congress about the November 2020 election, purported election fraud, actual or proposed election-related litigation, and election-related rallies and/or protests. This includes, but is not limited to, a December 21, 2021 meeting involving Mr. Trump, members of his legal team, and members of the House and Senate, during which attendees discussed objecting to the November 2020 election's certified electoral college votes as part of an apparent fight "against mounting evidence of voter fraud."

Mr. George Terwilliger III
Page 4

(10) Efforts by federal officials, including White House staff, Mr. Trump, the Trump reelection campaign, and members of Congress to plan or organize rallies and/or protests in Washington, D.C. related to the election, including, but not limited to, the January 6 rally on the Ellipse.

(11) Advance knowledge of, and any preparations for, the possibility of violence during election-related rallies and/or protests in Washington, D.C.

(12) Events in the days leading up to, and including, January 6. This includes, but is not limited to, campaign-related planning and activities at the Willard Hotel, planning and preparation for Mr. Trump's speech at the Ellipse, Mr. Trump and other White House officials' actions during and after the attack on the U.S. Capitol, and contact with members of Congress, law enforcement, the Department of Defense, and other federal agencies to address or respond to the attack.

(13) The possibility of invoking martial law, the Insurrection Act, or the 25th Amendment based on election-related issues or the events in the days leading up to, and including, January 6.

(14) The preservation or destruction of any information relating to the facts, circumstances, and causes relating to the attack of January 6th, including any such information that may have been stored, generated, or destroyed on personal electronic devices.

(15) Documents and information, including the location of such documents and information, that are responsive to the Select Committee's subpoena. This includes, but is not limited to, information stored on electronic devices that Mr. Meadows uses and has used.

(16) Topics about which Mr. Meadows has already spoken publicly. This includes, but is not limited to, Mr. Meadows's February 11, 2021, appearance on the Ingraham Angle show to discuss the January 6 attack on the U.S. Capitol, Mr. Trump's reactions to the attack, and the National Guard.

Again, this list is non-exclusive and may be supplemented as our investigation continues, but we do not expect to seek information from Mr. Meadows unrelated to the 2020 election and what led to and occurred on January 6. We also continue to interview additional witnesses who have personal knowledge of these issues and Mr. Meadows's involvement. As our investigation continues, we may develop additional information about the above-described areas or identify additional subjects about which we will seek information from your client. We will discuss those issues with you on an ongoing basis provided we are continuing to negotiate about these issues and Mr. Meadows's potential privilege assertions.

Mr. George Terwilliger III
Page 5

We believe that these topics either do not implicate any cognizable claim of executive privilege or raise issues for which the Select Committee's need for the information is sufficiently compelling that it overcomes any such claim. To that end, **please provide your input on the topics that the Select Committee has reiterated by way of this letter no later than Monday, November 8**. If there are areas listed above that you agree implicate no executive or other privilege, please identify those areas. Conversely, please articulate which privilege you believe applies to each area and how it is implicated. Our hope is that this process will sharpen our differences on privilege issues and allow us to develop unobjectionable areas promptly.

Mr. Meadows's deposition scheduled for November 12 can proceed on at least the agreed-upon topics, and we can move one step closer towards the resolution of outstanding issues.

Finally, it is worth emphasizing an additional point that is also addressed in the pending litigation involving the National Archives. For purposes of executive privilege, Mr. Meadows apparently sees no significant difference between himself and Mr. Trump as *former* executive branch officials, and President Biden and his chief of staff as *current* executive branch officials. That distinction, however, is meaningful because it is the incumbent President that is responsible for guarding executive privilege, not former officials. *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977); *see also Nixon v. GSA*, 433 U.S. 425, 449 (1977) (even the one residual privilege that a former president might assert, the communications privilege, exists "for the benefit of the Republic," rather than for the former "President as an individual"). With respect to the Select Committee's work, the incumbent President has actually expressly declined to assert executive privilege on a number of subjects on which the Select Committee has sought testimony or documents. *See Trump v. Thompson*, Case No. 1:21-cv-2769 (TSC), Doc. 21 (brief for the NARA defendants); *see also* Doc. 21-1 (Declaration of B. John Laster).

The accommodations process regarding potential claims of executive privilege is a process engaged in between the Executive Branch and the Legislative Branch. *See Trump v. Mazars USA LLP*, 140 S. Ct. 2019, 2030-31 (2020). Mr. Meadows represents neither. Nevertheless, we have in good faith considered your concerns and have proposed a course of action that reflects both that consideration and the Select Committee's urgent need for information.

Mr. George Terwilliger III
Page 6

      Our hope is that this description of topics allows us to narrow the list of potentially disputed issues and move forward with Mr. Meadows' deposition. You have asked for negotiation, and we have responded in good faith. As was true before, however, the Select Committee will view Mr. Meadows's failure to respond to the subpoena as willful non-compliance. Such willful non-compliance with the subpoena would force the Select Committee to consider invoking the contempt of Congress procedures in 2 U.S.C. §§ 192, 194—which could result in a referral from the House to the Department of Justice for criminal charges—as well as the possibility of having a civil action to enforce the subpoena brought against Mr. Meadows in his personal capacity.

                                              Sincerely,

                                              Bennie G. Thompson
                                              Chairman