**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK MEADOWS, | |
| *Plaintiff*, | **ORAL ARGUMENT REQUESTED** |
| v. | Case No. 1:21-cv-3217-CJN |
| NANCY PELOSI, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h), Defendants the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable Jamie B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, and the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol, by and through their counsel, move for summary judgment on all claims stated in the Platiniff's Amended Complaint.  There are no genuine issues of material fact and, for all the reasons set forth in the accompanying Memorandum of Law in Support of Defendants' Motion for Summary Judgment, the Defendants are entitled to judgment as a matter of law.

A proposed order is submitted herewith.

1

Respectfully submitted,

April 22, 2022

/s/ Douglas N. Letter
DOUGLAS N. LETTER
*General Counsel*
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

ARNOLD & PORTER KAYE SCHOLER LLP
John A. Freedman (D.C. Bar 453075)
Paul J. Fishman (D.C. Bar 449014)
Amy Jeffress (D.C Bar 449258)
David J. Weiner (D.C. Bar 499806)
John M. Hindley (D.C. Bar 1720648)
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com
David.Weiner@arnoldporter.com
John.Hindley@arnoldporter.com

SHER TREMONTE LLP
Justin M. Sher (Bar ID NY0320)
Michael Tremonte*
Noam Biale*
Maya Brodziak*
Kathryn E. Ghotbi*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

* Appearing pursuant to 2 U.S.C. § 5571(a).

2

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*
Douglas N. Letter

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-3271-CJN |
| | ) | |
| NANCY PELOSI, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................ i

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 5

    A.    The January 6th Attack ...................................................................................... 5

    B.    The Formation of the Select Committee .......................................................... 6

    C.    The Select Committee's Subpoenas to Mr. Meadows and Verizon................................ 8

    D.    The Two Separate Roles That Mr. Meadows Played As White House Chief of Staff, and As a Key Player on the Trump Campaign. .............................................................. 10

    E.    The Select Committee's Numerous Attempts to Gain Compliance by Mr. Meadows with Its Subpoena...................................................................................................... 12

STANDARD OF REVIEW ..................................................................................................... 15

ARGUMENT ........................................................................................................................ 16

I.    Defendants are Entitled to Summary Judgment on All of Mr. Meadows's Claims ............ 16

    F.    The Select Committee Has a Valid Legislative Purpose .................................. 16

    G.    The Select Committee Is Validly Constituted and Has Issued Valid Subpoenas. ......... 17

        1.    The Rulemaking Clause Prevents Federal Courts from Second-Guessing the Select Committee's Internal Operations ......................................................... 17

        2.    The Select Committee Is Properly Composed............................................. 19

    H.    Executive Privilege Does Not Authorize Mr. Meadows to Refuse to Appear and Testify or Provide Documents Requested by the Select Committee ...................................... 26

    I.    The Testimony and Documentary Information at Issue in this Motion............................ 27

        1.    Nor Is Mr. Meadows Entitled to Testimonial Immunity ............................. 41

    J.    The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from Verizon Pursuant to a Lawful Subpoena.................. 47

    K.    The Subpoenas at Issue Do Not Violate the Fourth or the First Amendments.............. 50

        1.    The Verizon Subpoena and the Subpoena to Mr. Meadows Do Not Violate Mr. Meadows's Fourth Amendment Rights ......................................................... 51

        2.    The Verizon Subpoena Does Not Violate Mr. Meadows's First Amendment Rights 54

CONCLUSION...................................................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Carr*,
369 U.S. 186 (1962)........................................................................................................17

*Barenblatt v. United States*,
360 U.S. 109 (1959)..................................................................................................54, 55

*\*Barker v. Conroy*,
921 F.3d 1118 (D.C. Cir. 2019)................................................................................18, 24

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*,
860 F.2d 346 (9th Cir. 1988) .......................................................................................55

*Buckley v. Valeo*,
424 U.S. 1 (1976).....................................................................................................55, 56

*Burnap v. United States*,
252 U.S. 512 (1920).......................................................................................................50

*Carpenter v. United States*,
138 S. Ct. 2206 (2018)..............................................................................................52, 53

*Celotex Corp. v. Catrett*,
477 U.S. 317, 324 (1986)...............................................................................................16

*Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*,
515 F.2d 1341 (D.C. Cir. 1975).....................................................................................17

*Clinton v. Jones*,
520 U.S. 681 (1997).......................................................................................................42

*Comm. on the Judiciary, U.S. House of Representatives v. McGahn*,
415 F. Supp. 3d 148 (D.D.C. 2019) ..............................................................................43

*\*Comm. on the Judiciary, U.S. House of Representatives v. Miers*,
558 F. Supp. 2d 53 (D.D.C. 2008) .................................................................................43
No. 08-5357, 2009 WL 3568649 (D.C. Cir. Oct. 14, 2009) .........................................43

*Digital Realty Tr., Inc. v. Somers*,
138 S. Ct. 767 (2018).....................................................................................................48

*Donald J. Trump for President, Inc. v. Boockvar*,
502 F. Supp. 3d 899 (M.D. Pa. 2020)...........................................................................46

*Harlow v. Fitzgerald*,
 457 U.S. 800 (1982) ................................................................................................42

*\*Hubbard v. United States*,
 514 U.S. 695 (1995) ................................................................................................49

*In re Sealed Case (Espy)*,
 121 F.3d 729, 745 (D.C. Cir. 1997) .......................................................................31

*INS v. Chadha*,
 462 U.S. 919 (1983) ................................................................................................17

*Metzenbaum v. FERC*,
 675 F.2d 1282 (D.C. Cir. 1982) .............................................................................18

*McPhaul v. United States*,
 364 U.S. 372 (1960) ................................................................................................51

*\*Rangel v. Boehner*,
 20 F. Supp. 3d 148 (D.D.C. 2013) .........................................................................17

*\*Senate Permanent Subcomm. v. Ferrer*,
 199 F. Supp. 3d 125 (D.D.C. 2016) .................................................................54, 55

*Smith v. Maryland*,
 442 U.S. 735 (1979) ................................................................................................52

*Sussman v. U.S. Marshalls Serv.*,
 494 F.3d 1106 (D.C. Cir. 2007) .............................................................................19

*\*Trump v. Deutsche Bank AG*,
 943 F.3d 627 (2d Cir. 2019) ...................................................................................50

*\*Trump v. Thompson*,
 20 F.4th 10 (D.C. Cir. 2021) ........................................2, 4, 6, 16, 17, 26, 27, 40, 44, 45, 50
 142 S. Ct. 680 (2022) ...................................................................................4, 6, 17, 40
 142 S. Ct. 1350 (2022) (mem.) .........................................................................17, 40

*Trump v. Wis. Elections Comm'n*,
 506 F. Supp. 3d 620 (E.D. Wis. 2020) ...................................................................46

*Trump v. Vance*,
 140 S. Ct. 2412 (2020) ............................................................................................42

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
 933 F.3d 728 (D.C. Cir. 2019) ...............................................................................22

*United States v. Beverly*,
   943 F.3d 225 (5th Cir. 2019) ................................................................53

*United States v. Bryan*,
   339 U.S. 323 (1950) ...............................................................................42

*United States v. Chem. Found., Inc.*,
   272 U.S. 1 (1926) ...................................................................................19

*United States v. Durenberger*,
   48 F.3d 1239 (D.C. Cir. 1995) ...............................................................18

*United States v. Reynolds*,
   345 U.S. 1(1953) ....................................................................................26

*United States v. Nixon*,
   418 U.S. 683 (1974) ...............................................................................42

*Ward v. Jackson*,
   No. CV-20-0343, 2020 WL 8617817 (Ariz. Dec. 8, 2020) ..................46

*Wood v. Raffensperger*,
   501 F. Supp. 3d 1310 (N.D. Ga. 2020) ..................................................46

*Yellin v. United States*,
   374 U.S. 109 (1963) ...............................................................................18

**Constitution**

U.S. Const., Art. I, § 5, cl. 2 .......................................................................17

**Statutes, Rules, and Regulations**

Fed. R. Civ. P. 56(a) ...................................................................................15

2 U.S.C. § 192 .............................................................................................14

2 U.S.C. § 194 .............................................................................................14

5 U.S.C. § 7323 ......................................................................................10, 39

5 C.F.R. § 734 ..............................................................................................10

18 U.S.C. § 1001 ....................................................................................48, 49

18 U.S.C. § 2701 *et seq*...............................................................................47
   18 U.S.C. § 2702 ..........................................................................47, 48, 50
   18 U.S.C. § 2712 ..................................................................................49

**Legislative Sources**

8 *Cannon's Precedents of the U.S. House of Representatives* (1936) ...........................................22

H. Res. 6, 116th Cong. (2019) ...........................................................................................22

H. Res. 10, 117th Cong. (2021) .........................................................................................25

H. Res. 24, 110th Cong. (2007) .........................................................................................22

H. Res. 437, 109th Cong. (2005) .......................................................................................20

H. Res. 503, 117th Cong. (2021) ..................................................7, 8, 19, 21, 22, 25, 51

H. Res. 567, 113th Cong. (2014) .......................................................................................23

H. Res. 554, 117th Cong. (2021) .......................................................................................23

H. Res. 730, 117th Cong. (2021) ....................................................................................8, 24

H. Res. 851, 117th Cong. (2021) ................................................................................2, 8, 24

H. Res. 1037, 117th Cong. (2022) ..................................................................................8, 24

H. Rep. 109-377 (2006) .....................................................................................................20

167 Cong. Rec. H3885–3886 (daily ed. July 26, 2021)..................................................8, 23

167 Cong. Rec. H5768-69 (daily ed., Oct. 21, 2021) .......................................................24

168 Cong. Rec. H4371-79 .................................................................................................24

151 Cong. Rec. 20873 (bound ed. Sept. 21, 2005) ...........................................................20

151 Cong. Rec. 21177-78 (bound ed. Sept. 26, 2005).......................................................20

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) ....................................................................21

167 Cong. Rec. H77-79 (daily ed. Jan. 6, 2021).................................................................7

167 Cong. Rec. H98-99 (daily ed. Jan. 6, 2021).................................................................7

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021)..............................................................14

167 Cong. Rec. H7785-94 (daily ed. Dec. 14, 2021).........................................................14

167 Cong. Rec. H7814-15, 117th Cong. (daily ed. Dec. 14, 2021)...........................2, 15, 24

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) ..............................................................8. 24

Rules of the U.S. House of Representatives, 117th Cong. (2021)
    House Rule I ............................................................................................................21
    House Rule XI .......................................................................................20, 21, 24, 25

**Other Sources**

Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Wash.Post (Jan. 5, 2021), https://perma.cc/5SMX-4FPX .................10, 32

Aaron R. Cooper, *Congressional Surveillance*,
    70 Am. U. L. Rev. 1799 (2021) ...........................................................................50

Black's Law Dictionary (11th ed. 2019)...................................................................22

Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), https://perma.cc/KS28-JJ3V ...................................................................37

Dalton Bennett and Jon Swaine, *The Roger Stone Tapes*,
    Wash. Post (Mar. 4, 2022), https://perma.cc/UX82-M2ZP ....................................39

Donald J. Trump (@realDonaldTrump) Twitter (Jan. 6, 2021 6:01 PM),
    https://perma.cc/29AH-HZNV...............................................................................37

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 6, 2021, 2:24 PM),
    https://perma.cc/Z9Q5-EANU...............................................................................35

Donald J. Trump (@realdonaldtrump), Twitter (Jan. 1, 2021 2:53 PM),
    https://perma.cc/WW6S-ENNE ............................................................................35

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 6, 2021 1:00 AM),
    https://perma.cc/9EV8-XJ7K ................................................................................34

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 6, 2021 8:17 AM),
    https://perma.cc/2J3P-VDBV ...............................................................................35

Donald J. Trump, President, Speech to the "Save America March" and rally (Jan. 6, 2021),
    https://perma.cc/2YNN-9JR3................................................................................35

Katelyn Polantz, Holmes Lybrand, and Hannah Rabinowitz, *Sobbing Capitol rioter described his assault of police Officer Michael Fanone: 'My God. What did I just do?'*, CNN (Dec. 1, 2021), https://perma.cc/V7HJ-QARJ ................................................................36

Letter from Chairman Bennie Thompson to Rep. Jim Jordan (Dec. 22, 2021),
    https://perma.cc/QLW4-86SP..................................................................................7

Mark Meadows, *The Chief's Chief* (2021) ................................................................31

Memorandum for the Honorable John W. Dean III, Counsel to the President, from
    Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel,

*Re: Appearance of Presidential Assistant Peter M. Flanigan Before a
Congressional Committee* (Mar. 15, 1972)..............................................................................46

President Trump Video Statement on Capitol Protesters, C-SPAN (Jan. 6, 2021),
https://perma.cc/XCW4-JDA7..........................................................................................37

Press Release, Jim Banks, McCarthy Taps Banks to Lead Republicans on Jan 6 Committee (July
19, 2021), https://perma.cc/WVW5-6DDH ...........................................................................7

Sargeant Aquilino Gonell Testimony, House Select Committee to Investigate the January 6th
Attack on the United States Capitol, *The Law Enforcement Experience on January 6th* (July
27, 2021), https://perma.cc/KG3L-DH65 ...............................................................................36

Trump supporters threaten to hang Mike Pence at Capitol, YouTube,
https://perma.cc/6KGR-VUE8...........................................................................................35

*United States v. Chrestman*,
No. 21-00218 (D.D.C. Feb. 11, 2021), https://perma.cc/Z2AX-3CWT .................................35

United States of America v. Marhsall Neefe and Charles Bradford Smith,
https://perma.cc/4DER-T44C ............................................................................................35

U.S. Office of Special Counsel, Investigation of Political Activities by Senior Trump
Administration Officials during the 2020 Presidential Election, Report of the Office of
Special Counsel (Nov. 9, 2021) .........................................................................................10

Vice Chair Cheney on Recommending Mark Meadows for Criminal Contempt,
January 6th Committee, YouTube (Dec. 13, 2021),
https://perma.cc/2JPJ-H6CZ ............................................................................................28

William Cummings, J. Garrison & J. Sergent, *By the numbers:
President Donald Trump's failed efforts to overturn the election*,
USA Today (Jan. 6, 2021), https://perma.cc/683S-HSRC.......................................................46

## **INTRODUCTION**

The Select Committee to Investigate the January 6th Attack on the United States Capitol (hereinafter "Select Committee") is investigating the violent attack on our Capitol on January 6, 2021, and efforts by the former President of the United States to remain in office by ignoring the rulings of state and federal courts and disrupting the peaceful transition of power.  Plaintiff Mark Meadows was President Trump's White House Chief of Staff during the events at issue.  But Mr. Meadows also played an additional and different role, along with members of the Trump campaign, Rudy Giuliani and others, in the President's post-election efforts to overturn the certified results of the 2020 election.  Mr. Meadows has published a book addressing a number of these issues and has spoken about them publicly on several occasions.

On September 23, 2021, the Select Committee issued a subpoena to Mr. Meadows for deposition testimony and relevant documentation regarding the events at issue.  SOMF ¶ 10. President Biden considered but declined to assert executive privilege or any form of immunity with respect to Mr. Meadows's testimony.

The Select Committee received certain documentation from Mr. Meadows, including 2,319 text messages from Mr. Meadows's private phone as well as privilege logs claiming executive, attorney-client, and marital privilege for many documents and text messages that Mr. Meadows refused to produce.  Although, after much negotiation, Mr. Meadows had agreed to appear for a deposition on December 8, 2021, he informed the Select Committee on December 7, 2021, of a change of heart; he filed this suit instead, seeking to justify his decision to refuse to appear or provide any testimony in response to the Select Committee's subpoena, either regarding his official activity as Chief of Staff or other activity for the Trump campaign.  *See* ECF 13-22 (Am. Compl. Ex. T), Letter from G. Terwilliger to Select Committee (Dec. 7, 2021).

Thereafter, the House of Representatives voted to hold Mr. Meadows in contempt of Congress. *See* 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (approving H. Res. 851, 117th Cong. (2021). The contempt report the House adopted repeatedly noted that Mr. Meadows not only refused to attend a deposition at all but refused to provide even indisputably non-privileged testimony to the Select Committee. *See* H. Rep. No. 117-216, at 2-3 (2021). Since that time, Mr. Meadows has continued to defy the Select Committee's subpoena and has provided no testimony even as to non-privileged information. SOMF ¶ 22.

In his Amended Complaint, Mr. Meadows asserts a range of legal arguments purporting to justify his refusal to comply with the Select Committee's subpoena. Each is deeply flawed as a matter of law. For example, Mr. Meadows argues that the Select Committee lacks an appropriate legislative purpose. *See* Am. Compl. ¶¶ 130-46. But the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 37-38 (D.C. Cir. 2021), has already rejected that argument, recognizing "Congress's uniquely weighty interest in investigating the causes and circumstances of the January 6th attack so that it can adopt measures to better protect the Capitol Complex, prevent similar harm in the future, and ensure the peaceful transfer of power." 20 F.4th at 35.

Similarly, two other courts have already rejected Mr. Meadows's arguments that the Select Committee is improperly composed under House Resolution 503 or applicable House Rules, or that the subpoenas issued by the Select Committee are otherwise infirm. *See* Oral Arg. Tr. at 34, *Budowich v. Pelosi*, No. 21-cv-3366 (D.D.C. Jan. 20, 2022), ECF 27; Order at 9 & n.12, *Eastman v. Thompson*, No. 8:22-cv-00099 (C.D. Cal. Jan. 25, 2022), ECF 43. As those and other courts recognize, the Constitution's Rulemaking Clause compels deference to the House of Representatives's interpretation and application of its own rules.

Since the Select Committee initially issued its subpoena for documents and testimony to Mr. Meadows, its investigation has progressed significantly.  The Select Committee has interviewed or deposed dozens of witnesses who interacted directly with Mr. Meadows, either in the White House or in connection with the Trump campaign to overturn the 2020 election.  This information has now allowed the Select Committee to identify with greater precision the subjects upon which it requires information from Mr. Meadows.  Consequently, the Select Committee has elected to focus its subpoena more narrowly going forward, to require only that Mr. Meadows give deposition testimony and provide documents regarding *seven discrete topics* that are directly and unambiguously relevant to the events of January 6th and the Select Committee's investigation (addressed in detail below).  *See infra* at 28-40.

1.   Testimony regarding non-privileged documents (including text and email communications) that Mr. Meadows has already provided to the Select Committee in response to the subpoena, and testimony about events that Mr. Meadows has already publicly described in his book and elsewhere;

2.   Testimony and documents regarding post-election efforts by the Trump campaign, the Trump legal team, and Mr. Meadows to create false slates of Presidential electors, or to pressure or persuade state and local officials and legislators to take actions to change the outcome of the 2020 Presidential election;

3.   Testimony and documents relating to communications with Members of Congress in preparation for and during the events of January 6th;

4.   Testimony and documents regarding the plan, in the days before January 6th, to replace Acting Attorney General Jeffrey Rosen with Mr. Jeffrey Clark so that the Department could corruptly change its conclusions regarding election fraud;

5.   Testimony and documents relating to efforts by President Trump to instruct, direct, persuade or pressure Vice President Mike Pence to refuse to count electoral votes on January 6th;

6.   Testimony and documents relating to activity in the White House immediately before and during the events of January 6th; and

7.   Testimony and documents relating to meetings and communications with individuals not affiliated with the federal government regarding the efforts to change the results of the 2020 election.

Mr. Meadows alleges that his documents and testimony regarding the events of January 6th should be protected by executive privilege.  *See* Am. Compl. ¶¶ 170-85.  None of Mr. Meadows's executive privilege arguments should apply as to certain of these topics:  1-4 and 7 above.  For other topics, the Select Committee's interest in these materials outweighs any basis for a general and unspecified assertion of privilege, as the D.C. Circuit has already held in a closely related context in *Trump v. Thompson*.

The *Thompson* court required production of hundreds of pages of documents allegedly covered by executive privilege, concluding that, under any test, "the profound interests in disclosure . . . far exceed [former President Trump's] generalized concerns for Executive Branch confidentiality."  *Trump v. Thompson*, 20 F.4th at 33.  The D.C. Circuit agreed that access to the information was "necessary to address a matter of great constitutional moment for the Republic." *Id*. at 49.  The Supreme Court later rejected the former President's request to stay that ruling. *Trump v. Thompson*, 142 S. Ct. 680 (2022).

Mr. Meadows also alleges that he is absolutely immune from any obligation to testify on *any* topic—by virtue of his former role as White House Chief of Staff.  But no court has ever so

4

ruled.  Even if such an absolute immunity doctrine existed to shield the official activities of a White House official (it does not), much of Mr. Meadows's testimony would relate to President Trump's campaign to overturn the 2020 election.  Mr. Meadows's activities in that context were not performed in an official capacity and could not be covered by any conception of "absolute immunity."  Indeed, even the Office of Legal Counsel (OLC) memoranda on which Mr. Meadows now apparently relies explicitly do not apply to such "unofficial" activity.  Ironically, those OLC memoranda were intended to guard against a perceived threat to the separation of powers.  But here, Mr. Meadows is attempting to use them to prevent Congress from fully investigating an attack that posed a dramatically more serious Constitutional threat.  Congress must have the ability to uncover exactly what happened on January 6th; and it must take appropriate and focused legislative action to preserve its role as a separate and co-equal branch of government.  Congress requires Mr. Meadows's testimony for that purpose.

Finally, Mr. Meadows's Amended Complaint also alleges that another Committee subpoena—to Verizon for records of Mr. Meadows's calls on January 6th and other relevant dates—is unlawful.  That subpoena seeks records of whom Mr. Meadows called on January 6th and during other relevant periods and does not seek the content of any of Mr. Meadows's conversations.  This motion also seeks a ruling that Mr. Meadows has no legal basis to attempt to prevent Verizon from complying with that subpoena.

Summary judgment is fully warranted.  For the reasons set forth herein, the Select Committee seeks a ruling on each of the claims in Plaintiff Meadows's Amended Complaint.

## **BACKGROUND**

### A.    **The January 6th Attack**

"On January 6, 2021, as a joint session of Congress convened in the U.S. Capitol to certify the vote count of the Electoral College, thousands of people, many of whom had marched

to the Capitol following a rally at which then-President Donald Trump spoke, gathered outside."

*United States v. Miller*, No. 1:21-cr-00119, 2022 WL 823070, at *1 (D.D.C. Mar. 7, 2022);

SOMF ¶ 1.  "[A] mob professing support for then-President Trump violently attacked the United

States Capitol in an effort to prevent a Joint Session of Congress from certifying the electoral

college votes designating Joseph R. Biden the 46th President of the United States.  The rampage

left multiple people dead, injured more than 140 people, and inflicted millions of dollars in

damage to the Capitol.  Then-Vice President Pence, Senators, and Representatives were all

forced to halt their constitutional duties and flee the House and Senate chambers for safety."

*Trump v. Thompson*, 20 F.4th 10, 15-16 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022)

(mem.); SOMF ¶ 2.  "The events of January 6, 2021 marked the most significant assault on the

Capitol since the War of 1812."  *Id.* at 18-19.

### B.    The Formation of the Select Committee

In response to that unprecedented attack, the House of Representatives adopted House

Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the

United States Capitol."  SOMF ¶ 3.  That resolution authorizes the Select Committee to: (1)

"investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the

Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the

domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing

such findings, conclusions, and recommendations for corrective measures . . . as it may deem

necessary."  *Id.*  The resolution further describes categories of potential corrective measures—

"changes in law, policy, procedure[], rules, or regulations that could be taken": (1) "to prevent

future acts of violence, domestic terrorism, and domestic violent extremism, including acts

targeted at American democratic institutions"; (2) "to improve the security posture of the United

States Capitol Complex while preserving accessibility of the Capitol Complex for all

Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism." H. Res. 503, 117th Cong. § 4(c) (2021).

To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom were to be appointed "after consultation with the minority leader."  SOMF ¶ 3; H. Res. 503, 117th Cong. § 2(a) (2021).  On July 1, 2021, Speaker Pelosi appointed eight Members of the House (seven Democrats and one Republican) to the Select Committee consistent with the resolution.  SOMF ¶ 4.  The House Minority Leader then presented his recommendations for five additional Republicans to be appointed to the Select Committee. *Id.*  The Speaker spoke with the Minority Leader, advised him that she would appoint three of the Members he had recommended, and asked the Minority Leader to recommend two other Republicans.[1]  Rather than comply with that request, the Minority Leader declined and, instead, withdrew all five recommendations and refused to participate further in the appointment of members.[2]  *See* Am. Compl. ¶ 58.

The Speaker consulted the House Parliamentarian, considered relevant precedent, and determined an appropriate course of action consistent with both House Resolution 503 and the House Rules.  The Speaker concluded that the Minority Leader's actions, and his refusal to consult further regarding appointments, did not prevent the Select Committee from operating.

---

[1] SOMF ¶ 5.  The members the Speaker declined to appoint were Jim Jordan and Jim Banks. Mr. Jordan was an active participant in the effort to overturn the 2020 election on January 6th. *See* 167 Cong. Rec. H77-79, H98-99 (daily ed. Jan. 6, 2021); *See* 167 Cong. Rec. H77-79, H98-99 (daily ed. Jan. 6, 2021); Letter from Chairman Bennie Thompson to Rep. Jim Jordan (Dec. 22, 2021), https://perma.cc/S6QY-J9BJ.  *See* Press Release, Jim Banks, McCarthy Taps Banks to Lead Republicans on Jan 6 Committee (July 19, 2021), https://perma.cc/WVW5-6DDH

[2] *See* Press Release, Kevin McCarthy, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee (July 21, 2021), https://perma.cc/KFQ7-C7B7 ("McCarthy Press Release").

This was because the Select Committee already had a quorum of Members under House Resolution 503.  *See* H. Res. 503 § 5(c)(3) ("[T]wo Members of the Select Committee shall constitute a quorum for taking testimony or receiving evidence and *one-third of the Members of the Select Committee shall constitute a quorum* for taking any action other than one for which the presence of a majority of the Select Committee is required.") (emphasis added).

Nevertheless, the Speaker decided to appoint an additional Republican Member to the Select Committee.  SOMF ¶ 6.  The Select Committee has since operated with seven Democrats and two Republicans, a composition the full House has affirmed repeatedly, first by tabling House Resolution 554—a privileged resolution filed by the Minority Leader contesting the composition of the Select Committee on the grounds similar to those argued here by Mr. Meadows (*see* 167 Cong. Rec. H3885-86)—and also by its adoption of three resolutions holding four individuals in contempt of Congress, one of which specifically addressed Mr. Meadows refusal to comply with the Select Committee's subpoenas. SOMF ¶ 8.[3]

### C.    The Select Committee's Subpoenas to Mr. Meadows and Verizon

In furtherance of its responsibility to "investigate the facts, circumstances, and causes" of the January 6th attack, on September 23, 2021, the Select Committee issued the subpoena at issue here to Mr. Meadows.  SOMF ¶ 9.  As the Select Committee explained in its cover letter to the subpoena, its investigation had "revealed credible evidence" of Mr. Meadows's "involvement

---

[3] H. Res. 1037, 117th Cong. (2022) (Recommending that the House of Representatives find Peter K. Navarro and Daniel Scavino, Jr. in contempt of Congress); H. Res. 851, 117th Cong. (2021) (Recommending that the House of Representatives find Mark Randall Meadows in contempt of Congress) ; H. Res. 730, 117th Cong. (2021) (Recommending that the House of Representatives find Stephen K. Bannon in contempt of Congress); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising these challenges to the Select Committee's means of operation before the full House during a debate over whether the House should adopt a contempt resolution).

in events within the . . . Select Committee's inquiry." SOMF ¶ 11. Specifically, Mr. Meadows was "with or in the vicinity of President Trump on January 6, had communications with the President and others on January 6 regarding events at the Capitol, and [was] a witness regarding activities of that day." SOMF ¶ 12. Indeed, at least one press report indicated that Mr. Meadows was in communication with organizers of the January 6th rally. *See id.*

Further, public reports indicated that Mr. Meadows was "engaged in multiple elements of the planning and preparation of efforts to contest the presidential election and delay the counting of electoral votes," and according to documents provided by the Department of Justice, he "directly communicated with the highest officials" at the Department "requesting investigations into election fraud matters in several states." SOMF ¶ 13. The Select Committee also understood that in the weeks after the 2020 election, Mr. Meadows "contacted several state officials to encourage investigation of allegations of election fraud, even after such allegations had been dismissed by state and federal courts, and after the Electoral College had met and voted on December 14, 2020." SOMF ¶ 14.

Accordingly, the Select Committee issued a subpoena seeking documents and deposition testimony regarding these and other matters relevant to the Select Committee's inquiry, with a document return date of October 7, 2021 and a deposition date of October 15, 2021. ECF 13-3 at 4 (Am. Compl. Ex. A). Chairman Thompson chose to delay these deadlines a number of times in an effort at accommodation.

On November 11, 2021, the Deputy Counsel to the President, writing on behalf of President Biden, sent a letter to Mr. Meadows's counsel, describing the consideration the President gave in deciding whether to assert absolute testimonial immunity and/or executive privilege with respect to the Select Committee subpoena. *See* SOMF ¶ 15. The President

declined to assert either claim. *Id.* The President determined, "in recognition of [the] unique and extraordinary circumstances," that "an assertion of executive privilege is not in the public interest, and is therefore not justified, with respect to particular subjects within the purview of the Select Committee." *See* ECF 13-14 at 2 (Am. Compl. Ex. L), Letter from Jonathan C. Su, Deputy Counsel to the President, to George J. Terwilliger III (Nov. 11, 2021). President Biden also concluded "[f]or the same reasons underlying his decisions on executive privilege" that he would "not assert immunity" to preclude Mark Meadows from testifying before the Select Committee. *Id.* at 3.

> **D.     The Two Separate Roles That Mr. Meadows Played As White House Chief of Staff, and As a Key Player on the Trump Campaign**

Federal law expressly prohibits federal officials such as Mr. Meadows (when serving as the Chief of Staff to the President) from acting under their official U.S. government authority and position to affect the outcome of a political election.[4]

Mr. Meadows acted in his non-governmental capacity with regard to numerous post-election campaign efforts, including by traveling to Georgia to observe an audit of absentee ballot signatures, and by lobbying state officials, legislators and others urging changes to state election results, by participating in an effort to create false electoral slates for certain states, and in other ways. SOMF ¶ 18.[5] Mr. Meadows was also involved in planning with Members of

---

[4] *See* 5 U.S.C. § 7323(a) (commonly referred to as the "Hatch Act"); 5 C.F.R. § 734.101 (2022) (defining "political activity"); 5 C.F.R. § 734.302 (prohibiting use of official title while engaged in political activity). *See generally* U.S. Office of Special Counsel, Investigation of Political Activities by Senior Trump Administration Officials during the 2020 Presidential Election, Report of the Office of Special Counsel 17, 22-23, 40 (Nov. 9, 2021), https://perma.cc/P887-827J.

[5] For example, Mr. Meadows participated in a widely publicized call with Georgia Secretary of State Raffensperger, and other related efforts seeking to change the election results in Georgia. *See* Amy Gardner & Paulina Firozi, *Here's the transcript and audio of the call between Trump and Raffensperger*, Wash. Post (Jan. 5, 2021), https://perma.cc/5SMX-4FPX.

Congress and others not in the Executive Branch for the events of January 6th.[6]  Mr. Meadows's

engagement in these activities in his capacity as a member of the Trump campaign has been

confirmed by the testimony of multiple witnesses,[7] by Mr. Meadows's own book,[8] and by the

non-privileged documents Mr. Meadows himself produced to the Select Committee (for

examples, *see infra* at 28-40).[9]  His unofficial role in the Trump campaign is also evident from

Mr. Meadows's privilege logs, which include separate claims of attorney-client privilege and

work product protection for hundreds of communications with lawyers acting for the campaign

or with other Trump campaign staff.  SOMF ¶ 19; Ex. E to Decl. of Timothy Heaphy, Mark

Meadows' Email Privilege Logs.

---

[6] Mr. Meadows "received text messages and emails regarding apparent efforts to encourage Republican legislators in certain States to send alternate slates of electors to Congress, a plan which one Member of Congress acknowledged was 'highly controversial' and to which Mr. Meadows responded, 'I love it.' Mr. Meadows responded to a similar message by saying '[w]e are' and another such message by saying 'Yes. Have a team on it.'" H. Rep. No. 117-216, at 9. He also participated in a call with President Trump, Members of Congress, attorneys for the President's campaign, and around 300 state and local officials "to discuss the goal of overturning certain States' electoral college results on January 6, 2021."  Ex. H to Decl. of Timothy Heaphy, January 6, 2021 Text Messages between Mark Meadows and Donald Trump Jr., H. Rep. No. 117-216, at 9-10 (citing messages produced by Mr. Meadows to the Committee).

[7] *See, e.g.*, Ex. P to Decl. of Timothy Heaphy, Hutchinson Tr. 47, 72-73; Ex. G to Decl. of Timothy Heaphy, Hutchinson Tr. Contd. 161-63; Ex. Z to Decl. of Timothy Heaphy, Raffensperger Tr. 102-105; Ex. Y to Decl. of Timothy Heaphy, J. Miller Tr. 125-26, 143-45.

[8] SOMF ¶¶ 25, 26.

[9] Ex. C to Decl. of Timothy Heaphy, Nov. 30, 2020 Email from Mark Meadows to Jason Miller (email from Mark Meadows's personal email account to senior campaign advisor authorizing the campaign to issue a press release); Ex. D to Decl. of Timothy Heaphy, Dec. 6, 2020 Email from Mark Meadows to Jason Miller (email from Mark Meadows's personal email account to senior campaign advisor with information about a suit filed by the campaign).

### E.   The Select Committee's Numerous Attempts to Gain Compliance by Mr. Meadows with Its Subpoena

As reflected in the attachments to the Amended Complaint, Mr. Meadows counsel, the White House, and the Select Committee engaged in lengthy correspondence regarding document production and deposition testimony.

Particularly relevant here, on October 11, 2021, counsel for Mr. Meadows wrote to counsel for the White House, asking the White House to "clarify whether you have directed the Archivist to produce privileged materials arising from Mr. Meadows's tenure as Chief of Staff to Congress, and if so, to clarify the scope of that directive." ECF 13-5 at 3 (Am. Compl. Ex. C), Letter from G. Terwilliger to D. Remus (Oct. 11, 2021). The letter further represented that former President Trump had expressed the view that "Mr. Meadows is immune from compelled testimony on matters related to his official responsibilities." *Id.* at 4. The letter stated that Mr. Meadows had "no reason to believe that President Biden has purported to waive testimonial immunity for Mr. Meadows in connection with the Select Committee's subpoena," and asked for an opportunity to "discuss these matters" before any decision was made. *Id.* at 4-5.

On November 11, 2021, Deputy Counsel to the President Jonathan Su informed Mr. Meadows's counsel that President Biden would not claim executive privilege or testimonial immunity with respect to Mr. Meadows's deposition or regarding any documents that he may possess bearing on the Select Committee's inquiry. *See* ECF 13-14 at 2-3 (Am. Compl. Ex. L). The letter explained that President Biden had determined "that an assertion of executive privilege is not in the public interest, and is therefore not justified, with respect to particular subjects within the purview of the Select Committee," including "events within the White House on or about January 6, 2021; attempts to use the Department of Justice to advance a false narrative that

12

the 2020 election was tainted by widespread fraud; and other efforts to alter election results or obstruct the transfer of power." *Id.* at 2.

After Mr. Meadows initially refused to testify—contending that "senior aides to the president cannot be compelled to provide [C]ongressional testimony" ECF 13-12 at 2 (Am. Compl. Ex. J), Letter from G. Terwilliger to Select Committee (Nov. 10, 2021) —Mr. Meadows's counsel wrote to the Select Committee in late November purportedly seeking an "accommodation."[10]  Specifically, in two letters dated November 26, 2021, Mr. Meadows's counsel agreed that Mr. Meadows would appear at a deposition subject to certain preconditions and agreed to produce 1,139 documents from Mr. Meadows's personal email account.  SOMF ¶ 16.  With the document production, counsel for Mr. Meadows provided a privilege log showing that Mr. Meadows was withholding hundreds of documents on the basis of asserted executive, marital, and attorney-client privileges.  *See* H. Rep. No. 117-216, at 19.

On December 3, 2021, Mr. Meadows's counsel produced 2,319 text messages to the Select Committee.  *See* ECF 13-20 at 2 (Am. Compl. Ex. R), Letter from M. Francisco to Select Committee (Dec. 3, 2021).  Counsel for Mr. Meadows also produced a privilege log showing that Mr. Meadows was withholding over 1,000 text messages from his personal cell phone based on claims of executive, marital, and attorney-client privileges.  SOMF ¶ 17.

A date for the deposition was then agreed upon for December 8, 2021, but on the day before the scheduled deposition, cooperation by Mr. Meadows stopped suddenly.  SOMF ¶ 20.

---

[10] The "accommodations" process involves negotiation between the Legislative Branch and the Executive Branch.  *See, e.g., Trump v. Mazars USA LLP*, 140 S. Ct. 2019, 2029-31 (2020).  Mr. Meadows, however, is not a part of and does not represent the Executive Branch.  As described *infra*, the Executive Branch has been consulted on the subpoena to Mr. Meadows and has decided not to assert privileges or otherwise seek an accommodation concerning testimony and documents from Mr. Meadows on subjects within the purview of the Select Committee.

Through counsel, Mr. Meadows wrote to the Select Committee "declin[ing] the opportunity to appear voluntarily for a deposition." *Id.* During a call with Select Committee staff that same day, Mr. Meadows's counsel indicated that Mr. Meadows would not appear at all, even to discuss the documents that he had already provided to the Select Committee and that were not covered by any claim of protective privilege. SOMF ¶ 21. On December 8, 2021, Mr. Meadows then failed to appear for his deposition. *See id.*

On December 13, 2021, the Select Committee considered and reported to the full House a contempt of Congress report and recommendation. The contempt report stressed Mr. Meadows's failure to testify regarding facts and documents not subject to any claim of privilege. *See generally* H. Rep. No. 117-216. During the Select Committee's business meeting, Vice Chair Liz Cheney reinforced the central claim of the contempt proceedings: "We believe Mr. Meadows is improperly asserting executive and other privileges, but this vote on contempt today relates principally to Mr. Meadows's refusal to testify about text messages and other communications that he admits are not privileged. He has not claimed and does not have any privilege basis to refuse entirely to testify regarding these topics."[11]

The next day the full House debated a resolution holding Mr. Meadows in contempt of Congress and referring him to the Department of Justice for criminal prosecution pursuant to 2 U.S.C. §§ 192, 194. *See* 167 Cong. Rec. H7785-94 (daily ed. Dec. 14, 2021). Although multiple members of the House argued on the House floor that the Select Committee lacked an appropriate legislative purpose, was not appropriately composed, and lacked authority to issue

---

[11] Transcript of Business Meeting on a Report Recommending that the House of Representatives Cite Mark Randall Meadows for Criminal Contempt of Congress at 8, House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117th Cong., 1st sess., (Dec. 13, 2021) (remarks of Rep. Liz Cheney of Wyoming) (Ex. B).

the subpoena to Mr. Meadows,[12] the full House did not agree, and the contempt resolution was

adopted.  *See id.* at H7814-15.  The Speaker provided the House's referral to the Department of

Justice, which has not yet announced a prosecutorial decision.

***Verizon Subpoena***

On November 22, 2021, the Select Committee issued a subpoena to Verizon for

"subscriber information and cell phone data associated with Mr. Meadows's personal cell phone

number."  SOMF ¶ 23.  The subpoena does not request any content of any communications, nor

does it request geo-location data.  *Id.*  To date, Verizon has not produced any of the subpoenaed

information to the Select Committee and has advised the Select Committee that it will not

provide the requested documents absent a ruling from this Court.

On December 8, 2021, Mr. Meadows filed this action seeking various forms of relief,

including a declaratory judgment and/or injunction to prevent the Select Committee from

obtaining the documents and testimony sought by the Select Committee's subpoenas to Mr.

Meadows and to Verizon.  He filed an amended complaint on April 1, 2022.

## STANDARD OF REVIEW

A court may grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  If the moving party has met its burden, the nonmoving party must set forth

---

[12] The remarks of Rep. Andy Biggs of Arizona are illustrative of criticisms leveled against the Select Committee that the House rejected: "This committee is illegitimate.  It has violated its own rules of creation.  It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6.  You can't have a committee to find out what happened because you are interested.  You can't do that.  And that is what they are doing today."  167 Cong. Rec. H7793.

"specific facts showing that there is a genuine issue for trial" to defeat the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## ARGUMENT

The Select Committee seeks summary judgment on each claim in Mr. Meadows's Amended Complaint—and specifically that Mr. Meadows has no valid legal ground to refuse to testify and produce relevant documents regarding the seven topics identified above.  The Court need not resolve any triable factual dispute to issue such a ruling.

**I.      Defendants are Entitled to Summary Judgment on All of Mr. Meadows's Claims**

**F.      The Select Committee Has a Valid Legislative Purpose**

As noted earlier, the D.C. Circuit has already determined that the Select Committee has a valid and "uniquely compelling" legislative purpose.  *Trump v. Thompson*, 20 F.4th at 37-38. That decision governs here, and Mr. Meadows's claims to the contrary fail.  *See* Am. Compl. ¶¶ 130-46.

In that case, former President Trump sued the Select Committee and the National Archives to enjoin the latter from producing to the Select Committee Presidential records concerning the January 6th attack.  The district court denied the requested injunction, and the D.C. Circuit affirmed.  The D.C. Circuit recognized that, "[e]ven under ordinary circumstances, there is a strong public interest in Congress carrying out its lawful investigations, and courts must take care not to unnecessarily halt the functions of a coordinate branch."  *Trump v. Thompson*, 20 F.4th at 48 (internal quotation marks and citations omitted).

As to the Select Committee's purpose, the D.C. Circuit explained:

The very essence of the Article I power is legislating, and so there would seem to be few, if any, more imperative interests squarely within Congress's wheelhouse than ensuring the safe and uninterrupted conduct of its constitutionally assigned business.  Here, the House of Representatives is investigating the single most deadly attack on the Capitol by domestic forces in the history of the United States.

16

*Id*. at 35.

The D.C. Circuit accordingly concluded that "the January 6th Committee plainly has a 'valid legislative purpose' and its inquiry concern[s] a subject on which legislation could be had." *Id*. at 41 (citation omitted).  The Supreme Court summarily denied Mr. Trump's request for an injunction pending review of the D.C. Circuit's decision, and then denied certiorari.  *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), *injunction denied*, 142 S. Ct. 680 (2022), *cert. denied*, 142 S. Ct. 1350 (2022) (mem.).  Recently, additional courts have likewise ruled that the Select Committee is pursuing legitimate legislative purposes.  Oral Arg. Tr. at 34, *Budowich v. Pelosi*, ECF 27; Order at 9 & n.12, *Eastman v. Thompson*, ECF 43.  No court has ruled or suggested otherwise.

### G.     The Select Committee Is Validly Constituted and Has Issued Valid Subpoenas.

Under the Constitution's Rulemaking Clause, courts cannot override Congress's interpretation of its own resolutions and rules.  Indeed, two courts have already rejected claims that the Select Committee is improperly constituted, or that it is not operating in accordance with its rules.

#### 1.     The Rulemaking Clause Prevents Federal Courts from Second-Guessing the Select Committee's Internal Operations

Under the Rulemaking Clause, "[e]ach House may determine the Rules of its Proceedings."  U.S. Const., Art. I, § 5, cl. 2; *see Baker v. Carr*, 369 U.S. 186, 233 (1962).  That provision is a critical aspect of the Legislative Branch's constitutional design as it "grants the House the power to make its own Rules about its internal proceedings," *Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013), which "only empowers Congress to bind itself," *INS v. Chadha*, 462 U.S. 919, 955 n.21 (1983); *see also Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1343 (D.C. Cir. 1975) (Rulemaking Clause is a "broad

grant of authority"). Both the Rulemaking Clause and separation-of-powers principles have led courts to avoid taking on interpretations of Congressional rules that conflict with Congress's own interpretations. *See, e.g., Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) ("Accordingly, we accept the House's interpretation of its own rules … thus eliminating any risk of running afoul of either the Rulemaking Clause or separation-of-powers principles.") (citation omitted).

The D.C. Circuit has long emphasized the deference owed to Congress in determining and interpreting its own rules, and that court has reaffirmed this approach in recent years. *See Barker*, 921 F.3d at 1130 ("The Rulemaking Clause of Article I, Section 5 of the Constitution clearly reserves to each House of the Congress the authority to make its own rules, and as we have explained, interpreting a congressional rule differently than would the Congress itself is tantamount to *making* the rules—a power that the Rulemaking Clause reserves to each House alone.") (emphasis in original; internal quotation marks and citation omitted).

Thus, a court's authority to interpret internal rules of either chamber of Congress is limited to situations where such interpretation "requires no resolution of ambiguities." *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995); *accord Metzenbaum v. FERC*, 675 F.2d 1282, 1287 (D.C. Cir. 1982) ("To decide otherwise would subject Congressional enactments to the threat of judicial invalidation on each occasion of dispute over the content or effect of a House or Senate rule.").[13]

In addition to the deference the D.C. Circuit has held must be accorded Congress in determining its own rules, such decisions are also entitled to the "presumption of regularity,"

---

[13] *Cf. Yellin v. United States*, 374 U.S. 109, 114-115, 119 (1963) (reversing contempt of Congress conviction because a House committee did not follow that committee's clear rules on executive session testimony).

which the Select Committee and Members of Congress, like all government officials, enjoy. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (internal quotation marks and citation omitted).  None of the allegations in the Amended Complaint come close to demonstrating the "clear evidence to the contrary," required to overcome that presumption. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926).

Courts that have heard challenges to the Select Committee's activities have very recently recognized their obligation to defer to the House's interpretation of its own rules and ruled against parties urging courts to reject the House's interpretation of its rules.  In *Budowich, supra*, the district court indicated that it would reject arguments like the ones Mr. Meadows makes here: the court would "have to defer to Congress in the manner of interpreting its rules," and that the court would be "usurping Congressional authority" were it to hold that the Select Committee was not validly composed.  Jan. 20, 2022 Oral Arg. Tr. 34:1-5, *Budowich v. Pelosi*, No. 21-cv-3366 (JEB) (D.D.C. Jan. 20, 2022).  Judge Carter, in Federal District Court for the Central District of California, also recently reached a similar conclusion.  *Eastman*, ECF No. 43 at 9 & n. 12 ("A court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'") (citations omitted); *see also Vander Jagt v. O'Neill*, 699 F.2d 1166, 1175-77 (D.C. Cir. 1982) (rejecting the "startlingly unattractive idea, given our respect for a coequal branch of government, for us to tell the Speaker" whom to appoint to committees).

### 2.    The Select Committee Is Properly Composed

Despite the Rulemaking Clause and the rulings above, Mr. Meadows asks this Court to step in and invalidate the House's interpretation of its own resolution and rules.

*First*, Mr. Meadows complains that the Speaker has appointed only nine Members to the Select Committee, rather than the thirteen identified by the Resolution.  Am. Compl. ¶¶ 121, 124; H. Res. 503 § 2(a).  As indicated above, the current composition of the Select Committee

follows from a decision by the Minority Leader to voluntarily withdraw his own recommendations, and to refuse thereafter to participate further in the consultation process identified in the Resolution.  *See supra* at 8-9.  After receiving advice from the House Parliamentarian and considering House precedent, the Speaker interpreted and applied House Resolution 503 and the House Rules in this unique set of circumstances.  She concluded that the Minority Leader's refusal to consult further and participate in the appointment process would not prevent the Select Committee from operating, so long as it did so with an appropriate quorum. *See supra* at 7-8.  Notwithstanding the Minority Leader's withdrawal from the process, the Select Committee has a quorum to do business pursuant to House Resolution 503 and House Rule XI.2(h).  SOMF ¶ 7.  As the Speaker concluded, nothing in House Resolution 503 enabled the Minority Leader or the House Republican Conference to halt operation of the Select Committee by withdrawing nominees and refusing to participate in the appointment consultation process.

House precedent regarding other select committees directly supports the Speaker's decision here.  In the 109th Congress, for instance, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty Members, using language similar to what is before this Court today.  *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee ***shall*** be composed of 20 members appointed by the Speaker …." (emphasis added)).  House Speaker Dennis Hastert appointed only eleven Members, a quorum to do business, all of whom were from the majority Republican Party.  *See* SOMF ¶ 7; 151 Cong. Rec. 20873 (bound ed. Sept. 21, 2005).  Further, a resignation was accepted, and another majority party Member appointed, pursuant to House Resolution 437, 109th Cong. (2005). *See* 151 Cong. Rec. 21177-78 (bound ed. Sept. 26, 2005).  The Katrina Select Committee also issued subpoenas.  *See* H. Rep. No. 109-377, at 23 (2006) (noting that the

Katrina Select Committee issued a subpoena to the Department of Defense, and that it was complied with).

Indeed, as the Speaker recognized, nothing in House Resolution 503 requires that *all* thirteen potential Members participate for the Select Committee to function.  In fact, House Resolution 503 expressly provides that "one-third of the Members of the Select Committee shall constitute a quorum" to conduct business, and that only two Members constitute a quorum for taking testimony or receiving evidence.  H. Res. 503, 117th Cong. § 5(c)(3).  The nine Members appointed by the Speaker clearly constitute a quorum consistent with House Resolution 503 and House Rule XI.2(h).  House Resolution 503 expressly contemplates the possibility of "vacancies," but does not provide a specific timeline for filling them.  *Id.* at § 2(c).  Nor does House Resolution 503 provide that the Select Committee becomes invalid or that it must suspend all action when vacancies arise.  *Id.*  Committees of the House routinely operate with vacancies. As of April 22, 2022, seven House Committees have at least one vacancy and nevertheless continue to operate normally.  It would invite chaos to permit litigants to bring court challenges to any actions of those or other House Committees based on disputes about the House's application of its own procedural rules.  That is precisely what the Rulemaking Clause should prevent.  Simply put, nothing in House Resolution 503 enables the Minority Leader to halt operation of the Select Committee by declining to participate in the appointment process.

*Second*, Mr. Meadows complains that none of the nine Members appointed by the Speaker were "appointed after consultation with the minority member as required by the authorizing resolution."  Am. Compl. ¶¶ 121, 125.  But consultation did occur, before the Minority Leader halted his further cooperation and withdrew from the process.  The Speaker interpreted and applied House Resolution 503 and the House Rules.  The power to appoint House

Members to select committees rests exclusively with the Speaker of the House. *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and conference committees ordered by the House."); 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (authorizing the Speaker to "accept resignations and to make appointments authorized by law or by the House"); H. Res. 503, 117th Cong. § 2 (providing that the Speaker shall appoint the Select Committee members). This is consistent with longstanding House precedent. *See* 8 *Cannon's Precedents of the U.S. House of Representatives* Ch. 234 § 2172 (1936) (citing "instances in which the majority declined to recognize minority recommendations for committee assignments.").

Had the House intended to provide the Minority Leader with more authority regarding the appointment of Select Committee members, it could have provided such a requirement, as it has in the past. For example, in the 116th Congress, the House created two Select Committees and required that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader." *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019) (Select Committee on the Climate Crisis); *id.* at § 201(b)(3) (Select Committee on the Modernization of Congress). Similarly, had the House wanted to delegate appointment power directly to the Minority Leader, it could have done so. *See*, *e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

The language used by House Resolution 503, "after *consultation* with the Minority Leader," H. Res. 503, 117th Cong. § 2(a) (emphasis added), allows the Speaker greater authority regarding the appointment of all Members. "Consultation" means to "seek[] advice or information of.'" *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) (internal quotation marks omitted); *see* Black's Law Dictionary (11th ed.

2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone").  This language is consistent with House practice and precedent:  The same language was used in the resolutions that created both the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, *see supra* at 20, and the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi, *see* H. Res. 567, 113th Cong. § 2(a) (2014).

Here, House Resolution 503 was followed:  The Minority Leader *was* consulted.  Am. Compl. ¶¶ 55-56.  Indeed, as Mr. Meadows admits, the Minority Leader made several suggestions to the Speaker regarding minority party Members to serve on the Select Committee, *see id.* at ¶ 56 (noting that the Minority Leader suggested Reps. Jim Banks of Indiana, Rodney Davis of Illinois, Jim Jordan of Ohio, Kelly Armstrong of North Dakota, and Troy Nehls of Texas).  The fact that the Speaker—using the authority provided to her by the House Rules, the January 4, 2021 Order of the House, and House Resolution 503—decided that the Select Committee would go forward with nine members—a quorum—when Representatives Davis, Armstrong, and Nehls were withdrawn and refused to serve does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.

*Third*, even if there were some genuine reviewable question here regarding the Speaker's interpretation of the House rules (and there is not), the full House has repeatedly spoken on this precise issue, affirming and ratifying the Speaker's decision regarding the composition of the Select Committee.  For example, on July 26, 2021, Minority Leader McCarthy offered a privileged resolution on the floor the House that began with the following clause, "[w]hereas, Speaker Pelosi's refusal to seat all five Republican Members directly harms the legitimacy, credibility, and integrity of the proceedings of the Select Committee."  H. Res. 554, 117th Cong. (2021). The privileged resolution would have condemned the Speaker and called on the Speaker

to appoint all of the Minority leader's choices.  The House dismissed, or in parliamentary terms, "tabled," the Minority Leader's resolution by a vote of 218 yeas and 197 nays. 167 Cong. Rec. H3885–3886 (daily ed. July 26, 2021).  Since that time, the House has ratified the Speakers' interpretation of House rules regarding the Select Committee's composition by voting to issue contempt referrals regarding non-compliance with Select Committee subpoenas, despite the same objections regarding Select Committee composition that Mr. Meadows makes again here.[14]  Again, the Constitution's Rulemaking Clause prevents a court from second-guessing the House of Representatives in this context.  *Barker*, 921 F.3d at 1130; *see also* ECF 43, *Eastman*, No. 8:22-cv-00099, at 9, n.12; *Vander Jagt*, 699 F.2d at 1175.

*Fourth*, Mr. Meadows also complains that the subpoena is invalid because the Select Committee "has no ranking minority member" and, therefore, "Chairman Thompson failed to

---

[14] The House's affirmation of the Select Committee's activity has involved thorough and considered processes.  For example, before the House voted to adopt the Select Committee's contempt resolution with respect to Mr. Meadows, the report on his contempt was brought before the Rules Committee of the House.  That Committee—which is charged with jurisdiction over the rules and order of business of the House—concluded in its report (H-Rpt. 117-217) that the Select Committee's report on Mr. Meadows was in keeping with procedural requirements of the House.  *See supra* at 15.  And when the resolution on Mr. Meadows's contempt was debated before the full House, several Members of Congress raised the argument about the composition of the Select Committee.  *See supra* note 15; *see also* 168 Cong. Rec. H4217 (Apr. 6, 2022) (specifically raising these challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Dan Scavino).  When this issue has been presented to all of these bodies and officials—the Select Committee, the Rules Committee, the Parliamentarian, the Speaker, and the full House of Representatives—the interpretive arguments Mr. Meadows now presents have been rejected.  The full House has now approved the Select Committee's referrals of Stephen Bannon, Mark Meadows, Peter Navarro, and Dan Scavino for contempt of Congress.  *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino).  These resolutions were reported by the Select Committee, approved for floor consideration by the House Rules Committee and approved by the full House.  *See* 167 Cong. Rec. H5768-69, 117th Cong. (daily ed. Oct. 21, 2021) (vote on Bannon); *id.* at H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022).  The full House's ratification of the referrals reinforces that Mr. Meadows's objections to its composition cannot be accepted.

make the requisite consultation before issuing the subpoena that compelled Mr. Meadows to appear for a deposition." Am. Compl. ¶ 128.[15]  That argument, too, is wrong. To the extent House Resolution 503 requires consultation with the "ranking minority member" prior to the issuance of a deposition subpoena, that requirement was satisfied by consultation with Vice Chair Liz Cheney.  Representative Cheney, by virtue of being the first minority party Member appointment to the Select Committee, is, by definition, the senior ranking minority Member of the Select Committee.  Consistent with House practice and precedent, the term "ranking member" means the first Member of the minority party appointed to the Select Committee by the Speaker.  *See, e.g.*, H. Res. 10, 117th Cong. (2021) (containing ranking minority member appointments to the standing Committees of the House, colloquially referred to as "ranking members").  That interpretation should not be subject to judicial review.  Here, the senior minority Member on the Select Committee (the first minority Member appointed) is Vice Chair Liz Cheney.  That is sufficient for purposes of House Resolution 503, as ratified by the full House of Representatives.  *See supra* at 25, n.16.  The Rulemaking Clause of the Constitution requires that the judiciary defer to the House regarding the interpretation and application of the House's own rules and procedures.

---

[15] Notably, Mr. Meadows does not object to the issuance of the subpoena to him for the production of documents.  Nor could he.  House Resolution 503 does not require consultation with the ranking minority Member before issuing a subpoena for documents; instead, it provides that the "chair of the Select Committee may authorize and issue subpoenas pursuant to clause 2(m) of [House] rule XI."  H. Res. 503, 117th Cong. § 5(c)(4).  In turn, House Rule XI.2(m) permits issuance of subpoenas for documents when the power to authorize and issue subpoenas has been "delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe."  *Id.*  Because House Resolution 503 specifically delegates to the Chairman of the Select Committee the power to authorize and issue subpoenas, it is consistent with House Rule XI.2(m)(3)(A)(i).

### H. Executive Privilege Does Not Authorize Mr. Meadows to Refuse to Appear and Testify or Provide Documents Requested by the Select Committee

Mr. Meadows claims his "conversations with the President, Vice President, and other senior executive officials are covered by executive privilege, as is any information regarding executive officials' deliberative processes regarding election security." Am. Compl. ¶ 177. Mr. Meadows appears to rely on a purported invocation of executive privilege by former President Trump, Am. Compl. ¶ 75, but fails to meet the requirements to invoke these qualified privileges.

As an initial matter, former President Trump has not properly invoked privilege over Mr. Meadows's documents or testimony. He has never directly or formally communicated that position to the Select Committee. As the Supreme Court has recognized, executive privilege "belongs to the Government and must be asserted by it," and there must be "a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953) (upholding invocation of the state secrets privilege involving protection of classified national security information). Mr. Meadows therefore cannot simply rely on former President Trump's purported instruction to him in refusing to comply with the Select Committee's subpoena.[16]

Indeed, Mr. Meadows has articulated only "generalized concerns for Executive Branch confidentiality." *Trump v. Thompson*, 20 F.4th at 33. The D.C. Circuit has already held that "[u]nder *any* of the" potentially applicable tests governing assertions of executive privilege, "the profound interests in disclosure advanced by President Biden and the January 6th Committee far

---

[16] *See* Procedures Governing Responses to Congressional Requests for Information, Presidential Memorandum 2-3 (Nov. 4, 1982), https://www.justice.gov/ola/page/file/1090526/download ("If the President decides to invoke executive privilege, the Department Head shall advise the requesting Congressional body that the claim of executive privilege is being made with the specific approval of the President.").

exceed" such "generalized concerns." *Id.* (emphasis added); *see also id.* at 38-39 ("Nor is such a 'generalized interest in confidentiality,' sufficient for a court to cast aside the January 6th Committee's exercise of core legislative functions, let alone enough for a court to throw a wrench into the ongoing working relationship and accommodations between the Political Branches.") (citation omitted). Like in *Trump v. Thompson*, "the [Select] Committee has—as President Biden agrees—demonstrated a specific and compelling need for [Mr. Meadows's] records because they provide a unique and critically important window into the events of January 6th that the [Select] Committee cannot obtain elsewhere." *Id.* 44-45. Mr. Meadows's "generalized assertion of privilege" must therefore "yield to the" Select Committee's "demonstrated, specific need" for the documents. *Id.* at 44.

In such circumstances, Mr. Meadows "bears the burden of at least showing some weighty interest in continued confidentiality that could be capable of tipping the scales back in his favor, and of 'mak[ing] particularized showings in justification of his claims of privilege[.]'" *Id.* at 38. He has done neither, nor could he. *See id.* (rejecting executive privilege claim because the former President had "not identified any specific countervailing need for confidentiality tied to the documents at issue, beyond their being presidential communications;" nor "made even a preliminary showing that the content of any particular document lacks relevance to the [Select] Committee's investigation"). Mr. Meadows's privilege assertions therefore fail at the threshold.

## I.    The Testimony and Documentary Information at Issue in this Motion

As explained above, the Select Committee's motion seeks summary judgment as to Mr. Meadows's refusal to appear for his deposition and produce documents on seven specific topics that the Select Committee identifies and describes briefly.

To illustrate that the Select Committee's "profound interest in disclosure . . . far exceed[s] [former President Trump's] generalized concerns for Executive Branch confidentiality," *see Trump v. Thompson*, 20 F.4th at 33, and to assist the Court in understanding the nature of the information sought from Mr. Meadows and the topics he is seeking to shield through his generalized objections, the Select Committee identifies certain relevant investigative material it has obtained.  These investigative materials are offered only to help identify and describe the Select Committee's interest in the specific information sought from Mr. Meadows— for its investigative purposes.  The Court need not address or resolve any of the underlying factual issues in the Select Committee's investigation to rule that Mr. Meadows lacks a legal basis to defy the Select Committee's subpoena as to these issues.  Thus, none of this illustrative, investigative material could present a genuine issue of material fact precluding summary judgment.

*Topic 1*:  *Testimony regarding non-privileged documents (including text and email communications) Mr. Meadows has already provided to the Select Committee in response to his subpoena and related testimony about events Mr. Meadows has already publicly described in his book and elsewhere.*

Certain of the text message exchanges Mr. Meadows produced in response to the Select Committee subpoena have already been made public.[17]  For example, Ms. Laura Ingraham of the Fox News Channel texted Mr. Meadows repeatedly, urging that the President immediately instruct his supporters to leave the Capitol:

> Laura Ingraham:  Hey Mark, The President needs to tell people in the Capitol to go home.

---

[17] Vice Chair Cheney on Recommending Mark Meadows for Criminal Contempt, January 6th Committee, YouTube (Dec. 13, 2021), https://perma.cc/2JPJ-H6CZ.

Laura Ingraham:  This is hurting all of us.[18]

But the President did not take the steps Ms. Ingraham and many others desperately urged (instructing his violent supporters to leave the Capitol) until 4:17 p.m. that afternoon—more than one hour and 45 minutes *after* Ms. Ingraham's messages.  Likewise, President Trump's son also texted Mr. Meadows:

> Don Trump Jr:  He's got to condemn this shit.  Asap.  The Capitol police tweet is not enough.

> Mark Meadows:  I am pushing it hard.  I agree.[19]

Other examples of relevant text messages abound, including a number of messages predating January 6th regarding the Trump campaign's planning for that day.  Again, some of these have previously been made public as well, including two exchanges with Fox News host Sean Hannity.  On December 31, 2020, Sean Hannity sent Mr. Meadows the following message:

> Sean Hannity: We can't lose the entire WH counsels office. I do NOT see January 6 happening the way he is being told.[20]

On January 5, 2021, a similar exchange occurred:

> Sean Hannity:  I'm very worried about the next 48 hours.

---

[18] *See* Ex. F to Decl. of Timothy Heaphy, Text Messages Between Mark Meadows and Laura Ingraham.  Mr. Meadows's text messages and the testimony of other officials show he was in the Oval Office dining room with President Trump that afternoon.  *See* Ex. P to Decl. of Timothy Heaphy, Hutchinson Tr. 134.

[19]  *See* Ex. H to Decl. of Timothy Heaphy.  This is one of many similar text message exchanges to or from Mr. Meadows during the violence.  In addition, witnesses who were present at the White House during this period confirm that Mr. Meadows was with the President, and multiple White House staff were urging the President to take action to halt the violence. Ex. I to Decl. of Timothy Heaphy, Kellogg Tr. 114-15, 129-30, 139-41.

[20] Ex. J to Decl. of Timothy Heaphy, December 31, 2020 Text Message from Sean Hannity to Mark Meadows.

Sean Hannity:  Pence pressure.  WH counsel will leave.[21]

Mr. Meadows also received text messages from multiple members of the House Freedom Caucus.  On January 1, 2021, at 4:17 p.m., Mr. Meadows received this message regarding the planning for the Joint Session of Congress on January 6th:

Rep. Chip Roy:  If POTUS allows this to occur . . . we're driving a stake in the heart of the federal republic . . . [ellipses in original][22]

Certain text communications with Members of Congress suggest that Mr. Meadows himself "pushed" for Vice President Pence to take unilateral action to reject the counting of electoral votes on January 6th.[23]  And while Mr. Trump's widely publicized call with Georgia Secretary of State Brad Raffensperger was ongoing, Mr. Meadows exchanged text messages regarding the call with another member of the Georgia government.[24]  In addition, Mr. Meadows communicated repeatedly by text with Congressman Scott Perry regarding a plan to replace Department of Justice leadership in the days before January 6th.[25]

---

[21] Ex. K to Decl. of Timothy Heaphy, January 5, 2021 Text Messages from Sean Hannity to Mark Meadows.

[22] Ex. L to Decl. of Timothy Heaphy, January 1, 2021 Text Message from Rep. Chip Roy to Mark Meadows.

[23] Ex. M to Decl. of Timothy Heaphy, Text Messages Between Mark Meadows and Rep. Jim Jordan (Rep. Jordan: "On January 6, 2021, Vice President Mike Pence, as President of the Senate, should call out all electoral votes that he believes are unconstitutional as no electoral votes at all ...."  Mark Meadows: "I have pushed for this. Not sure it is going to happen.").

[24] Ex. N to Decl. of Timothy Heaphy, January 2, 2021 Text Messages Between Mark Meadows and then-Dep'y Sec. of State Jordan Fuchs.

[25] Ex. O to Decl. of Timothy Heaphy, Text Messages Between Mark Meadows and Rep. Scott Perry.  Testimony from White House staff demonstrates Mr. Meadows's important role in that effort.  Ex. G to Decl. of Timothy Heaphy, Hutchinson Cont'd Tr. 155-56.  Other testimony obtained by the Committee demonstrates the plan contemplated that the new Acting Attorney General would change the Department's factual conclusions regarding election fraud.  Ex. Q to Decl. of Timothy Heaphy, Donoghue Tr. 77-81; *see also*, Ex. R to Decl. of Timothy Heaphy, Draft Letter from DOJ to Georgia Officials dated Dec. 28, 2020.

Mr. Meadows has produced all of this information without any privilege claim and has published his accounts and recollections in a book addressing a number of relevant issues. SOMF ¶¶ 25, 27.  In his book, *The Chief's Chief* (which was released immediately before Mr. Meadows abruptly stopped engaging with the Select Committee over his productions and testimony), Mr. Meadows describes specific conversations that he had with Mr. Trump while he was the President.  SOMF ¶ 28.  These descriptions included, among other things, discussions about fraud in the election and the January 6th attack on the United States Capitol.  SOMF ¶ 29. In one passage about the election, Mr. Meadows quotes Mr. Trump directly, and in a passage about January 6, Mr. Meadows describes a conversation he had with Mr. Trump after Mr. Trump spoke to rally goers.[26]

**Topic 2**:  *Testimony and documents regarding post-election efforts by the Trump campaign, the Trump legal team, and Mr. Meadows to create false slates of Presidential electors, or to pressure or persuade state and local officials and legislators to take actions to change the outcome of the 2020 presidential election.*

As indicated, Mr. Meadows participated, as a functionary of the Trump campaign, in activities intended to result in actions by state officials and legislatures to change the certified results of the election.  Thus, under D.C. Circuit precedent, documents and testimony regarding events in this capacity are not subject to claims of executive privilege.  *See In re Sealed Case (Espy)*, 121 F.3d 729, 752 (D.C. Cir. 1997) ("Of course, the [presidential communication] privilege only applies to communications that these advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters.")  One such example is the call with Georgia Secretary of State

---

[26] Mark Meadows, *The Chief's Chief* 259, 261 (2021).

Raffensperger, and other related efforts to change the election results in Georgia.[27]  Other

examples are numerous.  *See supra* at 10, 30.  For example, Mr. Meadows was also involved in

an effort to generate so-called alternative slates of electors for certain states which falsely

certified that President Trump rather than President Biden had been victorious.  *See supra* at 13-

14.  The Select Committee now has testimony from other White House staff that Mr. Meadows

and certain congressmen were advised by White House Counsel that efforts to generate false

certificates did not comply with the law:

> Q:  And so, to be clear, did you hear the White House Counsel's Office say that this plan
>
> to have alternate electors meet and cast votes for Donald Trump in States that he had lost
>
> was not legally sound?
>
> A:  Yes, sir. [28]

Despite that advice, the plan moved forward.

> **Topic 3**:  *Testimony and documents relating to communications with Members of*
>
> *Congress in preparation for and during the events of January 6th.*

As indicated, Mr. Meadows engaged in a great number of communications with

Congress, both before and *on January 6th* regarding the events of that day.  For example, the

Select Committee is aware that Mr. Meadows communicated with Congressmen Jim Jordan,

Scott Perry, and others repeatedly.[29]  Mr. Meadows has supplied no basis for his refusal to testify

regarding those communications.

---

[27] Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Washington Post (Jan. 5, 2021), https://perma.cc/5SMX-4FPX.

[28] Ex. G to Decl. of Timothy Heaphy, Hutchinson Cont'd Tr. 64; *see generally id.* at 61-68.

[29] *See, e.g.*, Ex. P to Decl. of Timothy Heaphy, Hutchinson Tr. 45-47, 72-73, 77-78, 142; Ex. G to Decl. of Timothy Heaphy, Hutchinson Cont'd Tr. 146-48.

***Topic 4***:   *Testimony and documents regarding the plan, in the days before January 6th,*
*to replace Acting Attorney General Rosen with Jeffrey Clark so that the Department of Justice*
*could corruptly change its conclusions regarding election fraud.*

Mr. Meadows participated in multiple communications with persons involved in the
effort to replace the Acting Attorney General in the days before January 6th.  He communicated
with Congressman Scott Perry about elevating Assistant Attorney General Jeffrey Clark.[30]   Other
communications relate to issues on which President Trump has not asserted privilege or
immunity claims; indeed, the Select Committee has already received testimony regarding the
President's communications with White House Counsel and multiple Justice Department
officials on these issues.[31]  Evidence shows that Mr. Clark intended, if appointed, to issue a
series of letters changing the Department's position and giving credence to President Trump's
allegations that the election was stolen.[32]  The Select Committee believes that such letters using
Department of Justice letterhead, would have lent the imprimatur of the Department of Justice to,
and appear to legitimize, false claims that the election was stolen if released prior to January 6th

---

[30] *See, e.g.,* Ex. O to Decl. of Timothy Heaphy.

[31] Ex. S to Decl. of Timothy Heaphy, Rosen Tr. 90 ("I have the luxury today of being able to
share conversations with the President, with the President's counsel, because the Department of
Justice on behalf of the current President and the counsel for the past President [are] not
objecting."); *see also id.* at 60, 96-97, 103-11.

[32] *See* Ex. Q to Decl. of Timothy Heaphy, Donoghue Tr. 77-81, 123-24 (discussing the proposed
letter to states and Oval Office meeting); Ex. S to Decl. of Timothy Heaphy, Rosen Tr. 128
("[Clark] advocated not just that the letter be sent but that there be public assertions about the
improprieties with regard to the 2020 election."); *id.* at 127 (confirming that if Clark had been
appointed Acting Attorney General, he would have sent the proposed "proof of concept" letter to
State officials); *See* Ex. R to Decl. of Timothy Heaphy (the letters would have falsely stated that
the Department of Justice had "identified significant concerns that may have impacted the
outcome of the election in multiple states" and encouraged state legislatures to call themselves
into special sessions related to the "appointment of Presidential Electors" in advance of the then-
approaching January 6, 2021 Joint Session of Congress).

and could thereby have mobilized an even more significant, violent attack. (No subsequent effort by Department of Justice staff to oppose such revelations could likely have put that genie fully back in the bottle in time.)

*Topic 5*:  *Testimony and documents relating to efforts by President Trump to instruct, direct, persuade or pressure then Vice President Mike Pence to unilaterally refuse to count electoral votes on January 6th.*

The Twelfth Amendment to the U.S. Constitution identifies the role that the Vice President, as President of the Senate, must play in Congress's proceeding to count electoral votes:  "*The President of the Senate shall*, in the presence of the Senate and House of Representatives, *open all the certificates and the votes shall then be counted*; The person having the greatest Number of votes for President, shall be the President...." (emphases added).  No ambiguity in that provision allowed the Vice President to refuse to count or delay the count of the certified electoral slates from any U.S. state on January 6th.  Nor could (or did) any provision of the Electoral Count Act.  And yet this is exactly what President Trump instructed, directed, pressured, and attempted to persuade the Vice President to do.  *See* Order at 32-40, 44, *Eastman v. Thompson,* No. 8:22-cv-00099 (Mar. 28, 2022), ECF No. 260 ("The illegality of the plan was obvious.") ("Their campaign was not confined to the ivory tower—it was a coup in search of a legal theory.").[33]  When those efforts did not succeed, President Trump issued a tweet about Vice

---

[33] For example, on January 4, 2021, President Trump met with Vice President Pence and his staff to discuss the Vice President's ability to alter the electoral count on January 6th. *See* Ex. F to Cong. Defs.' Br. in Opp. to Pl.'s Privilege Assertions at 82, 95, *Eastman v. Thompson*, No. 8:22-cv-00099 (C.D. Cal. Mar. 3, 2022), ECF No. 164-11. After this meeting, the President continued to pressure the Vice President both publicly and privately. At 1:00 a.m. on January 6th, President Trump tweeted: "If Vice President @Mike_Pence comes through for us, we will win the Presidency ... Mike can send it back!" Donald J. Trump (@realDonaldTrump), Twitter (Jan. 6, 2021 1:00 AM), https://perma.cc/9EV8-XJ7K.  At 8:17 a.m., the President again tweeted: "States

President Pence that resulted in further violence at the Capitol.[34]   Well after the violence was

underway, John Eastman (a lawyer assisting President Trump's effort to overturn the election)

continued to press the Vice President's team to reject certified electoral votes.  (Order at 11,

*Eastman v. Thompson*, No. 8:22-cv-00099 (Mar. 28, 2022), ECF No. 260 ("At 11:44 pm, Dr.

Eastman sent one final email to persuade Jacob to change his mind: 'I implore you to consider

one more relatively minor violation and adjourn for 10 days ....'."). Evidence obtained by the

Select Committee suggests that Mr. Meadows has knowledge relevant to each of these issues.

  *Topic 6*:  *Testimony and documents relating to activity in the White House immediately*

*before and during the events of January 6th.*

---

want to correct their votes ... All Mike Pence has to do is send them back to the States, AND WE
WIN. Do it Mike, this is a time for extreme courage!"  Donald J. Trump (@realDonaldTrump),
Twitter (Jan. 6, 2021 8:17 AM), https://perma.cc/2J3P-VDBV.  The President also called the
Vice President personally, again pressuring him to take action.  *See* Ex. G to Cong. Defs.' Br. in
Opp. to Pl.'s Privilege Assertions at 87, 90-92, Eastman v. Thompson, No. 8:22-cv-00099 (C.D.
Cal. Mar. 3, 2022), ECF No. 164-12.  And despite the Vice President's repeated statements that
he would not alter or delay the electoral count, the former President raised the issue again to the
crowd gathered on January 6th, urging the Vice President to "stand up for the good of our
Constitution and for the good of our Country," and adding that if Pence did not do so, the
President was "going to be very disappointed in [him]."  Donald J. Trump, President, Speech to
the "Save America March" and rally (Jan. 6, 2021), https://perma.cc/2YNN-9JR3.

[34] *See* Trump supporters threaten to hang Mike Pence at Capitol, YouTube,
https://perma.cc/6KGR-VUE8 (video depicting crowd of Capitol rioters chanting "hang Mike
Pence"); *United States v. Marhsall Neefe and Charles Bradford Smith*, https://perma.cc/4DER-
T44C; Donald J. Trump (@realDonaldTrump), Twitter (Jan. 6, 2021, 2:24 PM),
https://perma.cc/Z9Q5-EANU ("Mike Pence didn't have the courage to do what should have
been done to protect our Country and our Constitution, giving States a chance to certify a
corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously
certify. USA demands the truth!").  *See also* Complaint Affidavit, *United States v. Evans*, No.
21-00016 (D.D.C. Jan. 8, 2021), https://perma.cc/D7WE-CV2K ("They're making an
announcement right now saying if Pence betrayed us you better get your mind right because
we're storming that building."); Grand Jury Indictment, *United States v. Neefe et al.*, No. 21-
00567 (D.D.C. Sept. 8, 2021), https://perma.cc/L5H7-3FJP ("Then we heard the news on [P]ence
... And lost it ... So we stormed"); Complaint Affidavit, *United States v. Black*, No. 21-127
(D.D.C. Jan. 13, 2021), https://perma.cc/8KAL-5HEK ("Once we found Pence turned on us and
that they had stolen the election, like officially, the crowd went crazy. I mean, it became a mob.
We crossed the gate.").

The Select Committee has evidence indicating that the violent rioters on January 6th were motivated by President Trump's repeated claims, over several weeks, that the election was stolen, and his pleas that Americans travel to Washington on January 6th to "StopTheSteal."[35] Mr. Meadows was informed *before* the January 6th proceeding about the potential for violence that day:

> Cassidy Hutchinson:   I know that there were concerns brought forward to Mr. Meadows.  I don't know—I don't want to speculate whether or not they perceived them as genuine concerns, but I know that people had brought information forward to him that had indicated that there could be violence on the 6th.  But, again, I'm not sure if he—what he did with that information internally.

* * *

---

[35] Donald J. Trump (@realdonaldtrump), Twitter (Jan. 1, 2021 2:53 PM), https://perma.cc/WW6S-ENNE. *See generally United States v. Chrestman*, No. 21-00218 (D.D.C. Feb. 11, 2021), https://perma.cc/Z2AX-3CWT; Katelyn Polantz, et al., *Sobbing Capitol rioter described his assault of police Officer Michael Fanone: 'My God. What did I just do?'*, CNN (Dec. 1, 2021), https://perma.cc/V7HJ-QARJ (rioter charged with assaulting Metropolitan Police Department Officer Michael Fanone on January 6th with an "electroshock weapon" told investigators: "Trump called us. Trump called us to D.C. ... If he's the commander in chief and the leader of our country, and he's calling for help—I thought he was calling for help"); Criminal Complaint, *United States v. Grayson*, No. 21-00163 (D.D.C. Jan. 25, 2021), https://perma.cc/4FED-5PXB; Criminal Complaint, *United States v. Cua*, No. 21- 107 (D.D.C. Jan. 29, 2021), https://perma.cc/8ZX7-E9G8; Sargeant Aquilino Gonell Testimony, House Select Committee to Investigate the January 6th Attack on the United States Capitol, *The Law Enforcement Experience on January 6th* (July 27, 2021), https://perma.cc/KG3L-DH65 (Capitol Police Sargeant Aquilino Gonell testifying that during hand-to-hand combat with rioters on the lower west terrace of the Capitol on January 6th "all of them, all of them, were telling us 'Trump sent us.'").  A number of defendants in pending criminal cases have identified President Trump's allegations about the "stolen election" as a motivation for their activities at the Capitol; several also specifically cite President Trump's tweets asking that supporters come to Washington, D.C. on January 6th.  *See, e.g.*, Criminal Complaint, *United States v. Sandlin*, No. 21-88 (Jan. 20, 2021), https://perma.cc/H9G2-G5GC ("I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon."); Grand Jury Indictment, *United States v. Neefe et al.*, No. 21-00567 (Sept. 8, 2021), https://perma.cc/NR5Q-HQZC ("Trump is literally calling people to DC in a show of force. Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there.").

Cassidy Hutchinson:     I just remember Mr. Ornato coming in and saying that we had intel reports saying that there could potentially be violence on the 6th.  And Mr. Meadows said:  All right.  Let's talk about it.[36]

But despite this and other warnings, President Trump urged the attendees at the January 6th rally to march to the Capitol to "take back your country."[37]

Despite urgent pleas from Capitol Hill and from many of President Trump's supporters, President Trump did not act immediately to publicly ask or instruct the violent rioters leave the Capitol.  It is also now clear that Mr. Trump never telephoned his Secretary of Defense that day to order deployment of National Guard, and never contacted any federal law enforcement agency to order security assistance to the Capitol Police.[38]  Information received by the Select Committee indicates that Mr. Trump was in the dining room, watching on his TV, and did not urge his supporters to leave the Capitol for over three hours.[39]  And even at 4:17 p.m. when he released a video, President Trump told those in the Capitol "we love you. You're very special," and at 6:01 p.m. he tweeted, "Remember this day forever!"[40]

---

[36] Ex. P to Decl. of Timothy Heaphy, Hutchinson Tr. 37-38.

[37] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), https://perma.cc/KS28-JJ3V ("So we're going to, we're going to walk down Pennsylvania Avenue ... And we're going to the Capitol ... [and] we're going to try and give our Republicans, the weak ones because the strong ones don't need any of our help. We're going to try and give them the kind of pride and boldness that they need to take back our country.").

[38] *See* Ex. T to Decl. of Timothy Heaphy, C. Miller Tr. 124; Ex. U to Decl. of Timothy Heaphy, McCarthy Tr. 147; Ex. Q to Decl. of Timothy Heaphy, Donoghue Tr. 189-90; Ex. S to Decl. of Timothy Heaphy, Rosen Tr. 190-91.

[39] *See*, *e.g.*, Ex. I to Decl. of Timothy Heaphy, Kellogg Tr. 142-47 (Reflecting on the White House staff's effort on January 6th to persuade President Trump to ask his supporters to leave the Capitol and halt the violence: "I walked up to [Ivanka Trump] on the 7th.... and I told her I appreciated what she did that day and by talking to her dad. And I said: You know, I just thought what you did was to me pretty heroic.").

[40] President Trump Video Statement on Capitol Protesters, C-SPAN (Jan. 6, 2021), https://perma.cc/XCW4-JDA7; Donald J. Trump (@realDonaldTrump) Twitter (Jan. 6, 2021 6:01 PM), https://perma.cc/29AH-HZNV.

*Topic 7*:   *Testimony and documents relating to meetings and communications with individuals not affiliated with the federal government regarding the efforts to change the results of the 2020 election.*

Finally, the Select Committee seeks Mr. Meadows's testimony regarding communications with individuals not affiliated with the federal government, involving reported efforts to change the results of the 2020 election.  Available information indicates that certain of these individuals proposed to the President drastic action invoking some of the Nation's emergency powers provided to the President in statute.[41]  Indeed, one of the non-privileged documents that Mr. Meadows provided indicates that he had a meeting to discuss such actions on or about December 21, 2020.[42]  White House Counsel advised that measures like these would be illegal and threatened to resign (this was one of multiple White House Counsel resignation threats preceding January 6th).[43]

The Select Committee now seeks documents and deposition testimony from Mr. Meadows on these seven discrete topics.  Topics 1-4 and 7 do not involve any relevant privilege claims.  Indeed, Topic 1 relates to documentation that Mr. Meadows has already voluntarily produced to the Select Committee, without any privilege claim at all.  Topics 2 and 3 relate to Mr. Meadows's discussions with persons not within the Executive Branch.  Specifically, Topic 2 relates to Mr. Meadows's activities on behalf of the Trump campaign, not as White House Chief

---

[41] See Memorandum, *Presidential Findings—To Preserve Collect and Analyze National Security Information Regarding the 2020 General Election* (Dec. 16, 2020), https://s3.documentcloud.org/documents/21185950/never-filed-trump-executive-order-2020.pdf (purporting to invoke the National Emergencies Act, among others, to justify the Department of Defense seizing ballot machines used by localities in the election).

[42] Ex. V. to Decl. of Timothy Heaphy, at 2-3.

[43] Ex. G to Decl. of Timothy Heaphy, Hutchinson Cont'd Tr. 138.

of Staff.[44]  Topic 3 relates to discussions with Members of Congress—not other White House officials or the President.  And Topic 4 involves communications with Members of Congress, Scott Perry, and possibly others outside the Executive Branch.[45]  President Trump has already declined to assert privilege on issues related to Mr. Clark's potential appointment as Acting Attorney General (Topic 4).[46]  Likewise, Topic 7 also involves communications with people outside the White House, including members of the Trump political campaign and potentially others supporting the campaign, such as General Flynn, Roger Stone, and others.  The Select Committee is aware of no valid executive privilege claim as to any of these communications.

With regard to Topic 5 (President Trump's efforts to get Vice President Pence to refuse to count electoral votes), any executive privilege claim would face further insurmountable hurdles.  *First*, the President has no Constitutional role in the count of electoral votes.  Any communications on that topic between or on behalf of Mr. Trump and the Vice President necessarily involved Mr. Trump his capacity *as a presidential candidate*, not as President.  *Second,* Mr. Meadows's testimony on that topic involves communications with the Vice President in his role as President of the Senate—which of course is a role within the Legislative and not the Executive Branch.  The Vice President served as part of the Legislative Branch when

---

[44] As noted earlier, *see* n. 8, the Hatch Act does not allow a federal official to act in his official capacity for the purpose of affecting the outcome of an election.  *See* 5 U.S.C. § 7323(a)(1).

[45] *See also* Dalton Bennett and Jon Swaine, *The Roger Stone Tapes*, Wash. Post (Mar. 4, 2022), https://perma.cc/UX82-M2ZP (noting Roger Stone endorsed the effort to install Jeffrey Clark as acting attorney general in January 2021).

[46] Ex. W to Decl. of Timothy Heaphy, August 2, 2021 Letter from Douglas Collins to Jeffrey Clark.  The Select Committee has already gathered testimony on this topic, including testimony on discussions directly with President Trump and President Trump's White House Counsel.  *See, e.g.*, Ex. Q to Decl. of Timothy Heaphy, Donoghue Tr. 123-32.

preparing for and conducting his duties on January 6, 2021.[47]  Therefore, communications about

the proceedings on January 6th with the Vice President and his staff fall outside the ambit of any

executive privilege claim.

Topic 6, by contrast, does potentially involve issues on which claims of executive

privilege *might* conceivably be made.  But as the D.C. Circuit recognized in *Thompson*, the

failure to identify "any specific countervailing need for confidentiality tied to the documents [or

testimony] at issue, beyond their being presidential communications," 20 F.4th at 38, is

outweighed by Congress' "profound" and "uniquely compelling" interest in pursuing this

investigation.  *See id.* at 33 ("Under any of the tests advocated by former President Trump, the

profound interests in disclosure advanced by President Biden and the January 6th Committee far

exceed his generalized concerns for Executive Branch confidentiality.").  That conclusion is

binding here.  *See id.* at 37-38 (holding that any executive privilege was overcome by the Select

Committee's "uniquely compelling need," the sitting President's judgment that release was in the

country's best interest, and the careful compromise negotiated between the two branches of

government).  And, as noted earlier, the Supreme Court denied former President Trump's

entreaties that it should step in and stop the disclosure of the relevant material to the Select

Committee.  *Id.*, *injunction denied*, 142 S. Ct. 680 (2022), *cert denied*, No. 21-932 (2022).

---

[47] *See, e.g.*, Shannen Coffin, SYMPOSIUM: THE UNITED STATES VICE PRESIDENCY: IN
HISTORY, PRACTICE AND THE FUTURE: *Oh, VPOTUS, Where Art Thou? The
Constitutional Situs of the Vice Presidency as Surveyed by a Former Vice Presidential Lawyer*,
44 Pepp. L. Rev. 583, 588, 613 (2017) ("[i]t may be best to conceive of the vice presidency as
part of both political branches of government, with the particular location at any given moment
varying depending on whether the Vice President is performing his executive role of advising
and assisting the President or his legislative role"); *see also* Ex. X to Decl. of Timothy Heaphy,
Engel Tr. 71 (former Assistant Attorney General for OLC explaining that OLC would not advise
Vice President Pence on his role on January 6th because "[i]t is not the role of the Department of
Justice to provide legislative officials with legal advice on the scope of their duties").

Such a conclusion is also appropriate as to those documents on Mr. Meadows's privilege log that he has withheld from production on the basis of a claim of executive privilege. (To the extent that *in camera* review is necessary to make that determination as to specific documents on the Meadows log, the Select Committee seeks such review, and will file a specific motion to that effect if needed.)

### 1.      Nor Is Mr. Meadows Entitled to Testimonial Immunity

Mr. Meadows also argues that the Select Committee's subpoena "improperly attempts to compel testimony by a senior Executive Branch official." Am. Compl. ¶ 170. As indicated, only some of the activities at issue involve Mr. Meadows's activities as an Executive Branch official; many, including Topics 2 and 7, involve his role as a campaign functionary. But even for those activities for which Mr. Meadows was serving as Chief of Staff, he is not absolutely immune from testifying before a Congressional committee. The Court should reject any claim of absolute testimonial immunity for several reasons.

*First*, the current President of the United States has decided that it is not in the best interests of the Executive Branch to assert executive privilege or any form of immunity with respect to Mr. Meadows's deposition testimony on particular subjects within the purview of the Select Committee. ECF 13-14 (Am. Compl. Ex. L). President Biden carefully considered the institutional prerogatives of the Executive Branch and the importance of the Select Committee's investigation. *Id.* "The President believes that the constitutional protections of executive privilege should not be used to shield information reflecting an effort to subvert the Constitution itself, and indeed believes that such an assertion in this circumstance would be at odds with the principles that underlie the privilege." *Id.* "For the same reasons underlying his decisions on

executive privilege, President Biden [] determined that he will not assert immunity to preclude [Mark Meadows] from testifying before the Select Committee." *Id.*

Even if the Court were to consider Mr. Meadows's immunity argument without the benefit of the views of the current President and the Congress, Mr. Meadows would still have no compelling basis to assert absolute immunity. The Supreme Court has repeatedly held that the President himself is not absolutely immune from compulsory legal process. *See Trump v. Vance*, 140 S. Ct. 2412, 2431 (2020) (holding President cannot claim immunity from state criminal grand jury subpoenas); *Clinton v. Jones*, 520 U.S. 681, 684 (1997) (holding a sitting President not immune from civil litigation for acts done before taking office and unrelated to the office); *United States v. Nixon*, 418 U.S. 683, 707 (1974) (rejecting claim that absolute immunity protects Presidents from federal criminal subpoenas). Further, the Court has consistently held that compliance with a Congressional subpoena is a legal requirement "which every person within the jurisdiction of the Government is bound to perform when properly summoned." *See United States v. Bryan*, 339 U.S. 323, 331 (1950).

Neither the Supreme Court nor the D.C. Circuit has decided whether any White House advisors could be immune from compulsory Congressional process in matters involving their official conduct. But the Supreme Court has rejected claims of absolute immunity by Presidential aides in other contexts. *See Harlow v. Fitzgerald*, 457 U.S. 800, 809-10 (1982) (holding that Presidential aides are entitled only to qualified immunity in a suit for damages). And courts in this district have rejected the assertion of absolute immunity from compelled testimony before Congress for senior Presidential advisors.

In *Committee on the Judiciary, U.S. House of Representatives v. Miers*, former White House Counsel Harriet Miers argued that she was absolutely immune from a Congressional

subpoena for testimony.  558 F. Supp. 2d 53, 100 (D.D.C. 2008).  Judge Bates rejected that

claim, noting that there is not "a single judicial opinion that recognizes absolute immunity for

senior presidential advisors in this or any other context."  *Id.* at 99.  The court held that a former

White House Counsel must testify before the Congressional committee, reasoning that Supreme

Court precedent declined to provide such immunity to the President himself; numerous acts of

Congress, such as the Freedom of Information Act, would be rendered a nullity based on such

immunity; and the Office of Legal Counsel opinions that claimed such immunity were

unpersuasive because they cited no case law and were "hastily issued" and "conclusory."  *See id.*

at 103-04.[48]

More recently, building on Judge Bates's reasoning, Judge Jackson similarly rejected a

claim of absolute immunity from compelled testimony by former White House Counsel Don

McGahn.  Judge Jackson concluded that "the *Miers* court rightly determined not only that the

principle of absolute testimonial immunity for senior-level presidential aides has no foundation

in law, but also that such a proposition conflicts with key tenets of our constitutional order."

*Comm. on the Judiciary, U.S. House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 202-

03 (D.D.C. 2019).[49]  Specifically, Judge Jackson agreed with Judge Bates that absolute immunity

for Presidential aides was "all but foreclosed by" the Supreme Court's decisions in *United States*

*v. Nixon, Clinton v. Jones,* and *Harlow v. Fitzgerald, supra. Id.* at 202, 207.  And, recognizing

---

[48] Former White House Counsel Harriet Miers appealed the district court's decision to the D.C. Circuit, but the appeal was ultimately dismissed on voluntary consent of the parties.  *See Comm. on Judiciary of U.S. House of Representatives v. Miers*, No. 08-5357, 2009 WL 3568649 (D.C. Cir. Oct. 14, 2009).

[49] Judge Jackson's opinion as to the House Committee's standing was affirmed by the *en banc* D.C. Circuit.  *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc).  The appeal was ultimately dismissed on voluntary consent of the parties.

that "there may well be circumstances in which certain aides of the President possess confidential, classified, or privileged information," the court explained that, in the context of compelled Congressional testimony, "such withholding is properly and lawfully executed on a question-by-question basis through the invocation of a privilege, where appropriate." *Id.* at 213.

Mr. Meadows appears to be relying on historic opinions from the Office of Legal Counsel ("OLC") to support his position on immunity. But even if they were binding in this forum—which they are not—none addresses a set of circumstances like what the Select Committee is investigating here. None involved a circumstance where the incumbent President has decided not to assert immunity, and none involved a circumstance where a President is alleged to have assembled a violent mob in Washington, D.C., announced that the mob needed to take steps to "take back our country," and told them to march to the Capitol for that purpose. *Trump v. Thompson*, 20 F.4th at 18, 36 (quoting President Trump). The Select Committee is investigating whether, and exactly how, the former President attempted to overturn the lawful results of an election and attack Congress while Congress was attempting to perform its Constitutional duty to effect the peaceful transition of power. No OLC opinion addresses a situation where the Legislative Branch is attempting to uncover what happened when the Executive Branch provoked a violent attack on the Legislative Branch,[50] and then failed to provide immediate security assistance.[51] Separation of Powers principles in this context require

---

[50] Many defendants in pending criminal cases identified President Trump's allegation about the "stolen election" as a motivation for their activities at the Capitol. A number also specifically cited President Trump's tweets asking that supporters come to Washington, D.C., on January 6th. *See supra*, n. 35 (citing Criminal Complaint, *United States v. Sandlin*, No. 21-88 (D.D.C. Jan. 20, 2021); Grand Jury Indictment, *United States v. Neefe et al.*, No. 21-00567 (D.D.C. Sept. 8, 2021)).

[51] OLC opinions have also suggested that subjecting certain Executive Branch officials to public Congressional testimony might unfairly put public pressure on those officials to testify about

that Congress act to preserve its role as a separate and coordinate branch by determining how best to prevent such an attack from ever recurring.  To do so, it must understand exactly what happened.  Indeed, that is the purpose of the Select Committee investigation, and the Select Committee requires Mr. Meadows's testimony for that purpose.

*Second*, to the extent that any form of immunity might exist for a high-ranking White House official (it does not), that immunity must only be *qualified immunity* in this context.[52] And here, the D.C. Circuit has already announced its conclusion (which the Supreme Court refused to enjoin) after balancing the interests of Congress and Donald Trump.  *See Trump v. Thompson*, 20 F.4th at 33 ("profound interests" in disclosure "far exceed [Donald Trump's] generalized concerns for Executive Branch confidentiality").  Mr. Meadows's attempt to rely on qualified immunity to defy a Congressional subpoena should be rejected.

*Finally,* as should be clear from the materials cited here and the privilege logs provided by Mr. Meadows, he was not acting as anything like a typical White House Chief of Staff advising the President on official matters of government policy.  Mr. Meadows was playing a

---

matters on which they would otherwise decline to comment.   Here, the Select Committee has subpoenaed Mr. Meadows's deposition testimony, not his testimony in a public hearing.  The Select Committee is confident that Mr. Meadows's counsel can assert any objections he or she deems appropriate in the deposition without feeling undue public pressure.

[52] The Office of Legal Counsel recognizes that the Supreme Court rejected a claim of absolute immunity made by senior Presidential advisors in the context of a civil suit.  *Immunity of the Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. 5, 12-13 (2014); *see also Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 WL 2315338 (O.L.C.), at *28 (May 20, 2019).  But the factors that the Office relied upon to distinguish Supreme Court caselaw are not persuasive here in the circumstances described above.  Moreover, those OLC opinions did not consider a situation in which the current President has considered the issue and does not object to the witness providing testimony to a Congressional committee.

campaign role, attempting to facilitate a strategy that would have reversed the certified results of

the 2020 election.[53]

Many of Mr. Meadows's activities (and others of which he has knowledge) were

designed to secure the success of one political candidate (Donald Trump) over another candidate

(Joe Biden). Because many of the questions that the Select Committee intends to ask Mr.

Meadows involve his plainly unofficial conduct, there is no legal basis for Mr. Meadows's

refusal to appear for any deposition testimony even under OLC's rejected theories of immunity.

*See supra* at 5-15. Indeed, the OLC opinions on which Mr. Meadows likely relies limit their

conclusions to "matters that occur during the course of discharging [] official duties." *See, e.g.,*

*Immunity of the Director of the Office of Political Strategy and Outreach from Congressional*

*Subpoena*, 38 Op. O.L.C. 5 (2014). This is a longstanding and fundamental limitation in the

OLC's formulations of these immunity theories. *See*, *e.g.*, Memorandum for the Honorable John

W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General,

Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a*

*Congressional Committee* 3 (Mar. 15, 1972) (finding separation of powers does not preclude

---

[53] Dozens of judicial decisions have held that President Trump's claims of election fraud were
not supported by evidence or were legally incorrect. William Cummings, J. Garrison & J.
Sergent, *By the numbers: President Donald Trump's failed efforts to overturn the election*, USA
Today (Jan. 6, 2021), https://perma.cc/683S-HSRC; *see, e.g.*, *Donald J. Trump for President,
Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa. 2020) ("[T]his Court has been presented
with strained legal arguments without merit and speculative accusations, unpled in the operative
complaint and unsupported by evidence."); *Ward v. Jackson*, No. CV-20-0343, 2020 WL
8617817, at *2 (Ariz. Dec. 8, 2020) (plaintiff failed "to present any evidence of 'misconduct,'
'illegal votes' or that the Biden Electors 'did not in fact receive the highest number of votes for
office,' let alone establish any degree of fraud or a sufficient error rate that would undermine the
certainty of the election results"); *Trump v. Wis. Elections Comm'n*, 506 F. Supp. 3d 620, 639
(E.D. Wis. 2020), *aff'd*, 983 F.3d 919, 927 (7th Cir. 2020); *Wood v. Raffensperger*, 501 F. Supp.
3d 1310, 1331 (N.D. Ga. 2020), *aff'd*, 981 F.3d 1307, 1310 (11th Cir. 2020), *cert. denied*, 141 S.
Ct. 1379 (2021).

"Presidential Assistants from appearing before congressional committees" if "the inquiry is related to their private conduct"). In short, Mr. Meadows was acting as a functionary of the Trump campaign and he should not be entitled to any form of immunity at all.

**J.      The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from Verizon Pursuant to a Lawful Subpoena**

The Amended Complaint asserts that the Select Committee's subpoena to Verizon violates the Stored Communications Act, 18 U.S.C. § 2701 *et seq.* ("SCA" or the "Act"). *See* Am. Compl. ¶¶ 155-169. That is wrong as a matter of law because nothing in the Act limits the ability of a Congressional committee to obtain non-content records from a "person or entity providing electronic communication service to the public" via a lawful subpoena. 18 U.S.C. § 2702(a)(1).[54]

Mr. Meadows first suggests that the Verizon subpoena seeks the production "of the contents of communication" because it seeks "calls" and "text messages," Am. Compl. ¶¶ 107, 156. That is incorrect; the Verizon subpoena does *not* in fact seek the contents of any communication. It merely seeks "subscriber information" and "connection records and records of session times and durations." ECF 13-21 at 4 (Am. Compl. Ex. S). Subscriber information is limited to information about the user of the account, associated phone numbers and other identifying numbers. *See id.* Connection records and records of session times and durations simply mean records of the date and time, duration, and sender and recipient of any call, text message, or other communication.[55]

---

[54] The Select Committee agrees with Mr. Meadows that Verizon is such a "person or entity" under the statute.

[55] Connection Records and Records of Session Times and Durations are defined in the Verizon Subpoena as: "All call, message (SMS & MMS), Internet Protocol ('IP'), and data-connection

The Stored Communications Act contains no restrictions on Congress obtaining non-content records through a Congressional subpoena.  The Act generally allows disclosure of non-content records, although it prohibits (with one exception) voluntary disclosure of non-content records to "governmental entit[ies]."  18 U.S.C. § 2702(a)(3), (c)(4).  The definition of the term "governmental entity," as used in the Act, does not include Congress.  *Id.* § 2711(4); *id.* § 6.  And the Act expressly *permits* disclosure to "any person other than a governmental entity."  *Id.* § 2702(c)(6).

The statute's definitional terms make clear that Congress did not intend for the phrase "governmental entity" to include Congress.  *See Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) ("'When a statute includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning.").  The Act defines "governmental entity" as "a department or agency of the United States or any State or political subdivision thereof."  18 U.S.C. § 2711(4).  The terms "department" and "agency" have particular meanings in Title 18, as defined in Section 6.  That provision defines "department" as "one of the *executive* departments enumerated in section 1[now § 101] of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government."  *Id.* § 6 (emphasis added).  It likewise defines "agency" as "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense."  *Id.*  The Select Committee is neither

---

detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections."  ECF 13-21 at 4 (Am. Compl. Ex. S).

an executive department nor a governmental agency, and no "context" in the Stored Communications Act suggests that those terms apply to Congress.

The Supreme Court addressed a similar issue of statutory interpretation regarding the phrase "any department or agency of the United States" in *Hubbard v. United States*, 514 U.S. 695 (1995). That case concerned the applicability of 18 U.S.C. § 1001, forbidding making false statements to "any department or agency of the United States," to the Judicial Branch. *Id.* at 698. The Court noted initially that the definitions in Section 6 presumptively applied to "all of Title 18," including Section 1001. *Id.* at 700. The Court stated it was "incontrovertible" that "agency" did not refer to any court within the Judicial Branch. *Id.* The Court further concluded that nothing in the context of Section 1001 "shows that" the term "department" was intended to apply beyond the Executive Branch. *Id.* (quoting 18 U.S.C. § 6). The Court stated that there is "nothing in the text of the statute, or in any related legislation, that even suggests—let alone 'shows'—that the normal definition of 'department' was not intended." *Id.* at 701.[56]

As in *Hubbard*, the SCA's definition of "governmental entity" and the definition contained in Section 6 make plain that the term "governmental entity" does not apply to Congress. There is nothing in the Act that even suggests, let alone "shows," that Congress intended to include itself in the definition. Moreover, the statute contains other provisions that further reinforce this plain meaning.

---

[56] *Hubbard* overruled *United States v. Bramblett*, 348 U.S. 503 (1955), which held that the statute applied to false statements made to the Legislative Branch. The *Hubbard* Court stated that *Bramblett* "erred by giving insufficient weight to the plain language of §§ 6 and 1001," resulting "in a decision that is at war with the text of not one, but two different Act of Congress." 514 U.S. at 703, 708. After the ruling in *Hubbard,* Congress amended the statute at issue, 18 U.S.C. § 1001. False Statements Accountability Act of 1996 (FSAA), § 2, Pub. L. No. 104-292.

The Act provides that in the case of willful or intentional violations, the "head of the department or agency" in which the violation occurred may subject the violator to administrative discipline.  18 U.S.C. § 2712(c).  But the leadership of Congress and its committees do not constitute a "head" of an agency or department.  As the Supreme Court long ago established, "[t]he term 'head of a Department' means … the Secretary in charge of a great division of the *executive branch* of the government, like the State, Treasury, and War, who is a member of the Cabinet."  *Burnap v. United States*, 252 U.S. 512, 515 (1920) (emphasis added); *see also Trump v. Deutsche Bank AG*, 943 F.3d 627, 642 (2d Cir. 2019) (use of term "head of the agency or department" indicated Congress did not intend Right to Financial Privacy Act to apply to Congressional committee), *vacated on other grounds by Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020); *see also* Aaron R. Cooper, *Congressional Surveillance*, 70 Am. U. L. Rev. 1799, 1825-34 (2021) (surveying statutory text, context, and legislative history and concluding that in the Stored Communications Act Congress intended to exempt itself from the term "governmental entity," *id.* at 1828, 1833).

Accordingly, the plain text of the Stored Communications Act, as well as the overall context and structure of the statute, make clear that Congress is not a "governmental entity" as that term is defined in the Act.  As a result, because the Act expressly permits disclosure of non-content records to "any person other than a governmental entity," 18 U.S.C. § 2702(c)(6), the statute cannot be read to prohibit their disclosure to the Select Committee.

### K.        The Subpoenas at Issue Do Not Violate the Fourth or the First Amendments

Mr. Meadows further challenges the Select Committee's subpoenas based on the Fourth and First Amendments.  Those constitutional claims fail.

1.      **The Verizon Subpoena and the Subpoena to Mr. Meadows Do Not Violate Mr. Meadows's Fourth Amendment Rights**

Mr. Meadows makes various arguments that the subpoenas to him and Verizon for his phone records violate the Fourth Amendment's prohibition on unreasonable searches and seizures.  Each of his arguments is flawed.

a.      **The Subpoenas Are Not Overbroad, and in Any Event, the Select Committee Has Narrowed the Application of the Meadows Subpoena to Seven Discrete Topics.**

The D.C. Circuit recently held in *Trump v. Thompson*, 20 F.4th at 24, that "Congress's power to obtain information is broad and indispensable ... and encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." (internal punctuation and citations omitted).  "[T]he January 6th Committee plainly has a valid legislative purpose and its inquiry concerns a subject on which legislation could be had."  *Id.* at 41 (internal quotation marks and citation omitted).

In light of this holding, Mr. Meadows's argument that the subpoena violates the Fourth Amendment because it "is so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee," Am. Compl. ¶ 204, is mistaken.  A subpoena is not impermissibly overbroad if its call for documents or testimony is within the scope of the Congressional inquiry at issue.  *See McPhaul v. United States*, 364 U.S. 372, 382 (1960).  As described above, the Select Committee's inquiry includes examining the January 6th attack as well as its "circumstances" and "causes," to inform a consideration of "changes in law, policy, procedures, rules, or regulations."  H. Res. 503 § (3)(1), 4(c).  Given that scope, the subpoena is appropriately tailored to meet the Select Committee's mandate and is not impermissibly broad.  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509 (1975).  And in any event, the Select

51

Committee has focused its inquiry and narrowed its subpoena to Mr. Meadows as described herein. *See supra* at 14-23.

For the reasons described below, the subpoena to Verizon does not run afoul of the Fourth Amendment, and there is no other basis for Mr. Meadows to challenge the breadth of a Congressional subpoena. Even if he could challenge a Congressional subpoena under some legal standard imposing a scope limitation on Congress, the subpoena to Verizon was reasonable. The Select Committee is not seeking the content of communications with the Verizon subpoena, and its timeframe is appropriately tailored to the necessities of the Select Committee's investigation. The Select Committee operates under a mandate to investigate the facts, circumstances and causes relating to the January 6th attack and relating to the interference with the peaceful transfer of power. The Select Committee is seeking to understand the actions of Mr. Meadows as a central figure in the investigation during several specific months. In this context, the review of this non-content data is reasonable under any standard.

> **b.    The Supreme Court's Decision in *Carpenter v. United States* Does Not Apply to the Verizon Subpoena**

Next, Mr. Meadows relies on the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), to argue that the Select Committee's subpoena to Verizon violates the Fourth Amendment. Am. Compl. ¶ 200. But *Carpenter*, by its own terms, does not apply to the records the subpoena seeks.

In *Carpenter*, the Supreme Court faced the question of whether the Government's collection of historical cell-site location information ("CSLI") from a third-party telecommunications company constituted a "search" under the Fourth Amendment. 138 S. Ct. at 2211. The Court had previously held in *Smith v. Maryland*, 442 U.S. 735 (1979), that recording the numbers that a particular phone number dialed did not constitute a search because, among

other reasons, such records were voluntarily disclosed to the phone company and thus there was no reasonable expectation of privacy in them. *Id.* at 743-44.

In *Carpenter,* although historical CSLI data was in the possession of a third party telecommunications company, the Court "decline[d] to extend" *Smith* to historical CSLI, "[g]iven the unique nature of cell phone *location* records" and their ability to "achieve[] near perfect surveillance." *Carpenter*, 138 S. Ct. at 2217-18 (emphasis added). In particular, the Court distinguished historical CSLI from the "limited capabilities of a pen register," which consisted of "telephone call logs [that] reveal little in the way of 'identifying information.'" *Id.* at 2219 (citation omitted).

As noted above, the Verizon subpoena seeks only subscriber information, connection records, and records of session times and durations. *See* ECF 13-21 at 4(Am. Compl. Ex. S). It does not seek historical CSLI or the contents or substance of any communications associated with Plaintiff's phone number. *See id.* The records sought by the Select Committee, therefore, are governed squarely by *Smith*, not *Carpenter*. *See Carpenter*, 138 S. Ct. at 2220 (stating that decision is a "narrow one" that "does not disturb the application of *Smith*").[57]

Courts addressing suppression motions after *Carpenter* have consistently held that the decision does not apply to the kinds of records sought here, such as subscriber information and call-detail records. *See, e.g.*, *United States v. Beverly*, 943 F.3d 225, 239 (5th Cir. 2019)

---

[57] Mr. Meadows attempts to elide the distinction between historical CLSI and other phone records that are governed by *Smith*, alleging that the subscriber and call-detail records "*can* be used for historical cell site analysis." Am. Compl. ¶ 195 (emphasis added). But so can the phone number itself—law enforcement could simply request historical CSLI from a telecommunications carrier for a particular phone number. The additional subscriber and call-detail information would not provide any additional mechanism for obtaining historical CSLI or evading the warrant requirement set forth in *Carpenter*.

(holding *Carpenter* does not apply to subscriber information and call-detail records and declining to assume that such records may be used to track location); *United States v. Searcy*, No. CR 19-135, 2021 WL 3616062, at *5 (W.D. Pa. Aug. 16, 2021) ("Except for CSLI … Mr. Searcy has no legitimate expectation of privacy in information he voluntarily turns over to third parties[.]") (internal quotation marks and citation omitted); *Brown v. Sprint Corp. Sec. Specialist*, No. 17-CV-2561, 2019 WL 418100, at *4 (E.D.N.Y. Jan. 31, 2019) (holding *Carpenter* does not apply to subscriber and call-detail records).  Thus, *Carpenter* simply does not apply to the third-party Verizon subpoena here, and the Verizon subpoena does not violate Plaintiff's Fourth Amendment rights.

### 2.    The Verizon Subpoena Does Not Violate Mr. Meadows's First Amendment Rights

Mr. Meadows also argues that the subpoena to Verizon violates his First Amendment rights, but this argument is squarely foreclosed by *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 509-510 (1975).  There, the Supreme Court rejected an organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [its] First Amendment rights," explaining that the typical First Amendment balancing test "plays no part" when a Congressional subpoena is involved.  *Id.* at 509 n.16.  Here, too, Mr. Meadows's First Amendment arguments against enforcement of the Select Committee's subpoena must be rejected.

Even if Mr. Meadows's claim were subject to a balancing test, it would still fail: the balancing of "the competing private and public interests at stake" here plainly favors the Select Committee.  *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).  This Court has rejected claims that issuance of a Congressional subpoena violates a respondent's First Amendment rights.  *See Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016), *aff'd*,

856 F.3d 1080 (D.C. Cir. 2017).  That conclusion is entirely consistent with the Supreme Court's recognition that the public interest is extremely high when the focus is on ensuring "the free functioning of our national institutions."  *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (internal quotation marks omitted).  The Select Committee is doing precisely that by seeking testimony and records from Mr. Meadows.

Mr. Meadows, by contrast, fails to assert any First Amendment interest that could outweigh the very grave public interest here.  His conclusory assertions that "[t]he subpoena of Mr. Meadows's private cell phone data violates his right to free association and chills the exercise of free speech rights," Am. Compl. ¶ 208, is too amorphous to be actionable.  Courts require far more specificity, which is simply lacking here.  *See, e.g., Ferrer*, 199 F. Supp. 3d at 142 ("[I]invo[cation] of the First Amendment in general terms … is untenable and without legal support[.]").[58]

Assuming for purposes of argument that Mr. Meadows were able to substantiate a legitimate interest implicated by the Subpoena, the Select Committee's interest far outweighs his interest.  The Court's authority to scrutinize the Select Committee's interest is limited because "so long as Congress acts in pursuance of its constitutional power … the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Ferrer*, 199 F. Supp. 3d at 143 (quoting *Barenblatt*, 360 U.S. at 132-33).  Here, the Select Committee's subpoena seeks records relevant to determining the root causes of the violent

---

[58]*See also Buckley*, 424 U.S. at 74 (stating that showing an associational injury requires demonstrating a "reasonable probability that the compelled disclosure … will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *see also Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (stating that courts have "emphasized in each of those decisions … the need for objective and articulable facts, which go beyond broad allegations or subjective fears.…[A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights.").

January 6th attack on Congress itself and the constitutional responsibility to officially count Presidential electoral votes.  To determine the extent of Mr. Trump's and his campaign's efforts to implement the planning for the violent attack and the attack itself, the Select Committee requires a record of relevant communications.  This is a paradigmatic example of the governmental interest in the "free functioning of our national institutions."  *Buckley*, 424 U.S. at 66.  Accordingly, Mr. Meadows's First Amendment claim fails.

## **CONCLUSION**

For the reasons set forth above, this Court should grant summary judgment for the Defendants on all claims in Plaintiff Meadows's Amended Complaint.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
*General Counsel*
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

ARNOLD & PORTER KAYE SCHOLER LLP
John A. Freedman (D.C. Bar 453075)
Paul J. Fishman (D.C. Bar 449014)
Amy Jeffress (D.C Bar 449258)
David J. Weiner (D.C. Bar 499806)
John M. Hindley (D.C. Bar 1720648)
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com
David.Weiner@arnoldporter.com

56

John.Hindley@arnoldporter.com

SHER TREMONTE LLP
Justin M. Sher (Bar ID NY0320)
Michael Tremonte*
Noam Biale*
Maya Brodziak*
Kathryn E. Ghotbi*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

* Appearing pursuant to 2 U.S.C. § 5571(a).

Dated: April 22, 2022