**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK MEADOWS, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. 1:21-cv-3271-CJN |
| | ) |
| NANCY PELOSI, et al. | ) |
| | ) |
| | ) |

# Exhibit G

SELECT COMMITTEE TO INVESTIGATE THE

JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

CONTINUED INTERVIEW OF:   CASSIDY HUTCHINSON

Monday, March 7, 2022

Washington, D.C.

The interview in the above matter was held via Webex, commencing at 12:06 p.m.

Present:   Representatives Aguilar, Raskin, Cheney, and Kinzinger.

1   entertained externally was being brought to the attention of necessary individuals

2   internally to ensure that there was maximum cooperation and communication between

3   the external and internal interests that were looking into these theories.

4       Mr. George.   Okay.

5       In those meetings, did anybody from the White House Counsel's Office express an

6   opinion as to whether it was legal to have the Trump electors meet and cast electoral

7   votes in States that Mr. Trump had lost?

8       Ms. Hutchinson.   Could we have one moment, please?

9       Mr. George.   Of course.

10       Ms. Hutchinson.   Thank you.

11       [Discussion off the record.]

12       Mr. Passantino.   Okay.   We're back.   We had a discussion about the

13   parameters of attorney-client privilege, but ask your question again.

14       Mr. George.   Okay.

15       And I'd just note that Mr. Kinzinger is joining now as well.

16           BY MR. GEORGE:

17       Q   So my question was:   At any of these meetings with individuals from

18   outside the White House or the executive branch, did the White House Counsel's Office

19   express an opinion as to whether the plan to have electors for President Trump meet and

20   cast electoral college votes in States that President Trump had lost was legal?

21       A   Yes.

22       And just to be mindful of how extensive certain discussions were, like, those were

23   niche topics as the meetings progressed and other individuals were involved.   So there

24   were some meetings where they had expressed something along the lines of, "Let's

25   continue to look at this, make sure you're still coordinating with us, communicating with

1  us, let us know if there's anything worthy of bringing to our attention, we'd be happy to

2  look at it and schedule another meeting," to meetings where their definitive guidance to

3  external interests was more along the lines of, "That's not legal, we're not putting

4  ourselves in that line of fire," or, "Don't raise that to Mr. Trump, it's not appropriate, and

5  it's not a legal theory that we want to entertain right now."

6      Q    And, to be clear, what you just said about not being a legal theory they want

7  to entertain right now, not legal, not putting yourself in the line of fire, that was with

8  respect to this alternate electors plan in particular?

9      A    I apologize, I'm just trying to be careful, because there was the alternate

10  electors plan, but then there are groups and individuals and people that had slightly

11  different ways of looking at things or slightly different ways of potentially addressing that.

12  And I also don't want my words to be recorded and articulated as being any verbatim

13  conversation, because I'm paraphrasing here.

14      But -- so, as we looked at the alternate electors, it was, broadly speaking,

15  something that they were willing to hear theories about, willing to have the discussions

16  with people.

17      But then there were certain meetings where White House Counsel's Office gave

18  the guidance to external interests of, "This is fine, keep researching, keep your people on

19  this, let's stay in touch, don't do anything, don't elevate this to Mr. Trump without us

20  being read back in first," to meetings where they would give guidance to external

21  participants more along the lines of, "Hey, this isn't legally sound, we have fleshed this

22  out internally, it's fine that you think this but we're not going to entertain this in an

23  official White House capacity on behalf of the President, we're putting a stop to this."

24      Q    And just to be clear -- I appreciate that, and thank you for walking through

25  the progression and the various, kind of, instances where it may have come up.

1       But what idea was it that -- what wasn't legally sound and they didn't want to
2  pursue?
3       A    I don't recall specifically right now.   I just recall there would be certain
4  meetings where individuals would raise ideas or things that they might want to vet to
5  White House Counsel's Office, and they would have a little bit more of an explicit opinion
6  on it, versus other instances in meetings where it was a little easier to not -- I don't want
7  to say "easier" -- it was a little different in context from a legal standpoint of them
8  wanting to vet it and allowing it to kind of progress a little bit more before they put a stop
9  to things.
10      Q    Okay.   And --
11      A    I'm just trying to be careful here with --
12      Mr. Passantino.   You're good.   You're good.
13      Mr. George.   Yep.   No, I appreciate you trying to be careful there.
14      I guess I want to distinguish two things on this point.   The first is the plan and
15 efforts to have alternate electors meet and cast votes for Mr. Trump in States that he had
16 lost.
17      Is it your understanding that the White House Counsel's Office opinion of that was
18 that it wasn't legally sound and that that opinion was expressed in meetings at which
19 third parties were present?
20      Mr. Passantino.   Well, she's only testifying to what she heard people say.   She's
21 not able to talk about what they thought.
22      Mr. George.   Yep.
23      Mr. Passantino.   She did say what she heard them say.
24      You can ask again.   I'm not blocking you.   But I just want to make that
25 distinction very clear.

1        BY MR. GEORGE:

2    Q    And so, to be clear, did you hear the White House Counsel's Office say that

3    this plan to have alternate electors meet and cast votes for Donald Trump in States that

4    he had lost was not legally sound?

5    A    Yes, sir.

6    Q    And do you remember approximately when that was?

7    A    I'm trying to not be overly broad, but, right now, sitting here, I can recall at

8    the time, perhaps early to mid- December.   Now, it very well could've been the end of

9    November, but I'm trying to think about benchmark events and dates in my head, and

10   early to mid- December is the safer bet.

11   Q    And who was present for that meeting that you remember?

12   A    It was in our office.   It was Mr. Meadows, Mr. Giuliani, and a few of

13   Mr. Giuliani's, like -- well, I don't know if the correct term is "associates," but

14   Mr. Giuliani's associates.

15   Q    Do you remember who from --

16   A    Colleagues.

17   Q    -- White House Counsel -- oh, I'm sorry.   Go ahead.

18   A    No, I was -- associates, colleagues, however it might be characterized.

19   Q    Do you remember who from White House Counsel's Office was there and

20   delivered that message?

21   A    The very first time I heard it, I know Mr. Cipollone.   I'm inclined to say

22   Mr. Pat Philbin as well.   But, factually speaking, the very first, I am comfortable saying

23   Mr. Cipollone.

24   Q    Okay.

25        Do you remember -- bear with me one moment.

1            Were Members of Congress present for that meeting as well, either in person or

2    by phone?

3            A    Not at the meeting I'm thinking about.

1
2       [2:09 p.m.]
3               BY MR. GEORGE:
4       Q   Did this issue come up again where White House Counsel's Office expressed
5   an opinion on alternate electors where Members of Congress were present?
6       A   Yes, sir.
7       Q   When was that and what happened?
8       A   Sorry.   Could you repeat the first part of that question?   Sorry.
9       Q   Of course, yes.   So the question was, were there other meetings where the
10  White House Counsel's Office expressed an opinion on alternate electors came up where
11  Members of Congress were present?
12      A   Sorry.   I wanted to make sure that we weren't attributing one of the
13  opinions that I previously stated to Members of Congress.
14          Yes.   To answer your question broadly, yes, I do recall them raising it in meetings
15  with Members of Congress in early to mid-December likely, though, perhaps -- I say early.
16  Maybe like sometime after, like, December 8th.   I don't have the calendar in front of me
17  of the days of the week, but -- and I'm trying to think about when Members of Congress
18  started coming into our office to meet.   So first or second week of December.
19      Q   Okay.   And do you remember which Members of Congress were at the
20  meeting in which White House Counsel's Office expressed their opinion that this alternate
21  electors plan was not legally sound?
22      A   The initial meeting that I'm thinking of or generally and broadly speaking
23  about the events?
24      Q   How about we start with the initial meeting and then broadly speaking,
25  others who may have received the same message.

1   A   Initially -- the initial meeting that I'm thinking about in my head, Mr. Scott
2   Perry was present for, but I don't want to attribute White House counsel's opinion to that
3   meeting being let's entertain this, keep us in the loop versus no.   Just I recall their
4   opinions being expressed in the first meeting that I'm thinking about with Mr. Scott Perry.
5   Q   How about this:   How about, in meetings -- let me back up and rephrase.
6   Which Members of Congress were present during meetings at which the White
7   House Counsel's Office expressed their opinion that this plan related to alternate electors
8   was not legally sound, as opposed to just discussions about followup or further research?
9   Mr. Passantino.   You understand --
10   Ms. Hutchinson.   Mr. Perry is the member that immediately jumps out to me,
11   and I'm only -- I just want to be cautious because there frequently were Members that
12   would dial into meetings as a presence, but they weren't physically present.   And I know
13   that sometimes there were other people on the line that I wasn't aware of.   Mr. Perry is
14   one that immediately jumps to mind as me recalling him physically being there and then
15   pushing back on him.
16   Now, Mr. Jordan also would dial into meetings frequently, and I don't want to
17   attribute White House Counsel's Office pushing back on Mr. Jordan because I don't know
18   whether Mr. Jordan was personally pushing for that legal theory, if that makes any sense,
19   or if it was just them broadly speaking in the presence of Mr. Jordan.
20   The only one that immediately jumps out to me as being there and them kind of
21   pushing back a little bit would be both Mr. Perry, Mr. Gaetz -- Matt Gaetz -- Mr. Gohmert,
22   Louie Gohmert of Texas.
23   And it's entirely possible that there was more too.   I'm just -- I want to be careful
24   and not attribute any of the actions or words from White House Counsel's Office to
25   Members of Congress or external interests, just because it's difficult for me to look back

1    and recall details of those meetings or conversations that happened where the Members

2    were advocating for those theories personally, if that makes sense.

3                BY MR. GEORGE:

4        Q     It does, yes.

5              And there's a meeting on December 21st in the White House at which some of

6    those Members were present.   Do you think it was that meeting or a different meeting?

7        A     I recall them having conversations with Members that were a part of that

8    meeting, but there also were several Members that participated in that meeting that

9    were frequently present throughout this period that we're discussing.

10       Q     I see.   Let me ask a follow-on question.   It's related but not the same.

11             We just talked about the theory -- or excuse me -- the effort to have alternate

12   electors meet and cast votes for then-President Trump in States that he had lost.   I want

13   to fast-forward a little bit.   And the kind of follow-on theory that I know you have been

14   trying to distinguish in your mind -- and I appreciate that -- but like the follow-on theory

15   for John Eastman is that, because these votes now exist, because the Republican electors

16   have met and cast their votes, then the Vice President can choose to count those or not

17   count those during the Joint Session of Congress.

18             Do you remember any meetings at which third parties, so not White House

19   personnel or not executive branch members, were present in which the White House

20   Counsel's Office said that that, that use of the theory like that of John Eastman, was not

21   legally sound?

22       A     Yes.   But I can't attribute a specific meeting just because I don't recall right

23   now.   But I do recall --

24       Q     It did happen?

25       A     Yes.

1   said during the residence portion of that meeting?   I believe Mr. Giuliani was there with
2   you -- or was there as well?
3        A   The attorneys, Mr. Herschmann, Mr. Lyons, all were very clear, as has been
4   reported, that they would resign if this was approved.   And I know that that did factor
5   into Mr. Meadows' decision.   He didn't want to lose them.
6        Q   When you say "if this was approved, they would resign," what do you mean
7   by "this"?
8        A   If Ms. Powell had been appointed special counsel, if they had considered
9   invoking martial law more in depth, which -- I don't know if it was ever even something
10  that was, like, on the table, legitimately on the table.
11       But once it became clear that there would be mass resignations, including lawyers
12  in the White House Counsel's Office, including some of the staff that Mr. Meadows
13  worked closely with, you know, I know that that did factor into his thinking that night.
14       Q   And these issues that came up, including seizing voting machines and
15  appointing Ms. Powell as a special counsel and potentially imposing martial law, is it your
16  understanding that those were being considered or proposed in order to change the
17  outcome of the election and have Mr. Trump start a second term on January 20th?
18       A   So, like the Mr. Eastman theories, it was something that external individuals
19  felt could potentially be a constitutional and viable option to either stall certification of
20  the election or to delay the inauguration or to assert that Mr. Trump had actually won.
21  And there were theories -- you know, I can't speak to if Mr. Trump -- yeah, I'll leave it
22  there.
23       Q   Okay.   Fair enough.
24       So, at that time -- I just want to get, we'll call it "atmospherics," but just an
25  understanding of what the discussions were like at the White House.

1    A    He was.

2    Q    Who else from his team do you remember being there?

3    A    I don't remember anybody else that was in there and had accompanied

4    Mr. Giuliani to that meeting.

5    Q    Was Phil Waldron there, somebody we talked about earlier, if you

6    remember?

7    A    I don't remember if Mr. Waldron was there.

8    Q    How about John Eastman?   Was he at that meeting, to the best of your

9    knowledge?

10   A    To my knowledge, he was not there.

11   Q    All right.

12        And then we have a number of House Members.   I believe they were from the

13   House Freedom Caucus.   Is that right, generally?

14   A    That's accurate, generally.

15   Q    Okay.   So did that include Jim Jordan?

16   A    Yes, Mr. Jordan was there.

17   Q    Andy Biggs?

18   A    Mr. Biggs was there.

19   Q    Mo Brooks?

20   A    Mr. Brooks was there.

21   Q    Matt Gaetz?

22   A    Mr. Gaetz was there, although I don't believe Mr. Gaetz is a part of the

23   Freedom Caucus.

24   Q    Okay.   How about Marjorie Taylor --

25   A    [Inaudible.]

1   Q   Sure.   How about Marjorie Taylor Greene?

2   A   Was not at the time a member of the Freedom Caucus, as she was still

3   Congresswoman-elect, but, yes, Ms. Marjorie Taylor Greene was there.

4   Q   How about Louie Gohmert?   Was he there?

5   A   Mr. Gohmert was there.

6   Q   Do you remember anybody else who was there from the House or the

7   Congress?

8   A   Mr. Hice, Jody Hice; Mr. Gosar, Paul Gosar; I believe Ms. Lesko, Debbie Lesko

9   of Arizona.

10   And there was also a handful of others that were there that I -- Mr. Perry

11   definitely spoke.   I can't remember if he was dialed in or if he was physically present

12   though.   They dialed in a few Members over the course of that meeting.

13   Q   Okay.

14   What do you remember -- were you in that meeting the whole time?

15   A   Not the entire time, no.

16   Q   Okay.   What do you remember from that meeting?   What happened?

17   A   A few Members expressed their opinions and their thoughts on January 6th,

18   what they believed that the Vice President's role could potentially be --

19   Q   Can I stop you there?

20   A   Yes.

21   Q   On that issue in particular, the Vice President's role and what they thought it

22   would be, what was it?   What was the conversation like?

23   A   They felt that he had the authority to -- pardon me if my phrasing isn't

24   correct on this, but -- send votes back to the States or the electors back to the States,

25   more along the lines of the Eastman theory.   I'm not very well-versed on it, and I

1   apologize for that.

2   Q    That's quite all right.    That's exactly right.    So Mr. Eastman said that the
3   Vice President would have, among other things, the authority to count certain votes or to
4   delay the certification and send votes --

5   A    Right.

6   Q    -- back to the States.

7   A    Okay.    To send the votes back to the States, not the delegates or the
8   electors, but, yes, send the votes back.

9   Q    Okay.
10       And did both of those things, either the Vice President's power to count or not
11  count and also his power to send the votes back to the States, did they come up in that
12  meeting on the 21st?

13  A    They did.

14  Q    And did anybody in that meeting disagree with the idea that the Vice
15  President had the authority to do that, either of those options?

16  A    I don't recall anybody speaking out and definitively expressing disagreement
17  with that theory.    I believe I am not out of line for -- I don't want to say
18  "speculating" -- for saying that the Vice President's team appeared slightly skeptical.
19       But, you know, again, I wasn't present from start to finish, but I don't recall in my
20  presence or immediately afterwards hearing feedback from Members, anybody, you
21  know, saying anything that would have been perceived as controversial, which would've
22  been, "No, actually, the Vice President doesn't have that theory, and here's why."

23  Q    Okay.
24       Do you remember the Vice President or Mr. Short saying anything about this idea
25  during the meeting?

1    introduction or would have gave that introduction.   Sounds odd to me, but --

2        Q    I understand that there's a meeting that Mr. Clark had in the residence with
3    the President and potentially Scott Perry as well.   Do you know anything about that
4    meeting?

5        A    No.

6        Q    Okay.   Do you know --

7        A    I don't think Mr. Perry ever went to the residence.

8        Q    I'm sorry?

9        A    I don't think Mr. Perry ever spent time in Mr. Trump's residence.

10       Q    Do you know if Mr. Meadows was in touch with Jeff Clark?

11       A    Frequently.

12       Q    Okay.   Do you know how that started or why it started, what the purpose
13   of it was?

14       A    No.   I just came -- recognized Mr. Clark as somebody that was assisting the
15   efforts with the ongoing election investigation litigation in the White House.

16       Q    Do you know if Mr. Clark was working with Mr. Giuliani and his team?

17       A    Mr. Clark came to meetings that Mr. Giuliani was also in that also
18   met -- meeting with Mark, Mr. Meadows.   And I remember Mr. Clark's frequent
19   presence and his frequent outreach and communications, but I don't remember specific
20   meetings or know who he would have come with for what meeting.   He was around a
21   lot of people in a time when there was -- I'm not trying to be vague, but there was a lot of
22   people around and present and were in and out of rooms, so --

23       Q    Do you know what Mr. Clark -- or were you present for any meetings
24   between Mr. Clark and the President?

25       A    Not in the room, no.

1      Q    Okay.  Do you know what happened in any meetings between Mr. Clark
2  and the President, other than January 3rd?  That was with a lot of leadership with the
3  Department of Justice, and we don't need to get to that one yet.
4      A    Yet.
5  I'm sorry.  Could you restate your question?
6      Q    Yeah, sure.  Other than January 3rd, are you aware of any meetings that
7  Mr. Clark had with the President?
8      A    I remember him coming to the White House for meetings with Mr. Trump.
9  And, you know, I -- all -- almost all -- almost all, if not all, meetings Mr. Trump had, I had
10  insight on.  So, yes, I remember him coming to meetings with Mr. Trump.  But, again,
11  just bringing it back to what I previously said, I don't know if it was Mr. Giuliani who had
12  brought him, if it was Mr. Trump who had personally called him, like, who had
13  coordinated all these efforts and who was in the room for these meetings.  But I do
14  remember he might have had a meeting with Mr. Trump or Mr. Trump and Mr. Clark
15  having communications because Mr. Meadows was then involved in those conversations.
16      Q    Okay.  And on that point, how would Mr. Meadows communicate with Jeff
17  Clark, do you know?
18      A    Like on cell phone or by snail mail?
19      Q    Sure.  Cell phone, text messages, Signal application.
20      A    I've only known Mr. Meadows to communicate with Mr. Clark on his official
21  work phone and -- definitively his official work phone.
22      Q    Okay.  And do you know what happened in the meetings between Jeff Clark
23  and the President, or Mr. Meadows, for that matter?  And specifically I'm interested in
24  learning why -- or what the President or Mr. Meadows thought Mr. Clark could do in his
25  role at the Department of Justice.

1    You said you don't know what Mr. Meadows did with this letter once he received

2    it, correct?

3         A    Correct.  That's correct.

4         Q    And do you remember, were there any discussions about this letter or the

5    ideas in the letter about having the States call them -- State legislatures call themselves

6    back into session to evaluate issues related to the election at DOJ's request?

7         A    I remember the ideas -- that concept being discussed, broadly speaking.  I

8    remember Mr. Meadows mentioning it in meetings and once or twice in passerby

9    conversation with me, but nothing that would indicate his opinion on it, just as something

10   that, you know, was outlined in this letter and, you know, was the topic of conversation

11   at the time.  But I wasn't privy to any of those conversations extensively.

12        Q    Do you know whether the President advocated for this idea to have the

13   Department of Justice send a letter like this?

14        A    At the time, I'm not sure whether the President advocated for DOJ to send a

15   letter like this.

16             Mr. George.  Any questions on the Department or this letter?

17             BY MR. GEORGE:

18        Q    Okay.  All right.  So on December 22nd, I understand that Mr. Meadows

19   went to Cobb County in Marietta, Georgia, specifically, where an audit was being

20   conducted of signatures related to ballots cast in the 2020 election.

21        Did you go with Mr. Meadows on that trip?

22        A    I did not.  I was at the White House that day.  He asked me to stay behind

23   because he left before Mr. Trump left for Florida, and that way at least I was there in case

24   he needed anything on our behalf and he couldn't get ahold of Mr. Meadows.

25        Q    Did you at any point go to Georgia while Mr. Meadows was on this trip in

1    late December?

2            A    I did not.

3            Q    Do you know what the purpose of Mr. Meadows going to Georgia was during

4    this signature review?

5            A    The primary purpose of this trip was to visit family.   His son lives in Georgia,

6    and they went down to see his son for Christmas.   Conveniently, his son lives in close

7    proximity to Cobb County, and Mr. Meadows had discussed at length coordinating any

8    visits with Georgia State officials during this trip.

9            Q    I understand that he did meet with some Georgia officials, including Jordan

10   Fuchs, I believe is how you pronounce her name.   What was the purpose -- your

11   understanding of what was the purpose of him meeting with Ms. Fuchs?

12           Mr. Passantino.   Which one?   Okay.

13           Ms. Hutchinson.   He met with Ms. Fuchs at Cobb -- at the Cobb County when he

14   went to see the ballots being counted.   I'm trying to pull them up here.   There was a

15   few other officials there too.

16           He agreed -- can you guys hear me okay?

17           Mr. George.   Yeah, we can hear you.

18           Ms. Hutchinson.   Sorry.   We got a warning notification.

19           I'm sorry.   I lost my train of thought.

20           Mr. Meadows and Mr. Trump had conversations about what Mr. Meadows could

21   potentially do down in Georgia.   Now, there was a point where I was going to go with

22   him because he was going to conduct a few more meetings, but then it was decided that

23   he would make it a little bit more informal and casual, which is when he decided to go

24   watch the ballots being counted.

25           I'm not sure if he reached out to Ms. Fuchs directly to coordinate that.   However,

1    I got a call from her later that day, and he went there with the intention of speaking to

2    the volunteers and the staff members that were counting the ballots and reevaluating the

3    ballots cast on November 3rd.

4          And then there were a few other Georgia State officials that were present at that

5    time.   Now, whether they were present because there was official business going on or

6    because they knew that he was going to be there, thus, they wanted to meet with him,

7    I'm not sure.   But that's the overall gist of this particular visit.

8          BY MR. GEORGE:

9    Q    What did he think he could accomplish, if you know, by speaking to the

10    people who are doing the signature verification on ballots?

11    A    He wanted to do more of a status check to see where they were at with

12    things, if they had thoughts that they needed any more resources, if there was anything

13    that the White House could do to help ease the process along.   If they needed, like,

14    bodies, there were campaign officials that had been, you know, off-boarded and were

15    looking for jobs, so -- our campaign officials -- the Trump campaign officials, I should say.

16    But -- and then just had conversations with the Georgia State officials about what they

17    were hearing from the State about status of the election and, you know, if there was

18    significant evidence to their knowledge at that point.

19    Q    Significant evidence of fraud or irregularities in the election?

20    A    That's correct.   I apologize for not specifying.

21    Q    No.   That's quite all right.   That's my job.

22    So if you go to exhibit 27, please.

23    This is a text exchange that you had with somebody named Chris, with the initials

24    CG.   Do you know who that is?

25    A    Yes.   CG, he was the -- I'm trying to remember his appropriate title.   He