**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-3271-CJN |
| | ) | |
| NANCY PELOSI, et al. | ) | |
| | ) | |
| | ) | |

# Exhibit Q

1

2

3

4      SELECT COMMITTEE TO INVESTIGATE THE

5      JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6      U.S. HOUSE OF REPRESENTATIVES,

7      WASHINGTON, D.C.

8

9

10

11

12     INTERVIEW OF:    RICHARD PETER DONOGHUE

13

14

15                                    Friday, October 1, 2021

16

17                                    Washington, D.C.

18

19

20         The interview in the above matter was held via Webex, commencing at 10:02 a.m.

21         Present:    Representatives Schiff, Lofgren, Murphy, Raskin, and Cheney.

1          But we weren't reporting back to the White House simply because the President

2     mentioned some allegations.

3          Q     I see.   It wouldn't be consistent with protocol for you to go back to the

4     President every time something that comes up in a discussion is investigated or resolved?

5          A     He didn't instruct us to do that, and we weren't going to do it.   So.

6          Q     Yeah.   All right.   I want to turn your attention, if you can now to

7     exhibit 10, which we get back into Mr. Clark.   The next day, December 28th, you and Mr.

8     Rosen get an email from Mr. Clark, and he is asking for two urgent action items.   Tell us

9     about this email, the two actions that he requested, and what your response was.

10          A     Right.   So DAG Rosen and I spoke, I think, probably several times on the

11     27th and certainly the 28th because that was a Monday.   DAG Rosen and Jeff Clark had

12     a long personal and professional relationship.   They had known each other for decades.

13     They had worked at the same law firm together.   He knew Jeff Clark much better than I

14     did.   And, you know, we discussed why Jeff Clark's name was coming up, why it was

15     coming from the President, why it was coming from this Congressman.   And Jeff Rosen

16     said:   Well, look, I am going to talk to Jeff Clark to find out what's going on here.   We

17     got to get to the bottom of this.

18          So I think he had conversations with Jeff Clark earlier on the 28th.   They

19     preceded this email, which came fairly late in the day.   I did not talk to Jeff Clark before

20     this.

21          So, at 4:40, I received this email from Jeff Clark.   I read it.   I read the

22     attachment.   I had to read it more than once to make sure I really understood what he

23     was proposing.   And then I drafted a response.   I don't know where Jeff Rosen was at

24     this point, but I went to his office, and he wasn't there.   So I didn't get to discuss my

25     response with him before I sent it.   But I sent it out.   And then I saw him shortly

1        afterward, and he was very upset by Jeff Clark's request.    And he said that he had

2        instructed one of his administrative support personnel to get Jeff Clark in his conference

3        room.    He was -- he was a little angry.    And he said:    I want him down here.    We

4        need to talk to this guy and find out what's going on.

5                  So I think there's some emails that show up.

6            Q     Yeah.    And I don't want to jump ahead too much, Mr. Donoghue, because I

7        want to get to that conversation.    But let's go back to Mr. Clark's email.    The first thing

8        he asks of you is:    I would like to have your authorization -- "you" meaning you and Mr.

9        Rosen -- to get a classified briefing tomorrow from ODNI led by DNI Ratcliffe on foreign

10       election interference issues.    And he mentions activating the IEEPA and 2018 EO powers

11       about the Dominion machine access to the internet through a smart thermostat with a

12       net connection trail leading back to China.    He is essentially asking if you can get a

13       briefing about this allegation of Chinese control of Dominion machines through a

14       thermostat.    Did that strike you as odd, and what was your reaction to that specific

15       request?

16           A     Yes, it struck me as odd.    I won't go into details, but we received briefing

17       about what the IC, the intelligence community, knew about the election in advance.

18       This was inconsistent with what we had been told.    And I had not heard anything about

19       smart thermostats and internet connections leading back to China and things like that.

20       So the whole thing struck me as very odd.

21           Q     Yeah, and that Mr. Clark, the head -- acting head of the Civil Division is asking

22       for a classified briefing with the Director of National Intelligence about this allegation.

23       That also procedurally was odd?

24           A     Yes.

25           Q     Okay.    He also then -- the second ask is this draft letter, which I believe is

1       attached to the email that he sends you and Mr. Rosen.    And that letter is a draft letter

2       that you and Mr. Rosen and he, Mr. Clark, would sign to the Governor, the Speaker of the

3       House, and the president pro tempore of the Georgia legislature, essentially asking them

4       to stand down and not certify the results of their election.    How did that request strike

5       you, and what did you do about it?

6               A      It struck me as very strange and somewhat alarming.    And, as I said, I had

7       to read it more than once to make sure I understood what he was proposing here.    It

8       was completely inconsistent with the Department's role, generally.    And it was

9       inconsistent with what our investigations, to date, had revealed.    And so I think I made

10      my views known in the email response I sent to him.

11              Q      Yeah, which we'll get to.    To be clear, he asks that -- a version of this letter

12      be sent to each relevant State.    So was his request to send this letter, drafted for

13      Georgia, not just to Georgia officials but to officials in other States where there had been

14      allegations of election fraud?

15              A      Yes.    That was my understanding of his proposal.

16              Q      All right.    He writes that he put it together quickly -- "it" being the

17      letter -- but other messages suggest that it may have been drafted by Ken Klukowski.

18      Do you know Ken Klukowski and what his role may have been within the Department's

19      Civil Division at that time?

20              A      No.    I don't.

21              Q      Okay.    Did you know whether or not Mr. Clark was talking to anyone else in

22      the Department about this letter or other election issues?

23              A      No.    I had no reason to think that.

24              Q      All right.    So you respond, Mr. Donoghue.    We get to your response, which

25      is tab 11.    You drafted a pretty comprehensive, specific response reflecting your

1    frustration on the 28th, just about a little over an hour later, at 5:50.    I won't ask you to

2    read it to us, but just summarize for us your overall reaction and what's reflected in the

3    email.

4            A     I tried to make it clear to him that this is not the Department's role.    Again,

5    we don't do quality control for State elections.    The States run the elections.    We

6    investigate crimes, and we look at civil rights matters.    So I tried to make it clear to him

7    that this is simply not our role, to recommend to the States what they do and, secondly,

8    that we have conducted investigations and that the factual claim he was making here was

9    simply not accurate.    And so I reminded him that AG Barr had made public statements

10   on this point, less than a week prior, or, I guess, exactly a week prior was the last time he

11   had made some public statements, and that this was just completely unacceptable and

12   not anything that I would ever sign.    And I know Jeff Clark -- or Jeff Rosen, rather, had

13   the same response.

14           Q     You say in the first paragraph:    There's no chance that I would sign this

15   letter or anything remotely like this.    You sort of lead with the conclusion.    You then, in

16   the first paragraph, challenge his factual assumptions.    You said:    The investigations

17   that I am aware of relate to suspicions of misconduct that are of such a small scale that it

18   would simply not impact the outcome of the election.    AG Barr made that clear to the

19   public only last week, and I am not aware of intervening developments that would change

20   that conclusion.

21           So, setting aside whether it would be appropriate for the Department to tell a

22   State what to do, you're challenging -- is it fair to say you're challenging the factual basis

23   included in his letter to the State official?

24           A     That's right.    And he himself, Jeff Clark, would have no way of knowing

25   what investigations we had conducted or not because he was not involved in election

1   matters.

2        Q     Right.   You then, in the second paragraph, Mr. Donoghue, you say:   I

3   cannot imagine a scenario in which the Department would recommend that a State

4   would assemble its legislature to determine whether already certified election results

5   should somehow be overridden by legislative action.   This would be a grave step for the

6   Department to take and could have tremendous constitutional, political, and social

7   ramifications for the country.

8        Is that your sort of procedural response here that this is just not the Department's

9   role to be quality control for State elections and tell a State legislature what to do?

10       A     Yes.   That's the point I was making.   Yes.

11       Q     All right.   So, when you and Mr. Rosen get this letter, you compose the

12   response.   You indicated previously that Mr. Rosen essentially summons Mr. Clark up to

13   the 5th floor for a face-to-face meeting.   Does that meeting then occur?

14       A     Yes.   He is on the 4th floor.   But, yes, in the DAG conference on the 4th

15   floor.

16       Q     Okay.   So you are personally present, Mr. Donoghue, for that meeting

17   between Clark and Rosen?

18       A     Yes.   It was the three of us.

19       Q     Tell us about the conversation there with Mr. Clark.

20       A     Mr. Clark explained that he had been looking at some of these allegations on

21   his own, that he had information, that he had concerns about the reliability of the

22   outcome of the election.   He mentioned this smart thermostat thing.   It was clear that

23   he had been reading some affidavits that were attached to some of the civil filings in

24   some of the cases that were pending or already dismissed around the country.   He had

25   various theories that seemed to be derived from the internet about why the outcome of

1      so when you joined at the President's invitation?

2            A      That's right.

3            Q      All right.   And who was inside the meeting when you got there?

4            A      When I entered the Oval Office, the President was behind the desk, and it

5      was Pat Cipollone, Pat Philbin, a White House lawyer named Eric Herschmann, Jeff Clark,

6      Jeff Rosen, Steve Engel, and then me.

7            Q      Are you sure Mr. Herschmann was a White House lawyer?

8            A      He was a lawyer who worked at the White House.   I'm not -- initially I

9      thought he worked in the White House Counsel's Office, but I think later someone told

10     me that wasn't the case.   I don't remember.   His role was never clear to me.   I know

11     he was a lawyer from New York.   I know he had been a prosecutor at some point.   But I

12     don't know what his title exactly was.   I'd seen him in some meetings previously, but I

13     didn't know exactly what his role was.

14           Q      Okay.

15           All right.   And, again, no notes of this meeting.   Is that right?   You don't take

16     notes -- you were inside the Oval Office and, you indicated before, didn't take notes when

17     you were in discussions inside that office.

18           A      No.

19           Q      All right.   Well, tell us what you remember, then, about the conversation.

20     What was the topic when you arrived, and how did it evolve from there?

21           A      The meeting took about another 2-1/2 hours from the time I entered.   It

22     was entirely focused on whether there should be a DOJ leadership change.   So the

23     election allegations played into this, but they were more background than anything else.

24           And the President was basically trying to make a decision and letting everyone

25     speak their minds.   And it was a very blunt, intense conversation that took several

1    hours.    And Jeff Clark certainly was advocating for change in leadership that would put

2    him at the top of the Department, and everyone else in the room was advocating against

3    that and talking about what a disaster this would be.

4         Q    What were Clark's purported bases for why it was in the President's interest

5    for him to step in?    What would he do, how would things change, according to Mr. Clark

6    in the meeting?

7         A    He repeatedly said to the President that, if he was put in the seat, he would

8    conduct real investigations that would, in his view, uncover widespread fraud; he would

9    send out the letter that he had drafted; and that this was a last opportunity to sort of set

10   things straight with this defective election, and that he could do it, and he had the

11   intelligence and the will and the desire to pursue these matters in the way that the

12   President thought most appropriate.

13        Q    You said everyone else in the room was against this.    That's Mr. Cipollone,

14   Mr. Philbin, Mr. Herschmann, you, and Mr. Rosen.    What were the arguments that you

15   put forth as to why it would be a bad idea for him to replace Rosen with Clark?

16        A    So, at one point early on, the President said something to the effect of,

17   "What do I have to lose?    If I do this, what do I have to lose?"    And I said,

18   "Mr. President, you have a great deal to lose.    Is this really how you want your

19   administration to end?    You're going hurt the country, you're going to hurt the

20   Department, you're going to hurt yourself, with people grasping at straws on these

21   desperate theories about election fraud, and is this really in anyone's best interest?"

22        And then other people began chiming in, and that's kind of the way the

23   conversation went.    People would talk about the downsides of doing this.

24        And then -- and I said something to the effect of, "You're going to have a huge

25   personnel blowout within hours, because you're going to have all kinds of problems with

1 resignations and other issues, and that's not going to be in anyone's interest."

2   And so the President said, "Well, suppose I do this" -- I was sitting directly in front

3 of the President. Jeff Rosen was to my right; Jeff Clark was to my left. The President

4 said, "Suppose I do this, suppose I replace him," Jeff Rosen, "with him," Jeff Clark, "what

5 do you do?" And I said, "Sir, I would resign immediately. There is no way I'm serving

6 1 minute under this guy," Jeff Clark.

7   And then the President turned to Steve Engel, and he said, "Steve, you wouldn't

8 resign, would you?" And Steve said, "Absolutely I would, Mr. President. You'd leave

9 me no choice."

10   And I said, "And we're not the only ones. You should understand that your

11 entire Department leadership will resign. Every AAG will resign." I didn't tell him

12 about the call or anything, but I made it clear that I knew what they were going to do.

13   And I said, "Mr. President, these aren't bureaucratic leftovers from another

14 administration. You picked them. This is your leadership team. You sent every one

15 of them to the Senate; you got them confirmed. What is that going to say about you,

16 when we all walk out at the same time? And I don't even know what that's going to do

17 to the U.S. attorney community. You could have mass resignations amongst your

18 U.S. attorneys. And then it will trickle down from there; you could have resignations

19 across the Department. And what happens if, within 48 hours, we have hundreds of

20 resignations from your Justice Department because of your actions? What does that say

21 about your leadership?"

22   So we had that part of the conversation. Steve Engel, I remember, made the

23 point that Jeff Clark would be leading what he called a graveyard; there would be no one

24 left. How is he going to do anything if there's no leadership really left to carry out any of

25 these ideas?

1       I made the point that Jeff Clark is not even competent to serve as the Attorney

2   General.   He's never been a criminal attorney.   He's never conducted a criminal

3   investigation in his life.   He's never been in front of a grand jury, much less a trial jury.

4       And he kind of retorted by saying, "Well, I've done a lot of very complicated

5   appeals and civil litigation, environmental litigation, and things like that."   And I said,

6   "That's right.   You're an environmental lawyer.   How about you go back to your office,

7   and we'll call you when there's an oil spill."

8       And so it got very confrontational at points.

9       And Pat Cipollone weighed in at one point, I remember, saying, you know, "That

10  letter that this guy wants to send, that letter is a murder-suicide pact.   It's going to

11  damage everyone who touches it.   And we should have nothing to do with that letter.

12  I don't ever want to see that letter again."   And so we went along those lines.

13      I remember Eric Herschmann chimed in several times, saying that, whatever Jeff

14  Clark wanted to do or thought he could do, there was no reason to think he could really

15  do it.

16      I remember saying at some point that, you know, Jeff wouldn't even know how to

17  find his way to Chris Wray's office, much less march in there and direct the FBI what to

18  do, and that, if you walked into Chris Wray's office, he wouldn't even know who you are.

19      So we had these conversations that went around and around and were very blunt

20  and direct.   And that went on for 2-1/2 hours.

21      Q   At one point, did the President disparage Mr. Rosen or talk about

22  Mr. Rosen's inaction or unwillingness to do anything about the election?

23      A   He did say several times, "You two," pointing at Mr. Rosen and me, "You two

24  haven't done anything.   You two don't care.   You haven't taken appropriate actions.

25  Everyone tells me I should fire you," and things of that nature.

1    He came back to that at the very end when he decided against a leadership

2    change.   And he announced that, and then he came back to that point and he said, "And

3    I know that these two here, they're not going to do anything.   They're not going to fix

4    this.   But that's the way it is, and I'm going to let it go anyway."

5         Q    Did Mr. Cipollone say anything about what he would do with respect to a

6    potential resignation if the President made this change?

7         A    He did at some point.   I guess that was on the heels of us talking about how

8    there would be resignations in the Department.   And I think Pat Cipollone said, "Well,

9    I'm not going to stand for this, I'm not going to be here if this happens either."

10        Q    So he said he would resign or not stand for it, would not be here, if the

11   President made this change.

12        A    Right.

13        Q    Who, Mr. Donoghue, was, sort of, the primary advocate or voice against the

14   leadership change?   Was it you personally, or was it sort of a consensus and everyone

15   was sort of equally chiming in?   Or just give me a better sense as to, sort of, who was

16   doing most of the talking and was the most strenuous advocate.

17        A    It was definitely a consensus.   We were all on the same page except for Jeff

18   Clark.   But we played different roles.

19        For one thing, Jeff Rosen was in a bad position because he was defending his own

20   job.   So anything he said, obviously, was very self-interested.   And so he wasn't in the

21   best position to make some of these arguments.   And by demeanor, he just has a

22   different demeanor, as does Pat Cipollone, as does Steve Engel.   So everyone played

23   their own role.   My demeanor is more aggressive and more blunt, and so I played that

24   role.

25        And so everyone was on the same page, advocating for the same thing in very

1    different ways, and I think that had an impact on the President.    I think he likes to see

2    that difference of view and different approach, and I think he lets people speak their

3    mind and fight it out in front of him before he makes a decision.

4           Q    I mean, I've heard this meeting described sort of like an "Apprentice"-like

5    meeting, where there's a firing decision at the end.    Is that a fair characterization?

6           A    I can honestly say I've never seen 1 minute of "The Apprentice" in my life, so

7    I can't opine about that.

8           Q    Fair enough.

9           Anyone else threaten to resign?    Mr. Philbin or Mr. Herschmann or anyone else

10   who was present?    Mr. Meadows?

11          A    Meadows was not there.

12          Q    I'm sorry, Mr. Meadows wasn't there.    Excuse me.    My mistake.

13          A    Right.    I don't remember if anyone else said anything specifically.    I think

14   Pat Philbin and Pat Cipollone were always sort of viewed as a package deal, so --

15          Q    Yeah.

16          A    -- if I thought about it for a moment, I would've thought, if Cipollone is

17   leaving, Philbin's leaving too.

18          But it was more a matter of me saying, "You're going to lose your Department

19   leadership," and then Pat Cipollone stepping in and saying, "And, basically, you're going

20   to lose your White House counsel as well."

21          Q    Yeah.    Okay.

22          After, I believe, he makes the decision to stay the course and leave Mr. Rosen in,

23   does he then start talking about the U.S. attorney in Atlanta, Mr. Pak?

24          A    I think that was actually before that.

25          Q    Okay.

1      A    I think the President really didn't announce his final decision until probably

2    about the last 15 minutes of the meeting.

3      Q    Uh-huh.

4      A    But somewhere in the middle of the meeting someone mentioned Atlanta,

5    and the President said, "Oh, yeah, Atlanta, Atlanta."   And then he picked up a piece of

6    paper that was on his desk, and he started waving it.   And he said, "No wonder nothing's

7    been found in Atlanta, because the U.S. attorney there is a Never Trumper."

8    And I had no idea what he was talking about.   I said, you know, "Mr. President, I

9    don't know what you mean."   And then he had this piece of paper, and he read a quote

10    from it that was purportedly from B.J. Pak, who was the U.S. attorney in Atlanta.   It was

11    critical of the President.

12    And I didn't know where this quote came from.   I had no idea what he was

13    talking about.   But I just said, look, Mr. President, I don't even know what a Never

14    Trumper is, but I'll tell you, all your U.S. attorneys were vetted, and I doubt B.J. said

15    anything like that.   But whatever it was, B.J. has been doing his job.

16    And he said, "No, no, no.   He's a Never Trumper."   He was very adamant about

17    that at that point.   "This guy is a Never Trumper.   He should never have been in my

18    administration to begin with.   How did this guy end up in my administration?"

19    And then he said, "I want you to fire him," to me.   I responded, "Mr. President,

20    I'm not going to fire him.   There's no reason to fire him."   And he said, "Well, then I'm

21    going to fire him."   I said, "Well, you should just know, before you make that decision,

22    that he told me a couple days ago he was submitting his resignation on Monday," which

23    was the next day.

24    So, if you want to fire someone who's resigning -- and then Pat Cipollone stepped

25    in and said, "Well, that's ridiculous.   The guy's resigning.   We're not going to fire him."

1        And the President said, "Fine.    I'm not going to fire him then, but when his

2    resignation comes in tomorrow, it's accepted immediately.    Tomorrow's his last day as

3    U.S. attorney."    And Pat said, "Fine.    We'll deal with that later" and, sort of, took it off

4    the table.

5        Q    Uh-huh.

6        A    And then the President said, "What do you know about Bobby Christine?"

7    Bobby Christine was the U.S. attorney in the Southern District of Georgia.    I was

8    surprised at the question.    I didn't know where it was going.    I said, "Bobby Christine is

9    an excellent U.S. attorney."    He said, "Yes, that's what I've heard.    I want Bobby

10   Christine to run the Northern District of Georgia."

11       I said, "Mr. President, Bobby Christine is already running the Southern District of

12   Georgia.    B.J. will have a first assistant.    When he leaves, the first assistant will step up

13   and be the U.S. attorney."    He said, "No.    I want Bobby Christine to do it, because if he

14   is really good the way people say, maybe he'll do the job."

15       And then he yelled for one of the administrative assistants to get Bobby Christine

16   on the phone.    They did in very short order.    Bobby ended up on the phone.    He was

17   clearly confused as to what was going on.

18       The President said, "Bobby, this is President Trump.    I'm sitting here with Rich,

19   Jeff, and some other people.    I want to know, are you able to run the Northern District

20   of Georgia?    Because B.J. Pak's going to be leaving."

21       And Bobby was clearly confused and said, "Mr. President, I can do whatever is

22   asked in that regard."    He said, "Great, Rich will call you later and explain everything"

23   and hung up.    And that was that.

24       So that was left as:    B.J. was resigning the next day, his resignation would be

25   accepted same day, and Bobby would take over the Northern District of Georgia for the

1    remaining few weeks of the administration.

2         Q    Did he saying anything more about Bobby Christine and why he thought

3    highly of him or thought that he would do something different than B.J. Pak had done?

4         A    No, just that he had heard great things about Bobby.   I knew that Bobby

5    was a one-star general in the -- I believe it was the Georgia National Guard.   And so he

6    had long military history.   I know that's something that the President favors.   I don't

7    know if that played into his understanding or not.

8         Q    Uh-huh.

9         All right.   Anything else you remember, Mr. Donoghue, before the last

10   15 minutes, when he says, "Okay, I'm not going to do it, I'm not going to make a change"?

11   Any other name come up, subject matter discussed, or anything else that's noteworthy

12   about the 2-1/2-hour meeting?

13        A    There was a lot there.   It was certainly a rollercoaster ride of a meeting, so

14   I'm sure there are things I'm not remembering.   I think at some point he had asked

15   about names of other U.S. attorneys.   You know, what do you think of this guy?   What

16   do you think of that guy?   And I just said:   Good U.S. attorneys, they're solid, they're

17   doing their job.

18        Q    Uh-huh.

19        When he announced his decision, did he give a reason why he was not going to

20   follow through with the change to put Clark in as the Acting Attorney General?

21        A    So, in about the last 15 minutes, after he'd heard everyone out extensively,

22   he said, "All right, I've heard everyone, and we're not going to do this."

23        He looked at Jeff Clark.   He said, "I appreciate your willingness to do it.   I

24   appreciate you being willing to suffer the abuse.   But the reality is, you're not going to

25   get anything done.   These guys are going to quit.   Everyone else is going to resign.   It's

1   going to be a disaster.   The bureaucracy will eat you alive.   And no matter how much

2   you want to get things done in the next few weeks, you won't be able to get it done, and

3   it's not going to be worth the breakage."

4          I think someone else had used that term earlier, maybe Pat Cipollone, "Is it really

5   worth the breakage?"   And the President said, "It's not going to be worth the breakage

6   to make this change at this point."

7          Q    Uh-huh.

8          A    And he said again, "These two, I know, are not going to get it done.   But

9   that is what it is at this point."   He talked about how disappointed he was in us, but said

10   to Clark that, I'm just not going to do this.

11         At that point, Clark began trying to get the President to change his mind.   He said

12   a number of things -- you know, history is calling, this is our opportunity, we can get this

13   done, and so on and so forth.   And the President then just sort of doubled down and

14   said, "No, we're not going to do it."

15         Q    Uh-huh.

16         A    At that point, the President looked at me and said, "So now what happens

17   with him?", gesturing toward Jeff Clark.   I didn't understand the question.   I said, "Sir?"

18   And he said, "Are you going to fire him?"

19         I said, "No, I'm not going to fire him.   I don't have the authority to fire him.   He's

20   a Senate-confirmed Assistant Attorney General."   And the President said, "Well, I'm not

21   going to fire him."   I said, "Well, that's fine then, sir.   We should all just go back to

22   work."

23         And we all got up and walked out of the Oval Office.

1      What you are doing there is more important.    But if you can spare the time, get on these

2      calls so we can hear directly what's going on, on the ground.

3           That might have --

4           Q     Is that what led to you --

5           A     That might have been before the Chief of Staff called in the car.    I can't

6      really remember.

7           Q     And is that what led to you, essentially, leading the 18 -- the 1900 call?

8           A     Yes.    Both the 1800 call and the 1900 call, I was told in advance, at least in

9      one case by the DAG himself, that you're the senior official on the ground in terms of

10     civilian executive branch agencies.    And, therefore, when we start this call, we're going

11     to turn it over to you to brief up what the situation is on the ground.    And I did that both

12     in the 1800 and 1900 calls.

13          Q     And I just want to turn to the page of your handwritten notes where you

14     state:   Prepped for the 1800 call.

15          A     Right.

16          Q     Sorry, we've gone a little bit out of order, but it's completely fine.

17          So we talked about the 1900 call, and you told us what leadership was on that call.

18     I want to clarify in your notes for the 1900 call, it says POTUS and VP.

19          Was the President on that call?

20          A     No, I never spoke to the President that day.    He was not on any calls that I

21     was on.

22          Q     Was there any attempt by the President to contact you that day?

23          A     Not that I'm aware of.

24          Q     Did you later learn that the President attempted to call you that day after --

25          A     No.    On January 6th?    No, I never heard that the President tried to contact

1   me on January 6th.

2            Q      And apart from Mr. Cipollone and Mr. Meadows, did any White House

3   official attempt to call you directly on January 6th?

4            A      No.    We had a call from the Situation Room, so that was operated out of

5   the White House, but there were no other officials reaching out to me that I'm aware of.

6            Q      Who was in the Situation Room at the White House?    Do you remember?

7            A      I don't.    This call, this 1800 call, this did not have the congressional

8   leadership on it.    And I don't believe the Vice President was on that call either.    It was

9   more of, I think, a law enforcement-level call.

10           Q      If we could just go through what you briefed them on in that 1800 call, that

11  would be helpful.

12           A      So these notes I have in exhibit 54 titled Prep for 1800 Situation Room Call, I

13  made these notes to myself a few minutes in advance of the 1800 call because I wanted

14  to make sure that I covered each of these points.

15           So I made this list with Dave Bowdich and Ashan Benedict and some of the Capitol

16  Police officers with me to make sure I wasn't missing any key information.

17           I ran through the list.    I prepared it.    When the 1800 call started out of the

18  Situation Room, they turned it to me first.    That's why I have the first entry there as,

19  "See call prep notes."    And I, essentially, read this list, and I briefed them on what the

20  situation was.

21           And then the call continued from there with other people chiming in about

22  perimeter fencing.    General Hokansen, H-o-k-a-n-s-e-n, talked about the D.C. National

23  Guard role and things like that.

24           Q      Before we move on from the 6 p.m. and the 7 p.m. call on January 6th -- and

25  just so I'm clear, you're still at the Capitol at that time.    Is that right, Mr. Donoghue?