IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK MEADOWS, | ) |
| *Plaintiff*, | ) |
| v. | ) Case No. 1:21-cv-3271-CJN |
| NANCY PELOSI, et al. | ) |

# Exhibit S

SELECT COMMITTEE TO INVESTIGATE THE

JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:   JEFFREY A. ROSEN

Wednesday, October 13, 2021

Washington, D.C.

The interview in the above matter was held in Room 4480, O'Neill House Office Building, commencing at 10:00 a.m.

Present:   Representatives Murphy, Luria, and Cheney.

whole pages of the President speaking.

But, as I say, I remember things that are consistent with Rich's notes, and that is part of why I take no exception that, if that's what he wrote, that's what he wrote.

Q     You indicated earlier that one of the things that the Department did not do was to hold a press conference.

A     That's right.

Q     And there was suggestion that you do that, and you --

A     Yes.

Q     -- appropriately did not.

So, again, what did the President say about why it was important to hold a press conference or to publicly make certain statements about the election?

A     Well, I'll give you an example.    I don't know if it's on this call or another one, because some of these blur a little bit, but at one point he was saying:    Many people are saying the Department of Justice is missing in action.    You know, you're not doing anything.    No one sees you doing anything.    No one sees you having any press conferences.    No one sees you denouncing the fraud that I'm hearing is all over the place.

So that would be an illustration where -- again, that's not an exact quote, but that's the way I remember him.    He would say, you know, "People are telling me the Justice Department is missing in action."    And then we would say, "Mr. President, that's just wrong.    The Department of Justice has done its job.    Just let us do our job."    And he would say, "Well, if you're doing your job, why haven't you found the fraud that everyone tells me is out there?"    And we'd say, "Well, some people are giving you bad information.    You're listening to the wrong people."    And, you know, it would go back and forth like that.

things that, as we sit here today, have been sorted out but back then would not have been, which is the, for example, privilege questions. I have the luxury today of being able to share conversations with the President, with the President's counsel, because the Department of Justice on behalf of the current President and the counsel for the past President not objecting. But there are -- that didn't get resolved, I think, until late July.

So not trying to add complexity where it doesn't exist but what I'm trying to say there are a series of complexities that do exist. And the course we did chart did work out. I think the point you made that I would agree with is it is extremely important in the Senate confirmation process that, at the front end, for the Congress or in that case the Senate, I guess, to help ensure that the people that are appointed to responsible positions are people of principle and character.

And I think it's worth thinking about prospectively the things you're pointing to. But I think those need more thought than I've given instructively, that I can constructively address today.

Mrs. Luria. No. I understand that those are complex issues that are perhaps things we look at in the work of this committee and how we, you know, prevent something like this from happening in the future.

But did want to hear your personal perspective of having been the person in the role, if there were things that went through your mind and actions that you thought you would have liked to have been able to take or kind of what your feeling was as you found yourself in that situation. So I appreciate your feedback and your insight into that.

Ms. Luria. And I yield back.

I don't have any further questions, and thank you for appearing before the committee today?

Mr. Rosen. Thank you.

be, you know, almost equally farfetched.

Q   At some point, Mr. Meadows actually emailed you that YouTube link, and Mr. Donoghue's response, upon receipt:   "Pure insanity."   Is that the same --

A   Yes.   Yes.   You've reminded me of that.   That's right.

Q   Yeah.   And did that accurately characterize your reaction, as well, to this theory, that it just --

A   Yes.

Q   -- was pure insanity, no basis whatsoever?

A   I'm going to understate.   It was not corroborated.

Q   Yeah.   Okay.

So, later that day, Mr. Rosen, after this meeting, the President called you directly. There was a phone conversation, and there's some discussion about the possibility of the Supreme Court -- this is not reflected in notes, but I believe you testified previously that there's a followup phone call with the President himself.   Do you remember that?

A   So I think Rich and I had a phone call with the President sometime on that Tuesday.

Q   Uh-huh.

A   I'm trying to remember if the brief came up in that one or not.   It wouldn't surprise me if it did.

What I remember better was that, on Wednesday, after the Kurt Olsen incident, I spoke to the President.   I think that was just me, or Rich may have been in my office, but I don't think it was on the speakerphone.   Some of these were on speakerphone with me and Rich, and some, it was just me, but Rich could've been in my office.

And the way I remember it is, on Wednesday, I wound up telling the President, "This doesn't work.   There's multiple problems with it.   And the Department of Justice

is not going to be able to do it."   And --

Q   And what was his reaction?

A   He was accepting of it.   He didn't actually argue.   I didn't know that going into the call --

Q   Uh-huh.

A   -- so I had prepared.   You probably remember these notes that OLC, I guess Steve's office, had prepared for me.

Q   Right.

A   But the President just acquiesced.

Q   Yeah.   So you conveyed to him, "Hey, we don't have standing to file this," told him that explicitly, and he acquiesced.

A   Yes.

Q   Okay.

A   And to my best recollection -- I've been asked this before, is, did it come back?

Q   Yeah.

A   I can't say definitively, but I don't think so.   I think that was the end of it.

Q   Now, there was one case in which the Department did intervene.   Is that right?   I think you mentioned --

A   Yeah.

Q   -- in opening statement there was only one matter in which --

A   Yeah.

Q   -- there was standing and Department did intervene.   And can you tell us about that?

A   Well, it didn't intervene.   It was -- the Vice President was the defendant.

Q    Yeah.

A    And so he was at the Sunday night meeting. I think he had called me, that he had heard, I'm assuming from either Mr. Cipollone or Mr. Meadows, that it was happening, and had called me and just told me he was going to come to it.

Q    Yeah. Did he say why? It was the only meeting in which he shows up.

A    Yeah.

Q    Why was he there? Did he or others say?

A    I don't remember exactly. But I know what he said at the meeting, and that makes me think that he had indicated something along -- you know, that he had previewed where he was coming from, which was that he thought the Department of Justice should be left to do its work in the way that it thinks is appropriate.

Q    Yeah. He's actually quite directly critical of Mr. Clark and his credentials during the meeting with the President. Is that right?

A    Absolutely correct.

Q    Calls him out, saying, "No experience. You're not qualified for this job."

A    Yes.

Q    Said all that directly to Mr. Clark and to the President in that meeting?

A    Yes.

Q    Okay. So it sounds like in the meeting everyone agrees but Mr. Clark that it would be a terrible mistake for the President to make that change.

A    That's how I remember it, yes.

Q    Yeah.

The one quote that I wanted to ask you about is, at some point it's reported that the President says, "I know you, Jeff," pointing or gesturing toward you, "and you're not going to do anything. You don't even know or agree about the election. I don't know

Jeff Clark, but he'll do something about the election," essentially making this juxtaposition between you represent inaction and Clark represents action.   So the discussion is not just who's going to serve, but is the Department going to take action?

Is that accurate?   Sort of, you and your status is tied to action versus inaction?

A   I would agree with that.   I think the dialogue that you recited I think is, in substance, right.   Again, I don't have a transcript, but it's consistent with how I remember that playing out.

Q   Okay.

And, during the meeting, the lone voice for action or for change is Mr. Clark.

A   Correct.

Q   Do you remember any argument he put forth specifically as to why he could or should be installed and what action he would or should take as a result?

A   Well, he made arguments about why the letter would be effective, that he thought it would -- he said that it would set off multiple reactions.

Q   So this is the letter that we talked about a little before --

A   Yes.

Q   -- that you and Mr. Donoghue had clearly said no factual basis and --

A   That's right.

Q   -- clearly inappropriate for the Department?

A   That's right.

Q   The letter was back, and at the meeting it's discussed that he would send such a letter?

A   Yes.

Q   Okay.

A   And so he advocated for that.

He also defended his own credentials against some of the attacks that were being made. He argued that the rest of the room were being self-defeating, you know, that, if you don't try it, you don't know what's going to happen, I think was the nature of that.

Let me think. This was a very, very long meeting.

Q   Yeah.

A   And everybody spoke at one time or another. Some people spoke repeatedly. The President interjected some places. There were a few places he spoke at greater length, but a lot of the meeting, he let other people talk.

Q   Uh-huh.

A   And so I'm trying to remember the different places that Jeff Clark spoke. Because he spoke more than once. And I have more the image, that he would get in a debate, you know, that Rich Donoghue and he would have back-and-forth, and Steve Engel and he would have back-and-forth, and Eric Herschmann and he would have back-and-forth --

Q   Yeah.

A   -- that that occurred numerous times.

But the overall substance was, different people in the room were saying, this is not legally well-founded, this is not the Department's role, this letter is inappropriate. They challenged Jeff Clark's qualifications to even be making these arguments. They challenged both whether he was qualified to be Attorney General but also is he even qualified to address election fraud, you know, even from his current position, let's say.

Q   Uh-huh.

A   And so there's this range of issues.

Now, at more than one juncture, a number of people do raise that, if this goes ahead, there are going to be resignations. And I think lots of people raised that. I let

other people speak to that, for obvious reasons, that they were speaking in support of me, so it wasn't my place to speak to.    Jeff Clark didn't speak to that, but I think almost everybody else did.    I remember Pat Cipollone spoke to it, Rich Donoghue.

There was one moment where I remember Steve Engel, and Steve was explaining why he thought it was inappropriate for the Department of Justice to be sending a letter to Georgia and that he had multiple reasons for that.    And he commented that, if it went, that there would be resignations.    And, again, this is in substance.    I don't remember the exact words.

And then Steve Engel, when he was saying that, the President said to him, "Well, Steve, you've been at Justice the whole time.    You wouldn't resign."    And Steve -- I remember this because it was very vivid -- said, "No, Mr. President.    If you replace Jeff Rosen with Jeff Clark and send this letter, I would have no choice.    I would have to resign."

And the President looked to me, startled, and said, "Steve, you wouldn't resign." And Engel repeated it.    He said, "Mr. President, I would have no choice.    I would have to resign."

So that was highly corroborative of what had been said by other folks.

Q    Uh-huh.

So the only substantive election-related action that was discussed was the sending of the letter?    Was there also a discussion of the special counsel or the press conference or the Supreme Court brief, the litany of possible things that had been considered that you mentioned in your opening statement?

A    I don't remember them being discussed in individual -- you know, what about the Supreme Court brief --

Q    Yeah.

A   -- or what about this?   I remember at a higher level of generality, that there are more steps.   The focus was on the letter --

Q   Uh-huh.

A   -- and that the letter would produce multiple steps and would, you know, be connected to some kinds of public statements.   Because, by definition, the letter wasn't going to stay secret.

So I don't remember it in terms of going back to that Supreme Court brief or something.   I remember it just more, there's this one approach that says, in effect, do nothing, and this other approach that says, start taking steps.   And the debate was about that.   And I think I agreed with your question earlier, that the approach and the people were effectively merged.

Q   Yeah.

Well, I don't want to correct you, but when you say "do nothing," at this point the Department had done a great deal already with respect to evaluating claims of election fraud.   That had already occurred --

A   No, that's right.   "Do nothing" is a shorthand for --

Q   For prospectively do nothing?

A   For prospectively taking steps that would be critical of the election and its validity.

Q   I see.

All right.   So the President makes a decision in the meeting, basically decides, I'm going to stay put, I'm not going to replace you, Acting Attorney General Rosen, with Mr. Clark.

Did he explain why?   What was the reason, if any, he cited as to why he stayed put with you as the leader of the Department?

A     He was very conclusory about that.   He just made a declarative statement that, all right, we're just not going to do this, we're not going to make a change, something to that effect.

Q     Did he cite the resignations or the damage it would do to make a change?

A     No, it wasn't -- you know, in a room full of lawyers, you'll forgive me -- it wasn't like a judge that said, here's my opinion, here's where I come out --

Q     And here's the reason?

A     -- here's the four reasons.   It was more declaratory.   You know, we'd been there for a long time, I think 2, 2-1/2 hours at that point, something like that, and he just declared, okay, we're not going to make the change.

Q     Without explanation?   He doesn't tie it to any specific factor?

A     No.   As I said, he didn't tie it to a statement of reasons.

Q     Yeah.

A     As I alluded to, there had been a number of fairly memorable moments during the course of the discussion, so everybody there probably has their own perspectives on which one was the key.

Q     Uh-huh.

A     You know, there were several that I remember really well.   Others, not so well, because it was a very long meeting.

Q     Yeah.

A     The Engel anecdote that I just mentioned.   Eric Herschmann and -- he and others, but Eric Herschmann.   It was a very vivid attack on Jeff Clark's qualifications.

Q     So the reasons put forth were Mr. Clark's personal lack of qualifications or experience with elections; the letter to State officials, again, would not be appropriate institutionally; and the resignations.   "Hey, the Department will empty out if this has

occurred."

    Those are sort of the main arguments against a change, as you recall?

A    Those, but there were a couple of others.

Q    Uh-huh.

A    Maybe they were slightly abstract, that this is not the right thing to do, this is not in the best interest of the country.

Q    Uh-huh.

A    I'm trying to remember some specifics.

    I mean, there was some discussion, again, that you're getting bad information, that these episodes of alleged fraud, that people have said this, that, or the other incident, those aren't valid.    That was repetitive, to some extent, but it did come up again.

Q    Uh-huh.    Yeah.

A    But those are certainly some of the big ones.

Q    I see.

    After he announced his decision, did Mr. Clark continue to push, continue to argue his case, despite the fact that the President had announced he wouldn't make a change?

A    Not when the President said, look, we're just going to -- we're not going to make the change, when he, in effect, announced a decision.

    Earlier on, there were some moments where it wasn't clear if maybe we were done, and so Mr. Clark did make a push then.

    But he also did the opposite one time, too.    I think, you know, you may recall in the Senate hearing, I pointed out that, at one point, he actually said to the President, "I think it's time to call the question."

    So there was some of both, you know, of --

Q   And what did the President say when he said it was time to call the question?   Did he say, "It's my decision as to when to call the question," or something like that?

A   He had a facial expression that said that.

Q   "Don't tell me when it's time --

A   Yeah.

Q   -- to decide"?

A   Yeah.   And the discussion wound up continuing quite a fair amount after that, too, actually.

Q   Okay.

A   But when the President announced his bottom line, if I can put it that way, I think Mr. Clark was accepting that the President gets to make the call.

Q   Yeah.

A   It probably wasn't what he had thought -- what he, Jeff Clark, thought going in.   But the President gets to make the call.

Q   Yeah.

And did that, Mr. Rosen, essentially end it?   When I say "it," I mean pushing you allegations of alleged voter fraud or suggestions that the Department should take certain action.   I have a sense that this meeting was sort of the punctuation here, that, okay, Department of Justice is not any longer going to be a source of relief for the President.

A   I perceive it the way you just said, that that was the end of it.   And I would say that's somewhat corroborated by:   The President had been calling me with some regularity in those 2 weeks, and after January 3rd he did not.

Q   Yeah.   No more contact with him until the very last -- well, did you ever have any more contact with the President after that meeting?

A     I think, generally, no, except he called, I think, on the 19th.   And I think he was calling various Cabinet officers and just saying, "Thank you for your service."

Q     Yeah.   I see.

How about Mr. Meadows?   Did he continue to call you, talk with you, post- this meeting on January 3rd about anything, in particular about the election?

A     To my best recollection as I'm sitting here is that he didn't talk to me about the election but he did contact me about some other stuff --

Q     Yeah.

A     -- including that oversight issue --

Q     Got it.

A     -- that had not been resolved.

Q     Yeah.   Which I'm not -- okay.

[Discussion off the record.]

Mr. Rosen.   So just a clarification.

BY MR. HEAPHY:

Q     Sure.

A     January 6th I think of as being about a riot, but I suppose if you define that as also being about the electoral count -- because that was going on that day --

Q     I see.

A     -- there was a point in the early afternoon when Mr. Meadows and Mr. Cipollone called me.

Q     Uh-huh.

A     And we can talk some more about that if you --

Q     We will, but Soumya is going to get into that day.   I appreciate the clarification.

were discussed, you testified before the Senate that those were tied together.    In what way were those two things, meaning the draft letter from Jeff Clark and appointing Jeff Clark as Acting Attorney General tied together?

A    So I think this goes back to the discussion we had with Mr. Heaphy, that the personnel and the approach were bound together, that it wasn't -- well, here is maybe a simple way to say it.    There was no scenario in which he got to keep me and send a letter to Georgia because I'd resign before that happened.    And, likewise, Jeff Clark, if he had been chosen, did not indicate that he would be pleased to be the Acting Attorney General and take no actions with respect to the validity of the election.

Q    So I know you're reluctant to speculate on what could have happened, but based on what Jeff Clark had said to you, were you under the impression that, if Jeff Clark had been appointed Acting Attorney General, he would have sent the letter or something like it to State officials in Georgia?

A    Yeah.    I don't -- I'm not speculating there.    He advocated that he wanted to do that.

Q    And I believe he referred to it or maybe even labeled it at some point as a proof-of-concept letter.    Is that correct?

A    Yes.

Q    And, from that, did you take it that he wanted to send a similar letter to other States as well?

A    Yes, because I think he had said that.    I don't know if he said it at the meeting or he said that to me and Rich Donoghue in the earlier conversations.    But, at some point, I think he had said that, while Georgia was the focal, that he would think that, as you alluded to, it's a proof of concept to do other places as well.

Q    And did Jeff Clark ever indicate that if he were appointed Acting Attorney

General, he would state publicly that the 2020 Presidential election was corrupt?

A   Maybe not as blunt as you just said it, but --

Q   What's the best way to describe it?

A   That he advocated not just that the letter be sent but that there be public assertions about the improprieties with regard to the 2020 election.

Q   And did Jeff Clark ever express an opinion whether, if he had been appointed Acting Attorney General, he would have the Department of Justice file an original action in the Supreme Court?

A   I don't remember the Supreme Court thing coming up at the Sunday night meeting, so I have to harken back to whether I commented on that later on.   As I sit here right now, nothing's coming to mind, but that -- that's one I might need to think about.

Q   So, regarding the President's suggestion that he might change the Department of Justice's leadership during one of your meetings with the President, Mr. Donoghue's notes indicated that he said something to the -- that he, Mr. Donoghue, said something to the effect of "fine, but that won't change the Department's position."

Do you remember him saying something along those lines?

A   Yes.   That -- this is in the early phase, right, where we know that Jeff -- at that early phase, we were aware that Jeff Clark had gone to this meeting at the Oval, but we did not have insight that he had a different path in mind.   So, when the President raised that comment that -- again, I'm just paraphrasing, that Jeff -- people tell me Jeff Clark is great or whatever, we somewhat discounted that as in, you know, fine. You -- you've met him once.   But, you know, the Department's position is the Department's position.

Q   So it's certainly understandable that, given what Mr. Donoghue knew at the

anyone has any questions about the calls that day.

Ms. Cheney.   I do, Soumya.

Jeff, can you talk about, over the course of the day, whether it occurred to you at all to think about President Trump and what he was doing?

Mr. Rosen.   In some sense.   I mean, you can see there is so much going on that there is not a lot of time for what I'll call reflection.

But I think that -- I think I learned at some point he had put out some kind of a statement that was not what we would have wished for.   You may have it and refresh me.   I don't remember the specifics.   But I just remembered thinking that's not what we would have wished for.

And the White House staff were -- at least the ones I dealt with, and they're reflected on this, which, at least to my best recollection, were Pat Cipollone, Robert O'Brien, and Mark Meadows -- they were very much in the same posture we were: Let's get as much help to the Capitol as fast as possible.

So I think that there was at least the hope that somebody in the White House could talk to the President.

Ms. Cheney.   And were there any discussions about that?

Mr. Rosen.   That's what I'm saying, is I -- it's such a blur, the day is such a blur that I just don't recall that.

Ms. Cheney.   Did you -- how did you think about the fact that you had talked to everybody up to the Vice President, but not the President?

Mr. Rosen.   Well, I, as I say, I think the initial statement that I had seen put out was not what we would have wished for.   And I'm really not -- not really even sure how to respond to that, because we got so focused during the day on what we have to do and what can we do and trying to be in a posture of being part of the solution, trying to be

helpful.

Obviously, the situation was terrible, but once this breach of the Capitol occurred there was this tremendous urgency and just ongoing all day long, you know -- what's happening, what can we do, what else do we know, and what do we hear from DHS, what do we know -- that it just gets caught up in the moment of:   Let's do our job.   You know, we'll do our job, and let's hope everybody is doing what they're supposed to do. And that's how I remember it.

Ms. Cheney.   In terms of the first statement, do you recall the statement that the President put out calling the Vice President a coward?

Mr. Rosen.   Yeah.   I didn't actually see it, but someone had come into my office and said a variant of, "You will not believe this statement."   And it was something similar to what you just said -- again, I don't remember the exact words -- and just being both surprised and disappointed at that statement.

Ms. Cheney.   Did you have any reason to believe at any moment that the President was taking action?   Did anybody come to you and say, "He's taking action to stop this"?

Mr. Rosen.   Not -- no, not in those words or equivalent.   Just the fact that Mark Meadows and other White House staff were saying, "Do everything you can to help address this situation."

Ms. Cheney.   But they weren't telling you what they are trying to do --

Mr. Rosen.   No.

Ms. Cheney.   -- internally?

Mr. Rosen.   No.   At least not that I remember.   The thing that just sticks with me is this urgency of, "Can everybody try to get help?"

Ms. Cheney.   Okay.