IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK MEADOWS, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-3271-CJN |
| ) | |
| NANCY PELOSI, et al. ) | |
| ) | |
| *Defendants*, ) | |
| ) | |
| ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. "On January 6, 2021, as a joint session of Congress convened in the U.S. Capitol to certify the vote count of the Electoral College, thousands of people, many of whom had marched to the Capitol following a rally at which then-President Donald Trump spoke, gathered outside." *United States v. Miller*, No. 1:21-cr-00119, 2022 WL 823070, at *1 (D.D.C. Mar. 7, 2022).

2. "[A] mob professing support for then-President Trump [then] violently attacked the United States Capitol in an effort to event a Joint Session of Congress from certifying the electoral college votes designating Joseph R. Biden the 46th President of the United States.  The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol.  Then-Vice President Pence, Senators, and Representatives were all forced to halt their constitutional duties and flee the House and Senate chambers for safety." *Trump v. Thompson*, 20 F.4th 10, 15-16 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) (mem.).

3.  In response to that attack, the House of Representatives adopted House Resolution 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United

States Capitol." That resolution authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures … as it may deem necessary." H. Res. 503, 117th Cong. § 4(a)(1)-(3) (2021).

3. To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader." H. Res. 503 § 2(a).

4. On July 1, 2021, pursuant to the resolution, Speaker Pelosi appointed eight Members of the House (seven Democrats and one Republican) to the Select Committee. 167 Cong. Rec. H3597 (daily ed. July 1, 2021). On July 19, 2021, the House Minority Leader presented his recommendations for five additional Republicans to be appointed to the Select Committee. Press Release, Kevin McCarthy, McCarthy Names House Republicans to Serve on Select Committees (July 19, 2021), https://perma.cc/W3JD-8QED.

5. The Speaker then spoke with the Minority Leader, advised him that she would appoint three of the Members he had recommended, and asked the Minority Leader to recommend two other Republicans. Rather than comply with that request, the Minority Leader declined and, instead, withdrew all five recommendations and refused to participate further in the appointment of members. Press Release, Kevin McCarthy, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee (July 21, 2021), https://perma.cc/V6GG-BALN.

6. After the Minority Leader declined to make further recommendations, the Speaker interpreted House Resolution 503 and the relevant House Rules, and determined a course of action under House Resolution 503 and the House Rules. She then named an additional Republican to the Select Committee. 167 Cong. Rec. H3885 (daily ed. July 26, 2021); Am. Compl. ¶ 58.

7. The Speaker's appointment of nine Members was in recognition of the quorum requirements for the Select Committee to conduct business and receive witness testimony. *See* Rule XI.2(h), Rules of the U.S. House of Representatives, 117th Cong. (2021); *see also* H. Res. 503§ 5(c)(3).

8. The Select Committee has operated with seven Democrats and two Republicans, and the full House has approved three resolutions of contempt of Congress referred to it by the Select Committee, one of which was addressed to Mr. Meadows specifically. 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021); *id.* at H5768-69, 117th Cong. (daily ed. Oct. 21, 2021); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022).

9. On September 23, 2021, the Select Committee issued a subpoena to Mr. Meadows for deposition testimony and documentation regarding the events of January 6, 2021, and the facts and circumstances that led to the violent attack on the Capitol that day. ECF 13-3 (Am. Compl. Ex. A).

10. As authorized by Mr. Meadows, an attorney named Scott Gast accepted service of this subpoena on behalf of Mr. Meadows on September 23, 2021. H. Rep. 117-216, at 47 (2021).

11. The Chairman of the Select Committee explained in a cover letter accompanying the subpoena that its investigation had "revealed credible evidence" of Mr. Meadows's "involvement in events within the scope of the Select Committee's inquiry." ECF 13-3 at 4 (Am. Compl. Ex. A).

12. Specifically, the Select Committee's letter explained that Mr. Meadows was "with or in the vicinity of President Trump on January 6th, had communications with the President and others on January 6 regarding events at the Capitol, and [was] a witness regarding activities of that day." *Id.*

13. The Select Committee letter also identified public reports indicating that Mr. Meadows was "engaged in multiple elements of the planning and preparation of efforts to contest the presidential election and delay the counting of electoral votes." *Id.* Further, the Select Committee letter stated that, according to documents provided by the Department of Justice, Mr. Meadows "directly communicated with the highest officials" at the Department "requesting investigations into election fraud matters in several states." *Id.*

14. The Select Committee letter also indicated the Select Committee's understanding that, in the weeks after the 2020 election, Mr. Meadows "contacted several state officials to encourage investigation of allegations of election fraud, even after such allegations had been dismissed by state and federal courts, and after the Electoral College had met and voted on December 14, 2020." *Id.*

15. On November 11, 2021, the Deputy White House Counsel informed Mr. Meadows's counsel that President Biden had considered but declined to assert executive privilege or any

form of immunity with respect to Mr. Meadows's testimony or production of documents in response to the Select Committee's subpoena. ECF 13-14 at 3 (Am. Compl. Ex. L).

16. On November 26, 2021, Mr. Meadows's counsel wrote that Mr. Meadows would appear at a deposition subject to certain preconditions, ECF 13-17 at 3-4 (Am. Compl. Ex. O), and agreed to produce 1,139 documents from Mr. Meadows's personal email account, ECF 13-18 at 2 (Am. Compl. Ex. P).

17. On December 3, 2021, the Select Committee received certain documentation from Mr. Meadows, including 2,319 text messages from Mr. Meadows's private phone without Mr. Meadows or any executive branch official asserting any claim of privilege over those materials. Mr. Meadows also provided the Select Committee with a privilege log showing Mr. Meadows was withholding over 1,000 text messages from his personal cell phone based on claims of executive, marital, and attorney-client privileges. *See* H. Rep. 117-216, at 19, 130 (2021).

18. In Mr. Meadows's privilege logs where he claimed attorney-client privilege for certain email communications, Mr. Meadows identified more than 200 communications he initiated or participated in based on his role in the Trump campaign with people reported to be members of the Trump campaign legal team or other Trump campaign staff. *See, e.g.*, Ex. A to Decl. of Timothy Heaphy, Dec. 6, 2020 Emails from Mark Meadows to Jason Miller. Mr. Meadows also had a role in post-election Trump campaign efforts, including travelling to Georgia to observe an audit of absentee ballot signatures, communicating with state officials, legislators, and others regarding state election results, and planning with members of Congress and others not in the Executive Branch for the events of January 6th. *See, e.g.*, Amy Gardner &

Paulina Firozi, *Here's the transcript and audio of the call between Trump and Raffensperger*, Wash. Post (Jan. 5, 2021), https://perma.cc/5SMX-4FPX.

19.  Mr. Meadows's privilege logs also included separate claims of work product protection and executive privilege for dozens of email communications with lawyers acting for the campaign and/or other campaign staff.  *See* Ex. E to Decl. of Timothy Heaphy, Mark Meadows Email Privilege Log.

20.  Although Mr. Meadows had agreed to appear for a deposition on December 8, 2021, he informed the Select Committee on December 7, 2022, of a change of heart.  Instead of appearing for the deposition, he filed this suit and refused to appear before or provide any testimony to the Select Committee, either regarding his activity as Chief of Staff or his other activity for the Trump campaign.  ECF 13-22 (Am. Compl. Ex. T).

21.  Thereafter, the House of Representatives voted to hold Mr. Meadows in contempt by a vote of 222 yeas and 208 nays.  167 Cong. Rec. H7814-15(daily ed. Dec. 14, 2021).  Some members of the House argued before the House Rules Committee and on the House floor that the Select Committee lacked an appropriate legislative purpose, was not appropriately composed, and lacked authority to issue the Meadows subpoena.  The House Rules Committee reported a resolution governing floor consideration of the measure and the full House adopted the contempt resolution emanating from the Select Committee's contempt report.  The contempt report adopted by the House repeatedly noted that Mr. Meadows not only refused to attend a deposition at all but refused to provide even indisputably non-privileged testimony to the Select Committee. *See, e.g.*, H. Rep. 117-216 at 3 (2021).

22. Since that time, Mr. Meadows has continued to refuse to comply with the Select Committee subpoena's demand for testimony, even with respect to non-privileged information.

23. On November 22, 2021, the Select Committee issued a subpoena to Verizon for "subscriber information and cell phone data associated with Mr. Meadows's personal cell phone number." Am. Compl. ¶ 107. The subpoena does not request any content of any communications, nor does it request geo-location data. *See* ECF 13-21 (Am. Compl. Ex. S). To date, Verizon has not produced any of the subpoenaed information to the Select Committee, and it has advised the Select Committee that it will not provide the requested documents absent a ruling from this Court.

24. On January 30, 2022, former-President Trump issued a press release stating: "Actually, what they are saying, is that Mike Pence did have the right to change the outcome, and they now want to take that right away. Unfortunately, [former-Vice President Pence] didn't exercise that power, he could have overturned the Election!" Press Release, Donald J. Trump, Statement by Donald J. Trump, 45th President of the United States of America (Jan. 30, 2022), https://perma.cc/9FBF-J7HE.

25. On December 7, 2021, Mr. Meadows's book about his ten months as White House Chief of Staff, *The Chief's Chief*, was released by All Seasons Press.

26. Former President Trump reviewed the book in advance and did not object to its publication. *See* Statement by Donald J. Trump (October 13, 2021), https://perma.cc/MGS4-7P6S.

27. In his book, Mr. Meadows recounts specific conversations he had with the former President.

28. In his book, Mr. Meadows discloses his views and observations of events that occurred on January 6, 2021.

29. Prior to January 6, 2021, Mr. Meadows conducted activities for the Trump presidential campaign. For example, Mr. Meadows stated in his book, "For weeks, we had been campaigning at a herculean pace." Mark Meadows, *The Chief's Chief*, at 243 (2021). *See also id.* at 230 (stating, "I had spent most of the day helping the campaign team set up an election command center in the East Wing of the building"); *id.* at 235-37, 241 (describing how Mr. Meadows called the managing editor of Fox News's Washington division to convey the "problem" of Fox News covering a Biden campaign rally instead of a Trump campaign rally occurring at the same time, and how Mr. Meadows called him again on election night to complain about Fox News "call[ing] Arizona for Joe Biden").

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492)
   *General Counsel*
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for the Defendants*

April 22, 2022