**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT & IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 9

A.   AUTHORITY AND PURPOSES OF THE SELECT COMMITTEE ............................ 10

B.   COMPOSITION OF THE SELECT COMMITTEE ........................................................ 11

C.   ACTIVITIES OF THE SELECT COMMITTEE ............................................................ 12

D.   THE SELECT COMMITTEE'S SUBPOENA & MR. MEADOWS'S
      ACCOMMODATION EFFORTS ................................................................................ 13

E.   THE SELECT COMMITTEE'S VERIZON SUBPOENA & BREAKDOWN OF
      ACCOMMODATION EFFORTS ................................................................................ 15

STANDARD OF REVIEW ............................................................................................ 17

ARGUMENT ................................................................................................................ 18

I.   TESTIMONIAL IMMUNITY PROTECTS FORMER CHIEF OF STAFF
     MEADOWS FROM CONGRESSIONAL COMPULSION TO TESTIFY
     ABOUT HIS WHITE HOUSE SERVICE .................................................................. 18

     A.   The Separation of Powers prohibits Congress from subpoenaing the White
          House Chief of Staff for testimony. ...................................................................... 19

     B.   Testimonial immunity applies, and Mr. Meadows is entitled to judgment,
          because the subpoenas targeted him based on his role as Chief of Staff. ............ 25

     C.   Even if factual questions about the "capacity" in which Mr. Meadows took
          certain actions were relevant, the Congressional Defendants would not be
          entitled to summary judgment because those factual questions are
          disputed. ................................................................................................................ 30

II.  THE SELECT COMMITTEE DID NOT HAVE A VALID LEGISLATIVE
     PURPOSE FOR THE SUBPOENAS .......................................................................... 31

III. THE SUBPOENAS WERE NOT VALIDLY ISSUED .................................................. 35

     A.   The Select Committee Is Not Properly Composed Under H. Res. 503
          § 2(a). .................................................................................................................... 36

     B.   The Subpoenas Were Not Validly Issued Under H. Res. 503 § 5(c)(6). ............. 37

IV.  ADDITIONAL ISSUES WITH THE SUBPOENAS PRECLUDE SUMMARY
     JUDGMENT IN FAVOR OF THE CONGRESSIONAL DEFENDANTS.................... 38

     A.   The Subpoenas Violate the Separation of Powers by Infringing Upon
          Executive Privilege. .............................................................................................. 38

     B.   The Select Committee Cannot Obtain Records under the Verizon
          Subpoena Consistent with the Stored Communications Act. ................................ 43

     C.   Compelled Production under the Verizon Subpoena Would Violate the
          Fourth Amendment. .............................................................................................. 44

D.      Compelled Production of Cell Phone Data under the Verizon Subpoena
        Would Violate the First Amendment. ................................................................. 46

CONCLUSION ......................................................................................................................... 47

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Air Line Pilots Ass'n v. Fed. Express Corp.*,
   139 F. Supp. 3d 320 (D.C. Cir. 2015)...............................................................17, 18

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*,
   333 F.3d 168 (D.C. Cir. 2003)........................................................................46

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...............................................................................17, 18

*Army Times Publ'g Co. v. Department of the Air Force*,
   998 F.2d 1067 (D.C. Cir. 1993)........................................................................39

*Auer v. Robbins*,
   519 U.S. 452 (1997)....................................................................................31

*Black Panther Party v. Smith*,
   661 F.2d 1243 (D.C. Cir. 1981)........................................................................46

*Buckley v. Valeo*,
   424 U.S. 1 (1976).......................................................................................46

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018).................................................................................45

*Christoffel v. United States*,
   338 U.S. 84 (1949)......................................................................................2

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)....................................................................................31

*Clinton v. City of New York*,
   524 U.S. 417 (1998)....................................................................................42

*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
   558 F. Supp. 2d 53 (D.D.C. 2008)................................................................ *passim*

*Comm. on Judiciary, United States House of Representatives v. McGahn*,
   415 F. Supp. 3d 148 (D.D.C. 2019).................................................7, 22, 23, 25

*Eastland v. United States Servicemen's Fund*,
   421 U.S. 491 (1975)....................................................................................31

*Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*,
   655 F.2d 380 (D.C. Cir. 1981).....................................................................28, 29

*Forrester v. White,*
    484 U.S. 219 (1988)..............................................................................................26

*Gojack v. United States,*
    384 U.S. 702 (1966)..............................................................................................36

*Gravel v. United States,*
    408 U.S. 606 (1972)..............................................................................................20

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)..............................................................................................23

*I.N.S. v. Chadha,*
    462 U.S. 919 (1983)..............................................................................................42

*Katz v. United States,*
    389 U.S. 347 (1967)..............................................................................................45

*Liveright v. United States,*
    347 F.2d 473 (D.C. Cir. 1965)............................................................................36

*McGrain v. Daugherty,*
    273 U.S. 135 (1927)..............................................................................................37

*Meadows v. Pelosi,*
    1:21cv3217 (D.D.C. Dec. 8, 2021) ....................................................................16

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985)........................................................................................26, 27

*Morrison v. Olson,*
    487 U.S. 654 (1988) (Scalia, J., dissenting)......................................................26

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977).......................................................................8, 21, 28, 33

*Oklahoma Press Pub. Co. v. Walling,*
    327 U.S. 186 (1946)..............................................................................................45

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997)......................................................................20, 39

*Senate Select Comm. on Presidential Campaign Activities* v. *Nixon,*
    498 F.2d 725 (D.C. Cir. 1974)......................................................................28, 40

*Shelton v. United States,*
    327 F.2d 601 (D.C. Cir. 1963)............................................................................36

* *Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) ................................................................................ *passim*

*Trump v. Thompson*,
   142 S. Ct. 680 (2022) (statement of Kavanaugh, J., respecting denial) ............7, 13, 22, 24, 41

*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021) ...................................................................34

*United States v. Bannon*,
   1:21cr670, ECF No. 28-9 (D.D.C. Feb. 4, 2022) .................................9, 38

*United States v. Grumman*,
   227 F. Supp. 227 (D.D.C 1964) ..............................................................36

*United States v. Nixon*,
   418 U.S. 683 (1974) ........................................................................ *passim*

* *Watkins v. United States*,
   354 U.S. 178 (1957) ........................................................................ *passim*

*Yellin v. United States*,
   374 U.S. 109 (1963) ..................................................................2, 9, 36, 38

**Statutes**

18 U.S.C. §§ 241-42 .........................................................................28

18 U.S.C. § 2702(c)(1) .....................................................................44

18 U.S.C. § 2711 ..............................................................................43

52 U.S. Code §§ 10307, 20511 ........................................................28

H.R. 3233 ........................................................................................10

H. Res. 503, 117th Cong. (2021) ..........................8, 10, 11, 12, 33, 36, 37, 38

Presidential Records Act of 1978 .....................................................13

Stored Communications Act ..........................................................43, 44

U.S. Const. amend. I ..........................................1, 19, 28, 29, 46

U.S. Const. amend. IV .......................................1, 41, 44, 45, 46

U.S. Const. amend. V .......................................................1, 41

U.S. Const. amend. VI ............................................................1

U.S. Const. art. I, § 5, cl. 2 ..........................................................................................5

U.S. Const., art. II, § 3 ..............................................................................................27

**Other Authorities**

Aaron Blake, *The key texts between Mark Meadows, Mike Lee and Chip Roy*,
    Wash. Post (Apr. 15, 2022),
    https://www.washingtonpost.com/politics/2022/04/15/lee-roy-meadows-texts/ ......................4

Alan Feuer, et al., *Justice Dept. Widens Jan. 6 Inquiry to Range of Pro-Trump
    Figures*, N.Y. Times (Mar. 30, 2022) .........................................................................25

\* *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op.
    O.L.C. 1 (1999) ...........................................................................................6, 18, 19, 20

Bob Woodward & Robert Costa, *Virginia Thomas urged White House chief to
    pursue unrelenting efforts to overturn the 2020 election, texts show*, Wash.
    Post (Mar. 24, 2022)
    https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-
    meadows-texts/ .....................................................................................................4

Christina Prignano, *Read Sean Hannity's texts to Mark Meadows*, Boston Globe
    (Jan. 5, 2022) .........................................................................................................4

Edward-Isaac Dovere, *Obama's Cabinet Lacks Voter Sway,* Politico (October 31,
    2014), https://www.politico.com/story/2014/10/obamas-cabinet-doesnt-
    deliver-midterm-boost-112370 ...............................................................................30

Fed. R. Civ. P. 12(b)(6) ............................................................................................17

Fed. R. Civ. P. 12(c) ................................................................................................1, 17, 19

Fed. R. Civ. P. 56 ....................................................................................9, 17, 19, 30, 31

George Washington, *Message to the House Regarding Documents Relative to the
    Jay Treaty*, March 30, 1796. ......................................................................................7

House Rule XI, Cl. 2 ................................................................................................4, 11

*Immunity of the Assistant to the President and Director of the Office of Political
    Strategy and Outreach from Congressional Subpoena*,
    38 Op. O.L.C. \*5 (July 15, 2014) .......................................................................6, 18, 20, 21

*Immunity of the Former Counsel to the President From Compelled Congressional
    Testimony*,
    31 Op. O.L.C. 191 (2007) ...............................................................................6, 18, 21

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic
    Affairs, from William H. Rehnquist, Assistant Attorney General, Office of
    Legal Counsel, Re: *Power of Congressional Committee to Compel
    Appearance or Testimony of "White House Staff"* (Feb. 5, 1971). ...................................6, 18

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has
    Asserted a Claim of Executive Privilege*,
    8 Op. O.L.C. 101 (1984) ...................................................................................6, 18

*READ: Text messages Sean Hannity, Marjorie Taylor Greene, Ivanka Trump and
    others sent to Mark Meadows*, CNN (Apr. 25, 2022),
    https://www.cnn.com/2022/04/25/politics/read-mark-meadows-texts-sean-
    hannity-ivanka-trump-marjorie-taylor-greene/index.html .........................................4

Ryan Nobles, et al., *CNN Exclusive: 'We control them all': Donald Trump Jr.
    texted Meadows ideas for overturning 2020 election before it was called*,
    CNN (Apr. 9, 2022), https://www.cnn.com/2022/04/08/politics/donald-trump-
    jr-meadows-text/index.html ..................................................................................4

Mary Clare Jalonick & Michael Balsamo, *House 1/6 Panel Rejects Justice Dept.'s
    Transcript Request*, Associated Press (May 17, 2022),
    https://apnews.com/article/capitol-siege-government-and-politics-subpoenas-
    criminal-investigations-merrick-garland-
    73d8309734a5dad4532f96c53f14a403...................................................................24

Max Rose for Congress, *Max Rose: Risk Everything* (Dec. 13, 2021), YouTube,
    https://youtu.be/4tKfqiBScaY...............................................................................29

Quaye Quartey for Congress, *Quartey for Congress - Campaign Launch Video*,
    Facebook (June 3, 2021),
    https://www.facebook.com/quarteyforcongress/videos/188080856538494............................29

SSCI, *Report of the Select Committee on Intelligence*, United States Senate, *on
    Russian Active Measures Campaigns & Interference in the 2016 U.S.
    Election*, Volume 5: Counterintelligence Threats and Vulnerabilities (116th
    Cong.), https://www.intelligence.senate.gov/sites/default/files/documents/
    report_volume5.pdf................................................................................................3

Yair Rosenberg, *Treasury's First Orthodox Chief,* Tablet (January 10, 2013),
    https://www.tabletmag.com/sections/news/articles/treasurys-first-orthodox-
    chief......................................................................................................................31

Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over
    100 subpoenas for phone records*, CNN Politics (Dec. 7, 2021),
    https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-
    records/index.html ...................................................................................................3

## INTRODUCTION

The events at the U.S. Capitol building on January 6, 2021, were abhorrent and unjustified. But this case is not about that day. Rather, this case and the cross-motions now before the Court concern the maintenance of important safeguards established under Separation of Powers and other constitutional principles to ensure that those principles are respected and enforced when one of its committees seeks to compel testimony from and about the work of the Chief Executive and his senior aides. As the Supreme Court has made clear, heightened judicial scrutiny is required when congressional subpoenas implicate the Separation of Powers—especially where, as here, they implicate Executive Privilege. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032–35 (2020). A congressional committee witness remains fully protected by the rights specified in the First, Fourth, Fifth and Sixth Amendments, and his obligations under any subpoena are circumscribed by the necessity that those rights be respected. *See Watkins v. United States*, 354 U.S. 178, 188 (1957) ("The Bill of Rights is applicable to investigations as to all forms of governmental action."). Under any level of scrutiny, the Select Committee's subpoenas to Mr. Meadows and his cell phone carrier exceed its constitutional and statutory authority, and the Court can and should declare them without force or effect.

The Congressional Defendants' rushed summary judgment motion should be denied because, in the first instance, the facts upon which it relies are disputed as to material matters. Such purported facts merit testing through discovery. To do otherwise would deny Mr. Meadows the day in court he is due. Moreover, the Congressional Defendants are simply wrong on the law and cannot carry their burden to sustain the motion.

Conversely, Mr. Meadows's cross-motion presents purely legal issues that are ripe for judgment in his favor—either on the pleadings themselves under Rule 12(c) or, alternatively, on summary judgment. No court of authority has ever held that a former President or a senior

presidential aide, such as a White House Chief of Staff, can be compelled to appear before a congressional committee—let alone be compelled to also testify as to matters on which the former President claims Executive Privilege. Two District Court opinions which Defendants cite to the contrary are both distinguishable in context and, in any event, they are not controlling and do not persuasively address the Separation of Powers issues at play.

Testimonial immunity and Executive Privilege represent the clearest grounds for resolving this case in favor of Mr. Meadows. But two additional issues—the unauthorized composition of the Committee and its lack of a recognized legislative purpose for targeting Mr. Meadows—can also be a basis for judgment in Mr. Meadows's favor. As stand-alone issues, courts might prefer to leave such issues in the hands of the Congress that created them. But, here, they merit judicial review because the Court cannot avoid them without giving effect to subpoenas that provoke a Separation of Powers clash between the political branches. A congressional committee is subject to judicial review of its own rules when its conduct fails to abide by such rules to the detriment of a witness's rights. *See Yellin v. United States*, 374 U.S. 109, 114 (1963); *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949) ("The question is rather what rules the House has established and whether they have been followed.").  Likewise, the committee subpoena at issue here does not conform to the requirements for its issuance by the Select Committee's authorizing resolution and is invalid on that basis alone. Moreover, the subpoena here fails the test of serving a valid legislative purpose and cannot survive judicial scrutiny on that basis.  *See Mazars USA, LLP*, 140 S. Ct. at 2031.

The context of these issues heightens the need for judicial review. This case arises from an attempt by a Select Committee of the U.S. House of Representatives to target the Chief of Staff to a United States President with unprecedented investigative tactics. Federal courts have

traditionally opined on the scope of congressional investigative authority in cases involving investigations more restrained in scope and tactics than those presented by the Congressional Defendants' unprecedented overreach. The Select Committee's sweeping investigation is not the sort of modest investigation-to-inform-lawmaking that has defined most federal jurisprudence on Congress's investigative authority. Three features of the Select Committee's investigation—at least the portion that has swept in Mr. Meadows—highlight how different it is from an ordinary legislative investigation, and highlight the need for a thorough judicial review.

To start, the Select Committee's investigation more closely resembles a law enforcement investigation than a legislative inquiry. The hallmarks of a law enforcement investigation also surround the Committee. The staff includes numerous former federal prosecutors, the Select Committee's members have publicly discussed the theories of criminal liability that they are pursuing, and they have employed tactics like confidential hold letters and cell phone metadata warrants that are hallmarks of a law enforcement investigation.[1] These tactics color the character of the investigation, since it is firmly established that "Congress may not issue a subpoena for the

---

[1] Its tactics, particularly the far-reaching use of metadata subpoenas, represent an unprecedented expansion of Congressional investigative authority. In 2016, the Senate Select Committee on Intelligence pursued cellphone metadata, but noted that it was "not aware of any congressional committee that had pursued the production of such data."[1] SSCI, *Report of the Select Committee on Intelligence*, *United States Senate*, *on Russian Active Measures Campaigns & Interference in the 2016 U.S. Election*, Volume 5: Counterintelligence Threats and Vulnerabilities, at 21 (116th Cong.), https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf ("SSCI Report"). And even in that instance, the Senate Select Committee was circumspect with its use of metadata subpoenas, using them only "in very limited situations in which other avenues for investigation had been foreclosed." SSCI Report, at 23. The Select Committee has not been so circumspect here, seeking the metadata of more than 100 individuals, many of whom are private persons hardly (if at all) connected to the Select Committee's jurisdiction. *See* Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over 100 subpoenas for phone records*, CNN Politics (Dec. 7, 2021), https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-records/index.html (last visited Dec. 21, 2021).

purpose of 'law enforcement.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)).

Next, the Select Committee's public actions have an unmistakably politically motivated "name and shame" element to them.  The Select Committee's investigation has so far been defined by leaks of private communications. Within days of his December 3 document production, the Select Committee began releasing Mr. Meadows's private documents, in apparent violation of House rules.[2] They have since waged a sustained campaign against Mr. Meadows in the press, fueled by these steady leaks of text messages.[3] And just recently, they cleared the cache by releasing ***all*** the text messages that Mr. Meadows produced to the Select Committee.[4]  Once again, these publicity leaks raise concerns about the Select Committee's motives because it is a settled rule that "'there is no congressional power to expose for the sake of exposure.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)).

---

[2] House Rule XI, Cl. 2(i) states, "[O]nly the chair or ranking minority member, after consultation with each other, may make public statements regarding matters before the committee or any subcommittee thereof." As discussed further below, there is no Ranking Member of the Select Committee with whom the Chair could consult as required, and in any event, the current record does not indicate whether any sort of consultation preceded these leaks.

[3] *See, e.g.*, Aaron Blake, *The key texts between Mark Meadows, Mike Lee and Chip Roy*, Wash. Post (Apr. 15, 2022), https://www.washingtonpost.com/politics/2022/04/15/lee-roy-meadows-texts/; Ryan Nobles, et al., *CNN Exclusive: 'We control them all': Donald Trump Jr. texted Meadows ideas for overturning 2020 election before it was called*, CNN (Apr. 9, 2022), https://www.cnn.com/2022/04/08/politics/donald-trump-jr-meadows-text/index.html;          Bob Woodward & Robert Costa, *Virginia Thomas urged White House chief to pursue unrelenting efforts to overturn the 2020 election, texts show*, Wash. Post (Mar. 24, 2022) https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-meadows-texts/; Christina Prignano, *Read Sean Hannity's texts to Mark Meadows*, Boston Globe (Jan. 5, 2022), https://www.bostonglobe.com/2022/01/05/nation/read-sean-hannitys-texts-mark-meadows/.

[4] S*ee READ: Text messages Sean Hannity, Marjorie Taylor Greene, Ivanka Trump and others sent to Mark Meadows*, CNN (Apr. 25, 2022), https://www.cnn.com/2022/04/25/politics/read-mark-meadows-texts-sean-hannity-ivanka-trump-marjorie-taylor-greene/index.html.

Finally, the Select Committee's procedures have deviated from the traditional bipartisan mechanisms that can restrain excess and insure fairness in legislative investigations, particularly those aimed at targets in the political sphere. While the Rulemaking Clause affords the House substantial autonomy in establishing its internal procedures, U.S. Const. art. I, § 5, cl. 2, that authority has long been leavened by minority participation in committee affairs, a check on the exercise of power that is glaringly absent here where the committee has in essence no minority participation. While as a standalone issue, that might be one for the House itself to consider, the Judiciary must step in where its "own duty to enforce the constitutionally protected rights of individuals is affected." *Watkins*, 354 U.S. at 205,

All these factors—the Separation of Powers implications, the Select Committee's use of law-enforcement tactics, including its quest for evidence to support allegations of alleged criminality and its media campaign through politicized leaks—counsel in favor of careful and deliberate judicial review, and against the Congressional Defendant's poorly supported suggestion that the Court should rush to judgment to accommodate their primetime hearings set to begin in less than a month.[5]

As summarized immediately below and on the basis of the points and authorities detailed herein, the Court should deny the Congressional Defendants' motion and grant judgment (either on the pleadings or on summary judgment) and declaratory relief to Mr. Meadows.

\*       \*       \*

**First**, testimonial immunity—long recognized by the U.S. Department of Justice in formal opinions under administrations of both parties as a core principle of the Separation of Powers—

---

[5] The June hearings themselves are likely to yield further evidence of the Defendants' and the Committee's purposes. The Court may therefore wish to defer final consideration of any motion for summary judgment until the parties have an opportunity to address such evidence.

protects Mr. Meadows, as former White House Chief of Staff, from compelled testimony before Congress arising out of his official position.  For decades, the Attorneys General of both parties and attorneys in DOJ's Office of Legal Counsel have, after careful analysis of the law, maintained that Congress may not constitutionally compel testimony from the President or his most senior aides[6]—including after their service has ended.  *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192–93 (2007) ("Separation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers."); *see also Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008) (explaining the persuasive authority of OLC opinions and granting them "as much weight as the force of their reasoning will support").  As Attorney General Janet Reno explained, "[s]ubjecting [a White House Chief of Staff] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."  *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999).  While two district court opinions have questioned

---

[6] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 131 (1984); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. *5 (July 15, 2014); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971). The testimonial immunity of senior White House advisors has enjoyed unanimous bipartisan support, with notable opinions coming out of the Nixon, Clinton, Bush, and Obama Justice Departments.

this immunity,[7] they have not squarely addressed the important Separation of Powers considerations that the Department of Justice has raised.  And in any event, as the Congressional Defendants acknowledge, this immunity remains an open question that neither the Supreme Court nor the D.C. Circuit has ever addressed.  *See* Defs.' Mot. for Summ. J., ECF No. 15 at 53.[8]

*Second*, the subpoenas challenged here, to Mr. Meadows and his cell phone carrier, lack a "valid legislative purpose."  *Mazars*, 140 S. Ct. at 2033.  Dating back to George Washington's seminal invocation of executive privilege in 1796, it has been understood that Congress may only subpoena information relevant to a "purpose under the cognizance of the House of Representatives."  George Washington, *Message to the House Regarding Documents Relative to the Jay Treaty*, March 30, 1796.  Congress has the burden to "establish a 'demonstrated, specific need" for the [requested] information," *id.* at 2032 (quoting *United States v. Nixon*, 418 U.S. 683, 713 (1974))—in other words, that the information "is 'demonstrably critical' to its legislative purpose," *id.* (quoting *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974)).  While the Select Committee has, at various times, articulated potential legislation that might result from its investigation—notwithstanding that the Select

---

[7] *See Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008); *Comm. on Judiciary, United States House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 199–200 (D.D.C. 2019).

[8] As discussed further below, there is also no merit to the Congressional Defendants' suggestion that the privileges and immunities attaching to Mr. Meadows were not properly presented.  They can cite no authority for the proposition that President Trump was required to invoke privilege or testimonial immunity in a communication directed to the Select Committee, as opposed to instructing Mr. Meadows to preserve them, as he did. And it is equally irrelevant that President Biden has not supported Mr. Meadows's claims of privilege and immunity, as Justice Kavanaugh recently explained: "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

Committee lacks statutory authority to mark up any proposed legislation, *see* H. Res. 503, 117th Cong. § 4(d) (2021)—it has never articulated why pursuing privileged communications between Mr. Meadows and then-President Trump is "demonstrably critical" to its investigation. *Nixon*, 418 U.S. at 713. Nor has the Select Committee even attempted to show, for instance, that its subpoena was "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S. Ct. at 2036. It is also clear that the Select Committee could not make that showing; by its own admission, it subpoenaed Mr. Meadows before it had even completed other efforts to collect relevant information from non-privileged sources. *See id.* at 2025 (holding that an important factor in assessing whether Congress can compel production of information about the President and his senior advisors is whether Congress has alternative means of getting the same information); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 482 (1977) (same). And if anything, the record shows that the Select Committee is targeting Mr. Meadows for two reasons that are squarely out of bounds: law enforcement and public exposure.

***Third***, the subpoenas are invalid because the Select Committee is not a validly constituted body authorized to issue Congressional subpoenas. The Select Committee was created by the passage of House Resolution 503, but neither the Select Committee nor the Speaker of the House have adhered to the resolution's dictates. Section 2(a) of the Resolution states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021). The Select Committee has only 9 members, none of whom were appointed after consultation by the minority leader as required by § 2(a). In addition, § 5(c)(6) of the Resolution authorizes Chairman Thompson to order depositions by subpoena only "upon consultation with the ranking minority member." *Id.* But the counsel for the Select Committee has admitted that it has no ranking minority member—*i.e.*, no senior-most

member of the minority, appointed after consultation with the minority leader.  *See* Mot. Compel

Disc. Ex. 9 at 5, *United States v. Bannon*, 1:21cr670, ECF No. 28-9 (D.D.C. Feb. 4, 2022).

Chairman Thompson therefore could not satisfy the consultation requirement of § 5(c)(6) in

purporting to subpoena Mr. Meadows to testify before the Select Committee. The Select

Committee's failure to adhere to its own rules is judicially cognizable and results in invalidation

of the Committee's actions. *See Yellin v. United States*, 374 U.S. 109, 114 (1963); *see also Watkins*

*v. United States*, 354 U.S. 178 (1957) (holding that congressional subpoena could not be enforced

where it exceeded "the constitutional requisites of fairness for witnesses").

*        *        *

For these and other reasons set forth below, the subpoenas are invalid and cannot be

enforced against Mr. Meadows.  The Court should therefore grant him judgment as a matter of law

and enter a declaratory judgment invalidating the subpoenas. But if the Court should conclude that

these issues are not determinative, then the proper course would be to take up Mr. Meadows's

pending motion under Rule 56(d), defer ruling on the pending dispositive cross motions, and direct

the parties to conduct reasonable discovery that would allow them to develop the factual record in

a way that would allow the Court to resolve this dispute.

**BACKGROUND**

Plaintiff Mark R. Meadows served as Chief of Staff to President Donald J. Trump from

March 31, 2020, until January 20, 2021, and before that as a Member of the U.S. House of

Representatives, representing North Carolina's 11th Congressional District, from January 3, 2013,

to March 30, 2020.  This case arises from two subpoenas issued by the Select Committee to

Investigate the January 6th Attack on the United States Capitol—one that seeks to compel Mr.

Meadows to testify before Congress about his tenure as White House Chief of Staff, and one that

9

seeks his personal cell phone records from that time period directly from his telecommunications provider.

## A.      Authority and Purposes of the Select Committee

After the well-known events of January 6, 2021, Congress considered establishing a "National Commission to Investigate the January 6 Attack on the United States Capital Complex," which would have been a bipartisan, bicameral commission tasked with investigating those events and proposing "corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism." First Am. Compl. ¶ 28; Pl.'s Statement of Facts ¶ 1.   The bill to establish this bipartisan commission, H.R. 3233, passed the House on May 19, 2021, but a cloture motion in the Senate failed on May 28, 2021, and the measure died.   First Am. Compl. ¶¶ 29–30; Pl.'s Statement of Facts ¶ 1.

One month later, the House passed H. Res. 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol," on a near party-line vote.   First Am. Compl. ¶¶ 32-35; Pl.'s Statement of Facts ¶ 2. While the Select Committee established by H. Res. 503 has similar aims as the would-be Commission, it expressly provides that "[t]he Select Committee may not hold a markup of legislation," First Am. Compl. ¶ 36; Pl.'s Statement of Facts ¶ 3. Consistent with that limitation, House Speaker Pelosi and members of the Select Committee frequently describe the purposes of the committee as generating a public record of the events of January 6th and making criminal referrals to the U.S. Department of Justice. *See* First Am. Compl. ¶¶ 39–47; Pl.'s Statement of Facts ¶ 20–25.   The Select Committee's investigative staff is led by two former United States Attorneys, Timothy J. Heaphy and John Wood, and includes more than a dozen former federal prosecutors.   *See* First Am. Compl. ¶ 37; Pl.'s Statement of Facts ¶ 19.

**B.**      **Composition of the Select Committee**

In contrast to the bipartisan Commission that failed to pass Congress, H. Res. 503 contemplates that the Select Committee will have thirteen members appointed by the Speaker, only five of whom are to be "appointed after consultation with the minority leader." First Am. Compl. ¶ 54; Pl.'s Statement of Facts ¶ 4. Speaker Pelosi appointed Chairman Thompson and six additional Democrat members: Reps. Lofgren, Schiff, Aguilar, Murphy (FL), Raskin, and Luria. *See* First Am. Compl. ¶ 55; Pl.'s Statement of Facts ¶ 6. She appointed Republican Liz Cheney, one of the two Republicans who had voted in support of H. Res. 503, without designating any position for her. *See id.*

Consistent with H. Res. 503, House Minority Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, including Rep. Jim Banks of Indiana to serve as Ranking Member. *See* First Am. Compl. ¶ 56; Pl.'s Statement of Facts ¶ 7. Speaker Pelosi then made what she characterized as the "unprecedented decision" not to appoint any of the Republican members recommended by the Minority Leader as contemplated in H. Res. 503. *See* First Am. Compl. ¶ 57; Pl.'s Statement of Facts ¶ 8. Instead, she added Rep. Kinzinger, the only other Republican who voted in favor of H. Res. 503, and left four vacancies. *See* First Am. Compl. ¶ 58; Pl.'s Statement of Facts ¶ 8. Since there was no Ranking Member, Chairman Thompson subsequently designated Rep. Cheney to serve as "Vice Chair"—a title that nowhere appears in H. Res. 503. *See* First Am. Compl. ¶ 59; Pl.'s Statement of Facts ¶¶ 13–14. And while House Rule XI, cl. 2(d) contemplates the appointment of a committee vice chair, that position is for a "member of the majority party," which Rep. Cheney is not. First Am. Compl. ¶ 60; Pl.'s Statement of Facts ¶ 15–16.

Indeed, counsel for the Congressional Defendants has made clear elsewhere the position that Vice Chair Cheney ***is not the Ranking Member*** of the Select Committee. *See* Pl.'s Statement of Facts ¶ 18. The Ranking Member role is significant because H. Res. 503 provides that orders for the taking of depositions first require "consultation with the ranking minority member." First Am. Compl. ¶ 53; Pl.'s Statement of Facts ¶ 17.

## C.     Activities of the Select Committee

Since its inception in July 2021, the Select Committee has held only one public hearing. *See* First Am. Compl. ¶ 64; Pl.'s Statement of Facts ¶ 25. The Select Committee has, however, gathered a substantial number of documents and testimony from private individuals and entities, much of which then leaked to the news media. *See* First Am. Compl. ¶ 64; Pl.'s Statement of Facts ¶ 26. The Select Committee has issued more than one hundred wide-ranging subpoenas for documents and the testimony of witnesses, *see* First Am. Compl. ¶ 65; Pl.'s Statement of Facts ¶ 27, and by its own account has interviewed more than 1,000 witnesses, *see* Pl.'s Statement of Facts ¶ 26. Unlike in ordinary congressional investigations, the Select Committee has demanded records of and sent preservation notices to social media companies, telecommunications companies, banking entities, and even the national party committee of their political opposition. *See* First Am. Compl. ¶ 65; Pl.'s Statement of Facts ¶¶ 28–31. Many of those subpoenas were issued covertly to third parties who held the cell phone or banking data of the Select Committee's target. *See* First Am. Compl. ¶ 66; Pl.'s Statement of Facts ¶¶ 29, 31.

The Select Committee has also issued "sweeping" demands for presidential records from the National Archives and Records Administration (NARA) and seven other Executive Branch agencies. First Am. Compl. ¶¶ 67–68; Pl.'s Statement of Facts ¶ 32. Those document requests gave rise to a dispute between former President Trump, who asserted Executive Privilege over some of

the documents in NARA's custody pursuant to the procedures set forth in the Presidential Records Act of 1978, and President Biden who, through counsel, instructed NARA to produce the documents and purported to waive privilege. *See* First Am. Compl. ¶¶ 68–69; Pl.'s Statement of Facts ¶ 33. Following a months-long legal battle, NARA released at least some of the requested presidential records to the Select Committee, including some that were created or used by Mr. Meadows. *See* First Am. Compl. ¶ 70; Pl.'s Statement of Facts ¶ 34. In connection with that litigation, Justice Kavanaugh pointedly noted that "[a] former President must be able to successfully invoke the Presidential communications privilege for *communications* that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

**D.     The Select Committee's Subpoena & Mr. Meadows's Accommodation Efforts**

On September 23, 2021, the Select Committee served a subpoena on Mr. Meadows which included a sweeping set of document requests that related to his tenure as White House Chief of Staff and a demand that he appear for a deposition. *See* First Am. Compl. ¶¶ 71–74; Pl.'s Statement of Facts ¶ 37.

On October 6, 2021, former President Trump sent a letter to Mr. Meadows instructing him to maintain privilege and invoke any applicable immunities to resist the subpoena.  Pl.'s Statement of Facts ¶ 40.  Specifically, the letter instructed Mr. Meadows that he should "where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena . . . [and] not provide any testimony concerning his official duties in response to the Subpoena." First Am. Compl. ¶ 75; Ex. A. As a former member of Congress and former White House Chief of Staff, Mr. Meadows recognized the importance of the Separation of Powers and

respects the prerogatives of both the Legislative Branch and the Executive Branch.  And he also appreciated that these sorts of disputes are traditionally resolved through a process of compromise and accommodation between the branches.  He therefore for months communicated by and through counsel with the Select Committee in an effort to reach an accommodation that would allow him to provide information to the Select Committee without contradicting longstanding Executive Branch positions about testimonial immunity and Executive Privilege. *See* First Am. Compl. ¶¶ 76–104; Pl.'s Statement of Facts ¶ 46.[9]

Throughout extensive exchanges with the Select Committee, Mr. Meadows remained concerned that the Select Committee did not intend to respect the boundaries of Executive Privilege, but he strove to find a path forward.  On November 22, Chairman Thompson rejected Mr. Meadows's latest proposal to answer written interrogatories before testifying. *See* First Am. Compl. ¶ 100; Pl.'s Statement of Facts ¶ 50. The Select Committee eventually accepted Mr. Meadows's proposal to provide a voluntary deposition on December 8, 2021, with certain conditions. *See* First Am. Compl. ¶ 103; Pl.'s Statement of Facts ¶ 51. Chairman Thompson in return demanded that Mr. Meadows produce all responsive documents by Friday, December 3. *See* First Am. Compl. ¶ 104; Pl.'s Statement of Facts ¶ 52.

Notwithstanding reservations about the Select Committee's intentions, Mr. Meadows agreed to produce responsive, non-privileged documents and to make a voluntary appearance for a deposition. *See* First Am. Compl. ¶¶ 101–02; Pl.'s Statement of Facts ¶ 52. His agreement to appear was based on the understanding that the Select Committee would limit its questions in good

---

[9] It is notable that the Committee, while claiming that Mr. Meadows should appear and raise objections to questions where Executive Privilege is claimed, has nowhere cited any evidence that the Committee Chair has by training experience or any other salient factor the expertise to rule substantively as to what is or is not subject to a valid claim of privilege. On the contrary, the subpoena the Chair issued expressly requires production of *prima facie* privileged information.

faith to matters outside the scope of privilege and that Mr. Meadows would have three business days to review any documents which the Select Committee intended to show him or question him about during the deposition. *See* First Am. Compl. ¶¶ 101; Pl.'s Statement of Facts ¶ 51. His document production included more than 1,000 emails and other documents from his personal Gmail account, as well as 2,319 text messages and metadata from his personal cell phone. *See* First Am. Compl. ¶¶ 102, 104; Pl.'s Statement of Facts ¶ 52.

**E.      The Select Committee's Verizon Subpoena & Breakdown of Accommodation Efforts**

The weekend prior to his planned deposition, Mr. Meadows received a letter from Verizon Wireless, the carrier for the personal cell phone he had used during his tenure as White House Chief of Staff. The letter notified him that Verizon had received a subpoena from the Select Committee requesting certain phone records. *See* First Am. Compl. ¶¶ 105–106; Pl.'s Statement of Facts ¶ 56.  The Verizon Subpoena instructs Verizon to produce subscriber information and cell phone data associated with Mr. Meadows's prior personal cell phone number held during his time of service as Chief of Staff, including subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata.  *See* First Am. Compl. ¶ 107; Pl.'s Statement of Facts ¶ 57.  The cell phone data requested could include all calls, text messages, and other records of communications associated with that phone number and can be used for historic cell site analysis. *See id*.  The Verizon Subpoena requested all Mr. Meadows's personal cell phone data for four months: October 1, 2020 to January 31, 2021.  *See id*.

On December 7, 2021, Mr. Meadows notified the Select Committee that he would no longer appear voluntarily for a deposition.  *See* First Am. Compl. ¶ 111; Pl.'s Statement of Facts ¶ 58.  This decision followed the revelation of the Verizon Subpoena and public statements by

Chairman Thompson and other Select Committee members, all of which indicated that the Select Committee viewed itself as conducting a law enforcement inquiry.  *See* First Am. Compl. ¶¶ 109–110; Pl.'s Statement of Facts ¶ 58.  He again offered, however, to respond to written interrogatories that would allow the Select Committee to develop a clear record of his answers to the Select Committee's questions while affording Mr. Meadows a meaningful opportunity to assess and assert privilege where appropriate.  *See* First Am. Compl. ¶ 111; Pl.'s Statement of Facts ¶ 50.

The next day, December 8, 2021, Mr. Meadows initiated this action to seek a judicial forum to resolve the important Separation of Powers and other issues presented by this dispute.  *See* Compl., *Meadows v. Pelosi*, 1:21cv3217 (D.D.C. Dec. 8, 2021); Pl.'s Statement of Facts ¶ 59.

The House of Representatives voted to refer Mr. Meadows to the Department of Justice for contempt of congress on December 14, 2021.  *See* First Am. Compl. ¶¶ 113; Pl.'s Statement of Facts ¶ 60.  During the floor debate in the House, Chairman Thompson accused Mr. Meadows of being "part of a coverup" of January 6. *See* First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 60. Rep. Cheney read Mr. Meadows's private text messages aloud before making an unmistakable accusation that Mr. Meadows knew former President Trump "through action or inaction, corruptly sought to obstruct or impede Congress' official proceeding to count electoral votes." First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 61.  Rep. Lofgren also read Mr. Meadows's text messages on the House floor, First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 62, as did Reps. Schiff, *id.*, Aguilar, *id.*, and Luria, *id.* And in the weeks following the vote, Mr. Meadows's private text messages dominated the news cycle, as the Select Committee intended.  *See* First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 63.

The leaks of Mr. Meadows's text messages have continued steadily ever since.  *See* Pl.'s Statement of Facts ¶ 63.  And just recently, ***all*** the text messages that Mr. Meadows produced to

the Select Committee have been provided to CNN and publicly released.  *See* Pl.'s Statement of Facts ¶ 64.

The Select Committee is the only plausible source of these leaked communications.  *See* First Am. Compl. ¶ 115.  Aside from his counsel, only the Select Committee members and staff possess Mr. Meadows's confidential production of emails and text messages.  *See id*.  And neither Mr. Meadows nor his counsel has provided these records to the press.  *See id*.; Pl.'s Statement of Facts ¶ 65.

## STANDARD OF REVIEW

Under Federal Rule of Procedure 12(c), a party is entitled to judgment on the pleadings when he can show "at the close of the pleadings, that no issue of material fact remains to be resolved, and that he or she is entitled to judgment as a matter of law" *Air Line Pilots Ass'n v. Fed. Express Corp.*, 139 F. Supp. 3d 320, 323 (D.C. Cir. 2015) (quoting *Konah v. District of Columbia*, 915 F. Supp. 2d 7, 18 (D.D.C. 2013)). The standard for Rule 12(c) is virtually indistinguishable from a Rule 12(b)(6) motion. The court views all factual allegations in the light most favorable to the non-moving party. *Id.* at 324. But in its review, the court is "limited to considering facts alleged in the [pleadings], any documents attached to or incorporated in the [pleadings], matters of which the court may take judicial notice, and matters of public record." *Id.* (quoting *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 47 (D.D.C. 2005)).

If the court does not accept that the moving party is entitled to judgment as a matter of law based on the pleadings, it can still grant summary judgment pursuant to Federal Rule of Procedure 56 when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they might affect the outcome of the case, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), and an issue is "genuine" if a reasonable jury could find in favor of the non-moving party. *Id.* at 248. "In determining whether

a genuine issue of fact exists, the court must view all inferences in favor of the non-moving party."

*Air Line Pilots Ass'n.*, 139 F. Supp. 3d at 324 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The party opposing a motion for summary judgment must provide "affirmative evidence" that disputes of material fact exist and that there is a "genuine issue for trial." *Anderson*, 477 U.S. at 248.

## ARGUMENT

**I.    Testimonial Immunity Protects Former Chief of Staff Meadows from Congressional Compulsion to Testify About His White House Service**

The most straightforward basis for granting judgment in favor of Mr. Meadows is that he is constitutionally immune, as a matter of the Separation of Powers, from being compelled to testify before Congress about his service as White House Chief of Staff.  This has been the long-standing position of the U.S. Department of Justice, as articulated by Attorneys General of both major parties and by DOJ's Office of Legal Counsel.  *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 131 (1984); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. *5 (July 15, 2014); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971).  The testimonial immunity of senior White House advisors has enjoyed unanimous

bipartisan support, with notable opinions coming out of the Nixon, Clinton, Bush (43), and Obama Justice Departments.

Under the principles of testimonial immunity, the challenged subpoenas—which seek to compel testimony from Mr. Meadows arising from his service as White House Chief of Staff and to obtain cell phone records in support of his deposition—are constitutionally invalid. The Congressional Defendants suggest that they can nevertheless question him about matters like campaign activity that supposedly fell outside the scope of his official duties. *See* Defs.' Mot. Summ. J., ECF No. 15 at 42-43, 56-58. But that contention fails on many levels: it misconstrues the nature of testimonial immunity for senior White House advisors; it impinges on protected First Amendment activity and misconstrues the role of White House Chief of Staff; and it relies on disputed factual allegations that, at a minimum, would merit further discovery. The Court should thus grant judgment in favor of Mr. Meadows under Rule 12(c) (or alternatively, under Rule 56) based on testimonial immunity. But even if the Court were not prepared to do so, there would be no basis for granting judgment in favor of the Congressional Defendants, and the proper course would be to allow further factual development on the relevant issues.

A.     **The Separation of Powers prohibits Congress from subpoenaing the White House Chief of Staff for testimony.**

The constitutional rationale for prohibiting congressional subpoenas to White House Chiefs of Staff is straightforward. As Attorney General Janet Reno explained, "[s]ubjecting [a White House Chief of Staff] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999). "Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise

19

the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at *5 (July 15, 2014). The challenged subpoenas here show precisely that danger:  a congressional committee is targeting the former Chief of Staff to a President from the opposite party and has ***already shown*** that it intends to use the information it obtains from him for partisan gain, including in the run up to the 2022 midterm elections.

The testimonial immunity is also a matter of interbranch comity: "The President is a separate branch of government.  He may not compel congressmen to appear before him.  As a matter of separation of powers, Congress may not compel him to appear before it." Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982).  And again, as Attorney General Reno explained, a White House Chief of Staff for this purpose is the President's alter ego. *See Assertion of Executive Privilege*, 23 Op. O.L.C. at 5; *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.").  Congress can no more compel testimony from a White House Chief of Staff than the President may compel testimony from a congressman's chief of staff.  *Cf. Gravel v. United States*, 408 U.S. 606, 616–17 (1972) (holding that the Speech or Debate Clause covers congressional aides because "the day to day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos").

It is telling that, notwithstanding the more than 1,000 interviews it has apparently conducted, the Select Committee has never attempted to subpoena former President Trump.  *See*

Pl.'s Statement of Facts ¶ 26.  And that has remained true even as the committee has taken the bold step of issuing subpoenas to fellow members of Congress.  *See* Pl.'s Statement of Facts ¶ 27.  The decision not to subpoena President Trump likely reflects the Congressional Defendants' awareness that to do so would plainly contravene the Separation of Powers.  But those concerns are not assuaged by going after his alter ego "[b]ecause a presidential adviser's immunity is derivative of the President's."  *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5.

The fact that Mr. Meadows is a former White House Chief of Staff does not change the calculus.  As the Office of Legal Counsel has opined, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers."  *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192–93 (2007).  Without a guarantee of continuing confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977).  President Truman succinctly explained how important it was for immunity to continue after a President's term in office nearly 70 years ago:

> "'[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President.  The doctrine would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes.'"

*Immunity of the Former Counsel to the President* 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14).  And Justice Kavanaugh recently emphasized the related point that "[a] former President must be able to successfully invoke the

Presidential communications privilege for communications that occurred during his Presidency."

*Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial).

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

Id. at 681.  The logic of that expression of a separation of powers principle applies with equal force to maintenance of testimonial immunity.

In two prior cases, judges in this district have declined to apply testimonial immunity to senior advisers of a former president.  *See Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008); *Comm. on Judiciary, United States House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 199–200 (D.D.C. 2019).  But neither decision is binding on this Court, and the court in *Miers* explicitly limited its decision to the "the context of this particular subpoena dispute." 558 F. Supp. at 106 (admitting that "[t]here may be some instances where absolute (or qualified) immunity is appropriate for such advisors").  Even the Congressional Defendants acknowledge that "[n]either the Supreme Court nor the D.C. Circuit has decided whether any White House advisors could be immune from compulsory Congressional process in matters involving their official conduct."  Defs.' Mot. Summ. J., ECF No. 15 at 53.  And more importantly, neither the *Miers* decision nor the *McGahn* decision adequately explained how compelled congressional testimony for a senior Presidential aide could comport with relevant Separation of Powers precepts.

In *Miers*, the court rested its decision primarily on the notion that testimonial immunity was "entirely unsupported by existing case law."  558 F. Supp. 2d at 99.  But the lack of prior case

law just underscores how rare this particular clash of the Legislative and Executive Branches has been in our Nation's history. *See McGahn*, 415 F. Supp. 3d at 200 ("The dearth of cases involving compelled congressional process issued to Executive branch officials is likely attributable to the fact that subpoena-related conflicts between Congress and the Executive branch are usually negotiated, rather than litigated."). As the Supreme Court has emphasized, the two Branches have historically been able to resolve this sort of clash through inter-branch accommodation rather than through recourse to the courts. *See Mazars*, 140 S. Ct. at 2029 (explaining that these types of disputes traditionally "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'") (quoting Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel)).

The *Miers* decision also relied on the Supreme Court's holding in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), that Presidential aides enjoy qualified immunity, rather than absolute immunity, from civil damages claims, and suggested that "civil suits for money damages present a greater potential for such a chilling effect" than congressional subpoenas. 558 F. Supp. 2d at 101–02. But that conclusion ignores the heightened concerns that arise as a matter of the Separation of Powers whenever Congress targets a co-equal branch of government. *See Mazars*, 140 S. Ct. at 2033. Indeed, the Supreme Court in *Mazars* squarely rejected the Congressional Defendants' argument that congressional subpoenas targeting the President indirectly are no different than a congressional subpoena to any other individual. *Compare* Defs.' Mot. Summ. J., ECF No. 15 at 53 ("[C]ompliance with a Congressional subpoena is a legal requirement 'which every person within the jurisdiction of the Government is bound to perform when properly

summoned.'") (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)), *with Mazars*, 140 S.

Ct. at 2033 ("The House . . . would have us ignore that these suits involve the President. . . . [But]

[t]he House's approach fails to take adequate account of the significant separation of powers issues

raised by congressional subpoenas for the President's information.").

The *Miers* decision further fails to grapple with the underlying purposes of immunity:  to

protect against a chilling effect on the advice of current and future White House aides and to

promote comity among the branches.  As Justice Kavanaugh  explained in the context of Executive

Privilege:   "Without sufficient assurances of *continuing* confidentiality, Presidents and their

advisers would be chilled from engaging in the full and frank deliberations upon which effective

discharge of the President's duties depends."  *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022)

(statement of Kavanaugh, J., respecting denial).   The prospect of compelled congressional

testimony from a President' senior-most aides threatens the same chilling effect—even apart from

the specific concerns raised by individual questions of Executive Privilege.   And it does not

promote comity to create a clash between Legislative and Executive prerogatives—especially at a

time when Congress is apparently unwilling to be cooperative with the Executive Branch either.

*See* Mary Clare Jalonick & Michael Balsamo, *House 1/6 Panel Rejects Justice Dept.'s Transcript

Request*, Associated Press (May 17, 2022), https://apnews.com/article/capitol-siege-government-

and-politics-subpoenas-criminal-investigations-merrick-garland-

73d8309734a5dad4532f96c53f14a403.

The court also emphasized the necessity of the *Miers* congressional investigation because

Congress was the only institution that could, in their oversight capacity, "investigate and respond"

to possible "improper partisan influence" within the Department of Justice at that time.  558 F.

Supp. 2d at 58.  That is  remarkably dissimilar to the case here,  where the Congressional

Defendants' investigation itself is undertaking an improperly partisan prosecutorial process and where the current Department of Justice—who is actually tasked with upholding our nation's laws—is investigating the very events on which the Select Committee claims to be seeking Mr. Meadows' testimony. *See* Alan Feuer, et al., *Justice Dept. Widens Jan. 6 Inquiry to Range of Pro-Trump Figures*, N.Y. Times (Mar. 30, 2022), https://www.nytimes.com/2022/03/30/us/politics/justice-dept-widens-jan-6-inquiry.html.

The *McGahn* decision relied principally on *Miers*, citing it as "the only recorded case in our Nation's history that directly addresses the legal argument that a senior-level presidential aide is immune to a legislative subpoena seeking testimony when the President directs him to ignore that congressional mandate." 415 F. Supp. 3d at 200. The court acknowledged that the sparse judicial record "is likely attributable to the fact that subpoena-related conflicts between Congress and the Executive branch are usually negotiated, rather than litigated." *Id.* But then quizzically, the court expressed agreement with *Miers* that OLC's opinions were unpersuasive because they did not "cite[] to a single judicial opinion recognizing the asserted absolute immunity." *Id.* at 202 (quoting *Miers*, 558 F. Supp. 2d at 104). That reasoning is entirely circular, and one could just as easily point out that *Miers* failed to cite a single opinion (judicial or executive) authorizing Congress to subpoena a senior White House aide. Because the *McGahn* Court "adopt[ed] [*Miers*'] absolute testimonial immunity analysis in full," *id.*, it too failed to grasp the important constitutional considerations raised by a congressional subpoena to a senior White House aide.

**B.**   **Testimonial immunity applies, and Mr. Meadows is entitled to judgment, because the subpoenas targeted him based on his role as Chief of Staff.**

It would seem fairly straightforward that, if testimonial immunity prohibits Congress from seeking to compel testimony from a former White House Chief of Staff, then the challenged subpoenas are invalid. But the Congressional Defendants contend otherwise, arguing that some

(but not all) of the topics on which they wish to question him "involve his role as a campaign functionary" rather than "Mr. Meadows's activities as an Executive Branch official."  Defs.' Mot. Summ. J., ECF No. 15 at 52.  This contention is wrong for several reasons.

*First*, in assessing the Separation of Powers concerns that give rise to testimonial immunity, the relevant inquiry is whether the Court has before it "congressional subpoenas for the President's information" which "unavoidably pit the political branches against one another," *Mazars*, 140 S. Ct. at 2034—not whether any given question Congress might ask entails Mr. Meadows's execution of a core Executive function.  Indeed, the White House Chief of Staff, though the President's closest advisor and alter ego, does not carry out any core Executive function in his own capacity; his advice and actions bear weight only to the extent they inform or reflect the decision-making of the President.  Testimonial immunity is thus, by necessity, different from areas like judicial immunity where "immunity is justified and defined by the functions it protects and serves." *Forrester v. White*, 484 U.S. 219, 227 (1988).[10]  In the case of a White House Chief of Staff, the interbranch conflict and the chilling effect against which testimonial immunity protects arises whenever a Chief of Staff is targeted as a Chief of Staff to the President.  There is no genuine dispute here that Congress has subpoenaed Mr. Meadows and his cellphone carrier

---

[10] The Supreme Court has also explained that "officials who are entitled to absolute immunity . . . are subject to other checks that help to prevent abuses of authority from going unredressed." *Mitchell v. Forsyth*, 472 U.S. 511, 522 (1985).  For the White House Chief of Staff, the President himself provides the check, since the Chief of Staff cannot execute the laws in his own right, and the President is free to terminate the Chief of Staff at will.  The President in turn is directly accountable under our Constitution. *See Morrison v. Olson*, 487 U.S. 654, 711 (1988) (Scalia, J., dissenting) ("The checks against any branch's abuse of its exclusive powers are twofold: First, retaliation by one of the other branch's use of *its* exclusive powers: Congress, for example, can impeach the executive who willfully fails to enforce the laws . . . . Second, and ultimately, there is the political check that the people will replace those in the political branches (the branches more 'dangerous to the political rights of the Constitution') who are guilty of abuse.") (quoting Federalist No. 78, p. 465).

precisely because he served as President Trump's Chief of Staff.  Testimonial immunity therefore attaches.[11]

**Second**, even if the availability of testimonial immunity hinged on the relevant "function" of the targeted official,[12] the Congressional Defendants' distinction between "Mr. Meadows's activities as an Executive Branch official" and "his role as a campaign functionary," Defs.' Mot. Summ. J., ECF No. 15 at 52, would be wrong both as a matter of law and fact.

Without any legal or factual support, the Congressional Defendants breezily claim that "a typical White House Chief of Staff" limits his role to "advising the President on official matters of government policy" and would have nothing to do with an incumbent President's campaign or with post-election inquiries into the integrity of the election.  Defs.' Mot. Summ. J., ECF No. 15 at 56.  One might be tempted to think they are new to Washington.  Administration of federal election law is just as squarely within the purview of the President (and thus his Chief of Staff), who has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const., art.

---

[11] The fact that the Office of Legal Counsel has distinguished instances in which a senior White House aide is subpoenaed over "'their private conduct,'" Defs.' Mot. Summ. J., ECF No. 15 at 58. (quoting Memorandum for the Honorable John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* 3 (Mar. 15, 1972)), is wholly irrelevant here.  That is plainly not what the Select Committee has done with Mr. Meadows.

[12] The Congressional Defendants' argument assumes that the relevant role or function is the one that they now identify, in the course of defending civil litigation, as opposed to the one they identify in the subpoena itself.  *See* Defs.' Mot. Summ. J., ECF No. 15 at 52.  They cite no authority for that proposition, however, and it makes little sense as a practical matter.  A White House Chief of Staff in receipt of a congressional subpoena for testimony must decide whether to comply before he learns what particular topics Congress might be interested in discussing.  Moreover, to suggest that immunity cannot attach until particular questions are posed and assessed defeats the entire purpose of testimonial immunity.  *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("[Qualified immunity] is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").  By the time Congress has the Chief of Staff in the witness chair, the damage is done.

II, § 3—as is any other aspect of federal law. *See, e.g.*, 52 U.S. Code §§ 10307, 20511; 18 U.S.C. §§ 241-42.  Moreover, an incumbent President running for reelection does not thereby forfeit his First Amendment rights.  *See, e.g.*, *Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 388 (D.C. Cir. 1981) (explaining that "political expression and association concerning federal elections and officeholding" represent "the very heart of the organism which the first amendment was intended to nurture and protect" and therefore demand "heightened judicial concern").  The combination of Separation of Powers concerns and First Amendment protection only heightens Congress's burden in seeking Mr. Meadow's testimony about such protected activity.

The Congressional Defendants' argument is further refuted by the Watergate scandal, which arose from President Nixon's alleged involvement in the cover-up of a break-in to the Democratic National Committee headquarters.  The scandal sparked numerous proceedings and led to some of the most significant cases involving Presidential records, privilege, and the Separation of Powers.  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977); *United States v. Nixon*, 418 U.S. 683 (1974); *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974).  In *Senate Select Committee*, the D.C. Circuit specifically held that Congress could not compel production of taped discussions between Nixon and his senior aides. *See* 498 F.2d at 726.  But in none of these cases did the Supreme Court or the D.C. Circuit ever suggest that Separation of Powers protections were inapplicable because the Watergate break-in involved a political activity rather than an official one.[13]

---

[13] *Mazars* further undermines their argument by establishing that the Separation of Powers limits Congress's subpoena power even when the subject of the subpoena predates the President's tenure and thus necessarily lacks any connection to his official duties.  *See* 140 S. Ct. at 2033 (holding that heightened scrutiny applies even to "cases involving nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations").

The Select Committee's own members surely appreciate that a clear line between official acts and election-related conduct is often untenable. In fact, several Democrat candidates for Congress have used the events of January 6 in furtherance of their campaigns. *See, e.g.*, Quaye Quartey for Congress, *Quartey for Congress - Campaign Launch Video*, Facebook (June 3, 2021), https://www.facebook.com/quarteyforcongress/videos/188080856538494; Max Rose for Congress, *Max Rose: Risk Everything* (Dec. 13, 2021), YouTube, https://youtu.be/4tKfqiBScaY. It takes little political savvy to understand the members of the Select Committee are using this investigation—one allegedly conducted in their official roles—to support their case against Republicans in the midterm elections.

Moreover, even if political activity was somehow hermetically sealed off from the official duties of the White House Chief of Staff, that would just take the Congressional Defendants out of the Separation of Powers frying pan and into the First Amendment fire. *See Machinists Non-Partisan Pol. League*, 655 F.2d at 388; *see also Watkins v. United States*, 354 U.S. 178, 187–88 (1957) ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. . . . This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice. The Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged.").

The Congressional Defendants' bald assertion that discussions and actions related to President Trump 2020 campaign or integrity of the 2020 election were outside the scope of his work as the Chief of Staff therefore falls flat first as matter of law but also as a matter of fact.

**C.      Even if factual questions about the "capacity" in which Mr. Meadows took certain actions were relevant, the Congressional Defendants would not be entitled to summary judgment because those factual questions are disputed.**

Should the Court disagree and conclude that it is legally relevant whether Mr. Meadows ever acted in a campaign capacity that exceeded his role as Chief of Staff, then the proper course would be to allow a reasonable discovery period in which the relevant facts can be further developed—after either denying the Congressional Defendants' summary judgment motion outright or granting Mr. Meadows's pending motion under Rule 56(d).  *See* Pl.'s Mot. Deny Without Prejudice or Defer Ruling Defs.' Mot. Summ. J., ECF No. 20.

While the Congressional Defendants contend, without citing any factual support, that White House Chiefs of Staff do not get involved with an incumbent President's reelection campaign, common sense and facts subject to judicial notice are to the contrary. The breadth of the Chief of Staff's duties necessarily includes activities relevant to the President's reelection. *See* Pl.'s Statement of Facts ¶ 42.  And Mr. Meadows would prove that, if necessary, using facts obtained through discovery.  Some of the potentially relevant records are in the Congressional Defendants' custody or control, such as the Presidential records produced to the Select Committee by the National Archives. *See* Pl.'s Statement of Facts ¶ 34.  Other potentially relevant information lies in the hands of non-parties, including the Executive Branch and former Chiefs of Staff themselves, many of whom engaged in efforts related to their President's election efforts. The public record readily reveals the existence of such evidence; two of President Barack Obama's Chiefs of Staff, Denis McDonough and Jack Lew, engaged in public efforts to aid the President's election efforts. McDonough's efforts to persuade Cabinet members to campaign on behalf of the President's agenda in advance of the 2014 elections were widely publicized. *See* Edward-Isaac Dovere, *Obama's Cabinet Lacks Voter Sway,* Politico (October 31, 2014),

https://www.politico.com/story/2014/10/obamas-cabinet-doesnt-deliver-midterm-boost-112370.

Lew was involved even more directly, engaging in policy debates and meeting with voters on the

campaign trail. *See* Yair Rosenberg, *Treasury's First Orthodox Chief,* Tablet (January 10, 2013),

https://www.tabletmag.com/sections/news/articles/treasurys-first-orthodox-chief.          These

well-documented events demonstrate at least a dispute of fact as to the scope of the White Chief

of Staff's duties.

It would thus be premature for the Court to grant summary judgment in favor of the

Congressional Defendants, even if the Court were to somehow agree with their legal position that

campaign activities are categorically ineligible for testimonial immunity.[14]  The proper course in

that scenario would be for the Court to deny their motion, or to defer it by granting Mr. Meadows's

pending Rule 56(d) motion, and to allow for a reasonable period of discovery.

## II.    The Select Committee Did Not Have a Valid Legislative Purpose for the Subpoenas

The subpoenas challenged here, to Mr. Meadows and his cellphone carrier, lack a "valid

legislative purpose." *Mazars*, 140 S. Ct. at 2033. The Select Committee has no freestanding

authority to issue subpoenas enforceable by contempt. Instead, its investigative powers are

ancillary to its legislative authority. *See id.* at 2031. Any subpoena not directly tied to a valid

legislative purpose is therefore beyond the scope of Congress's Article I authority. *See Eastland*

*v. United States Servicemen's Fund*, 421 U.S. 491, 506 (1975).

---

[14] As noted above, *see supra* n.11, the Court would also need to conclude that Congress may
narrow its subpoena in defensive litigation and define the capacity in which the respondent will be
questioned based on its *post hoc* litigating position. *Cf. Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142, 156–57 (2012) (holding that federal courts cannot defer to a federal agency's *post
hoc* litigating position, even if it otherwise would under *Auer v. Robbins*, 519 U.S. 452 (1997),
where doing so would create "unfair surprise").

In *Mazars*, the Supreme Court articulated a three-tiered approach to assessing the validity of Congress's aims in obtaining records through an investigation. The lowest burden for Congress applies in cases "that do not involve the President's papers." 140 S. Ct. at 2033. Congress still must show that its requests "relate to a valid legislative purpose or concern a subject on which legislation could be had." *Id.* (internal quotations & alterations omitted). But it does not need to carry any additional burden. The highest burden for Congress applies where, as here, Congress goes after "information subject to executive privilege." *Id.* at 2032. In such cases, Congress "must establish a 'demonstrated, specific need" for the [requested] information," *id.* (quoting *United States v. Nixon*, 418 U.S. 683, 713 (1974))—in other words, that the information "is 'demonstrably critical' to its legislative purpose," *id.* (quoting *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974)). Finally, the *Mazars* Court articulated an intermediate tier of scrutiny that applies to "congressional subpoenas for the President's information" even when executive privilege is not at issue. *Id.* at 2033. Such requests still raise "significant separation of powers issues" since they "unavoidably pit the political branches against one another." *Id.* at 2034. Applying the ordinary "valid legislative purpose" standard to such cases is inadequate, the Court recognized: "Any personal paper possessed by a President could potentially 'relate to' a conceivable subject of legislation, for Congress has broad legislative powers that touch on a vast number of subjects." *Id.* The Court thus articulated "[a] balanced approach" which requires "a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the 'unique position' of the President." *Id.* at 2035 (quoting *Clinton* v. *Jones*, 520 U.S. 681, 698 (1997)).

The Select Committee has not even tried to meet its burden under these standards. While the Select Committee has, at various times, articulated potential legislation that might result from its investigation—notwithstanding that the Select Committee lacks statutory authority to mark up any proposed legislation, *see* H. Res. 503, 117th Cong. § 4(d) (2021)—it has never articulated why pursuing privileged communications between Mr. Meadows and then-President Trump is "demonstrably critical" to its investigation. *Nixon*, 418 U.S. at 713. Nor has the Select Committee even attempted to show, for instance, that its subpoena was "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S. Ct. at 2036.

Nor could they since the subpoenas targeting Mr. Meadows fall well short of the *Nixon* standard, or even the intermediate *Mazars* standard. The Committee subpoenaed Mr. Meadows before it had even completed other efforts to collect relevant information from non-privileged sources.[15]  *See Mazars*, 140 S. Ct. at 2025 (holding that an important factor in assessing whether Congress can compel production of information about the President and his senior advisors is whether Congress has alternative means of getting the same information); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 482 (1977) (same). Indeed, the Select Committee now claims to be "laser-focused" on Mr. Meadows and the questions it seeks to ask him.  *See* Tr. Status Conference May 4, 2022.  But that contention just further highlights how woefully inadequate the Select

---

[15] *See, e.g.*, Letter from Chairman B. Thompson to G. Terwilliger (Nov. 5, 2021) ("[T]his list is non-exclusive and may be supplemented as our investigation continues …. We also continue to interview additional witnesses who have personal knowledge of these issues and Mr. Meadows's involvement."); Letter from G. Terwilliger to Chairman B. Thompson (Nov. 8, 2021) ("The courts have made clear that an important factor in assessing whether Congress can compel production of information about the President and his senior advisors is whether Congress has alternative means of getting the same information. If the Select Committee is already gathering documents and testimony about Mr. Meadows and his conduct during the relevant period, as your letter suggests, it is not clear why the Select Committee needs to gather that information again from him—in a posture that would threaten long-term effects for executive privilege.") (citations omitted).

Committee's predication was—whether measured by the heightened *Nixon* standard or the intermediate *Mazars* standard—when it issued the subpoenas in late 2021.

The subpoena also fails on legislative purpose because the record shows that the Select Committee has targeted Mr. Meadows for purposes that lie squarely outside its authority.  The Supreme Court has firmly established that "Congress may not issue a subpoena for the purpose of 'law enforcement,'" *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)), and that "'there is no congressional power to expose for the sake of exposure,'" *id.* (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)).  Both statements from members of the Select Committee and its choice of investigative tactics demonstrate that the Select Committee is pursuing a law enforcement objective—at least in its targeting of Mr. Meadows and other senior White House officials.  Moreover, it is equally clear that the Select Committee is seeking information from Mr. Meadows for the purpose of public disclosure, as reflected in the Select Committee's release of his personal text messages.

The Congressional Defendants' reliance on *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), is misplaced.  The legislative purpose inquiry analyzes whether a particular subpoena serves a valid purpose, not whether an investigation as a whole serves a valid purpose. *Mazars*, 140 S. Ct. at 2031.  Though there may be legitimate purposes for the Select Committee's investigation, the Meadows Subpoena extends far beyond the scope of any legitimate legislative purpose.  The Supreme Court has emphasized the need for specificity in Congress's stated legislative purpose. *See Mazars*, 140 S. Ct. at 2036.  And in cases concerning the President, whom Mr. Meadows advised, "it is 'impossible' to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims." *Id.* at 2036.  The Select Committee has failed to consider or recommend any draft legislation related to the topics provided in the Meadows

Subpoena, nor has it provided any explanation for how its requests to Mr. Meadows would further any specific legislative end.

The Select Committee included one stated legislative purpose in the Meadows Subpoena: to "recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations." This statement could not conceivably be more impermissibly "vague" and "loosely worded." *Watkins v. United States*, 354 U.S. 178, 201 (1957). It is exactly the type of authority the Supreme Court criticized in *Watkins*, where a committee tried "in essence, to define its own authority, to choose the direction and focus of its activities." *Id.* at 205.  The subpoena seeks Executive Branch deliberative material, information both temporally and logically disconnected from the events of January 6, and information that is irrelevant to any conceivable legislation. The Select Committee seeks to "radiate outward infinitely to any topic thought to be related in some way" to January 6. *Id.* at 204. Its effort to do so places it beyond its constitutional authority.

One need only look to "[t]he authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves" to see the Select Committee's true purpose. *Watkins*, 354 U.S. at 209.  Any generalized purported legislative purpose for Mr. Meadows's testimony is entirely pretextual and unsupported by the statements and actions of members of the Select Committee. The subpoenas are relevant only to serve the purpose that members of the Select Committee have stated time and again: to engage in ad-hoc law enforcement and expose possible wrongdoings of their political adversary. *See* First Am. Compl. ¶¶ 26-39; *See* Pl.'s Statement of Facts ¶¶ 20–24.  Neither are permissible.

## III.    The Subpoenas Were Not Validly Issued

The subpoenas are invalid because the Select Committee is not a validly constituted body authorized to issue Congressional subpoenas. The Select Committee was created by the passage of House Resolution 503, but the Select Committee and the Speaker of the House have failed to adhere to the Resolutions' dictates.

Contrary to the Congressional Defendants' assertions, "[i]t has been long settled, of course, that rules of Congress and its committees are judicially cognizable." *Yellin v. United States*, 374 U.S. 109 (1963). The same is true of authorizing resolutions, which are a jurisdictional limit on a committee's authority. *Watkins v. United States*, 354 U.S. 178, 206 (1957). More than merely finding congressional rules cognizable, the Supreme Court has held that when a rule relates to the lawful authorization for an inquiry, rules "must be strictly observed." *Gojack v. United States*, 384 U.S. 702, 708 (1966). Putting that principle into practice, the DC Circuit and this Court have invalidated multiple convictions for contempt of Congress where a congressional committee failed to adhere to its own rules in issuing a subpoena. *See Liveright v. United States*, 347 F.2d 473, 474 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963); *United States v. Grumman*, 227 F. Supp. 227, 233 (D.D.C 1964). Particular scrutiny of the Select Committee's compliance with its own rules is justified here, where its use of compulsory process has sparked a separation of powers dispute during an investigation of the majority party's political opposition by an almost entirely partisan committee. To borrow language from the Supreme Court, the Congressional Defendants prepared meticulously to compel Mr. Meadows to testify. "It is not too exacting to require that the Committee be equally meticulous in obeying its own rules." *Yellin*, 374 U.S. at 124.

A.     **The Select Committee Is Not Properly Composed Under H. Res. 503 § 2(a).**

The subpoenas are invalid because the Select Committee that issued them is not operating as a duly authorized committee of the House of Representatives.   The Select Committee was

established by H. Res. 503.  Section 2(a) of that Resolution states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021). The Select Committee has only 9 members: seven Democrats and two Republicans. None of these members was appointed from the selection of five GOP congressman put forth by Minority Leader Kevin McCarthy, as required by § 2(a). And in any event, it lacks even the lopsided 8-5 composition that H. Res. 503 calls for.

Nothing in our Constitution expressly authorizes Congress or its committees to issue subpoenas.  The Supreme Court has held that an authority to investigate is inherent in Congress's lawmaking function, and that duly authorized congressional committees may exercise this subpoena authority implied by Article I. *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). But the Court has never held that this implied power extends to individual members or to ad hoc groups; only when an authorized committee follows the prescribed rules.

Speaker Pelosi failed to appoint members consistent with the authorizing resolution of the Select Committee. The Speaker has appointed only nine members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs that the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).  Further, of those nine members Speaker Pelosi has appointed, none was appointed after consultation with the minority member, as is required by the authorizing resolution. H. Res. 503 § 2(a), 117th Cong. (2021).  Thus, the Select Committee as it currently stands—and stood at the time it issued the subpoenas in question—has no authority to exercise Congress's implied power to issue subpoenas in support of its lawmaking function.

**B.      The Subpoenas Were Not Validly Issued Under H. Res. 503 § 5(c)(6).**

The subpoenas are also invalid, aside from the composition of the Select Committee as a whole, because Chairman Thompson failed to "consult[] with the ranking minority member."  H.

Res. 503 § 5(c)(6).   Section 5(c)(6) authorizes the Chair of the Select Committee to order depositions by subpoena only "upon consultation with the ranking minority member." *Id.* But the Select Committee has no ranking minority member—*i.e.*, no senior-most member of the minority, appointed after consultation with the minority leader.   Indeed, Congress's clear position is that Rep. Cheney—the senior-most Republican member of the Select Committee—serves as Vice Chair and ***not*** as Ranking Member.   *See* Exhibit 9, Interview of Kristin Amerling at 5, ECF No. 28-9, *United States v. Bannon*, No. 1:21cr670 (D.D.C. Feb. 4, 2022).   Chairman Thompson therefore could not satisfy the consultation requirement of § 5(c)(6) in purporting to subpoena Mr. Meadows to testify before the Select Committee.   As noted above, the Select Committee's failure to adhere to its own rules is judicially cognizable and can result in invalidation of the Committee's actions. *See Yellin*, 374 U.S. at 114; *Watkins*, 354 U.S. at 206.

## IV.   Additional Issues with the Subpoenas Preclude Summary Judgment in Favor of the Congressional Defendants

For each of the forgoing reasons, Mr. Meadows is entitled to judgment in his favor either on the pleadings, or in the alternative, on summary judgment.   But if the Court were to disagree, it would not follow that the Congressional Defendants are entitled to summary judgment.   There are several additional issues that Mr. Meadows has raised in his complaint which, while perhaps not amenable to summary disposition in his favor, nevertheless preclude summary disposition against him.

### A.   The Subpoenas Violate the Separation of Powers by Infringing Upon Executive Privilege.

Separate and apart from the issue of testimonial immunity addressed above, the Meadows Subpoena is invalid to the extent it would require Mr. Meadows to breach Executive Privilege.

During his time as Chief of Staff, Mr. Meadows was among the most senior Executive Branch officials and his communications and deliberations were covered by executive privilege.

That privilege reaches Mr. Meadows's communications "in the course of preparing advice for the President," *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997), and any materials that reveal his or other executive officials' predecisional deliberative processes. *See Army Times Publ'g Co. v. Department of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993). The subpoena served on Mr. Meadows clearly seeks information protected by executive privilege. Among other things, the subpoena expressly requests summaries of Mr. Meadows's conversations with the President, records of his conversations with other senior executive officials, and the contents of advice provided to the President by his senior advisors. *See* Am. Compl. Ex A, ECF No. 13-3.

Throughout the course of negotiations regarding potential accommodations, the Select Committee has repeatedly clarified that the subpoena seeks privileged information. Most notably, the Select Committee provided Mr. Meadows with a list of topics for his deposition, informing him that it believed these topics did not "implicate any cognizable claim of executive privilege." That list expressly included Mr. Meadows's conversations with the President, his communications with the Vice President, two Oval Office meetings, and White House Officials' deliberations regarding election security. *See* Am. Compl. Ex. G, ECF No. 13-9. Mr. Meadows's conversations with the President, Vice President, and other senior executive officials are covered by executive privilege, as is any information regarding executive officials' deliberative processes regarding election security. But the Select Committee's list of topics have varied dramatically over time. What began with 27 topics in the subpoena expanded to sixteen "non-exclusive" topics on November 5, followed by another eight topics on November 9. *See* Am. Compl. Exs. A, ECF No. 13-3, G, ECF No. 13-9, & I, 13-11. It appears the Congressional Defendants have currently settled on seven topics for the purposes of this litigation. *See* Defs.' Mot. Summ. J., ECF No. 15 at 14-15.

When a congressional committee uses its subpoena power to seek information covered by executive privilege, the subpoena will only be enforced where "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Select Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974). The information sought by the Select Committee is not demonstrably critical to its functions as it is not relevant to any legislative purpose and could be obtained from alternative sources. Additionally, the vast majority of the information sought by the Select Committee could be obtained from other sources. Very little, if any, of the information sought by the Select Committee is in Mr. Meadows's sole possession. Much of it could obtained via subpoenas to individuals outside the Executive Branch or individuals who lie farther from the core of executive privilege.

The Select Committee has confirmed that its subpoena violates the Separation of Powers by seeking and obtaining a purported "waiver" of executive privilege from President Biden. To support the efficacy of this waiver, they cite to the DC Circuit's holding in *Trump v. Thompson* that "the profound interests in disclosure advanced by President Biden and the January 6th Committee" exceed the "generalized concerns for Executive Branch confidentiality" asserted by President Trump in that case. *See* ECF No. 15 at 26–27. But Mr. Meadows has articulated specific issues of executive privilege and, to the extent his objections have been generalized, it has been because the Select Committee has refused to identify with particularity the questions it intends to ask. Additionally, as articulated above, the "profound interests" put forward in *Trump v. Thompson* ran to the documents at issue in that case; the subpoena to Mr. Meadows must stand on its own legs.

President Biden's purported waiver does not vitiate Mr. Meadows's assertion of privilege at the direction of former President Trump. Nothing in the Constitution or laws of the United

States gives President Biden the authority to compel a former official (now private citizen) to divulge privileged communications from a former President's administration under the premise that he is simply waiving executive privilege.[16] As Justice Kavanaugh recently explained, "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* Therefore, notwithstanding President Biden's purported waiver, Executive Privilege still applies.

Executive privilege does not expire with a President's term. The core purpose of executive privilege is to ensure that a President and his advisors are "free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974). President Biden lacks both the legal authority to compel Mr. Meadows to divulge privileged information and the

---

[16] President Biden's justification for a wholesale waiver of then-President Trump's Executive Privilege does not withstand even a cursory test as matter of law. President Biden asserts that the "unique and extraordinary circumstances" justifies setting aside constitutional principle. Such an assertion should be viewed just as suspect as a claim that Fourth Amendment rights can be abridged by the non-exigent need for a search without warrant because the investigation concerns a "unique and extraordinary" case, or that Fifth Amendment protections can be cast aside because the alleged crime is particularly heinous. President Biden's justification is no justification at all to abandon constitutional principles.

knowledge necessary to making an informed judgment as to whether privilege should be maintained. It is clear that President Biden could not, of his own accord, compel Mr. Meadows to divulge privileged conversations with former President Trump; the President has no such authority over former officials either inherently or as a matter of federal law. Likewise, President Biden is in no position to judge whether it would or would not be in the national interest to "waive" Executive Privilege as to Mr. Meadow's potential testimony because he has no knowledge of the substance of privileged communications and deliberations at issue. Thus, President's Biden's purported waiver of President's Trump's Executive Privilege claims, whatever its effect, is not sufficient to vitiate Mr. Meadow's maintenance of privilege as a matter of law.

It is equally clear that Congress, acting on its own, could not obtain privileged information from Mr. Meadows without satisfying the stringent standards established by the Supreme Court in *United States v. Nixon*, 418 U.S. 683, 714 (1974). The Select Committee and President Biden cannot do collectively what neither can do alone. The Supreme Court has consistently held that two branches acting in concert are no more capable of altering the balance of the separation of powers than one acting alone. *Cf. Clinton v. City of New York*, 524 U.S. 417 (1998) (invalidating a line-item veto for violating the Separation of Powers notwithstanding both Congressional and Presidential consent to the statutory scheme); *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983) (same for a one-house legislative veto). If coordination between a subsequent President and one chamber of Congress were sufficient to overcome testimonial immunity or executive privilege, the very purpose of these constitutional protections would be subverted. A constitutional protection that does not survive a mere party-change in the political branches is no constitutional protection at all.

Mr. Meadows's conversations with former President Trump were protected by executive privilege and testimonial immunity while President Trump was in office, and they remain protected afterwards.

**B.    The Select Committee Cannot Obtain Records under the Verizon Subpoena Consistent with the Stored Communications Act.**

The Stored Communications Act prohibits the Select Committee from obtaining the subpoenaed records from Verizon.  To the extent the Select Committee is seeking production of the contents of communications, that request is prohibited under Section 2702(a)(1) of Title 18.  The Stored Communications Act generally provides that "a person or entity providing electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).  Verizon is "a person or entity providing electronic communication service to the public," and the Select Committee qualifies as "any person or entity" within the meaning of the Stored Communications Act.  *See* 18 U.S.C. § 2711 (providing no specialized definition of "person" or "entity").Section 2702(a)(1) thus prohibits knowing disclosure of "the contents of a communication" stored by Verizon to the Select Committee absent an express statutory exception outlined in Section 2702(b).  None of the statutory exceptions in Section 2702(b) applies to the Select Committee's subpoena.

To the extent the Select Committee is seeking production only of non-communication records and information, that request is prohibited under Section 2702(c) of Title 18.  The Stored Communications Act provides that "[a] provider described in [Section 2702(a)] may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2))" if one of seven criteria is

met.  Mr. Meadows is "a subscriber to or customer of [Verizon's] service" within the meaning of the Stored Communications Act.

The Select Committee cannot obtain the subpoenaed records under Section 2702(c)(1) because disclosure would not be "as otherwise authorized in section 2703." 18 U.S.C. § 2702(c)(1). Specifically, on information and belief, the Select Committee has not obtained and cannot obtain "a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction," as would be required to obtain records "in electronic storage in an electronic communications system for one hundred days or less." *Id.* § 2703(a). Nor has the Select Committee provided Mr. Meadows with "prior notice" and obtained either (i) "an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena" or (ii) "a court order," as would be required to obtain records "in electronic storage . . . for more than one hundred and eighty days." *Id.* § 2703(a), (b)(1).  The Select Committee does not have lawful consent to obtain the subpoenaed records. *See id.* § 2702(c)(2). The Select Committee does not constitute or represent "a law enforcement agency" within the meaning of the Stored Communications Act. *Id.* § 2702(c)(7).  The Select Committee may represent a "governmental entity" but, on information and behalf, have not shown and cannot demonstrate "in good faith" "that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." *Id.* § 2702(c)(4), (6).

Thus, here too, even if the Court were not prepared to grant judgment in favor of Mr. Meadows at this juncture, these deficiencies in the Verizon Subpoena would preclude summary judgment in favor of the Congressional Defendants.

### C. Compelled Production under the Verizon Subpoena Would Violate the Fourth Amendment.

The Verizon Subpoena is also invalid because it violates Mr. Meadows's Fourth Amendment rights. That subpoena instructs Verizon to produce subscriber information and cell phone data associated with the phone number previously used by Mr. Meadows. This cell phone number was used by Mr. Meadows as his personal cell phone during his tenure as White House Chief of Staff. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. The cell phone data requested includes all calls, text messages, and other records of communications associated with that phone number, and it can be used for historic cell site analysis. The requested data covers four full months: October 1, 2020 through January 31, 2021.

Mr. Meadows has a reasonable expectation of privacy in his personal cell phone data. The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967). The fact that a third party at least temporarily stores a person's cell phone data does not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoenas untethered from any valid legislative purpose. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946). If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. Mr. Meadows has not provided his consent for Verizon to produce his cell phone data to the Select Committee. And for the reasons discussed *supra*, the Select Committee's subpoenas are invalid.

Additionally, a congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents is unreasonable and falls outside the scope of Congress' legitimate legislative power. See *Mazars*, 140 S. Ct. at 2040. The subpoena contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights. For the Select Committee to subpoena Verizon for all Mr. Meadows's personal cell phone data over the course of four months is entirely unreasonable. Such a request is so broad both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose.

As the subpoenas in question exceed the lawfully authorized purpose of the Select Committee, full compliance with such subpoenas would violate Mr. Meadows's Fourth Amendment protection against unlawful search and seizure.

### D. Compelled Production of Cell Phone Data under the Verizon Subpoena Would Violate the First Amendment.

The subpoena of Mr. Meadows's private cell phone data violates his right to free association and chills the exercise of free speech rights. Mr. Meadows used his personal phone to engage in protected advocacy and other speech, including privileged speech with his attorneys and spouse. Mr. Meadows also used his personal phone to engage in private conversations with friends and family. All of these associational and expressive activities are protected by the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d 1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179 (D.C. Cir. 2003).

The Committee has no legitimate purpose for seeking the protected information demanded by the subpoena, much less a compelling one. Mr. Meadows has already provided the Committee

46

with the substance and metadata of his responsive emails and text messages. Additional information will not meaningfully aid the Committee in any valid pursuit.

Even if had a valid reason to seek protected information, the Committee has put in place no safeguards to protect Mr. Meadows's rights. It provided Mr. Meadows with no notice of the subpoena and has provided him with no opportunity to assert claims of privilege or other legal protections over the demanded information. It also has no provisions for a taint team or analogous filter for privileged information. The entirety of the demanded information, including that which is constitutionally or otherwise protected, will be turned over to the Committee to do with as it pleases.

The Verizon subpoena is also a clear effort to chill the speech of the Committee Member's political adversaries.  The body that issued this subpoena is composed of 9 members, 7 of whom belong to the political party that opposed the President under which Mr. Meadows served. Allowing an entirely partisan select committee of Congress to subpoena the personal cell phone data of executive officials would work a massive chilling of current and future Executive Branch officials' associational and free speech rights

The Committee's asserted interest is insufficient and its alternative means of obtaining this information are too obvious to justify such a drastic chilling of speech.

## CONCLUSION

For the reasons discussed, the Court should grant Mr. Meadows's motion and deny the Defendants' motion for summary judgment.

Dated: May 20, 2022

Respectfully submitted,
MARK R. MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I certify that, on May 20, 2022, a copy of the foregoing was filed on the Court's CM/ECF system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III