**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARK MEADOWS,

                      Plaintiff,

     v.

NANCY PELOSI, *et al.*,

                      Defendants,

Case No. 1:21-cv-3217-CJN

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.  MR. MEADOWS'S MOTION FAILS TO COMPLY WITH RULE 56(C) AND
    LOCAL RULE 7(H) ............................................................................................2

II. TESTIMONIAL IMMUNITY DOES NOT PROTECT MR. MEADOWS FROM
    CONGRESSIONAL COMPULSION TO TESTIFY BEFORE THE SELECT
    COMMITTEE........................................................................................................5

    A.  Separation of Powers Concerns Support, Rather Than Undermine,
    Enforcement of the Select Committee's Subpoena ..................................5

    B.  There is No Basis to Immunize Mr. Meadows From Testifying on the
    Seven Select Topics ................................................................................11

    C.  Discovery Is Not Necessary on Mr. Meadows's Role ...........................15

III. SUMMARY JUDGMENT IN FAVOR OF THE SELECT COMMITTEE IS
     APPROPRIATE BECAUSE THERE IS NO GENUINE DISPUTE OF
     MATERIAL FACT..............................................................................................17

    A.  The Select Committee is Entitled to Summary Judgment on the Select
    Committee's Valid Legislative Purpose ................................................18

    B.  The Select Committee is Entitled to Summary Judgment on Its
    Composition and the Validity of the Subpoenas....................................21

        1.  The Select Committee is Entitled to Summary Judgment on the
        Issue of Whether the Committee is Properly Composed ..........................23

        2.  The Select Committee is Entitled to Summary Judgment on
        Whether the Subpoenas Were Validly Issued...........................................24

    C.  The Select Committee is Entitled to Summary Judgment on Whether the
    Subpoenas Infringe on Executive Privilege...........................................25

    D.  The Select Committee is Entitled to Summary Judgment on the Stored
    Communications Act Claims ..................................................................30

    E.  The Select Committee is Entitled to Summary Judgment on the Fourth or
    First Amendment Claims ........................................................................31

CONCLUSION........................................................................................................33

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................17

*Barenblatt v. United States*,
  360 U.S. 109 (1959)..........................................................................................15, 20

*Barker v. Conroy*,
  921 F.3d 1118 (D.C. Cir. 2019) ............................................................................21

*Buckley v. Valeo*,
  424 U.S. 1 (1976)..............................................................................................32, 33

*Budowich v. Pelosi*,
  No. 21-cv-3366-JEB (D.D.C. Jan. 20, 2022)...............................................1, 18, 22

*Carpenter v. United States*,
  138 S.Ct. 2206 (2018)............................................................................................31

*Clinton v. Jones*,
  520 U.S. 681 (1997)................................................................................................12

*\*Comm. on the Judiciary, U.S. House of Representatives v. McGahn*,
  415 F. Supp. 3d. 148 (D.D.C. 2019) ...........................................................5, 7, 8, 9

*Comm. on the Judiciary, U.S. House of Representatives v. McGahn*,
  951 F.3d 510 (D.C. Cir. 2020) ................................................................................5

*Comm. on the Judiciary, U.S. House of Representatives v. McGahn*,
  968 F.3d 755 (D.C. Cir. 2020) (en banc) ................................................................5

*\*Comm. on the Judiciary, U.S. House of Representatives v. Miers*,
  558 F. Supp. 2d. 53 (D.D.C. 2008) ......................................................5, 7, 8, 9, 14

*\*Eastland v. United States Serviceman's Fund*,
  421 U.S.491 (1975)...............................................................................15, 20, 31, 32, 33

*Eastman v. Thompson*,
  No. 822CV00099DOCDFM, 2022 WL 1407965 (C.D. Cal. Jan. 25, 2022)................1, 18, 22

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*,
  284 F. Supp. 2d 15 (D.D.C. 2003) *aff'd* 98 Fed. App'x 8 (D.C. Cir. 2004)...........................11

*Hutcheson v. United States*,
  369 U.S. 599 (1962) ........................................................................................21

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) ........................................................................................21

*McPhaul v. United States*,
  364 U.S. 372 (1960) ...................................................................................18, 31

*Nat'l Min. Ass'n v. Slater*,
  167 F. Supp. 2d 265 (D.D.C. 2001) ..................................................................7

*Nixon v. Adm'r of Gen. Servs.*,
  433 U.S. 425 (1977) ........................................................................................10

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ........................................................................................12

*Rangel v. Boehner*,
  20 F. Supp. 3d 148 (D.D.C. 2013) ..................................................................21

\* *Republican Nat'l Comm. v. Pelosi*,
  --- F. Supp. 3d. ---, No. CV 22-659 (TJK), 2022 WL 1294509 (D.D.C. May 1,
  2022) *appeal pending* D.C. Cir. No. 22-5123........................................1, 18, 20, 22, 23, 24, 33

*Senate Select Comm. on Ethics v. Packwood*,
  845 F. Supp. 17 (D.D.C. 1994) .......................................................................18

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
  498 F.2d 725 (D.C. Cir. 1974) ..............................................................10, 14, 29

*Shelton v. United States*,
  327 F.2d 601 (D.C. Cir. 1963) ........................................................................22

*Smith v. Maryland*,
  442 U.S. 735 (1979) ........................................................................................31

*Thompson v. Trump*,
  --- F. Supp. 3d. ---, No. 21-cv-00400 (APM), 2022 WL 503384 (D.D.C.
  Feb. 18, 2022) ...........................................................................................13, 14

*Trump v. Mazars USA, LLP*,
  140 S.Ct. 2019 (2020) .........................................................................6, 19, 20, 29, 31

*Trump v. Thompson*,
  142 S. Ct. 680, 211 L. Ed. 2d 579 (2022) ...............................................7, 28, 30

*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021) ...................................1, 2, 3, 6, 11, 15, 18, 26, 27, 28, 29, 30, 31

*United States v. Durenberger*,
   48 F.3d 1239 (D.C. Cir. 1995) .............................................................................21

*United States v. Nixon*
   418 U.S. 683 (1974) ...................................................................................9, 19, 20, 29

*United States v. Reynolds*,
   345 U.S. 1 (1953) ..............................................................................................27

*United States v. Rostenkowksi*,
   59 F.3d 1291 (D.C. Cir. 1995) .............................................................................22

*Watkins v. United States*,
   354 U.S. 178 (1957) .........................................................................................20

*Yellin v. United States*,
   374 U.S. 109 (1963) .........................................................................................22

**Constitutional Provisions**

U.S. Const., Art. I, § 5, cl. 2 ..............................................................................21

First Amendment ....................................................................................2, 15, 31, 32

Fourth Amendment ...................................................................................2, 31, 32

**Statutes**

5 U.S.C. §§ 7321 *et seq.* .........................................................................................12

18 U.S.C. § 2702(c)(6) ........................................................................................30

44 U.S.C. § 2204(a) ...........................................................................................28

**Other Authorities**

167 Cong. Rec. H5748 (Oct. 21, 2021) ....................................................................23

167 Cong. Rec. H7667 (Dec. 14, 2021) ...................................................................23

H.R. 1037, 117th Cong. (2022) ............................................................................23

H. Res. 503, 117th Cong. (2021) ......................................................................... *passim*

## INTRODUCTION

As in every other case litigated against the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), this case does not turn on disputed facts.  It turns on the law.  *See Republican Nat'l Comm. v. Pelosi*, --- F. Supp. 3d. ---, No. CV 22-659 (TJK), 2022 WL 1294509, at *6-7 (D.D.C. May 1, 2022) ("*RNC*") (resolving merits of similar claims without discovery) *appeal pending* D.C. Cir. No. 22-5123; *see also Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) (denying request for preliminary injunction and addressing merits of similar issues without discovery); *Eastman v. Thompson*, No. 822CV00099DOCDFM, 2022 WL 1407965 (C.D. Cal. Jan. 25, 2022) (same); *Budowich v. Pelosi*, No. 21-cv-3366 (JEB) (D.D.C., Boasberg, J.), Jan. 20, 2022 Oral Arg. Tr. (same).

Plaintiff Mark Meadows has not shown that any of the issues before this Court turn on disputed issues of fact.  And, as the D.C. Circuit and several other courts have already concluded, his legal claims lack merit.  Defendants therefore respectfully request that the Court grant the motion for summary judgment.

As an initial matter, Mr. Meadows has failed to support his summary judgment motion with citations to materials in the record, as required by Federal Rule of Civil Procedure 56(c) and Local Rule 7(h), and his motion may be denied on that basis.[1]  His motion fares no better on the merits:  Testimonial immunity does not protect Mr. Meadows from responding to the Select

---

[1]    Pursuant to Rule 56(c)(2) and Local Rule 7(h)(1) Defendants are submitting with this opposition a Statement of Genuine Issues and Response to Plaintiff's Statement of Undisputed Material Facts, which notes that many of the facts cited by Mr. Meadows are not supported by admissible evidence and/or are not material in that they are irrelevant to resolving the legal issues presented by his case.

Committee's subpoena, and the separation of powers doctrine in fact supports *enforcement* of the subpoena. Discovery will not change those fundamental precepts.

Further, contrary to Mr. Meadows's contentions, the subpoenas (to him and to Verizon) are within the scope of what the D.C. Circuit has already concluded is a valid legislative purpose, *Trump v. Thompson*, 20 F.4th at 37-38, and Mr. Meadows is precluded by the Rulemaking Clause from contesting that the subpoenas were validly issued or the Select Committee was not duly constituted. Mr. Meadows's motion for summary judgment therefore fails. In addition, the Court should grant Defendants' motion for summary judgment because Mr. Meadows has raised no genuine dispute of material fact with regard to his claims of executive privilege, or the protections of the Stored Communications Act, the Fourth Amendment, or the First Amendment. Accordingly, for the reasons outlined in Defendants' motion and more fully below, the Court should deny Mr. Meadows's motion for summary judgment and request for discovery and grant Defendants' motion.

<u>**ARGUMENT**</u>

I. **MR. MEADOWS'S MOTION FAILS TO COMPLY WITH RULE 56(C) AND LOCAL RULE 7(H)**

Mr. Meadows's Statement of Material Fact (ECF 29-2) fails to comply with Rule 56(c) and Local Rule 7(h) in multiple ways, including its failure to (i) cite material "facts," Rule 56(c)(1), L.R. 7(h)(1)  as opposed to immaterial facts or legal principles, (ii) fails to cite to "materials in the record," Rule 56(c)(1)(A), L.R. 7(h)(1), (iii) fails to cite materials "that would be admissible in evidence," Rule 56(c)(2), and (iv) relies on a declaration not "made on personal knowledge," Rule 56(c)(4). These defects are laid out in detail in Defendants' Statement of Genuine Issues and Response to Plaintiff's Statement of Undisputed Material Facts. To summarize the key deficiencies:

- Mr. Meadows's facts about the formation, composition, operations, or investigative scope of the Select Committee (ECF 29-3 ¶¶ 4-18, 25-31, 45, 66) as well as the legislative purpose of the Committee and intent of Committee members (ECF 29-3 ¶¶ 3, 19-24, 61) are irrelevant for reasons described at length in Judge Kelly's recent decision in *RNC*. *See* 1:22-cv-659-TJK ECF 33 at 29-37 (discussing Rulemaking Clause and the D.C. Circuit's opinion in *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021)).

- Many of Mr. Meadows's facts (ECF 29-3 ¶¶ 7, 9-10, 18, 25-27, 29-31, 33-35, 39-40, 42-44, 46, 53-56, 58, 63-65, 67) are objectionable under Rule 56(c)(2) because they are not "presented in a form that would be admissible in evidence," including that they are hearsay (with no obvious applicable exception) or improper opinion testimony.

- Various propositions that Mr. Meadows supports through his counsel's declaration are objectionable under Rule 56(c)(4) because they are not based on counsel's "personal knowledge" and/or are improper opinion testimony from a non-expert. ECF 29-4 ¶ 4 ("based on public reporting"), ¶ 7 ("[u]pon information, belief, and personal experience"), ¶ 8  (based on "knowledge and belief").

Similarly, Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts (ECF 29-3) either does not contest the facts, or does not dispute the facts in a manner consistent with the requirements of Rule 56(c) or Local Rule 7(h)(1).  Specifically, Mr. Meadows does not dispute 23 of Defendants' 29 Statements of Fact.  *Compare* Defendants' Statement of Material

Facts, ECF 15-28 ("SOMF") *with* ECF 29-3 ¶¶ 1-4, 8-17, 19-22, 24-25, 27-29.[2]  With regard to

the six remaining paragraphs, Mr. Meadows argues that they do not cite "the parts of the record

relied on to support the statement."  ECF 29-3 ¶¶ 5-7, 18, 23, 26.  For most of these paragraphs,

Mr. Meadows appears to be ignoring the actual allegation, each of which includes a citation.

*See, e.g.,* SOMF ¶¶ 5-7, 26 (citing materials in the public domain with web links), ¶ 18 (citing

Heaphy Declaration Ex. A (ECF 15-2), ¶ 23 (citing complaint & exhibit).  To the extent

Plaintiff's "dispute" is premised on the failure to include copies of public domain materials or

that the few points where Plaintiff contends the assertion is not supported by the cited

documents, Plaintiff is submitting these materials and supplemental declarations with this brief

to ensure the summary judgment record is full and complete and so the Court can evaluate for

itself whether the statements are not supported.  *See* Supp. Exs. 1 & 2.  But it bears emphasis that

Mr. Meadows has not identified genuine or material disputes with regard to any of these points,

as he is required to under Rule 7(h)(1).  To give an example, Mr. Meadows contends that SOMF

¶ 18, which states that Mr. Meadows' privilege logs includes communications "with people

reported to be members of the Trump campaign legal team or other Trump campaign staff" is not

---

[2]    While Mr. Meadows purports to dispute the "relevance" of Defendants' SOMF ¶¶ 8, 15, 21, 24, 25, 27, 28, he fails to support these assertions with "references to the parts of the record relied on to support the statement." ECF 29-3 ¶¶ 8, 15, 21, 24, 25, 27, 28.  Moreover, the "relevance" of the fact that Mr. Meadows published a book discussing events and communications over which he now purports to assert a privilege or immunity (SOMF ¶¶ 25, 27, 28) is obvious.  So is the fact that Mr. Meadows was told that the President had "declined to assert executive privilege or any form of immunity" concerning his testimony or production statements.  SOMF ¶ 15.  And so is the fact that the Select Committee's actions (SOMF ¶ 8). regarding Mr. Meadows were ratified in his contempt vote.  SOMF ¶ 15.

     Similarly, Mr. Meadows's quibbles that the subpoena was not "limited to the events of January 6," ECF 29-3 ¶ 9, that he had a "change of heart" about testifying, ECF 29-3 ¶ 20, and that he does not "agree on the scope of non-privileged testimony" that he previously agreed to testify about before backing out of his agreement to testify, EC 29-3 ¶ 22, are not material disputes; Mr. Meadows nowhere explains why these issues preclude entry of summary judgment.

"supported by the cited documents."  ECF 29-3 ¶ 18.  But the cited privilege log, which was submitted as ECF 15-6, plainly contains communications between Mr. Meadows and well known senior members of the Trump campaign   team (including Bill Stepien, Justin Clark, and Boris Epshteyn) and campaign counsel (Rudy Guiliani, Sidney Powell, Jenna Ellis); this is not a material dispute.  Similarly, Mr. Meadows asserts that SOMF ¶ 26, which states "Former President Trump reviewed [Mr. Meadows'] book in advance and did not object to its publication" is not supported by the cited source.  ECF 29-3 ¶ 26.  The language at the cited source reads:

> Mark Meadows, our great Chief of Staff during some very exciting White House years, has written a new book entitled The Chief's Chief. It is available for pre-order now, and doing really well. If you want to learn about politics, truth, our great administration, and exciting achievements that took place in government, pre-order your copy now. Remember, there has never been an administration like ours. We did things that no other administration even thought they could do. The Chief's Chief would make an incredible Christmas present, and with United States supply lines totally dead, and with thousands of ships having no way of unloading because of incompetent leadership, you will have no other thing you can buy anyway. Seriously, it's a fantastic book, and Mark Meadows and his wonderful wife Debbie are great people.

*Statement by Donald J. Trump* (Oct. 13, 2021) (Ex. 2).  Mr. Meadows has simply failed to raise a genuine dispute with regard to this or Defendants' other material facts.

## II.     TESTIMONIAL IMMUNITY DOES NOT PROTECT MR. MEADOWS FROM CONGRESSIONAL COMPULSION TO TESTIFY BEFORE THE SELECT COMMITTEE

### A.     Separation of Powers Concerns Support, Rather Than Undermine, Enforcement of the Select Committee's Subpoena

As the Select Committee has already explained in detail in its opening brief, ECF 15 at 42–44, Mr. Meadows is not entitled to testimonial immunity both because the Executive has not asserted executive privilege over his testimony and because no such absolute immunity exists for subordinate executive officials.  *See Comm. on the Judiciary, U.S. House of Representatives v.*

*Miers*, 558 F. Supp. 2d 53, 103–04 (D.D.C. 2008); *see also Comm. on the Judiciary, U.S. House of Representatives v. McGahn*, 415 F. Supp. 3d. 148, 202–03 (D.D.C. 2019).[3]  Though Mr. Meadows concedes that caselaw uniformly holds that there is no testimonial immunity for such officials, ECF 29-1 at 22, he nonetheless argues that separation of powers concerns necessitate that testimonial immunity apply to him.  He is incorrect.

To start, there is no factual basis to the premise of Mr. Meadows's argument; there is no dispute that the Executive has informed him that President Biden had considered but declined to assert executive privilege or any form of immunity with respect to Mr. Meadows's testimony or production of documents, and Mr. Meadows has, in fact, produced thousands of documents and had agreed to testify before backing out at the last minute.  *See* Am. Compl Ex. L (ECF 13-14) at 3, Ex. O (ECF 13-17) at 3-4, Ex. P (ECF 13-18) at 2, Ex. R (ECF 13-20), Ex. T (ECF 13-22).  For all of his legal analysis about separation of powers, Mr. Meadows ignores that the Executive Branch and Congress are actually *in alignment* as to what information the Select Committee is entitled to obtain.  Therefore, contrary to Mr. Meadows's assertion, separation of powers concerns require that the Court respect the outcome reached by the political branches.[4]

As the D.C. Circuit in *Trump v. Thompson* noted, "[t]he Supreme Court has emphasized the importance of courts deferring to information-sharing arguments wrestled over and worked out between Congress and the President," and has emphasized the courts' "duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that those [Political]

---

[3]   Then-District Court Judge Jackson's opinion as to the House Committee's standing was initially vacated by a panel of the D.C. Circuit, which held the dispute was non-justiciable, 951 F.3d 510 (D.C. Cir. 2020), but that decision was vacated and Judge Jackson's standing ruling was ultimately affirmed by the *en banc* Circuit, 968 F.3d 755 (D.C. Cir. 2020) (en banc).

[4]   This is especially true given that President Biden, as the incumbent president, "is the principal holder and keeper of executive privilege, and he speaks authoritatively for the interests of the Executive Branch." *Trump v. Thompson*, 20 F.4th at 33.

branches themselves have reached.'" *Trump v. Thompson*, 20 F.4th at 37–38 (quoting *Mazars*,

140 S. Ct. 2019, 2031 (2020)).[5]

        And Mr. Meadows's legal arguments about executive privilege, in any event, are wrong.

He first argues that he is entitled to testimonial immunity because that is the conclusion reached

by several opinions of the Department of Justice Office of Legal Counsel ("OLC"). ECF 29-1 at

19–22.  Of course, OLC opinions are Executive Branch guidance that are not binding on the

Judiciary, *see Nat'l Min. Ass'n v. Slater*, 167 F. Supp. 2d 265, 284 n.18 (D.D.C. 2001), *overruled*

*on other grounds Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752 (D.C. Cir. 2003).   In both *Miers* and

*McGahn*, judges within this district rejected OLC's reasoning on the question Mr. Meadows now

raises before this Court.  In *McGahn*, then-District Court Judge Jackson rejected OLC's opinion

on testimonial immunity because it failed to cite judicial caselaw and contained faulty reasoning,

noting that "it appears that an endorsement of the principles that OLC espouses would amount to

adopting the absolute testimonial immunity for senior-level presidential aides by *ipse dixit*."

*McGahn*, 415 F. Supp. 3d at 204–07. Similarly, in *Miers*, Judge Bates stated, "[t]he question,

then, is how much credence to give to those [OLC] opinions" and concluded that "the Court is

---

[5]    Resisting the controlling precedent in this Circuit, Mr. Meadows repeatedly cites to Justice
Kavanaugh's statement respecting the denial of former President Trump's application for stay of
mandate and injunction pending review. Justice Kavanaugh's statement simply points out the
need for some ongoing confidentiality for a former President's communications.  But the D.C.
Circuit did not suggest that a former President has no such interest; to the contrary, the Supreme
Court denied former President Trump's request for an injunction because the Circuit "analyzed
and rejected President Trump's privilege claims under any of the tests he advocated, without
regard to his status as a former President, . . . [and thus] the Court of Appeals concluded that
President Trump's claims would have failed even if he were the incumbent." *Trump v.
Thompson*, 142 S. Ct. 680 (2022) (internal quotation marks, alteration, and citation omitted).
Accordingly, Justice Kavanaugh's statement does not detract at all from the force of the D.C.
Circuit's opinion.

not at all persuaded by the Reno and Bradbury [OLC] opinions" because they are "for the most part conclusory and recursive."  *Miers*, 558 F. Supp. 2d at 104.

Despite both cases involving separation of powers disputes between Congress and the then-incumbent administration, Mr. Meadows argues that *Miers* and *McGahn* should be disregarded because they did not adequately consider the separation of powers implications in requiring executive officials to testify before Congress. ECF 29-1 at 22. Both the *Miers* and *McGahn* courts explicitly discussed the separation of powers implications posed by the question whether Executive officials enjoyed absolute testimonial immunity.

For example, in *Miers*, Judge Bates considered the Executive's reliance on separation of powers for testimonial immunity, and found that such concerns were insufficient to overcome the compulsion to testify.  There, the Bush Administration argued that separation of powers concerns, specifically Presidential autonomy, necessitated the availability of absolute immunity from testimony. Judge Bates thoroughly addressed—and persuasively rejected—this argument:

> The interest in presidential autonomy proffered by the Executive does not support the assertion of absolute immunity here. In *Nixon v. Sirica,* the D.C. Circuit explained: If the claim of absolute privilege was recognized, its mere invocation by the President or his surrogates could deny access to all documents in all the Executive departments to all citizens and their representatives, *including Congress,* the courts as well as grand juries, state governments, state officials and all state subdivisions. The Freedom of Information Act could become nothing more than a legislative statement of unenforceable rights. Support for this kind of mischief simply cannot be spun from incantation of the doctrine of separation of powers. . . .
>
> Presidential autonomy, such as it is, cannot mean that the Executive's actions are totally insulated from scrutiny by Congress. That would eviscerate Congress's historical oversight function.

*Miers*, 558 F. Supp. 2d at 103 (citation omitted).

The same is true of the decision in *McGahn*.  There, then-District Court Judge Jackson rejected the Trump Administration's invocation of separation of powers concerns by noting that

allowing absolute testimonial immunity would in fact directly contradict the purpose of

separating power among three branches:

> Here, once again, DOJ calls on separation-of-powers principles to do work that
> the Framers never intended. Indeed, *the entire point* of segregating the powers of
> a monarch into the three different branches of government was to give each
> branch certain authority that the others did not possess. Thus, while the branches
> might well be conceived of as co-equals (in the sense that one cannot unlawfully
> subvert the prerogatives of another), that does not mean that all three branches
> must be deemed to have the *same* powers. To the contrary, the President cannot
> hale members of Congress into the White House for questioning *precisely*
> *because* the power of inquiry resides with the Legislature, and also because the
> Constitution itself expressly prevents the Executive branch from becoming
> inquisitors by inflicting its own subpoena power on members of Congress for
> political reasons.

*McGahn*, 415 F. Supp. 3d at 212; *see also id.* at 154 ("Indeed, when DOJ insists that Presidents

can lawfully prevent their senior-level aides from responding to compelled congressional process

and that neither a federal court nor Congress has the power to do anything about it, DOJ

promotes a conception of separation-of-powers principles that gets these constitutional

commands exactly backwards.  In reality, it is a core tenet of this Nation's founding that the

powers of a monarch must be split between the branches of the government to prevent

tyranny.").  Mr. Meadows's argument that these courts did not address separation of powers

concerns is therefore plainly incorrect.

Moreover, Mr. Meadows's argument falters because absolute testimonial immunity is

merely a subspecies of the broader notion of executive privilege, which seeks to ensure that the

President is able to fulfill his constitutional duties.  *See Miers*, 558 F. Supp. 2d at 107 n.38

(noting that "that basis of" absolute immunity "is rooted in notions of executive privilege").  In

the executive privilege context, courts have consistently found that separation of powers

concerns do not turn executive privilege into an absolute protection or testimonial immunity.

Rather, courts have consistently found that the Executive Branch's need for confidentiality to

prevent a chilling effect on its communications with staff in the execution of its duties must be balanced against the needs of the coordinate branches seeking to effectuate their own constitutional responsibilities.

For example, in *United States v. Nixon*, the Supreme Court, in rejecting the President's argument that he was entitled to absolute privilege, noted that "[i]n designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence." 418 U.S. 683, 707 (1974); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977) ("*GSA*") (holding President's invocation of an absolute executive privilege "rests upon an archaic view of the separation of powers as requiring three airtight departments of government. Rather, in determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress"); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (balancing the interests of the Executive against the needs of a Congressional Committee).

In other words, the separation of powers is not a get-out-of-subpoena-compliance-free card, but rather a principle that must be weighed by courts in balancing the various interests at issue in a given case.

Mr. Meadows provides no explanation for why the reasoning in cases like *Nixon* regarding the separation of powers concerns in the executive privilege context does not apply

10

with equal force to his claim of testimonial immunity.  Instead, he asserts in conclusory fashion that the decisions rejecting absolute testimonial immunity failed to account for the "chilling effect" on the advice of Executive Branch officials and do not "promote comity" between the branches. ECF 29-1 at 24.  But, as the caselaw demonstrates, the potential chilling effect on Presidential communications does not automatically supersede the interests of other branches.

There is nothing regarding the separation of powers concerns raised by Meadows that requires a different balancing of these interests and providing the Executive with the protection of absolute testimonial immunity.  Indeed, as the D.C. Circuit held in *Trump v. Thompson*, "the profound interests in disclosure advanced by … the January 6th Committee far exceed … generalized concerns for Executive Branch confidentiality."  20 F.4th at 33.  Mr. Meadows provides neither a factual basis nor legal argument compelling a different conclusion.

For these reasons, Mr. Meadows is not entitled to absolute testimonial immunity based on concerns over separation of powers.

**B.  There Is No Basis to Immunize Mr. Meadows from Testifying on the Seven Select Topics**

Even if some form of testimonial immunity did exist (which would plainly be a qualified immunity under relevant precedent), Mr. Meadows would still not be entitled to it because the information sought by the Select Committee is outside the scope of any purported testimonial immunity.  As described at length in its summary judgment brief, the Select Committee seeks testimony on seven specific topic areas, none of which are subject to testimonial immunity.  ECF 15 at 27–41.

Mr. Meadows raises opposition only to the topics related to his role in former President Trump's reelection campaign.  ECF 29-1 at 25-29.  He does not contest defendants' other

arguments regarding why testimonial immunity does not apply.[6]  ECF 29-1 at 25–26.  With

regard to the Trump 2020 campaign, Mr. Meadows first argues that testimonial immunity is so

broad as to include any campaign-related conduct because the "the relevant inquiry is whether

the Court has before it congressional subpoenas for the President's information." ECF 29-1 at 26.

Therefore, he argues, the mere fact that Mr. Meadows served as Chief of Staff during the period

in question is enough to grant testimonial immunity.

Such a broad application is beyond even what OLC argues immunity encompasses.  OLC

has advised that Executive officials *can* appear before Congressional committees if "the inquiry

is related to their private conduct."  Mem. for the Honorable John W. Dean III, Counsel to the

President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, Re:

Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee 3

(Mar. 15, 1972).  Mr. Meadows argues that it is impossible to draw a line between private and

official functions, ECF 29-1 at 29, but federal law draws precisely that line: campaign-related

conduct must be deemed private conduct because the Hatch Act prohibits executive officials

from engaging in campaign-related activities in their official capacities.  *See* 5 U.S.C. §§ 7321 *et*

*seq.*

Moreover, the proposed breadth of the testimonial immunity that Mr. Meadows suggests

would be wider in scope than the immunity afforded to the President.  *See Nixon v. Fitzgerald*,

457 U.S. 731, 756 (1982) ("In view of the special nature of the President's constitutional office

and functions, we think it appropriate to recognize absolute Presidential immunity from damages

---

[6]    Mr. Meadows has therefore conceded those arguments. *See Hopkins v. Women's Div., Gen.
Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) *aff'd* 98 Fed. App'x 8 (D.C. Cir.
2004) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain
arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to
address as conceded.").

liability for acts within the 'outer perimeter' of his official responsibility."); *Clinton v. Jones*, 520 U.S. 681, 693–94 (1997) (declining to extend Presidential immunity to unofficial conduct). However far testimonial immunity extends, it does not provide *more* protection to a President's aide than to the President.

Mr. Meadows next argues that even if testimonial immunity is limited to conduct within the scope of an Executive official's duties, his conduct was within the scope of those official duties. ECF 29-1 at 29-30. Crucially, he does not dispute that he engaged in the underlying conduct at issue, such as participating in a call with Georgia state officials in which former President Trump repeatedly urged Georgia's Secretary of State to alter the outcome of the Presidential vote in that State, or meeting with Phil Waldron on December 21, 2020, to discuss ways to change the results of the 2020 election. ECF 15-23 (Heaphy Decl. Ex. V). Rather, he argues that all of this conduct is within the scope of his official duties as Chief of Staff and further states that determining the line between executive and campaign work is untenable. He is incorrect, as the Hatch Act makes clear.[7]

Moreover, a court in this district recently analyzed whether former President Trump's conduct in the weeks leading up to January 6th, as well as events that day, constituted conduct within the scope of his duties as President. Former President Trump asserted that he was immune from civil damages liability because his alleged conduct "fell within the outer perimeter of his official presidential responsibilities." *Thompson v. Trump*, --- F. Supp. 3d. ---, No. 21-cv-00400 (APM), 2022 WL 503384,*11 (D.D.C. Feb. 18, 2022). Judge Mehta determined otherwise. Specifically, Judge Mehta found that the former President's pre-January 6th tweets, the planning

---

[7]    Indeed, Mr. Meadows's claim that his participation in former President Trump's reelection campaign occurred in his official role as Chief of Staff appears to amount to an admission that he violated the Hatch Act.

leading up the January 6th Rally, and the January 6th Rally Speech itself all fell *outside* the scope of the President's official duties.  *See id.* at \*17–18.

For example, Judge Mehta found that the former President's tweets criticizing state officials for not doing enough to ensure his victory in their states, his direct contact with local election officials and state legislators in Michigan, Pennsylvania, and Georgia to overturn their election results, and his tweets expressing support for rallies in November and December 2020, were all geared at "securing incumbency" and therefore were "not official acts." *Id.* at \*17.  The same was true of the former President's tweets in support of rallies in November and December 2020, and planning for and speaking at the January 6th rally. *Id.* at \*17-18.  All of these actions, Judge Mehta concluded, "do not relate to [the President's] duties of faithfully executing the laws, conducting foreign affairs, commanding the armed forces, or managing the Executive branch." *Id.* at \*18.  "These are unofficial acts, so the separation-of-powers concerns that justify the President's broad immunity are not present here."  *Id.* at \*18.

The same is true for any testimonial immunity that Mr. Meadows asserts for his role in assisting then-President Trump in these actions.  Testimonial immunity for Executive officials can only extend as far as the Executive's own immunity.  *Cf. Miers*, 558 F. Supp. 2d at 100 (noting that executive officials are regarded as the President's "alter ego").  Therefore, Mr. Meadows's campaign-related activity, in support of President Trump's efforts to remain in office, are beyond the scope of any purported testimonial immunity.

Mr. Meadows's reliance on Watergate-era cases to argue that campaign-related activity is protected by testimonial privilege is baseless.  First, only one of the cases relied upon by Mr. Meadows concerned a Congressional subpoena to the Executive Branch. *Senate Select Comm.*, 498 F.2d 725.  There, though the D.C. Circuit ruled against enforcing the subpoena, it did not

address the content of the conversations the subpoena sought but rather focused its holding on the fact that the Senate Select Committee's need for the material was "cumulative," given that the House impeachment inquiry had already obtained the identical information. *Id.* at 731-32. Here, by contrast, numerous courts have already held that the Select Committee's investigation is in furtherance of potential legislation, as described in H. Res. 503. *Trump v. Thompson*, 20 F.4th at 41–42.

Furthermore, Mr. Meadows argues that, if the Court finds that the conduct was not done in his official capacity as White House Chief of Staff, his conduct is nevertheless protected by the First Amendment. ECF 29-1 at 29. This is a red herring. The First Amendment does not provide absolute testimonial immunity regarding an individual's ability to engage in campaign and other First Amendment activity without Congressional inquiry. Rather, it provides a balancing test that weighs "the competing private and public interests at stake." *Barenblatt v. United States*, 360 U.S. 109, 126 (1959). As explained in more detail *infra*, "balancing plays no part" where a suit "attempts to interfere with an ongoing activity by Congress," *Eastland v. United States Serviceman's Fund,* 421 U.S.491, 510 n. 16 (1975), and in any event the First Amendment interests asserted by Mr. Meadows are insufficient to outweigh the Select Committee's compelling need for the information.

Accordingly, even if some sort of absolute testimonial privilege did exist, Mr. Meadows would not be entitled to it. This precludes summary judgment in favor of Mr. Meadows.

### C.     Discovery Is Not Necessary on Mr. Meadows's Role

Mr. Meadows argues that, if the Court decides that there is a legal question whether he was acting in an official or private capacity while engaging in campaign activities as Chief of Staff, then discovery is necessary to determine in which capacity he was acting. ECF 29-1 at 30. This argument incorrectly assumes, of course, that absolute testimonial immunity would be

available if he were acting in an official capacity, which, for the reasons discussed above, it is

not.  Accordingly, even if an issue of fact existed, it is not material to the outcome of this case.

Moreover, discovery is not necessary to resolve any factual dispute. First, as described in

more detail *supra*, the determination of whether specific conduct is within the scope of Mr.

Meadows's official role as Chief of Staff is a legal determination.  Mr. Meadows's contention

that his conduct should be classified as executive rather than campaign-related is therefore a

legal rather than factual dispute.  For Mr. Meadows to raise an issue of fact, under Rule 26(c), he

would need to identify a dispute over what he did and what occurred.  He has not done so; he has

not submitted declarations or any other evidence that he did not engage in campaign-related

activities identified in Plaintiffs' motion.  *Compare* ECF 15 at 10-11, 31-32, 38-41 and cited

record evidence *with* ECF 29-1 at 27-29 (no response to factual assertions).  Accordingly,

discovery would serve no purpose.

Second, to the extent this Court determines that further factual development is necessary,

there is no discovery Mr. Meadows could take from the Select Committee that would shed light

on this issue.  Mr. Meadows himself is in the best position to provide evidence on his role and

conduct during his term as Chief of Staff.  Therefore, he would not need discovery from others to

make that determination.  If Mr. Meadows had facts about his own conduct that would suggest

he was operating in an official rather than unofficial capacity, he should have put them forward

in a declaration opposing summary judgment.  He did not.  He has made no showing how

additional discovery on the actions he personally took would add anything probative on this

question.  He is instead trying to run out the clock.

Of course, if this Court were to allow discovery on whether Mr. Meadows was acting in

his official capacity in lobbying state legislatures and other efforts to reverse the election

outcome in 2020, the Committee would immediately issue a notice for his deposition. And Mr.

Meadows would have no genuine basis to resist such a deposition. This is, of course, similar to

the ultimate relief that the Select Committee sought in its own summary judgment motion.

Likewise, Mr. Meadows has made no showing that discovery from other "former Chiefs of

Staff," (ECF 29-1 at 30), Mr. Meadows contends (without citing evidentiary support) engaged in

similar efforts to support Presidential reelection campaigns would be necessary; this information

would shed no light on the nature of Mr. Meadows's own conduct. The question is not whether a

Chief of Staff can participate in an election at all, it is whether Mr. Meadows undertook activities

of that type in his official capacity. Mr. Meadows knows what Mr. Meadows did here, and he

cannot pretend not to know in order to delay this case.

## III.   SUMMARY JUDGMENT IN FAVOR OF THE SELECT COMMITTEE IS APPROPRIATE BECAUSE THERE IS NO GENUINE DISPUTE OF MATERIAL FACT

The Court should grant summary judgment to the Congressional defendants because,

while Mr. Meadows purports to raise disputed issues, none are issues of material fact. Indeed,

Mr. Meadows has cross-moved on a number of these issues, including whether the Select

Committee has a valid legislative purpose, ECF 29-1 at 31-35, the validity of the subpoenas,

ECF 29-1 at 35-38, and whether the Select Committee is validly composed, ECF 29-1 at 36-37,

which implicitly recognizes that there are no material facts in dispute regarding these issues. *See

generally* Rule 56(a).

"Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or

unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As discussed below, none of the facts Mr. Meadows identifies as disputed are dispositive of any

legal issue. In most cases, the "facts" he cites are not properly raised under Rule 56(c); instead,

Mr. Meadows relies on erroneous legal arguments to resist the Defendants' motion.

Accordingly, summary judgment in favor of the Defendants is warranted.

      **A.**      **The Select Committee is Entitled to Summary Judgment on the Select Committee's Valid Legislative Purpose**

Mr. Meadows argues that he is entitled to summary judgment because the subpoenas lack a valid legislative purpose. ECF 29-1 at 31-35.  He is incorrect.  First, as explained in detail in the Select Committee's opening brief, the D.C. Circuit has already determined that the Select Committee is operating pursuant to a valid legislative purpose. *Trump v. Thompson*, 20 F.4th at 37–38.  That decision governs here.  Furthermore, all courts that have considered challenges to the Select Committee's subpoenas have likewise determined that the Committee is operating pursuant to a valid legislative purpose and that its subpoenas are valid.  Oral Arg. Tr. at 34, *Budowich v. Pelosi*, ECF 27; Order at 9 & n.12, *Eastman v. Thompson*, ECF 43; *RNC*, 2022 WL 1294509, at *16–17.  No court has ruled or suggested otherwise.

Next, contrary to Mr. Meadows's argument, the correct inquiry is not whether the subpoenas themselves have a valid legislative purpose but rather whether the information sought falls within the scope of the Select Committee's valid legislative purpose.  *See Senate Select Comm. on Ethics v. Packwood*, 845 F. Supp. 17, 20-21 (D.D.C. 1994) ("In determining the proper scope of a legislative subpoena, this Court may only inquire as to whether the documents sought by the subpoena are 'not plainly incompetent or irrelevant to any lawful purpose [of the Select Committee] in the discharge of [its] duties.'") (quoting *McPhaul v. United States*, 364 U.S. 372, 381 (1960)).  Mr. Meadows fails to articulate how any of the seven topics on which the Select Committee seeks information are unrelated to its overall investigative and lawmaking purpose.  That is because it is clear that these topics seek information that goes to the crux of the Select Committee's investigation.

The Select Committee is tasked, in part, with determining "the facts, circumstances, and causes relating to" the attack and "the interference with the peaceful transfer of power." H. Res. 503 §§ 3, 4(a)(1).  The information sought from Mr. Meadows focuses almost entirely on his work with and on behalf of former President Trump to contest the results of the 2020 Presidential election, whether through contesting individual state results, changing the leadership at the Department of Justice to give the imprimatur of that agency to the former President's bid to stay in power, or attempting to persuade former Vice President Pence to alter the results during the certification process on January 6th.  This information clearly relates to the Select Committee's task to determine the facts, circumstances, and causes related to the January 6th attack.

Mr. Meadows's arguments to the contrary are unavailing.  First, he argues that the proper standard to assess the valid legislative purpose is not to consider whether such a purpose exists, but instead to import tests from the executive privilege context into this analysis, by employing the standards articulated in *United States v. Nixon* or *Mazars*. ECF 29-1 at 32-33.  But neither case is relevant to determining whether the Select Committee's investigation has a valid legislative purpose.  The four-part test set forth in *Mazars* determines whether the production of personal Presidential papers, unprotected by executive privilege, can be compelled by Congress.  *Mazars*, 140 S.Ct. at 2033, 2035-36.  *Mazars* is thus inapplicable to the facts here.  Personal papers of or about the President and official papers containing Presidential communications are two distinct concepts that are subject to different tests to determine if they can be disclosed.  *Mazars* dealt with the specific situation of Congress seeking disclosure of personal documents belonging to a sitting President related to activities he engaged in in his personal capacity.  Here, neither Mr. Meadows nor the President he served are sitting officials, the documents sought do *not* include documents belonging to that President, the information sought is on topics *not*

covered by executive privilege, and the sitting President has concluded it is not in the national interests to oppose the testimony sought by the Select Committee.  Accordingly, *Mazars* is inapposite.

Applying the executive privilege test from *United States v. Nixon* is equally illogical. That test was designed to determine whether executive privilege would shield a President from a valid *grand jury* subpoena.  The legislative purpose test articulated in *Eastland* and other cases is a distinct test developed for Congress, developed specifically with the separation of powers concerns between Congress and the Executive in mind; replacing it with the test from *United States v. Nixon* would merely apply a test designed for a materially different branch to Congress.[8]

Mr. Meadows also argues that, even if the Select Committee is operating pursuant to a valid legislative purpose, that purpose is vitiated by the fact that there is a concurrent criminal investigation and that the investigation is merely a pretext for the Select Committee's true purpose of revealing the wrongdoing of and shaming their political adversaries. ECF 29-1 at 35.

Mr. Meadows provides no support for, much less does he demonstrate there is a genuine factual dispute concerning, these allegations.  Moreover, if Congress is acting pursuant to a valid legislative purpose, a court *cannot* consider any other motives or the effect of the investigation exposing criminal activity.  *See, e.g., RNC*, 2022 WL 1294509, at * 9, *18 (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998), *Barenblatt*, 360 U.S.at 132, and *Watkins v. United States*, 354 U.S. 178, 200 (1957));  *see also Watkins*, 354 U.S. at 200 (stating that the motives of committee members in conducting their investigation "would not vitiate an investigation which had been

---

[8]    In any event, as explained below, the Select Committee's interest in the information it seeks more than meets the requirements of either the *United States v. Nixon* or *Mazars* tests.

instituted by a House of Congress if that assembly's legislative purpose is being served").  Nor is it "a valid objection to the investigation that it might possibly disclose crime or wrongdoing." *McGrain*, 273 U.S. 135, 179-80 (1927); *see also Hutcheson v. United States*, 369 U.S. 599, 618 (1962) ("But surely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever ... crime or wrongdoing is disclosed.").

Even accepting Mr. Meadows's version of the facts, he does not come close to calling into question the valid legislative purpose of the Select Committee.  Accordingly, summary judgment should be granted in favor of Defendants.

**B.    The Select Committee is Entitled to Summary Judgment on Its Composition and the Validity of the Subpoenas**

Mr. Meadows next argues that the subpoenas were not validly issued because the Select Committee is not properly composed pursuant to H. Res. 503 § 2(a) and the subpoenas were not validly issued pursuant to H. Res. § 5(c)(6).  ECF 29-1 at 35-38.  Both of these arguments are unavailing, as several courts in this and other districts have already held.  But besides being meritless, these arguments at bottom ask the Court to second-guess Congress's interpretation of its own rules.  That inquiry is barred by the Constitution's Rulemaking Clause.

The Rulemaking Clause, U.S. Const., Art. I, § 5, cl. 2, "grants the House the power to make its own Rules about its internal proceedings."  *Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013).  The D.C. Circuit has strongly cautioned courts against "interpreting a congressional rule differently than would the Congress itself," as that would be "tantamount to *making* the rules—a power that the Rulemaking Clause reserves to each House alone."  *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (internal quotation marks omitted).  Indeed, a court may only interpret such internal rules where such interpretation "requires no resolution of ambiguities."  *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995).

Mr. Meadows attempts to evade the force of this precedent by relying on cases in which a committee of Congress admitted it failed to follow its rules. *See* ECF 29-1 at 36 (citing, *inter alia*, *Yellin v. United States*, 374 U.S. 109 (1963)). Moreover, in the cases Mr. Meadows cites, the committees' rules were "quite explicit" and the conduct at issue involved the committee conceding that it departed from the practice the rule required. *Yellin*, 374 U.S. at 115, 122-23; *see id.* at 116-17 ("Weight should be given such a practice of the Committee in construing its rules." (citation omitted)); *see also Shelton v. United States*, 327 F.2d 601, 606-07 (D.C. Cir. 1963) (subpoena invalid where Senate Resolution authorized subcommittee to issue subpoenas, but where subpoena in question was issued neither by subcommittee or its members, but where "the decision to issue it was de facto made by Subcommittee counsel alone").

Here, however, courts have already held that there is at least sufficient ambiguity in the very provisions of H. Res. 503 Mr. Meadows cites that they must defer to Congress's interpretation of those provisions. *See RNC*, 2020 WL 1294509, at *15-16 (§§ 2(a); 5(c)(6)); *Eastman*, 2022 WL 1407965, at *6 n.12 (§ 2(a)); Tr. of Hr'g 33-34, *Budowich v. Pelosi*, No. 21-cv-3366-JEB (D.D.C. Jan. 20, 2022).

Mr. Meadows argues that the Select Committee's rules require "[p]articular scrutiny" because of the "separation of powers dispute" between himself and the Select Committee. ECF 29-1 at 36. For reasons discussed above, there is no separation of powers issue here because Mr. Meadows does not represent any branch of government and the Executive and Congress agree that it is in the national interest for Mr. Meadows to provide testimony. And in any event, separation of powers doctrine weighs heavily against this Court engaging in the kind of interpretation of House rules that Mr. Meadows invites. *United States v. Rostenkowksi*, 59 F.3d

1291, 1306 (D.C. Cir. 1995).  The Court would intrude on the separation of powers to grant Meadows's motion.

### 1.    The Select Committee Is Entitled to Summary Judgment on the Issue of Whether the Committee Is Properly Composed

In any event, Mr. Meadows's arguments are meritless.  The Select Committee is properly composed.  The fact that the Select Committee has nine members instead of thirteen does not render it invalidly constituted.  As Judge Kelly recently affirmed, that H. Res. 503 contains the word "shall" is "not conclusive as to whether thirteen members are required for it to lawfully operate."  *RNC*, 2022 WL 1294509, at *15.  Moreover, the full House has now on four occasions adopted contempt referrals from the Select Committee, including for Mr. Meadows, ratifying that it views the Select Committee as duly and validly constituted.  *See* H.R. 1037, 117th Cong. (2022) (Peter Navarro and Dan Scavino); 167 Cong. Rec. H7667, H7794, H7814–15 (Dec. 14, 2021) (Mark Meadows); 167 Cong. Rec. H5748, H5768–69 (Oct. 21, 2021) (Steve Bannon).  Mr. Meadows does not and cannot dispute these facts. *See* ECF 29-3 ¶ 21 ("Mr. Meadows does not dispute the House voted to hold him in contempt…").

Mr. Meadows also argues that the Select Committee is not validly constituted because Speaker Pelosi did not properly consult with the Minority Leader.  He disputes that the Speaker "spoke with the Minority Leader, advised him on the referenced matter, and asked him to recommend two other Republicans."  ECF 20-3 ¶ 5.  But Mr. Meadows does not dispute that the Minority Leader recommended five Republicans to the Select Committee, that the Speaker declined to appoint two of those five members, and the Minority Leader then withdrew his recommendations.  *See id.* ¶¶ 4-5.  Thus, the only dispute Mr. Meadows raises is a legal one – whether the Speaker's consideration and rejection of the Minority Leader's recommendations constitutes "consultation."  "To 'consult' with Minority Leader McCarthy, all Speaker Pelosi had

to do was ask for his 'advice or opinion.'" *RNC*, 2022 WL 1294509, at *16 (citing Consultation, Black's Law Dictionary (11th ed. 2019)).  "There is no dispute that she did.  That she did not accept all his recommendations, and that Minority Leader McCarthy then withdrew all his recommendations, does not mean that Speaker Pelosi failed to consult with him." *Id.* Accordingly, on the undisputed facts, Mr. Meadows fails to raise any argument to undermine the lawful composition of the Select Committee.  The Defendants are entitled to summary judgment on this issue.

> **2.    The Select Committee is Entitled to Summary Judgment on Whether the Subpoenas Were Validly Issued**

Mr. Meadows's arguments to invalidate the subpoenas also fail when he nitpicks the use of titles within the Select Committee.  He argues that the subpoenas were not validly issued under H. Res. 503 § 5(c)(6) because Chairman Thompson did not consult "with the ranking minority member" because there is purportedly no Republican on the Select Committee who holds the title "Ranking Member."  ECF 29-1 at 37-38.  This argument has already been persuasively rejected by Judge Kelly.  *See RNC*, 2022 WL 1294509, at *16.  "A 'ranking member' is 'the most senior (though not necessarily the longest-serving) member of the minority party on a committee.'"  *Id.* (citing "Ranking Member," Glossary of Legislative Terms, congress.gov) (alteration omitted).  Mr. Meadows does not dispute that Representative Cheney is, in his words, "the senior-most Republican member of the Select Committee."  ECF 29-1 at 38.  He complains, however, that her title is "Vice Chair," rather than "Ranking Member."  *Id.*  That interpretation should not be subject to judicial review.  As Judge Kelly concluded, consistent with the Rulemaking Clause, this Court "must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation purposes."  *RNC*, 2022 WL 1294509, at *16.  Accordingly, Mr. Meadows's

challenges to the issuance of the subpoenas fail.  The Select Committee is entitled to summary judgment on this issue.

### C.  The Select Committee is Entitled to Summary Judgment on Whether the Subpoenas Infringe on Executive Privilege

Mr. Meadows asserts that executive privilege bars the Select Committee's subpoena, but he fails to raise any genuine dispute of material fact as to executive privilege.  This is a legal issue, and the law is conclusively in the Select Committee's favor.

As noted above, and described in greater detail in its opening brief, the Select Committee has identified seven topics on which it seeks documents and testimony.  ECF 15 at 27–41.  These topics overwhelmingly cover information that is inarguably outside the scope of any claim of executive privilege.[9]  For example, Topic 1 deals with documents that Mr. Meadows has already provided to the Committee.  Topics 2, 3, 4, and 7 relate to conversations Mr. Meadows had with individuals *outside* the Executive Branch, including conversations with Members of Congress and local and state election officials regarding the results of the 2020 Presidential election. Topic 4 also deals with a subject on which former President Trump has previously declined to assert privilege.  Topic 5 deals with an issue outside the scope of the President's official duties.

The Court need not decide any factual dispute to conclude that these topics do not implicate executive privilege.  Mr. Meadows does not assert any facts, identify any documents, or point to any matters of public record that would raise a genuine issue of material fact.  Indeed, with the exception of Topic 2 (regarding the post-election activities by the Trump campaign) his

---

[9]   The Select Committee acknowledges that Topic 6, which seeks information related to activity in the White House immediately before and during the events of January 6th, could potentially elicit information that is protected by executive privilege. However, for the reasons described infra, even if executive privilege did attach, Congress's interest in gathering this information outweighs any Executive Branch interest in confidentiality.

papers do not engage at all with the specific topics that the Select Committee has identified. ECF 29-3 at 30.  Rather, he makes the conclusory assertion that he "has articulated specific issues of executive privilege" without explaining what they are or providing a citation to where they can be found. ECF 29-1 at 40.  This is insufficient to raise the genuine disputes of material fact necessary to deny the Select Committee's motion for summary judgment.

It is also insufficient to support an invocation of executive privilege because, as the D.C. Circuit has recently confirmed, "generalized concerns for Executive Branch confidentiality" are not enough when there are profound interests on the other side. *Trump v. Thompson*, 20 F.4th at 33; *see also id.* at 38.  That is all Mr. Meadows has raised here.  Even if former President Trump were in a position to assert executive privilege, without a specific claim of executive privilege asserted by President Trump over particular topics or documents, all the Select Committee need show is that its requests for information are within the scope of its legislative purpose. For reasons already stated, the Select Committee's requests easily clear that threshold.

The Select Committee is also entitled to summary judgment because Mr. Meadows has failed to raise a genuine dispute as to former President Trump's failure to properly invoke executive privilege protection.  In his opposition brief, Mr. Meadows merely assumes that President Trump has correctly invoked executive privilege. ECF 29-1 at 2, 12-14, 38-42.  Mr. Meadows is incorrect.

President Trump has had no communication with the Select Committee.  H. Rep. 117-216 at 22 (2021).  Rather, in an October 11, 2021 email, Mr. Meadows's attorney attached a letter from Mr. Trump's attorney, Justin Clark, stating that the Select Committee's subpoena to Meadows seeks information that is "unquestionably protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative

process, and attorney-client privileges." *Id.*  The letter also indicated that former President

Trump had instructed Mr. Meadows, to the extent permitted by law to "(a) where appropriate

invoke any immunities and privileges he may have from compelled testimony in response to the

Subpoena; (b) not produce any documents concerning his official duties in response to the

Subpoena; and (c) not provide any testimony concerning his official duties in response to the

Subpoena." *Id.*  As the Select Committee has previously noted, ECF 15 at 26, this is insufficient

to invoke the protection of executive privilege.  Executive privilege "belongs to the Government

and must be asserted by it; it can neither be claimed nor waived by a private party."  *United*

*States v. Reynolds*, 345 U.S. 1, 7–8 (1953).  Any assertions by Mr. Meadows alone are

insufficient to invoke executive privilege, and Mr. Meadows provides no legal authority or

factual support to suggest otherwise, entitling the Select Committee to summary judgment.

Even assuming that Mr. Meadows is correct in asserting that executive privilege has been

properly invoked (and for reasons discussed, he is not correct), the Select Committee is still

entitled to relief.  Given Mr. Meadows's failure to raise any material disputes of fact, the Court

can—and should—easily dispatch his erroneous legal arguments regarding executive privilege.

*First*, Mr. Meadows asserts that President Biden cannot waive executive privilege or

otherwise compel Mr. Meadows to produce documents or testify.  ECF 29-1 at 40-41.  Contrary

to that assertion, President Biden, as the President, is the holder of executive privilege, and thus

the individual entrusted with decisions about when to assert or waive the privilege.  *See Trump v.*

*Thompson*, 20 F.4th at 26 ("The executive privilege is just that—a privilege held by the

Executive Branch, 'not for the benefit of the President as an individual, but for the benefit of the

Republic.'" (quoting *Nixon v. GSA*, 433 U.S. at 449)).  Thus, "[t]he privilege, like all other

Article II powers, resides with the sitting President."  *Id.*  While former Presidents may invoke a

*qualified* privilege over records generated during their administrations, *see Nixon v. GSA*, 433

U.S. at 466, "[t]he right of a former President certainly enjoys no greater weight than that of the

incumbent," *Trump v. Thompson*, 20 F.4th at 32.

This is so because the President is best situated to determine whether executive privilege

should be invoked. *Id.* at 33 (stating that "it is only President Biden," as the incumbent, "who can

make a fully informed and circumspect assessment of all the competing needs and interests of

the Executive Branch").  Mr. Meadows's reliance on Justice Kavanaugh's statement respecting

the denial of the injunction by the Supreme Court for the opposite contention is misplaced.  *See*

*Trump v. Thompson*, 142 S. Ct. 680 (2002) (Statement of Kavanaugh, J., respecting denial). That

statement—which, even if persuasive, has no force of law—simply notes that former Presidents

must have some "assurances of continuing confidentiality."  *Id.*  But both the caselaw and

statutory provisions already provide such assurances.  *See Nixon v. GSA*, 433 U.S. at 449;

Presidential Records Act, 44 U.S.C. § 2204(a).  As discussed below, such confidentiality must

give way to the needs of other branches of government, especially when the President has

determined that waiver is in the best interest of the country.

Moreover, contrary to Mr. Meadows's assertion, ECF 29-1 at 41, President Biden is not

compelling him to do anything.  Rather, the President is exercising his power to decide whether

executive privilege is appropriate; something he is uniquely capable of doing. That the

President's decision means that Mr. Meadows is unable to avoid the compulsory nature of the

Subpoena is of no moment.

*Second*, even if former President Trump had properly invoked executive privilege (which

he has not) and even if the Court gave that invocation the same weight as an invocation by

President Biden (which it should not), it would still be insufficient to deny the Select Committee

access to the documents and information it seeks.  "Executive privilege may be overcome by 'a strong showing of need by another institution of government.'"  *Trump v. Thompson*, 20 F.4th at 26 (quoting *Senate Select Comm.*, 498 F.2d at 730).  Such is the case here.  The combination of President Biden's considered judgment to waive the privilege and "Congress's uniquely weighty interest in investigating the causes and circumstances of the January 6th attack," *id.* at 35, weigh against any potential claim of privilege by the former President.

 *Third*, this remains true even if this court applies a more exacting standard of review as urged by Mr. Meadows.  Though the D.C. Circuit in *Trump v. Thompson* held that President Biden's decision not to invoke executive privilege was operative, it also noted that even if former President Trump, could properly assert executive privilege over the documents, those documents should still be released because "the profound interests in disclosure advanced by President Biden and the January 6th Committee far exceed his generalized concerns for Executive Branch confidentiality."  20 F.4th at 32–33.

 In so holding, the D.C. Circuit applied every conceivable standard relating to Presidential information, from the "four-factor test laid out in *Mazars*" to the "*Senate Select Committee*'s requirement that the documents be demonstrably critical to the responsible fulfillment of the Committee's functions," to the "demonstrated and specific showing of need that was required in *United States v. Nixon*." *Id.* at 40–41 (internal quotations omitted).  In all three circumstances, the D.C. Circuit determined that the Select Committee's "legislative interest at stake passes muster under any of the[se] tests." *Id.* at 41; *see also id.* at 41–45 (applying all three tests to the documents requested by the Select Committee).

 The Supreme Court denied former President Trump's application for an injunction—relying on the fact that the D.C. Circuit held that Trump's privilege claims would have failed

even if he were an incumbent President—and then ultimately denied his petition for *certiorari*. *Trump v. Thompson*, 142 S. Ct. 680 (2022); *Trump v. Thompson*, 142 S. Ct. 1350 (2022). Though the exact documents and testimony sought here are different, they concern the same subject matter at issue in *Trump v. Thompson*. *Compare* ECF 15 at 3-4 (describing the seven discrete topics on which the Select Committee seeks Mr. Meadows's deposition testimony and documents) *with Trump v. Thompson*, 20 F.4th at 19-20 (describing the request for Presidential records). Mr. Meadows does not suggest otherwise. Accordingly, the D.C. Circuit's opinion in *Trump v. Thompson* is equally applicable to the facts here and further supports granting summary judgment to the Congressional defendants.

### D.    The Select Committee Is Entitled to Summary Judgment on the Stored Communications Act Claims

Mr. Meadows's argument that the Select Committee cannot obtain records from Verizon consistent with the Stored Communications Act is wrong. ECF 29-1 at 43-44. The Act expressly permits disclosure of non-communication records – *all that the Verizon subpoena seeks* – to "any person other than a governmental entity." 18 U.S.C. § 2702(c)(6). The Select Committee's opening brief explains in detail why Congress is not a "governmental entity" under the statute. *See* ECF 15 48-50. Mr. Meadows's opposition does not address that issue, instead asserting – without any legal or factual support – that "[t]he Select Committee may represent a 'governmental entity'" and positing why other situations described in the statute do not apply. ECF 29-1 at 44. But none of the situations discussed in Mr. Meadows's brief are in any way relevant to the Verizon subpoena. For the reasons set forth in the Select Committee's opening brief, it is not a governmental entity under the Stored Communications Act and thus the statute presents no barrier to disclosure of the Verizon records.

**E.     The Select Committee Is Entitled to Summary Judgment on the Fourth and First Amendment Claims**

Mr. Meadows raises no issue of fact concerning his constitutional claims; he instead presents legal arguments that are unavailing and should be rejected.  ECF 29-1 at 44-47.  The Court should reject Mr. Meadows's constitutional challenges to the subpoena as foreclosed by *Eastland*.  In *Eastland*, the Supreme Court held that Members of Congress cannot be subject to constitutional claims in relation to the issuance of Congressional subpoenas as part of an authorized Congressional investigation.  421 U.S. at 509-11.  Rejecting an organization's argument that a Congressional subpoena violated its First Amendment rights and that the subpoena's purpose was to "'harass, chill, punish, and deter' them in the exercise of their First Amendment rights," the Court explained that the argument "ignored the absolute nature of the speech or debate protection," which "provides an absolute immunity from judicial interference." *Id*. at 510 n.16.  Members of Congress are absolutely immune from such challenges.

Moreover, on the merits, as to the Fourth Amendment, Mr. Meadows ignores *Smith v. Maryland*, 442 U.S. 735 (1979), which forecloses his Fourth Amendment claim that *Carpenter v. United States*, 138 S.Ct. 2206 (2018) means that he has a reasonable expectation of privacy in his personal cell phone data.  ECF 29-1 at 45. In *Smith*, the Supreme Court upheld the collection of telephone call log information.  *Id.* at 743–44.  Though the Supreme Court in *Carpenter* declined to extend *Smith*'s holding to data that would provide information regarding a cell phone's location at the time a call as placed, it did not overrule *Smith*.  Moreover, the Select Committee "plainly has a valid legislative purpose." *Trump v. Thompson*, 20 F.4th at 41.  The Verizon subpoena calls for records within the scope of the Select Committee's inquiry, and thus is not overbroad.  *See McPhaul*, 364 U.S. at 382.

Nevertheless, Mr. Meadows argues that an "all-encompassing subpoena for personal, nonofficial documents is unreasonable and falls outside the scope of Congress' legitimate legislative power." ECF 29-1 at 46 (citing *Mazars*, 140 S. Ct. at 2040).  But the portion of that decision he cites is Justice Thomas's *dissent*, which was joined by no other Justice, and Mr. Meadows offers no factual basis or argument as to why a subpoena for non-content telephone data from the four-month period just preceding the election and leading up to January 6th constitutes an "all-encompassing" subpoena for personal records.  To the contrary, the Verizon subpoena is carefully tailored to the Select Committee's legitimate needs, and accordingly does not violate the Fourth Amendment.

Nor does the compelled production of cell phone data infringe on Mr. Meadows's First Amendment rights.  In addition to being foreclosed by *Eastland*,  none of Mr. Meadows's other arguments has merit.  For example, he argues that he used his cell phone to engage in protected advocacy and to have privileged conversations with his attorneys and spouse, as well as private conversations with friends and family.  ECF 29-1 at 46.  But, again, the Verizon subpoena does not seek, and will not obtain, the contents of any of Mr. Meadows's communications.

Moreover, as discussed in Defendants' motion, Mr. Meadows's generalized statement of his associational rights is insufficient to invoke First Amendment protection.  ECF 15 at 55 (citing *Ferrer*, 199 F. Supp. 3d at 142).  And associations, or their members, seeking protection under the First Amendment must demonstrate that compelling disclosure of the association's members will result in some type of harm.  *See Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (stating that showing an associational injury requires demonstrating a "reasonable probability that the compelled disclosure" "will subject them to threats, harassment, or reprisals from either

Government officials or private parties").  Mr. Meadows has not identified any concrete harm that the disclosure of his cell phone meta data will have.

In his proposed balancing, Mr. Meadows also asserts that the Select Committee has "no legitimate purpose" in issuing the Verizon subpoena, ECF 29-1 at 46, but the Committee's valid purpose has already been recognized by numerous courts, including the D.C. Circuit.  The Verizon subpoena seeks "reasonably relevant information from a narrow window during which" Mr. Meadows undertook various efforts to subvert the election.  *RNC*, 2022 WL 1294509, at *23.  Mr. Meadows proposed balancing of interests, ECF 29-1 at 46-47, is foreclosed by *Eastland*.  421 U.S. at 510, n. 16 ("Where we are presented with an attempt to interfere with an ongoing activity by Congress, and that activity is found to be within the legitimate legislative sphere, balancing plays no part").  In any event, Mr. Meadows makes no effort to argue why his personal interests should outweigh the substantial public interest in "ensuring the functioning of our national institutions."  *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (internal quotation marks omitted).  And on any such balancing, the Select Committee's interest would clearly outweigh Mr. Meadows's.

## CONCLUSION

For the reasons set forth above, this Court should deny summary judgment for the Plaintiff and grant summary judgment for the Defendants on all claims in Plaintiff's Amended Complaint.

Respectfully submitted,

/s/  *Douglas N. Letter*
Douglas N. Letter
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte[*]
Noam Biale
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

-and-

ARNOLD & PORTER KAYE SCHOLER LLP
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington,  D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

* Appearing pursuant to 2 U.S.C. § 5571(a).

Dated:  May 27, 2022

**CERTIFICATE OF SERVICE**

I certify that, on May 27, 2022, a copy of the foregoing was filed on the Court's CM/ECF

system, which will send notification to all counsel of record.

/s/ Douglas N. Letter