**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK MEADOWS, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )    Case No. 1:21CV3217 (CJN) |
| | ) |
| NANCY PELOSI, et al., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE
PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**<u>TABLE OF CONTENTS</u>**

Page

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 9

I. TESTIMONIAL IMMUNITY PROTECTS FORMER CHIEF OF STAFF
MEADOWS FROM CONGRESSIONAL COMPULSION TO TESTIFY
ABOUT HIS WHITE HOUSE SERVICE. ............................................................ 9

    A.    Testimonial Immunity Is Squarely Rooted in the Separation of Powers and
Is Directly at Issue in this Case............................................................. 10

    B.    The Congressional Defendants' Post Hoc Litigation Effort to Narrow
Their Inquiry Bolsters, Rather than Undermines, Mr. Meadows's Claims. ........ 16

II. THE SELECT COMMITTEE DID NOT HAVE A VALID LEGISLATIVE
PURPOSE FOR THE SUBPOENAS. ................................................................ 20

III. THE SUBPOENAS WERE NOT VALIDLY ISSUED. ................................................ 23

    A.    Select Committee's failure to adhere to H. Res. 503 is legally cognizable. ........ 23

    B.    The Select Committee's subpoenas were not issued in compliance with H.
Res. 503 due to failed composition...................................................... 27

    C.    The Select Committee's subpoenas were not issued in compliance with H.
Res. 503 due to lack of consultation with a ranking minority member. .............. 28

IV. THE CONGRESSIONAL DEFENDANTS' PROCEDURAL ARGUMENTS
ARE ALSO UNAVAILING............................................................................. 32

    A.    The recent developments in the RNC litigation show that the
Congressional Defendants' rush to summary judgment in this case was
misguided and unsupported. ............................................................... 32

    B.    The Congressional Defendants have not identified defects in Mr.
Meadows's statement of facts, and any material factual disputes would
only support his still-pending Rule 56(d) motion. ................................... 33

    C.    The Congressional Defendants improperly use their reply to claim new
grounds for seeking summary judgment................................................. 37

CONCLUSION.......................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Baker v. Conroy*,
   921 F.3d 1118 (D.C. Cir. 2019) ..................................................................................26

*Bloche v. Dep't of Def.*,
   414 F. Supp. 3d 6 (D.D.C. 2019) ...............................................................................38

*Bush v. Lucas*,
   462 U.S. 367 (1983) ...................................................................................................39

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018) ...............................................................................................38

\* *Christoffel v. United States*,
   338 U.S. 84 (1949) ................................................................2, 24, 25, 26, 27, 28

*Clinton v. Jones*,
   520 U.S. 681 (1997) ...................................................................................................14

*Comm. on Judiciary, U.S.H.R. v. McGahn*,
   415 F. Supp. 3d 148 (D.D.C. 2019) ....................................................................12, 13

*Comm. on Judiciary, U.S.H.R. v. Miers*,
   558 F. Supp. 2d 53 (D.D.C. 2008) .................................................................12, 13, 23

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ...............................................................................................22

*Eastland v. United States Servicemen's Fund*,
   421 U.S. 491 (1975) ...................................................................................................38

*English v. Trump*
   279 F. Supp. 3d 307, 323 (D.D.C. 2018) ..................................................................27

*Firth Sterling Steel Co. v. Bethlehem Steel Co.*,
   199 F. 353 (E.D. Pa. 1912) ........................................................................................15

*Gravel v. United States*,
   408 U.S. 606 (1972) ...................................................................................................14

*In re Grove*,
   180 F. 62 (3d Cir. 1910) .............................................................................................15

*Kalka v. Hawk*,
   215 F.3d 90 (D.C. Cir. 2000) .......................................................................................1

*Liveright v. United States*,
    347 F.2d 473 (D.C. Cir. 1965) ...................................................................................2, 24, 31

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)...........................................................................................................27

*Morrison v. Olson*,
    487 U.S. 654 (1988) (Scalia, J., dissenting)....................................................................13

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)...........................................................................................................15

*Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973) .........................................................................................12

*Quinn v. United States*,
    349 U.S. 155 (1955)...........................................................................................................21

*Rangel v. Boehner*
    20 F. Supp. 3d 148 (D.D.C. 2013) ....................................................................................26

*Republican Nat'l Comm. v. Pelosi*,
    No. 22-5123 (D.C. Cir. 2022) ...........................................................................6, 8, 21, 32, 33

*Republican Nat'l Comm. v. Pelosi*,
    No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022)..........6, 16, 20, 32

*Shelby Cnty., Alabama v. Holder*,
    43 F. Supp. 3d 47 (D.D.C. 2014) ......................................................................................39

*Shelton v. United States*,
    327 F.2d 601 (D.C. Cir. 1963) ...................................................................1, 24, 25, 26, 31

*Sitka Sound Seafoods, Inc. v. NLRB*,
    206 F.3d 1175 (D.C. Cir. 2000) .......................................................................................38

*Smith-Haynie v. D.C.*,
    155 F.3d 575 (D.C. Cir. 1998) .........................................................................................39

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020).........................................................................................11, 21, 22

*Trump v. Mazars USA, LLP*,
    940 F.3d 710 (D.C. Cir. 2019) .........................................................................................22

*Trump v. Thompson*,
    142 S. Ct. 680 (2022).................................................................................................5, 11, 12

*Trump v. Thompson,*
    20 F.4th 10 (D.C. Cir. 2021) ............................................................3, 6, 15, 20

*United States v. Ballin,*
    144 U.S. 1 (1892) ................................................................................2

*United States v. Nixon,*
    418 U.S. 683 (1974) ..........................................................................10, 11

*United States v. Reynolds,*
    345 U.S. 1 (1953) ...............................................................................15

*United States v. Rostenkowski,*
    59 F.3d 1291 (D.C. Cir. 1995) ......................................................7, 26, 28

*United States v. Smith,*
    286 U.S. 6 (1932) ................................................................................2

*Veg-Mix, Inc. v. U.S. Dep't of Agriculture,*
    832 F.2d 601 ....................................................................................35

*Watkins v. United States,*
    354 U.S. 178 (1957) ...........................................................................21

* *Yellin v. United States,*
    374 U.S. 109 (1963) .........................................1, 23, 24, 25, 26, 27, 31

**Statutes**

* H. Res. 503, 117th Cong. (2021) ......................................................... *passim*

**Other Authorities**

167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) .............................................13

Fed. R. Civ. P. 56(c) ..........................................................................8, 37

Fed. R. Civ. P. 56(d) ...................................................................8, 9, 33, 37

GOP H. Conf. R. 117th Cong. 14(e) ........................................................30

H. Rep. No. 114-887 (2016) ...................................................................30

*Hearing on S. 921 Before the Subcomm. on Constitutional Rights of the Senate
    Comm. on the Judiciary,* 85th Cong., 2d Sess., at 33–146 (1958) (statement of
    Att'y Gen. Rogers)..............................................................................10

*Immunity of the Assistant to the President & Director of the Office of Political Strategy and Outreach from Congressional Subpoena*,
   38 Op. O.L.C 1 (2014) ..................................................................................14

\* *Immunity of the Director of the Office of Political Strategy & Outreach*,
   38 Op. O.L.C. 5 (2014) ...........................................................................13, 18

LCvR 7(h) ...................................................................................................8

Letter from Elliot S. Berke, counsel for House Republican Leader Kevin
   McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate
   the Jan. 6th Attack on the U.S. Capitol (May 27, 2022) .........................................30

Notice of Hearing, Select Comm. to Investigate the Jan. 6th Attack on the U.S.
   Capitol, 117th Cong. (June 2, 2022) .........................................................................7

*Presidential Department Descriptions*, The White House: President Barack
   Obama,
   https://obamawhitehouse.archives.gov/participate/internships/departments#:~:
   text=The%20Office%20of%20Political%20Strategy,on%20behalf%20of%20t
   he%20President (last visited June 1, 2022) ...........................................................18

Press Release, Nancy Pelosi, Democratic Leader, U.S.H.R., *Pelosi Names
   Democratic Members to House Select Committee on Benghazi* (May 21, 2014)..............30, 31

R. Democratic Caucus 21(D)(1)(a), 117th Cong. (Jan. 14, 2021) ................................30

*Representative Charles B. Rangel*, Congress.gov .......................................................30

*Representative Sander M. Levin*, Congress.gov .........................................................30

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
   O.L.C. slip op., at \*4 (May 20, 2019) .....................................................................16

## INTRODUCTION

No authoritative appellate court opinion has ever held that a senior aide to a President, or a President himself, can be compelled by Congress to appear and give testimony, let alone when there is claim of Executive Privilege.  In their briefing, the Congressional Defendants do not, because they cannot, dispute this fact.  Likewise, no court has ever held that a former President cannot claim Executive Privilege, or that any President, present or former, must personally communicate a claim of Executive Privilege to a congressional committee.  Nor can the Congressional Defendants identify any case holding that the current President may, as here, act unilaterally to vitiate a former President's claim of Executive Privilege as to testimonial evidence sought by Congress.  Thus, ripe for consideration in this case are these momentous issues of constitutional dimension as to which Mr. Meadows can properly seek declaratory judgment.

Even so, under the avoidance doctrine, where there is a non-constitutional issue before the Court that can resolve the matter without resort to the foregoing and related constitutional issues, the Court should resolve the matter on that basis if possible.  *See Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000) ("Federal courts should not decide constitutional questions unless it is necessary to do so."); *Shelton v. United States*, 327 F.2d 601, 605 (D.C. Cir. 1963) (applying constitutional avoidance to congressional subpoena challenge).  Doing so here would mean granting summary judgment in favor of Mr. Meadows based on the Select Committee's failure to satisfy its composition and consultation requirements (while necessarily denying summary judgment for the Congressional Defendants).  The Supreme Court and the D.C. Circuit have both ruled unmistakably that the courts are empowered to apply and enforce congressional rules that affect the rights of a congressional witness.  *See Yellin v. United States*, 374 U.S. 109, 114 (1963) ("It has been long settled, of course, that rules of Congress and its committees are judicially cognizable.

And a legislative committee has been held to observance of its rules, just as, more frequently, executive agencies have been.") (internal citations omitted).[1]

Here, Mr. Meadows has challenged the subpoena issued to him on the grounds that it was not issued in accordance with applicable congressional rules. The Congressional Defendants attempt to dismiss this issue as one of 'nitpicking titles' and maintain that it is off limits to judicial review pursuant to the Rulemaking Clause. ECF No. 35 at 29. Relevant authority is to the contrary. Under controlling Supreme Court precedent, the issue of whether the subpoenas to Mr. Meadows were validly issued and are thus enforceable is very much a question for the Court. Just as in *Christoffel v. United States*, "[t]he question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. *The question is rather what rules the House has established and whether they have been followed*." 338 U.S. 84, 88–89 (1949) (emphasis added). As explained in detail below, the rules established for the Select Committee require that, for a deposition subpoena to issue, the Chair must consult with the Ranking Member. That rule was not followed because, as the Congressional Defendants have admitted (and as their dismissive "nitpicks the use of titles" comment confirms), ECF No. 35 at 24, the Select Committee has no designated Ranking Member. Thus, this non-constitutional issue is ripe for resolution and, under the Supreme Court and D.C.

---

[1] *See also Christoffel v. United States*, 338 U.S. 84, 88–90 (1949) (holding that validity of congressional subpoena turned on judicial determination of "what rules the House has established and whether they have been followed"); *United States v. Smith*, 286 U.S. 6, 33 (1932) (holding that, where "the construction to be given to [Senate] rules affects persons other than members of the Senate, the question presented is of necessity a judicial one"); *United States v. Ballin*, 144 U.S. 1 (1892) (interpreting and applying congressional rules to determine whether a bill was properly enacted); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965) (holding that Senate subcommittee's subpoena was invalid where it was authorized only by the subcommittee chairman, with limited consultation, and not by that entire subcommittee as required by Senate resolution).

Circuit decisions on point, results in judgment for Mr. Meadows that the subpoena in question was not validly issued and is unenforceable because its issuance was not in accord with the relevant requirements of the Select Committee and House rules.  *See infra* Part III.

The Congressional Defendants' "nitpicking" characterization is also consistent with their summary judgment briefing's cavalier treatment and dismissive rhetoric regarding the important constitutional issues outlined above.  Their claim of entitlement to summary judgment *in their favor* is belied by the obvious weaknesses and lack of persuasive force of the arguments they advance.  In the world of their arguments, long on rhetoric but short on authority:

- they can "support, rather than undermine," the Separation of Powers by pursuing this clash with a former Executive official, *see* ECF No. 35 at 10;

- the D.C. Circuit's ruling in *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021)—on the propriety of a *different* subpoena *for records* controlled by the Presidential Records Act— gives them a legal cudgel to extinguish constitutional obstacles to their obtaining *testimony* here asserted by a former President to be subject to Executive Privilege, *see* ECF No. 35 at 18–19;

- the current President can waive the former President's privilege in the context of an obviously political controversy, such that the incumbent alone has the final word on a privilege that the Congressional Defendants admit exists for the benefit of the Republic— leaving nothing to review because the President and the House control the question, *see id.* at 32–33;

- it is irrelevant that Mr. Meadows supplied thousands of non-privileged documents, and that the Congressional Defendants rebuffed any efforts to find exactly the kind of accommodation viewed by the Supreme Court favorably to resolve these issues, clearing

the way by their aim for him to be prosecuted for contempt of Congress and sent to prison, *see id.* at 11;

- finally and most pointedly perhaps, the Congressional Defendants maintain that Mr. Meadows cannot waive Executive Privilege yet somehow, at the same time, he is not competent to assert it either, *see id.* at 32, leaving him in exactly the legal no-man's land that justifies his coming to this Court asking it to "say what the law is," ECF No. 13 ¶ 6.

In sum, the Congressional Defendants' claimed highway to summary judgment is riddled with legal potholes, speed bumps, and dead-ends all together desperately lacking in authority or persuasion.

Fortunately for Mr. Meadows, and for the sound functioning of American government, our Constitution and laws do not give Congress the authority to demand whatever they wish and to ignore all constitutional principles that apply to their quest. To the contrary, it is well established that, when a congressional committee seeks to use the implied constitutional authority to compel testimony, it must respect the Separation of Powers; it must do so only in pursuit of a valid legislative purpose (and not for the purpose of generating publicity or pursuing law enforcement); and it must follow the rules associated with the delegation on which its claimed subpoena authority relies. Given its dismissive treatment of these legal guardrails in its brief, it is not surprising that the Congressional Defendants have overstepped them on the undisputed factual record.

\*       \*       \*

There are three straightforward grounds on which Mr. Meadows is entitled to relief, which would necessarily result in the Defendants' Summary Judgment motion being denied and Meadows motion being granted:

*First*, the Court should hold that, as a former Chief of Staff to then-President Trump, Mr. Meadows is immune from the Select Committee's effort to compel him to testify about his service in that role.  The Congressional Defendants do not and cannot dispute that no appellate precedent (from any Court of Appeals or from the Supreme Court) has ever held that a President's senior aide—or a President himself—can be compelled by Congress to appear and give testimony.  Nor does any such opinion hold, as the Congressional Defendants suggest, *see* ECF No. 35 at 32–33, that a former President cannot assert privilege or immunity, or that a President must personally communicate an assertion of privilege to a congressional committee.  Thus, at a minimum, these are open questions on important constitutional issues that merit judicial consideration and intervention.

But more than that, the soundest legal conclusions are that testimonial immunity does protect a former White House Chief of Staff like Mr. Meadows, as bipartisan Attorney General and OLC opinions have concluded; and that Separation of Powers concerns continue to require the protection of former President Trump and his most senior aide, even if the incumbent President does not support the assertion of privilege, as Justice Kavanaugh recently explained in his concurrence as to the denial of *certiorari* in *Trump v. Thompson*, 142 S. Ct. 680, 680–81 (2022) (Mem.) (statement of Kavanaugh, J., respecting denial of application).  And while the Congressional Defendants try to sidestep these important constitutional issues through a *post hoc* litigation effort to limit their subpoenas to "campaign activit[y]" supposedly outside his White House role, *see* ECF No. 35 at 20–22, that effort fails on both the facts and on the law.  *See infra* Part I.A.

Mr. Meadows is therefore entitled to declaratory relief based on testimonial immunity rooted in the constitutional Separation of Powers.

***Second***, the Court should also hold that the Select Committee has not met its burden of establishing a valid legislative purpose to support its subpoenas directed at Mr. Meadows.  In opposition, the Congressional Defendants rely on the D.C. Circuit's opinion in *Thompson*, 20 F.4th 10, and on Judge Kelly's recent ruling in *Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022).  But *Thompson* was about a very different case than this one and does not give the Select Committee the license it would take to avoid establishing that a valid legislative purpose underlies the particular subpoenas at issue in this case. The D.C. Circuit has granted the RNC injunctive relief pending its review of Judge Kelly's decision, a ruling that necessarily is based on its conclusion that the RNC is likely to succeed on the merits of its appeal.  *See* Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022).

Indeed, the Congressional Defendants' opposition brief further confirms what Mr. Meadows has argued from the beginning:  that the Select Committee is improperly pursuing the off-limits purposes of publicity and law enforcement, rather than a valid legislative purpose, in targeting Mr. Meadows.  The Congressional Defendants claim that they need Mr. Meadows's testimony in furtherance of their "task to determine the facts, circumstances, and causes related to the January 6th attack."  ECF No. 35 at 24.  But that is not a legislative purpose at all.  The Congressional Defendants make no attempt to identify a single piece of draft legislation—or even a hypothetical bill—that would be better informed by Mr. Meadows's testimony.  This only bolsters the conclusion, which was already obvious from the undisputed facts, that the Select Committee's goal is to gather information to make it public and/or for law enforcement purposes.[2]

---

[2] If anything, as Meadows's Amended Complaint avers and the still growing public record shows, the Select Committee is deeply engaged in the non-legislative purposes of exposure for the sake of exposure and/or in support of law enforcement, such as with its announced plans for several

Mr. Meadows is thus entitled to declaratory relief that the subpoenas are unenforceable for want of a valid legislative purpose.

*Third*, the Court should hold that the subpoenas are invalidly issued because the Select Committee is not compliant with the composition or consultation requirements of H. Res. 503. Indeed, this ground provides a narrow basis for invalidating the subpoenas that would allow the Court to avoid resolving the constitutional questions raised by testimonial immunity and legislative purpose.

While the Congressional Defendants make an effort to argue that the Court must take their word for it under the Rulemaking Clause, *see* ECF No. 35 at 26–29, they also cite *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), where the D.C. Circuit *rejected* the notion that House procedures are unreviewable and emphasized that "under Article III of the Constitution the courts are the final arbiters of the law and may not shirk their duty to interpret the law." *Id.* at 1306. Under *Rostenkowski*, in a separation of powers dispute over criminal prosecution of a Member of Congress for allegedly violating House rules, the interpretation of a House rule may be non-justiciable if it is genuinely ambiguous. *Id.* But in this case there is nothing ambiguous about H. Res. 503's direction that the Select Committee "shall" have 13 members, or the rule's requirement that a subpoena to appear for a deposition may only issue by the Chair after consultation with the Select Committee's "Ranking Member" (of which there is none). Not only may the Court apply the rules established for the Select Committee, it must do so.

---

days or prime time televised hearings. *See, e.g.,* Notice of Hearing, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, 117th Cong. (June 2, 2022), https://docs.house.gov/meetings/IJ/IJ00/20220609/114870/HHRG-117-IJ00-20220609-SD001.pdf.  If he is not entitled to summary judgment now on this issue, Mr. Meadows is at the very least entitled to the discovery the civil process affords to fully develop this record.

Mr. Meadows is entitled to declaratory relief that the subpoenas are unenforceable based on these failures to comply with H. Res. 503.

The Congressional Defendants try to resist these straightforward grounds for granting relief to Mr. Meadows by claiming that he has failed to comply with Fed. R. Civ. P. 56(c) and LCvR 7(h). *See* ECF No. 35 at 7–10. But that argument misstates the record and misconstrues the grounds for relief favoring Mr. Meadows. And just as importantly, it proves too little asking for too much. Even if the Court were to agree with the Congressional Defendants that Mr. Meadows has not yet developed a sufficient record of admissible evidence to support summary judgment in his favor, the proper course would be to grant Mr. Meadows's still-pending Fed. R. Civ. P. 56(d) motion to allow him a meaningful opportunity to pursue discovery.

Indeed, the most recent developments in the *RNC* litigation demonstrate that the Congressional Defendants' rush to judgment here is misguided and unsupported. There, as here, the Congressional Defendants claimed a pressing need for quick resolution ahead of scheduled "primetime" congressional hearings. But after the RNC appealed and the D.C. Circuit issued an injunction pending appeal, the Congressional Defendants suddenly lost their appetite for expediting proceedings and pursued a motion to defer the D.C. Circuit's consideration of that case. *See* Mot. Postponement Br. & Oral Arg., *RNC v. Pelosi*, No. 22-5123 (D.C. Cir. May 29, 2022). The Court should not countenance such transparent gamesmanship and false claims of a need for haste by rushing past a plaintiff's entitlement to discovery where needed. Indeed, that course would be all the more appropriate here because, unlike in other pending cases, the Congressional Defendants have waived any assertion of immunity under the Speech or Debate Clause since they have twice answered Mr. Meadows's complaints without asserting it.

Finally, it is important to note that the Congressional Defendants have improperly attempted to raise new grounds for summary judgment in *their* favor as part of their reply brief (which was understandably combined with their opposition to Mr. Meadows's own motion). *See infra* Part IV.C. But it is well established that such arguments are forfeited.

*     *     *

The Court thus has three distinct grounds on which it may grant judgment in Mr. Meadows's favor—testimonial immunity, valid legislative purpose, or compliance with H. Res. 503. The first two raise important constitutional questions about the Separation of Powers and Congress's implied subpoena authority, and the third involves a narrower ground that might avoid the need to resolve those issues. And if the Court should conclude that disputed facts bear on these issues, then it already has pending Mr. Meadow's Rule 56(d) motion to proceed to discovery.

**ARGUMENT**

**I.     Testimonial Immunity Protects Former Chief of Staff Meadows from Congressional Compulsion to Testify About His White House Service.**

The Congressional Defendants try to create the impression that Mr. Meadow's assertion of testimonial immunity is foreclosed by precedent. But it simply is not. Only two non-binding district court opinions have ever addressed the issue, and as Mr. Meadows previously explained, *see* ECF No. 29-1 at 30–33, neither opinion persuasively makes the case against testimonial immunity in these circumstances. Unable to gloss over the immunity issue, the Congressional Defendants also try to argue *around* it by questioning whether it was ever properly asserted and through a *post hoc* litigation effort to narrow the scope of their subpoenas to allegedly non-official topics. *See* ECF No. 35 at 30–31. But those efforts fail as well.

9

**A.** ***Testimonial Immunity Is Squarely Rooted in the Separation of Powers and Is Directly at Issue in this Case.***

The doctrine of testimonial immunity against congressional subpoenas for senior Presidential aides is not something that bipartisan Attorneys General and the Office of Legal Counsel made up from whole cloth. The notion that Presidential advisors and their papers enjoy constitutional protection dates back to the Nation's first President. *See generally Hearing on S. 921 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 85th Cong., 2d Sess., at 33–146 (1958) (statement of Att'y Gen. Rogers). One of the many concerning features of government under the Articles of Confederation that our Founders rejected in adopting our Constitution was unfettered access by the Continental Congress to records of core executive functions, such as foreign affairs. *See id.* at 36–37. When a congressional committee tried to investigate President Washington's Administration for its handling of "a military expedition led by General St. Clair under the direction of the Secretary of War," President Washington announced clear limits on his Administration's cooperation—including that "neither the committee nor House had a right to call on the head of a department, who and whose papers were under the President alone." *Id.* at 37. Thus, while many of the earliest disputes focused on production of documents rather than testimony—almost certainly because both branches viewed document production as a *less intrusive* accommodation—and thus on principles of Executive Privilege, it is equally clear that the same principles were understood to prevent Congress from compelling testimony from senior executive officials "who . . . were under the President alone." *Id.*

At least since the 1970s, when the Supreme Court was required to resolve interbranch disputes of executive privilege, federal courts have time and again endorsed the need for Executive Privilege and related protections not only to promote the President's informed and efficient decision-making, but also to preserve the Separation of Powers. *See, e.g.*, *United States v. Nixon*,

418 U.S. 683, 704–05 (1974); *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020).  Mr. Meadows is uniquely situated even among executive officials.  As former White House Chief of Staff, Mr. Meadows served as the most trusted official advisor to the President of the United States. He participated in some of the President's most delicate conversations, gave candid advice during the President's most private deliberations, and was privy to the innermost operations of the Executive Office.  The documents and communications of such an advisor enjoy constitutional protections because, as the Supreme Court has noted, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process." *Nixon*, 418 U.S. at 705.

As Justice Kavanaugh has explained in the context of the Presidential communications privilege (which is a particular species of Executive Privilege closely related to testimonial immunity), the same protection must continue to apply after a President's tenure ends, even if the new President disagrees.  *See Trump v. Thompson*, 142 S. Ct. 680, 680–81 (2022) (Mem.) (statement of Kavanaugh, J., respecting denial of application).

> By protecting the confidentiality of . . . internal communications, the Presidential communications privilege facilitates candid advice and deliberations, and it leads to more informed and better Presidential decisionmaking. . . . [B]y way of historical example, . . . the Constitutional Convention was conducted in complete privacy and . . . the records of the Convention remained confidential for more than 30 years.  As was true at the Constitutional Convention, the Presidential communications privilege cannot fulfill its critical constitutional function unless Presidents and their advisers can be confident in the present and future confidentiality of their advice. If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe.  Without sufficient assurances of continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* at 681 (quotation omitted).

The Congressional Defendants dismiss without evaluation the Justice's statement as lacking the "force of law," ECF No. 35 at 33; yet what the statement has is the force of reason, logic and common sense.  The Congressional Defendants would have the Court breeze past that and all the authority underlying learned OLC opinions, boldly asserting that their position to strip Mr. Meadows (and thus former President Trump) of these core constitutional protections "support[s], rather than undermine[s]" the Separation of Powers.  *Id.* at 10.  But they are simply wrong.

The Congressional Defendants renew their reliance on *Miers* and *McGahn* and assert, as if wishing would make it so, that those decisions "thoroughly addressed—and persuasively rejected—" Mr. Meadow's arguments about testimonial immunity.  *See id.* at 13.  But they then cite Judge Bates's discussion of a strawman argument that recognizing testimonial immunity would allow a President to "deny access to all documents in all the Executive departments to all citizens and their representatives, *including Congress.*"  *Id.* (quoting *Comm. on Judiciary, U.S.H.R. v. Miers*, 558 F. Supp. 2d 53, 103 (D.D.C. 2008)).  That passage from *Miers* was quoting *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973), which held that a grand jury subpoena overcame Executive Privilege over documents; it of course had nothing to say about testimonial immunity, and it shows that the quoted language came in the context of deciding whether constitutional protection for the President's information had been *overcome* in a criminal context, where under the relevant precedent the justification for production is far different and, not whether it existed in the first place.  Additionally, the Separation of Powers discussion in *McGahn* that they cite, *see* ECF No. 35 at 9 (citing *Comm. on Judiciary, U.S.H.R. v. McGahn*, 415 F. Supp. 3d 148, 212 (D.D.C. 2019), Judge Jackson opines without any citation or support that "the public spectacle of haling current

and former advisors to a sitting President before a committee of Congress" is not a Separation of Powers concern because "the power of inquiry resides with the Legislature."  415 F. Supp. 3d at 212 (cleaned up).  That conclusion is at the very least grandly overstated, if not just downright erroneous.  Article I of the Constitution conspicuously fails to enumerate any legislative "power of inquiry," and indeed, under our Constitution, the authority to investigate, and where appropriate to prosecute, past wrongdoing is quintessentially an Executive prerogative.  *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) (explaining that law enforcement is a governmental function which "has always and everywhere—if conducted by government at all— been conducted never by the legislature, never by the courts, and always by the executive").  The *McGahn* decision's reasoning is unpersuasive and offers the Court the thinnest of reeds upon which to rule on a fundamental constitutional question.

Moreover, neither *Miers*, nor *McGahn*, nor the Congressional Defendants' own brief addresses the important constitutional implications of forcing a former White House Chief of Staff to attend a hostile congressional deposition relating to his actions while serving the President. There are no guardrails to protect executive prerogatives in a congressional deposition.  House regulations provided that Chairman Thompson serves as the ultimate arbiter of any claimed privilege.  *See* 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) ("If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer.").  "[T]here is no judge or other neutral magistrate to whom a witness can turn for protection against questions seeking confidential and privileged information. The committee not only poses the questions to the witness, but also rules on any objections to its own questions according to procedures it establishes." *Immunity of the Director of the Office of Political Strategy & Outreach*, 38 Op. O.L.C. 5, 9 (2014).  If a single member of Congress can

13

unilaterally override a deponent's valid assertion of privilege belonging to a coequal branch of government, the privilege might as well not even exist.  The Congressional Defendants offer nothing to assuage these concerns.

The Congressional Defendants tellingly avoid addressing—and thus seem to concede—that it would be a clear affront to the Separation of Powers for Congress to subpoena former President Trump himself to testify before the Select Committee.  *See* ECF No. 29-1 at 28–29.  And since "a presidential adviser's immunity [from compelled testimony] is derivative of the President's," *Immunity of the Assistant to the President & Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C 1, 5 (2014), it follows that the Select Committee cannot compel Mr. Meadows to testify either.  This is consistent with how the Supreme Court has interpreted the scope of the Speech or Debate protections afforded to Congress, which the courts have extended (without any textual warrant) to legislative aides.  *See Gravel v. United States*, 408 U.S. 606 (1972).  Mr. Meadows served as the "alter ego" of the President, *id.* at 616, arguably even more than a legislative aide would serve as the alter ego of a Member. "It is literally impossible for Members of Congress to perform their legislative tasks without the help of aides and assistants," *id.*, and the same goes *a fortiori* for the President who has far greater constitutional responsibilities as the one Executive, than any given Member does acting as one of 535 in Congress.[3]

_____

[3] Their contention that, "[h]owever far testimonial immunity extends, it does not provide *more* protection to a President's aide than to a President," ECF No. 35 at 18, is another strawman.  They do not even contend that President Trump would not have immunity to congressional subpoena, and the supporting case they cite—*Clinton v. Jones*, 520 U.S. 681 (1997)—is wholly inapposite.  It famously involved the question whether a sitting President could be sued as a defendant in a civil damages action *during* his Presidency for conduct that occurred *before* the presidency.  That holding has nothing to say about testimonial immunity.

The Congressional Defendants argue that President Trump is a "'private party'" who cannot assert Executive Privilege, ECF No. 35 at 32 (quoting *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953)), and that "[a]ny assertions by Mr. Meadows alone are insufficient to invoke executive privilege," *id.*  Those arguments invite egregious error.  First, former President Trump is nothing like the corporation in *Firth Sterling Steel Co. v. Bethlehem Steel Co.*, 199 F. 353 (E.D. Pa. 1912), that the Supreme Court was referring to as a private party in *Reynolds*.  *See* 345 U.S. at 7 n.16.  Second, the Supreme Court decades ago squarely "reject[ed] the argument that only an incumbent President may assert [Executive Privilege] and [held] that … a former President[] may also be heard to assert [it]."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 439 (1977).  And third, *Reynolds* if anything bolsters Mr. Meadows's position all along that, as a now private citizen who previously served President Trump, he is in no position to *waive* the privileges and immunities that the former President had instructed him to preserve.  *See* 345 U.S. at 7 (stating that Executive Privilege "can neither be claimed *nor waived* by a private party") (emphasis added) (citing *In re Grove*, 180 F. 62 (3d Cir. 1910) (holding that navy contractor was not in contempt of Congress by refusing to produce information that he had been instructed to keep confidential by the Navy Department)).

The Congressional Defendants further argue that former President Trump has made only a "generalized" assertion of privilege, ECF No. 35 at 34, which fails to overcome the Select Committee's professed need for Mr. Meadow's testimony.  Of course, as discussed further below, *see infra* Part II, one of the major problems here is that the Select Committee has *not* articulated any valid legislative need for his testimony.  But even setting that aside, they miss the mark in calling for some more granular assertion of privilege.  Unlike the assertion of Executive Privilege in response to a request for documents, as was as issue in *Trump v. Thompson*, which calls for a

document-by-document assessment, testimonial immunity is much simpler.   Testimonial immunity is "distinct from, and broader than, executive privilege" in that it "extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself." *Testimonial Immunity Before Congress of the Former Counsel to the President*, O.L.C. slip op., at *4 (May 20, 2019).

> **B.     The Congressional Defendants' Post Hoc Litigation Effort to Narrow Their Inquiry Bolsters, Rather than Undermines, Mr. Meadows's Claims.**

The Congressional Defendants also argue that, "[e]ven if some form of testimonial immunity did exist, . . . the information sought by the Select Committee is outside the scope of any purported testimonial immunity."  ECF No. 35 at 16.  That is flat wrong.

To start, we must briefly address the absurd argument that Mr. Meadows only opposes "the topics related to his role in former President Trump's reelection campaign" and did not contest the Congressional Defendants' other arguments on testimonial immunity.  *See* ECF No. 35 at 16–17. The Congressional Defendants apparently overlooked at a minimum an entire section of Mr. Meadows's brief.  *See* ECF No. 29-1 at 46–51 (Part IV.A).  As discussed in Mr. Meadows's opposition to the Congressional Defendants' motion, it is first improper for the Select Committee to now purport to narrow its lines of inquiry as it is convenient to current circumstances.  *See id.* at 39 n.14.

This is not the first time the Select Committee has at least claimed to narrow an overly broad subpoena when it is challenged in court.  *See also Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509, at *3 (D.D.C. May 1, 2022).  Setting that aside, Mr. Meadows has consistently asserted his position that each of the topics set forth by the Select Committee infringe upon former President Trump's valid assertion of Executive Privilege.  And

though it has been difficult to follow the ever-shifting goalpost of topics the Select Committee has put forward, to be certain, Mr. Meadows believes each of the topics of inquiry the Congressional Defendants claim in their motion would be covered by Executive Privilege, just as Mr. Meadows discussed at length in his May 20, 2022 brief.  *See* ECF No. 29-1 at 46–51 (Part IV.A).

Far from undermining Mr. Meadows's claims, this *post hoc* attempt to narrow the subpoena shows that Mr. Meadows is entitled—at a minimum—to relief on those portions of the subpoenas that the Select Committee now claims it is no longer pressing.  The only remaining question, then, is whether those topics somehow sidestep testimonial immunity and all the other legal defects that Mr. Meadows has raised.[4]  They do not.

As Mr. Meadows has explained, the nice distinction that the Congressional Defendants would have the Court draw between the White House Chief of Staff's official role and his actions that related in one way or another to the then-President's reelection campaign is illusory.  *See* ECF No. 29-1 at 35–37.  They argue that this view of the role is too broad and even accuse Mr. Meadows (in a footnote) of admitting to violations of the Hatch Act.  *See* ECF No. 35 at 18 n.7.  That accusation is completely off-base.

Mr. Meadows has made no such admission.  Rather, he has asserted time and again that the role of White House Chief of Staff inherently involves political considerations.  Mr. Meadows undertook each of the actions discussed in the Congressional Defendants' motion within the scope of his duties as White House Chief of Staff.  And, yes, it is untenable for either Mr. Meadows or the Select Committee to tease out which words he used or actions he took with respect to ensuring

---

[4] To be clear, even if the Congressional Defendants were correct that these narrowed topics fell outside the scope of testimonial immunity, the subpoenas would still fail for want of a valid legislative purpose, *see infra* Part II, for failure to comply with H. Res. 503, *see infra* Part III, and for all of the other reasons raised in Mr. Meadows's complaint that may not be appropriate for summary disposition but which nevertheless undermine the subpoenas' enforceability.

our Nation's safety or the integrity of our elections had more political significance than official. To paraphrase the Select Committee on legislative purpose, when the Executive is carrying out its official duties, courts generally do not look behind the curtain to penalize them for ulterior political motives. *See id.* at 25. If they did, the courts would hardly have time for anything other than adjudicating claims that this or that agency action was *really* done for a political bump.

Second, the Hatch Act does not purport to be a touchstone for distinguishing official duties from nonofficial duties for constitutional purposes. It is a focused and limited Act that limits use of official resources for campaign purposes and imposes certain specified restrictions that, frankly, have no bearing on the issues before the Court.

It is no secret that members of the White House serve political functions and do so within the confines of their official roles. For example, the Obama White House established an Office of Political Strategy and Outreach. White House Archives indicate that this Office "provides the President and Senior Staff with information about the political environment to help advance the President's agenda and coordinates constituent outreach efforts on behalf of the President."[5] Somewhat ironically, when the Director of that Office of Political Strategy and Outreach, David Simas, was called before a congressional committee to discuss possible Hatch Act violations, the Department of Justice Office of Legal Counsel issued yet another opinion reiterating the "Executive Branch's longstanding position, reaffirmed by numerous administrations of both political parties, is that the President's immediate advisers are absolutely immune from congressional testimonial process." 38 Op. O.L.C. 5, 5 (2014).

---

[5] *Presidential Department Descriptions*, The White House: President Barack Obama, https://obamawhitehouse.archives.gov/participate/internships/departments#:~:text=The%20Offic e%20of%20Political%20Strategy,on%20behalf%20of%20the%20President (last visited June 1, 2022).

As discussed in Mr. Meadows's brief in support of his motion, even if the Court is to find he took political actions outside the scope of his official duties, congressional actions to impinge on those rights should receive heightened judicial scrutiny.  *See* ECF No. 29-1 at 40.  The Congressional Defendants cannot credibly contend that any of the actions by Mr. Meadows were simply that of a private citizen unrelated to his role as Chief of Staff.  When Mr. Meadows receives a text message on January 6, for instance, the Congressional Defendants' interest in that communication arises solely because Meadows served as Chief of Staff and had a role with the President, not that of some mere citizen interested in the happenings of that day.

While the Congressional Defendants' opposition again tries to assert a "compelling need for the information," as justification for overcoming constitutional obstacles to their demands, "their actions have indicated otherwise.  *See* ECF No. 35 at 20.  They refused to even engage Mr. Meadows on his offers of interrogatories to further their investigation, *see* ECF No. 29-2 ¶¶ 46–55; they knowingly and falsely promised to limit questioning to matters outside the scope of Executive Privilege—only to show their true intentions days before the planned deposition, *see id.*; and instead of expressing gratitude for his cooperation with respect to documents, for the past six months they used Mr. Meadows's private communications as a reason to smear him and his Republican allies in the press based on selective leaks and speculative innuendo as to why he took certain actions.  Even if the Select Committee once had a compelling need for Mr. Meadows's testimony, it is now plain that the one-time "need" pales in comparison to the Select Committee's compelling need to advance a political agenda.[6]

---

[6] Because the Select Committee's purposes are a factual issue as to which its conduct continues to furnish relevant evidence, should the Court not rule dispositively otherwise, Mr. Meadows should clearly be accorded time and the use of discovery to fully develop the factual picture relevant to judicial determination of whether the Select Committee has a legitimate legislative purpose or is instead engaged for purpose the Supreme Court has already defined as exceeding the limitation on

The Congressional Defendants also dispute that Mr. Meadows needs discovery relating to his own political activity.  It is the Congressional Defendants who have created the factual issue. Mr. Meadows maintains that the actions he took were properly undertaken as Chief of Staff.  It is the Congressional Defendants who claim his actions were private conduct not covered by testimonial immunity or Executive Privilege.  That makes the nature, purpose and extent of the conduct a relevant factual determination and one ripe for discovery.  But such factual development would not necessarily require Mr. Meadows to conduct discovery on the Congressional Defendants themselves.  For example, Mr. Meadows could conduct limited discovery by conducting a third-party deposition of the current White House Chief of Staff and ask which political, reelection, and/or election integrity considerations are excluded from his official duties.  The Congressional Defendants have placed this factual question squarely at issue, and Mr. Meadows should be able to conduct discovery on these issues should the Court find them determinative.[7]

## II.     The Select Committee Did Not Have a Valid Legislative Purpose for the Subpoenas.

The Select Committee has not met its burden of establishing a valid legislative purpose to support its subpoenas directed at Mr. Meadows.

Their legal arguments, which rely primarily on *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), and *Republican Nat'l Comm. v. Pelosi*.  No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022), are misguided and unpersuasive.  *Thompson* does not give the Select Committee license to subpoena whomever and whatever they want, nor does it excuse them from

---

congressional investigative authority, including leaks, by committee staff or otherwise, designed solely to expose for exposure's sake private information provided to the Select Committee.  No court has held that press leaks are a valid legislative purpose.

[7] In any event, to the extent the Congressional Defendants contend in the context of summary judgment proceedings that certain avenues of discovery be foreclosed, their request is premature. The means and timing of discovery disputes are governed by Federal Rules of Civil Procedure, Local Rules, and the Court's Standing Order and come later in the process.

establishing the connection between a valid legislative purpose and the particular subpoenas at issue in this case. Judge Kelly's decision in the *RNC* case is not binding, and respectfully, wrong on legislative purpose. But more importantly, the D.C. Circuit has effectively stayed that ruling based on an apparent determination that the RNC is likely to succeed on the merits of its appeal. *See* Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022). Neither decision provides any basis to gloss over the Select Committee's obligation to substantiate how Mr. Meadows's testimony would aid Congress in its lawmaking function. The Congressional Defendants must therefore live with the record in *this* case, not another case of their choosing. And on the record here, they have failed to carry their burden.

Their own litigating position confirms that they are running afoul of settled precedent. The Supreme Court very recently reiterated that "'there is no congressional power to expose for the sake of exposure,'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)), and that "Congress may not issue a subpoena for the purpose of 'law enforcement,'" *id.* (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). And yet the Congressional Defendants run headlong into those barriers by arguing that the motivating purpose behind their investigation is to gather information about past events that they publicly allege to constitute criminal wrongdoing and to use that information to prepare a public report. *See* ECF No. 35 at 24 (arguing that compelling Mr. Meadows's testimony would further the Select Committee's "task to determine the facts, circumstances, and causes related to the January 6th attack"); *see also id.* at 25. To argue that an investigation provides a valid legislative purpose for a congressional investigation is the definition of circular reasoning.

The Congressional Defendants do not identify any draft legislation that would be better informed by Mr. Meadows's testimony, or any conceivable legislative initiative that his testimony

might be needed to further.  And of course, the Select Committee has no authority to markup legislation in the first place.  *See* H. Res. 503 § 4(d), 117th Cong. (2021).  By contrast, in the litigation culminating in *Trump v. Mazars*, 140 S. Ct. 2019 (2019), the House was able to identify several pending legislative proposals related to the inquiry, including proposed legislation to require Presidential candidates to disclose tax returns (with President Trump's tax returns being the specific subject of the subpoena). *See generally Trump v. Mazars USA, LLP*, 940 F.3d 710, 727 (D.C. Cir. 2019), vacated and remanded, 140 S. Ct. 2019 (2020).  There is no such legislation in this case.

Without even a fig leaf, the Congressional Defendants cannot hide their naked intentions.  Thus, even if the existence of a valid legislative purpose would prevent a court from looking further into other motives, *see* ECF No. 35 at 25–26,[8] that principle would have no application here.  The very problem is that the Select Committee has not established a valid legislative purpose for its subpoenas targeting Mr. Meadows.

The Congressional Defendants also undermine their claim of a legislative purpose by claiming that they no longer seek to question Mr. Meadows about his official role.  *See* ECF No. 35 at 16–20.  As explained above and elsewhere, it is impossible to draw the fine line the Congressional Defendants would have the Court to draw between Mr. Meadows's role as White House Chief of Staff and activities that might have helped with the President's effort to get reelected.  But even if the Congressional Defendants were right, that would just further undermine the notion that they are pursuing a valid legislative purpose.  To the extent the Select Committee

---

[8] *But see Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–75 (2019) (holding that, while a court ordinarily "may not reject an agency's stated reasons for acting simply because the agency might also have other unstated reasons," a court may nevertheless look past an agency's stated reasons where they present a "significant mismatch" with what they are doing).

is directly targeting the campaign activity of its leadership's political opponent, that effort runs head long into the First Amendment, *see* ECF No. 29-1 at 37, and raises serious questions about what conceivable legislative purpose they could be pursuing.  It also means that they can no longer wrap themselves in the mantel of "'Congress's historical oversight function,'" ECF No. 35 at 13 (quoting *Miers*, 558 F. Supp. 2d at 103), since Congress has no oversight over conduct that they themselves claim to be outside the scope of the Executive Branch, *see, e.g.*, ECF No. 35 at 17 (arguing that they are now targeting Mr. Meadows only for "private conduct").

## III.    The Subpoenas Were Not Validly Issued.

The Select Committee has not complied with two key aspects of the rules governing Committee proceedings and as a result the subpoena issued to Meadows is invalid.  Both flaws are independently material to a judicially cognizable issue before the Court.

### A.    *Select Committee's failure to adhere to H. Res. 503 is legally cognizable.*

The Rules applicable to the Select Committee in pertinent part require (a) that the Select Committee be composed of 13 total members and (b) that a subpoena to a deposition can only be issued by the Chair in consultation with the Select Committee's "Ranking Member."[9] As the Supreme Court held in an analogous circumstance: "The Committee prepared the groundwork for prosecution in Yellin's case meticulously.  It is not too exacting that the Committee be equally meticulous in obeying its own rules." *Yellin v. United States*, 374 U.S. 109, 124 (1963).

In its brief, the Congressional Defendants boldly assert that Meadows "nitpicks … titles" of committee members and this does not even present a legitimate question for the Court, claiming that judicial consideration is barred by the Rulemaking Clause or some ill-defined deference to the Congressional Defendants' litigating positions.  *See* ECF No. 35 at 29–30.  They are wrong; what

---

[9] H. Res. 503 §§ 2(a), 5(c)(6), 117th Cong. (2021).

the Rulemaking Clause bars is judicial interpretation of congressional rules that would be rulemaking itself.  What the courts can, and in this instance must, do is hold the Select Committee to obeying the Rules that were made to govern its proceedings.  *See Christoffel*, 338 U.S. at 88–90.  The Rulemaking Clause is not a get out of jail free card for miscreant committees.  In closely analogous cases, the Supreme Court and D.C. Circuit have affirmed the role of courts in policing congressional compliance with its own requirements, including for its use of subpoena authority. The best precedent strongly supports this Court's authority to declare judgment for Mr. Meadows.

Two Supreme Court opinions and two well-reasoned decisions from Judge J. Skelly Wright on the D.C. Circuit strongly support Mr. Meadows's position.  *See Christoffel*, 338 U.S. at 88–90; *Yellin*, 374 U.S. at 121; *Liveright v. United States*, 347 F.2d 473, 475 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601, 605 (D.C. Cir. 1963).  There is no doubt: congressional subpoenas must comply with House rules in order to be valid.  Congress is free to create its own rules, including those delegating the implied authority to issue investigative subpoenas to a committee, but once it creates those rules, it must abide by them.  In *Christoffel*, for instance, the House rules required a quorum, and the defendant argued the committee lacked a quorum during the relevant time when statements challenged for perjury were made.  The committee argued that under the rules a quorum only need be present during the initiation of the testimony, not during the time of the challenged statements.  The Court, in ruling that Congressional rules required the presence of a quorum during the testimony, made clear where the line lies between judicially cognizable enforcement of congressional rules and judicial review barred by the Rulemaking Clause:

> Congressional practice in the transaction of ordinary legislative business is of course none of our concern, and by the same token the considerations which may lead Congress as a matter of legislative practice to treat as valid the conduct of its committees do not control the issue before us.  The question is neither what rules Congress may establish for its own governance, nor whether presumptions of

continuity may protect the validity of its legislative conduct.  The question is rather what rules the House has established and whether they have been followed.

*Christoffel*, 338 U.S. at 89.

Likewise, in a case where subpoena authorization was challenged, *Shelton v. United States*, the D.C. Circuit held that the committee's rules required the committee itself to issue a subpoena, not the chairman or staff of the committee acting alone.  The committee claimed its rules allowed the chairman alone to issue a subpoena.  The Court examined the relevant rules provisions and determined that the Rules expressly required that the committee as a whole authorize the subpoena (it did not blindly defer to the committee under the Rulemaking Clause, as the Congressional Defendants urge this Court to do).  Relying on the Supreme Court's decision in *Yellin,* Judge Wright held: "Since the Subcommittee did not authorize the issuance of the subpoena to Shelton, the subpoena was invalid."  327 F.2d at 606.

The teaching of these cases is plain and contradicts the Congressional Defendants' assertion that the issue of Select Committee adherence to its own rules is non-justiciable in this case.  To the contrary, the rule from these decisions is that a congressional committee is bound by the plain terms of its own rules, and when adherence to those rules is challenged by a witness with rights before the committee, the question is a legal one fully cognizable by the courts.  These cases all make clear that congressional committees must comply with their own rules, particularly those going to the authority to compel parties with subpoena power, and if they violate those rules, courts can and will declare the subpoena void.

Against this strong authority, the Select Committee here offers ancillary case law and a weak to non-existent response to the on-point precedent.  First, the Rulemaking Clause does not work to give the Select Committee cart blanche to violate the terms of delegation from the House. The Select Committee's three primary authorities for broad deference are inapt and do nothing to

undermine the law established in the cases discussed above.  In *Rangel v. Boehner*, the court merely rejected Congressman Rangel's attempt to challenge his censure as a political question primarily involving the Discipline Clause, and favorably cites the more on-point precedent from *Yellin* and *Christoffel*, where the Supreme Court decided committee power had been misused.  *See* 20 F. Supp. 3d 148 (D.D.C. 2013).  *Baker v. Conroy* fares no better.  That decision focused on an atheist's Establishment Clause challenge to congressional rules governing prayer, and the court noted how the House's interpretation that "prayer" required "religious prayer" was accepted by the court. *Baker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019).  This common-sense conclusion does not support any substantial deference on rules application, as the Select Committee suggests.

The Select Committee's reliance on *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), badly misses the mark.  That case involved a criminal fraud case against a Congressman, not a challenge to committee investigative authority and use of subpoenas.  And most all the House rules at issue were found to be judicially cognizable, even in that context.  The case does not require deference to a congressional interpretation of rules and the court follows without qualification *Yellin.  Id.* at 1305.  If the Select Committee were correct, and any proffered interpretation of House Rules must be deferred to, then *Christoffel* and *Shelton* were wrongly decided, since the congressional interpretation offered therein was rejected by the courts.  No rule of strong deference can be drawn from these cases.

The Select Committee also points to Judge Kelly's recent decision in active litigation between the Republican National Committee and the Select Committee, challenging a subpoena for some of the same reasons at issue in this case.  Judge Kelly, respectfully, was mistaken by fashioning an ambiguity in H. Res. 503 that plainly does not exist, and by applying an unwarranted level of deference to the Select Committee's litigating positions, taking *Rostenkowski* out of

context and ignoring the more on-point authority of *Yellin* and *Christoffel*.  As explained below, Judge Kelly also erred in how he interpreted H. Res. 503 on the merits.

> **B.     The Select Committee's subpoenas were not issued in compliance with H. Res. 503 due to failed composition.**

The Select Committee does not comply with H. Res. 503's requirements that the "Speaker **shall appoint** 13 Members to the Select Committee, 5 of whom **shall be appointed** after consultation with the minority leader."  H. Res. 503, 117th Cong. (2021) (emphasis added).  The Speaker never appointed 13 members and the Speaker never appointed 5 members in consultation with the Minority Leader.  There is no dispute about these facts, they are the status quo of the Select Committee's make-up.  For both reasons, the Select Committee was not validly constituted and cannot, as a matter of law, exercise delegated subpoena authority that belongs to Congress by implication.  *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  The Select Committee has almost no response to this.  It points to Judge Kelly's recent decision (stayed pending appeal by the D.C. Circuit), as supporting an interpretation that "shall appoint 13 Members" doesn't mean the Speaker shall appoint 13 members, it must mean "may."  It then makes the unprecedented and novel claim that the House's action on contempt resolutions operates to "ratify" the view that the Select Committee is validly constructed.

As to Judge Kelly's opinion, with respect, the better interpretation of H. Res. 503 is the plain meaning of the words require the Speaker to appoint 13 members.  Nothing in the context of the resolution supports a highly unusual interpretation that "shall" is optional and allows the Speaker to constitute a committee with only nine members, not the 13 specified (with five from the minority consultation process).  The only support for this strained interpretation of "shall" is a fleeting citation to *English v. Trump,* where the word "shall" was interpreted in context with other statutes, and otherwise notes that authority strongly supports the common sense view that shall "is

usually understood as mandatory." 279 F. Supp. 3d 307, 323 (D.D.C. 2018). The interrelationship between Dodd-Frank and the Federal Vacancies Reform Acts, at issue in *English*, says nothing about how the Speaker could possibly understand H. Res. 503 as anything other than a requirement to appoint 13 members. Judge Kelly then wrongly deferred to the House view that "shall" means "might," relying on a misreading of *Rostenkowski*. Unreasonable and erroneous House interpretation of rules can and should be rejected by this Court, as the interpretations were in *Christoffel* and its progeny.

The House vote on contempt resolutions cannot operate to "ratify" the Select Committee's legally deficient composition. *But see* ECF No. 35 at 28. There is no legal doctrine of ratification for such a fundamental error. If there were, then virtually all legal challenges to subpoenas would have come out otherwise since it is usually the case that a subpoena challenged in the context of contempt would have been subsequently subject to a referral vote outside the committee being challenged. In other words, failure to follow the rules in committee composition cannot be fixed by a mere contempt resolution vote; it would need to be addressed by amending H. Res. 503 or comply with the plain terms of the resolution by appointing 13 Members.

### C.     The Select Committee's subpoenas were not issued in compliance with H. Res. 503 due to lack of consultation with a ranking minority member.

In addition to lacking the requisite composition, the Select Committee failed to follow the rules for consultation with a ranking minority member before issuing the subpoena to Mr. Meadows. The Select Committee all but concedes it violated its own rules about consultation by claiming this argument is "nitpicking." On the contrary, protecting the rights of the minority party where they impact the Due Process rights of a committee witness, including by the common mechanism of allowing the minority party to designate a ranking member who exercises procedural rights, is precisely what the Supreme Court and the D.C. Circuit instruct that courts

must do.  As Mr. Meadows has shown, the Select Committee failed to consult with a "ranking minority member" because *there is no ranking minority member*.  In response, the Select Committee again relies on Judge Kelly's recent opinion (stayed pending appeal by the D.C. Circuit), and also contends that Rep. Liz Cheney is "ranking minority member *for consultation purposes*."  ECF No. 35 at 29 (emphasis added).  Where in House Resolution 503 is there a provision for such a designation? Why the qualification?  Perhaps because the Select Committee cannot bring itself to say what it knows to be false: Rep. Cheney is not the "ranking minority member," period.

It is not surprising that counsel for the House would thus readily admit to the Federal Bureau of Investigation that the Select Committee does not have a ranking minority member, and that Rep. Cheney is "Vice Chair," as it was recorded:

> LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members.  Representative LIZ CHENEY is acknowledged to the Vice Chair of the Select Committee … there are no express rules for the Vice Chair as there would be for a Ranking Member.

ECF No. 29-2 ¶ 18.  The Select Committee boldly says *nothing* in response to this quasi-judicial admission that Rep. Cheney is not the ranking minority member.  This undisputed evidence strongly supports Mr. Meadows's claim for judgment that the subpoenas at issue are invalid because there can be no compliance with the ranking minority member consultation requirements.

The Select Committee's response to the ranking minority member defect amounts to semantics.  In addition to mischaracterizing the clear legal requirement as "nitpicking," the Select Committee attempts to demean the position and role of the ranking minority member by calling it a "title."  Of course, both major parties regularly rely on appointment of ranking minority members to protect substantive rights; not merely treating it as a title.  Regardless of characterization, the Select Committee failed to follow its own clear rule.

In addition, the Select Committee again invokes Judge Kelly's recent opinion as having resolved the issue.  The reasoning of that decision, not binding on this court and unsettled by the ongoing appeal, should be rejected.   Judge Kelly, and the Select Committee, adopt the unreasonable and unprecedented view that the "ranking minority member" can be ascertained by simply looking at the member of a committee who is literally most senior in seniority, and party affiliation, without any role for the minority party and its leadership to designate the ranking position.  Although it is true that Rep. Cheney was the first (of two) Republican members that Speaker Pelosi appointed to the Select Committee, that mechanical understanding of the ranking minority member position is entirely contrary to past congressional practice and at odds with the uncontested view of the Minority Leader Kevin McCarthy that Rep. Cheney is simply not the ranking minority member.[10]

---

[10] As Minority Leader Kevin McCarthy recently stated, Representative Cheney "is clearly not the ranking minority member."  Letter from Elliot S. Berke, counsel for House Republican Leader Kevin McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (May 27, 2022), https://republicanleader.house.gov/wp-content/uploads/2022/05/McCarthyLetter-052722.pdf.   Ranking members, distinct than most senior members, have always been understood as the member designated by the minority party, without regard to simple seniority (on the Select Committee or in the House).  Both the Republican Conference Rules and Democrat Caucus Rules make this clear.  The Republicans provide for term limits, with no reference for seniority, for ranking members.  *See* GOP H. Conf. R. 117th Cong. 14(e), https://www.gop.gov/conference-rules-of-the-117th-congress/.   The Democrat Caucus Rules are even more stark—calling for election or secret ballot, again without reference to simple seniority.   *See* R. Democratic Caucus 21(D)(1)(a), 117th Cong. (Jan. 14, 2021), https://www.dems.gov/imo/media/doc/DEM_CAUCUS_RULES_117TH_April_2021.pdf.  Both Rules are consistent with the longstanding practice of minority party selection or designation of the "ranking minority member."  For example, in the 114th Congress, when the Democrats were in the minority, Representative Levin was ranking member of the House Ways & Means Committee, even though Representative Rangel had been more senior by 12 years.  *See* H. Rep. No. 114-887, at (II), 20 (2016).  *Compare Representative Sander M. Levin*, Congress.gov (last visited June 6, 2022), https://www.congress.gov/member/sander-levin/L000263, *with Representative Charles B. Rangel*, Congress.gov (last visited June 6, 2022), https://www.congress.gov/member/charles-rangel/R000053.  Consistent with this longstanding practice, even in politically contentious situations, the minority party simply speaks of "appointing" or "selecting" members of committees and ranking members.  *See, e.g.*, Press

In addition, the Select Committee argues the court *must* defer to the Select Committee and accept that Rep. Cheney was the "ranking minority member" *for consultation purposes*.   It is telling that the Select Committee cannot even bring itself to declaring Rep. Cheney the ranking minority member without qualification.   The case law regarding congressional authority to investigate by subpoena does not support the absolute deference the Select Committee demands. If such strong deference were required, then none of the challenges to congressional subpoenas would have succeeded.  *See, e.g.*, *Yellin v. United States*, 374 U.S. 109 (1963); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963). Especially when the requested deference is for an unreasonable and unprecedented position (declaring a ranking minority member contrary to the expressed position of the minority party), not only is deference not appropriate, it would constitute precisely the judicial intervention the Rulemaking Clause forecloses.

Finally, while the undisputed facts and public records subject to judicial notice strongly support Meadows position that Cheney is not the ranking minority member, if the Court has any doubt, then it should deny the Select Committee's motion for summary judgment and grant Mr. Meadows the opportunity conduct discovery and develop facts relevant to this issue.

---

Release, Nancy Pelosi, Democratic Leader, U.S.H.R., *Pelosi Names Democratic Members to House Select Committee on Benghazi* (May 21, 2014), https://web.archive.org/web/20141207010037/https://www.democraticleader.gov/newsroom/pelo si-names-democratic-members-house-select-committee-benghazi/.

IV.    **The Congressional Defendants' Procedural Arguments Are Also Unavailing.**

A.    *The recent developments in the RNC litigation show that the Congressional Defendants' rush to summary judgment in this case was misguided and unsupported.*

The Congressional Defendants' brief in opposition relies heavily on Judge Kelly's recent decision in *Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022), to justify their response to Mr. Meadows's arguments on invalid legislative purpose, the improper composition of the Select Committee, and the absentee ranking member. Just as they have done in Mr. Meadows's case, the Congressional Defendants in the *RNC* litigation asked the courts to rush to judgment on important constitutional concerns in order to meet their self-imposed (and likely politically motivated) deadlines.  But their reliance on *RNC* is flawed. First, the *RNC* case was not filed as a related case to Mr. Meadows's, and there are many critical factors distinguishing the *RNC* case from Mr. Meadows's.  In *RNC*, for example, there is no subpoena for testimony, nor are there claims of testimonial immunity or executive privilege.  Its ruling thus did not account for many of the important constitutional rights and protections at stake in this litigation.  For these reasons, the Court should decline the Congressional Defendants' pleas to adopt Judge Kelly's ruling on dispositive arguments of legislative purpose, the composition of the Select Committee, and the ranking member.

Second, with respect to the limited set of arguments shared by the RNC and Mr. Meadows, the Court should similarly be reluctant to adopt the findings in *RNC*.  Just as they did in the instant case, the Congressional Defendants made a dramatic appeal for the courts to quickly resolve their case so as "not to interrupt and delay the Select Committee's work at this critical juncture." Appellees' Corrected Resp. Appellant's Emergency Mot., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 24, 2022).  Twelve days ago, the D.C. Circuit issued an injunction pending appeal of Judge Kelly's decision, an action both parties agreed require the Court to consider the

RNC's likelihood of success on the merits, and granted the Congressional Defendants their requested expedited briefing schedule.  *See id.*; Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022); Emergency Mot., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 23, 2022).  And with that, it appears the juncture may not be so critical as the Congressional Defendants first suggested.  Undoubtedly recognizing their diminishing chances of success on appeal and out of concern for an appellate court ruling that would harm their likelihood of success in cases such as Mr. Meadows's, the Congressional Defendants changed their mind and moved the D.C. Circuit for a delay in briefing.  *See* Mot. Postponement Br. & Oral Arg., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 29, 2022).  These recent actions by the Congressional Defendants in the *RNC* case indicate their real concern: that the D.C. Circuit may not appease their hasty, bullying tactics against witnesses and courts.  The Court should not indulge their feigned rush to judgment in this matter either.

### B. The Congressional Defendants have not identified defects in Mr. Meadows's statement of facts, and any material factual disputes would only support his still-pending Rule 56(d) motion.

In their opposition to Mr. Meadows's statement of facts, the Congressional Defendants admit that Mr. Meadows disputes at least six paragraphs of their purported "undisputed" statement of facts.  *See* ECF No. 35 at 9.  That, in addition to their fit over Mr. Meadows's statement of facts in support of his motion and in opposition to the Congressional Defendants' motion for summary judgment, does nothing but emphasize Mr. Meadows's consistent refrain that, should he not be entitled to judgment as a matter of law, then there are clearly disputed material facts in this case that call for discovery.

Actually, Mr. Meadows disputed outright ten of the many allegations contained in the Congressional Defendants' 29 paragraphs of stated facts.  *See* ECF No. 35 at 9 (identifying the six disputed paragraphs); ECF No. 29-3 ¶¶ 9 ("Mr. Meadows disputes that the testimony and

documents demanded in the subpoena are limited to 'the events of January 6, 2021, and the facts and circumstances that led to the violent attack on the Capitol that day.'"), 20 ("Mr. Meadows disputes that he had a 'change of heart.'"), 21 ("Mr. Meadows does dispute that he and the Select Committee agree upon any 'indisputably non-privileged testimony.'"), 22 ("Mr. Meadows again disputes that he and the Select Committee agree on the scope of 'non-privileged information.'"). And with another four allegations, Mr. Meadows contested the Congressional Defendants' characterization of the document referenced, stating that the Court may itself refer to the document, rather than accepting the Congressional Defendants' characterizations. *See* ECF No. 29-3 ¶¶ 17–20.

The Congressional Defendants' opposition also contends that Mr. Meadows "appears to be ignoring the actual allegation, each of which includes a citation." ECF No. 35 at 9. But the Congressional Defendants apparently failed to understand Mr. Meadows's objection to each of these referenced statements, which note that the citations do not, in fact, support one or more aspects of the Congressional Defendants' statement.

The first example Congressional Defendants allege cannot be in dispute—that the privilege log "plainly includes communications between Mr. Meadows and well known members of the Trump campaign team" and campaign counsel—clearly ignores Mr. Meadows's argument. The Congressional Defendants' statement in question was that Mr. Meadows's privilege logs, ECF No. 15-6, "identified more than 200 communications he initiated or participated in based on his role in the Trump campaign with people reported to be members of the Trump campaign legal team or other Trump campaign staff." ECF No. 15-28 ¶ 18. Mr. Meadows disputed this part of their allegation on two grounds. First, neither the privilege logs nor the Congressional Defendants identified which individuals included in the privilege log were "reported to be members of the

Trump campaign legal team or other Trump campaign staff." *See* ECF No. 29-3 ¶ 18.  In this way, the Congressional Defendants did not properly support their contention, as Mr. Meadows noted. And second, nothing in the Congressional Defendants' referenced document indicates that Mr. Meadows undertook these communications "based in his role in the Trump campaign." *See id.* Further, for the many reasons stated in Part I.B, Mr. Meadows has objected to "the distinction Congressional Defendants attempt to draw between actions Mr. Meadows took as Chief of Staff to the President and those he took to reelect the President." *See id.*  So despite the Congressional Defendants' contentions otherwise, this is a material dispute.

The Congressional Defendants' other example, relating to Donald Trump's press release, is even more straightforward.  Mr. Meadows disputes that the press release supports the Congressional Defendants' statement that "Former President Trump reviewed [Mr. Meadows's] book in advance and did not object to its publication."  Nothing in the press statement Congressional Defendants cite, *see* ECF No. 35-3, states that former President Trump read Mr. Meadows's book.  And even if the fact that former President Trump released the statement is alone sufficient to show he "did not object to its' publication" (which Mr. Meadows submits it is not) the Select Committee's own statements dispute the fact that former President Trump approved of Mr. Meadows's book prior to publication.  *See* 167 Cong. Rec. H7645 (daily ed. Dec. 14, 2021) (statement of Rep. Raskin) ("Mark Meadows' book came out with tons of startling and eye-popping revelations about January 6th and the role that then-President Donald Trump played. Ex-President Trump exploded and called Mr. Meadows' book fake news.").

The Congressional Defendants next object to a number of Mr. Meadows's presented facts as hearsay and thus, not admissible in evidence.  These objections include an official FBI report filed in another case before this very Court.  *Compare* ECF No. 35-1 ¶ 18, *with Veg-Mix, Inc. v.*

*U.S. Dep't of Agriculture*, 832 F.2d 601, 607 ("Courts may take judicial notice of official court records."). It is unclear, for example, why the Congressional Defendants argue that Mr. Meadows's citations to press releases are inadmissible hearsay, *see, e.g.*, ECF No. 35-1 ¶ 7, but their own citations to press releases (not by any party to this case or subject to any other obvious hearsay example) are admissible, *see, e.g.*, ECF No. 15-28 ¶ 4, 5, 24. Mr. Meadows has disputed the relevant portions of these statements. The Congressional Defendants' objections are unavailing, and each of these statements is admissible.[11]

Unfortunately, Mr. Meadows has not had the benefit of purported subpoena power to support his arguments in opposition to the Congressional Defendants' motion, nor was he privy to much of the testimony and documents cited by and attached to their motion. As the Congressional Defendants point out in their opposition, ECF No. 35 at 9, without the benefit of any discovery, Mr. Meadows is unable to support factually his challenge to some of the Congressional Defendants' statements of fact, *see* ECF No. 29-3, and his own additional facts in opposition to the Congressional Defendants' motion, *see* ECF No. 29-2. For this reason, Mr. Meadows disputed each statement of alleged fact (and any accompanying commentary) that was unsupported by the Congressional Defendants' own citations. *See* ECF No. 29-3, ¶¶ 5, 6, 7, 18, 23, 26. For example, without additional discovery, Mr. Meadows is unable to support his dispute that Speaker Pelosi has fulfilled her duties pursuant to H. Res. 503. *See* ECF No. 29-3 ¶¶ 5, 6; *see also* Letter from Elliot S. Berke, counsel for House Republican Leader Kevin McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (May 27, 2022) ("The Speaker did not appoint five members after consultation with the minority leader.").

---

[11] To the extent the Court seeks full briefing on each of the Congressional Defendants' twenty-six hearsay arguments, Mr. Meadows welcomes such opportunity.

It is for these reasons that Mr. Meadows filed a motion pursuant to Federal Rule of Civil Procedure 56(d), asking the Court to deny without prejudice or delay ruling on the Congressional Defendants' motion for summary judgment, ECF No. 20. But while the Court has held that motion in abeyance, Mr. Meadows continues to emphasize that he is entitled to summary judgment on the issues that Congressional Defendants label "irrelevant."

Specifically, the facts relating to "the formation, composition, operations, or investigative scope" and the legislative purpose and intent of the Select Committee are of utmost relevance to Mr. Meadows's motion. *See supra* Parts II–III. The Congressional Defendants' attempt to dismiss such claims as irrelevant due to a nonbinding and distinguishable court decision is unjustified. *See* Part IV.A *supra*.

And lastly, the Congressional Defendants object to counsel's declaration in support of some of the material facts. Counsel's declaration is based on his personal knowledge, the basis of which is provided in each of the specific declarations. *See* ECF No. 29-4. The declaration fully comports with the requirements of Federal Rule of Civil Procedure 56(c)(4).

### C.     The Congressional Defendants improperly use their reply to claim new grounds for seeking summary judgment.

The Congressional Defendants' arguments on the other issues which Mr. Meadows has raised in his complaint but on which he has not yet sought summary judgment—namely, the Stored Communications Act, the First Amendment, and the Fourth Amendment—are also misplaced.

To start, the Congressional Defendants have sought summary judgment on Mr. Meadows's Fourth Amendment claim based on absolute immunity for the first time in their reply. They argue that they are immune from Mr. Meadows's argument that the subpoena violates the Fourth Amendment. *See* ECF No. 35 at 36. According to the Congressional Defendants, they have

absolute immunity from this constitutional claim because of the protection afforded to congressional Speech or Debate.  *Id*.

This argument is foreclosed as a ground for summary judgment in their favor because Congressional Defendants failed to raise it before their reply.  Courts in this Circuit have "generally held that issues not raised until the reply brief are waived."  *Bloche v. Dep't of Def.*, 414 F. Supp. 3d 6, 24 n.4 (D.D.C. 2019) (quoting *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C. Cir. 2000)).  Thus, a new argument for summary judgment will be rejected when raised for the first time in reply.  *See id*.

The Congressional Defendants made no mention of absolute immunity as a defense to Mr. Meadows's Fourth Amendment claim in their motion for summary judgment and supporting memorandum.  *See* ECF No. 15 at 62–65.  Instead, they argued that the subpoena was not overbroad and that *Carpenter v. United States*, 138 S. Ct. 2206 (2018), did not apply to the information sought.  *Id*.  The Congressional Defendants cited the case they now rely on to assert immunity—*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975)—but only in a section of their memorandum discussing Mr. Meadows's First Amendment claim.  *Id*. at 54.  This mere reference to a related case in a different section of their memorandum falls far below the standard to raise immunity as a ground for judgment on the Fourth Amendment claim.  *See Bloche*, 414 F. Supp. 3d at 24 n.4 (explaining that an argument is waived "when a party does not argue a point until its reply brief, even if the party referred to the argument in its opening brief").

The argument further fails because the Congressional Defendants have waived their claim for absolute immunity under the Speech or Debate Clause against *any* of Mr. Meadows's claims since they failed to raise that defense in their Answer to Mr. Meadows' First Amended Complaint.  *See* ECF No. 17 at 31–33.  Constitutional immunity, including under the Speech or Debate Clause,

is an affirmative defense.  *See Bush v. Lucas*, 462 U.S. 367, 377 (1983) (referring to an "affirmative defense based on the speech or Debate Clause of the Constitution"); *see also Shelby Cnty., Alabama v. Holder*, 43 F. Supp. 3d 47, 53 (D.D.C. 2014), *aff'd sub nom. Shelby Cnty., Ala. v. Lynch*, 799 F.3d 1173 (D.C. Cir. 2015) (explaining that sovereign immunity is an affirmative defense). "[A]n affirmative defense not raised by answer cannot be raised in dispositive motions that are filed post-answer."  *Smith-Haynie v. D.C.*, 155 F.3d 575, 578 (D.C. Cir. 1998).  Thus, the Congressional Defendants cannot rely on Speech of Debate immunity to defeat Mr. Meadows's claims.

## CONCLUSION

For the reasons discussed, the Court should grant Mr. Meadows's motion and deny the Congressional Defendants' motion for summary judgment.

Dated: June 6, 2022

Respectfully submitted,
MARK MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I certify that, on June 6, 2022, a copy of the foregoing was filed on the Court's CM/ECF system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III