IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARK MEADOWS, | ) |
| *Plaintiff*, | ) |
| v. | ) Case No. 21-cv-3217 (CJN) |
| NANCY PELOSI, et al., | ) |
| *Defendants*. | ) |

**STATEMENT OF INTEREST OF THE UNITED STATES**

The United States, through the Department of Justice, files this Statement of Interest pursuant to the Court's invitation and 28 U.S.C. § 517. The Court's Minute Order noted that "Plaintiff's arguments rely, in part, on certain opinions of the Office of Legal Counsel" ("OLC"), and the Court therefore invited the United States to state its view "as to whether Plaintiff is entitled to absolute or qualified testimonial immunity from the subpoena at issue in this case." Minute Order (June 23, 2022). The OLC opinions cited by the Court concluded that Congress may not compel current and former immediate advisers to a sitting President to testify about their official duties.[1] Plaintiff, by contrast, is a former adviser to a former President. The cited OLC opinions do not address that situation, and the Department of Justice has not previously taken a position on the extent

---

[1] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. 5 (July 15, 2014); *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __ (May 20, 2019).

1

to which separation-of-powers principles limit the circumstances in which an immediate adviser to a former President may be required to comply with a congressional subpoena to testify about official duties.[2]

When a congressional committee demands testimony from an immediate presidential adviser after the President's term of office has ended, the relevant constitutional concerns are lessened. Accordingly, the Department does not believe that the absolute testimonial immunity applicable to such an adviser continues after the President leaves office. But the constitutional concerns continue to have force. The need to safeguard the confidentiality of presidential communications continues, as do the separation-of-powers principles requiring respect for the independence and dignity of the Office of the President.

In the Department of Justice's view, a form of *qualified* immunity is appropriate to address those continuing and significant separation-of-powers concerns: Congress's implied authority to investigate does not extend to compelling immediate advisers to a former President to testify about their official duties—and, correspondingly, those advisors are immune from such compelled testimony—unless Congress has made a sufficient

---

[2] Plaintiff suggests that OLC has concluded that absolute immunity extends to former immediate advisers to former Presidents. *See* Pl.'s Mem. of P. & A in Supp. of Mot. for Judg. on the Pleadings, ECF # 29-1 at 6. But the opinion on which Plaintiff relies addressed the immunity of a former immediate adviser to a *sitting* President (former counsel to then-President Bush, Harriet Miers). *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192–93 (2007). In addition, the Department has never taken the position that the relevant immunity extends to the production of documents. *See* Pl.'s Mem. of P. & A in Supp. of Mot. for Judg. on the Pleadings, ECF # 29-1 at 19. The OLC opinions address only immunity from compelled testimony. The rationales for such immunity do not justify any such categorical rule with respect to a subpoena for documents and, in any event, such a rule is foreclosed by the Court of Appeals' decision in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc).

showing of need or the immunity has been waived. Courts should, in other words, "carefully assess" whether Congress's "asserted legislative purpose warrants the significant step," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2035 (2020), of compelling an immediate adviser to a former President to testify about his or her official duties.

Courts have developed a variety of standards to address analogous separation-of-powers questions. *See Mazars*, 140 S. Ct. at 2035-36; *In re Sealed Case*, 121 F.3d 729, 742-45 (D.C. Cir. 1997); *Senate Select Committee*, 498 F.2d at 732. But as in *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), however, this Court "need not conclusively resolve" the contours of the standard that applies here because the Select Committee has satisfied "any of the tests," *id*. at 33, that might define the qualified testimonial immunity of an immediate adviser to a former President. And for the same reason, the Court need not determine whether the sitting President's determination that an assertion of testimonial immunity is not warranted here independently precludes any assertion of such immunity by the former President. *Cf. Trump v. Thompson*, 142 S. Ct. 680 (2022).

## ARGUMENT

I. **A QUALIFIED IMMUNITY PROTECTS AN IMMEDIATE ADVISER TO A FORMER PRESIDENT FROM COMPELLED CONGRESSIONAL TESTIMONY ABOUT HIS OR HER OFFICIAL DUTIES**

The Executive Branch has long taken the position that separation-of-powers concerns preclude Congress from compelling immediate advisers to a sitting President to testify about their official duties.[3] Those concerns do not disappear when the President

---

[3] OLC has understood this category of advisers to be limited to senior members of the White House staff who meet regularly with the President to advise him on the exercise of his constitutional and statutory functions. *See Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. 5, 16 (2014). It does not include officers and employees in executive branch agencies whose duties are to implement federal statutes, even if some

3

leaves office. But the calculus does change, and the Constitution requires only a qualified testimonial immunity for immediate presidential advisers once the President is no longer in office.

A. The Supreme Court has "long recognized the unique position in the constitutional scheme that the Office of the President occupies." *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 382 (2004) (brackets and internal quotation marks omitted). And it has likewise recognized the "singularly unique role under Art. II of a President's communications and activities, related to the performance of duties under that Article." *United States v. Nixon*, 418 U.S. 683, 715 (1974). The constitutional separation of powers thus protects the President, as the head of a co-equal branch of government, from congressional encroachments on this aspect of the independence of his Office. *See Cheney*, 542 U.S. at 385 ("[S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated.").

The President is also "entitled to confidentiality in the performance of his 'responsibilities' and 'his office,' and 'in the process of shaping policies and making decisions.'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("*AAPS*") (quoting *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 449 (1977). Both the Supreme Court and the D.C. Circuit have emphasized the manifest importance "to the operation of Government" of allowing the President to keep communications regarding the exercise of his duties confidential, and the "constitutional underpinnings" of

---

such officials also may occasionally advise the President. A President's Chief of Staff plainly qualifies.

4

that authority in the separation of powers. *United States v. Nixon*, 418 U.S. at 705-06, 708; *see In re Sealed Case*, 121 F.3d at 742 (reaffirming the "great public interest in preserving the confidentiality of conversations that take place in the President's performance of his official duties because such confidentiality is needed to protect the effectiveness of the executive decision-making process") (internal quotation marks omitted) (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973)).

B. Many of the same principles that preclude Congress from summoning the President to appear before a legislative committee also require immunity from compelled congressional testimony for a sitting President's immediate advisers. *See Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 843 (D.C. Cir. 2008) ("When the Legislature purports to affect the prerogatives of the President *or his subordinates*, we must ask whether it 'impermissibly undermines the powers of the Executive Branch, or . . . prevent[s] [it] from accomplishing its constitutionally assigned functions.'") (emphasis added) (quoting *Morrison v. Olson,* 487 U.S. 654, 685 (1988)). OLC and the courts have often described that principle as a form of testimonial "immunity," but it can also be described as a limit on Congress's investigative authority that is required by the Constitution's separation of powers.

First, and most importantly, testimonial immunity for a sitting President's immediate advisers is necessary to protect the President's independence and autonomy from Congress. *See* 23 Op. O.L.C. at 4; *cf. Cheney*, 542 U.S. at 385. Given the vast responsibilities of the President's office, this Circuit has recognized that "[t]he President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisors." *In re Sealed Case*, 121 F.3d at 750. If a congressional

5

committee could compel testimony from the President's immediate advisers, it could wield that power to harass and interrogate them in an effort to influence their future advice or other actions they take in the course of advising or assisting the President in the discharge of the President's constitutional and statutory responsibilities. The obligation to appear and testify at a time and place of Congress's choosing could also unduly distract such advisers from their critical work assisting the President in the discharge of his Article II duties.

In addition, allowing Congress to interrogate the President's immediate advisers could jeopardize the President's constitutionally protected interests in obtaining and preserving the confidentiality of frank counsel. Invocation of executive privilege may be inadequate to prevent inadvertent disclosure of confidential and privileged communications when congressional questions repetitively probe areas of protected communications. Moreover, the invocation of privilege represents a breakdown in negotiations between co-equal branches that "should be avoided whenever possible." *Cheney*, 542 U.S. at 390. If a President's immediate advisers were compelled to appear before congressional committees in situations where they would frequently and legitimately refuse to answer questions about presidential communications on privilege grounds, the likely result would be a series of contentious incidents in proceedings before the committee—and potentially endless resort to the courts to resolve specific privilege disputes, thereby continually "embroiling the federal courts in . . . power contest[s]" between the political branches, *Raines v. Byrd*, 521 U.S. 811, 833 (1997) (Souter, J., concurring). Committees also would be free to make efforts to embarrass the adviser or the President—or both—by forcing public invocations of privilege, with very little likelihood that the committee would learn anything of value. That spectacle would

undermine the separation of powers in its own right. And the prospect of such contentious hearings would also threaten to make advisers reluctant to serve or to engage in candid exchanges of ideas, to the detriment of the greater public interest.

For these reasons, Presidential administrations of both parties have consistently taken the view that a sitting President's immediate advisers—current and former—cannot be compelled to testify before Congress about their official duties. *See, e.g.*, *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, slip op. at 3-12 (May 20, 2019); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at 5-16 (July 15, 2014). We acknowledge that some judges have disagreed with that view.[4] But neither the Supreme Court nor the D.C. Circuit has addressed the question, and we submit that the Executive Branch's longstanding position is firmly grounded in separation-of-powers principles. This Court, however, need not address that question here, because this case does not involve a subpoena to an immediate adviser to a sitting President.

C. The constitutional concerns described above are in some respects less acute when Congress seeks to compel testimony from immediate advisers to a former President about their official duties while in office. Accordingly, the Constitution does not require the continuation of absolute testimonial immunity for such advisers. But it would still pose a serious threat to the separation of powers to give Congress unchecked authority to compel

---

[4] *See Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 100-06 (D.D.C. 2008) (Bates, J.); *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 200-14 (D.D.C. 2019) (Jackson, K.B., J.), *rev'd and remanded on other grounds*, 973 F.3d 121 (D.C. Cir), *rehearing en banc granted, judgment vacated* (Oct. 15, 2020); *Comm. on the Judiciary v. McGahn*, 951 F.3d 510, 537-42 (D.C. Cir. 2020) (Henderson, J., concurring), *rev'd and remanded on other grounds*, 973 F.3d 121 (D.C. Cir), *rehearing en banc granted, judgment vacated* (Oct. 15, 2020); *id.* at 558 (Rogers, J., dissenting).

7

the testimony of a former President's immediate advisers as soon as he or she left office. In this context, therefore, the constitutional separation of powers requires a qualified, rather than absolute, testimonial immunity.[5]

Once the President becomes a private citizen, Congress cannot use the questioning of his immediate advisers to extract promises from the witnesses about, or unduly influence, their future official conduct, or to otherwise "'exert an imperious controul' over the Executive Branch" in its current operations. *Mazars*, 140 S. Ct. at 2034 (quoting The Federalist No. 71, at 484 (A. Hamilton)). And compelling testimony from immediate advisers to a former President obviously does not prevent them (or him) from performing any official duties.

On the other hand, the interest of future Presidents in obtaining candid advice from immediate advisers would still be jeopardized to some degree by the prospect of compulsory congressional questioning, regardless of when the questioning occurs. The interest in maintaining the confidentiality of presidential communications thus continues even after the end of a President's term in office, although that interest may diminish to a degree over time and can also be safeguarded, at least in part, by executive privilege. *Cf. Thompson*, 142 S. Ct. at 681 (statement of Kavanaugh, J., respecting denial of application).

Significantly, moreover, unchecked congressional authority to compel a former President's immediate advisers to testify about their official duties would threaten the

---

[5] That testimonial "immunity" could also be understood as a limit on Congress's implied investigative power in the form of a requirement that Congress must make a specific showing—above and beyond what would be required to subpoena an ordinary witness—to demonstrate that its "asserted legislative purpose warrants the significant step," *Mazars*, 140 S. Ct. at 2035, of compelling a former immediate adviser to testify about his or her official duties.

separation-of-powers principles that serve as a "safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo*, 424 U.S. 1, 122 (1976). "Congress could perhaps use the threat of a post-Presidency pile-on to try and influence the President's conduct while in office" and "thus could wield the threat of intrusive post-Presidency subpoenas to influence the actions of a sitting President 'for institutional advantage.'" *Trump v. Mazars USA, LLP*, No. 21-5176, 2022 WL 2586480, at *19 (D.C. Cir. July 8, 2022) (quoting *Thompson*, 20 F.4th at 44, and *Mazars*, 140 S. Ct. at 2036). Or a house of Congress could employ its investigative powers to interrogate or embarrass immediate advisers to a former President to attack the former President solely for partisan gain. Such tactics could weaken the Presidency even if the advisers never disclosed privileged information and even if no future advisers censored candid advice out of a fear of being subjected to such a spectacle.

Accordingly, in our view the application of what might be called a qualified, rather than absolute, immunity from compelled testimony is appropriate after a President leaves office. Such a qualified immunity would protect the separation of powers by preventing Congress from compelling a former President's immediate advisers to testify about their official duties when such testimony is not necessary to the exercise of Congress's investigative authority. But at the same time, qualified testimonial immunity—unlike the absolute immunity that the Department has argued is applicable to immediate advisers to a sitting President—would allow Congress to obtain such testimony when it can make a sufficiently strong showing of need.

D. Courts and OLC have developed various tests to address analogous separation-of-powers questions or to balance analogous competing interests. In *Senate Select*

*Committee*, the D.C. Circuit held that a congressional committee's subpoena for recordings of conversations between the President and his Counsel could overcome an assertion of executive privilege only if "the subpoenaed evidence [wa]s demonstrably critical to the responsible fulfillment of the Committee's functions." 498 F.2d at 731. Similarly, OLC has suggested that if an immediate adviser to a sitting President were entitled only to qualified rather than absolute immunity, that immunity could be overcome only by a showing that satisfied the *Senate Select Committee* standard. *Immunity of the Assistant to the President and Director of the Office Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. 5, 17-18 (2014).

In *Sealed Case*, the D.C. Circuit held that, "to overcome a claim of presidential privilege raised against a *grand jury* subpoena, it is necessary to specifically demonstrate why it is likely that evidence contained in presidential communications is important to the ongoing grand jury investigation and why this evidence is not available from another source." 121 F.3d at 757 (emphasis added); *see also United States v. Nixon*, 418 U.S. at 713 (stating that a "demonstrated, specific need for evidence in a pending criminal trial" may overcome an assertion of presidential privilege).

In *Mazars*, the Supreme Court rejected those standards as too "demanding" when a congressional subpoena seeks "nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations." 140 S. Ct. at 2032-33. But even in that context, the Court held that courts must "perform a careful analysis that takes adequate account of the separation of powers principles at stake." *Id.* at 2035. The Court explained, for example, that "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs" and that "courts

10

should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective." *Id.* at 2035-2036.

This Court need not decide on the exact contours of the qualified testimonial immunity that applies in this context: All of the various potential standards take into account similar considerations, and the Select Committee's showing is sufficient to satisfy any of them.

## II. THE SELECT COMMITTEE HAS ADEQUATELY JUSTIFIED THE SUBPOENA IN THIS CASE

The standards articulated in *Senate Select Committee*, *Sealed Case*, and *Mazars* ask whether the subpoena seeks evidence in service of a valid and sufficiently important legislative interest; whether that evidence is sufficiently relevant to that interest, and whether the party seeking the evidence has shown that it could not reasonably be obtained elsewhere. In another case involving the Select Committee's investigation of the events of January 6, the D.C. Circuit held that the Select Committee's showing of need for the requested information satisfied "any of the tests" put forward in that case, including the standards from *Senate Select Committee*, *Sealed Case*, and *Mazars*. *Thompson*, 20 F.4th at 33; *see id.* at 41-45. The same is true here.

First, this Court and others have repeatedly recognized that the events of January 6, 2021, are of immense importance and that investigating those events is "related to, and in furtherance of, a legitimate task of the Congress." *Watkins v. United States*, 354 U.S. 178, 187 (1957). As the D.C. Circuit wrote,

> The events of January 6, 2021 marked the most significant assault on the Capitol since the War of 1812. The building was desecrated, blood was shed, and several individuals lost their lives. Approximately 140 law enforcement officers were injured, and one officer who had been attacked died the next day. In the aftermath, workers labored to sweep up broken glass, wipe away blood, and clean feces off the walls. Portions of the

11

>building's historic architecture were damaged or destroyed, including 'precious artwork' and '[s]tatues, murals, historic benches and original shutters[.]'

*Thompson*, 20 F.4th at 18-19 (citations omitted). The D.C. Circuit emphasized the Select Committee's "uniquely weighty interest in investigating the causes and circumstances of the January 6th attack so that [Congress] can adopt measures to better protect the Capitol Complex, prevent similar harm in the future, and ensure the peaceful transfer of power." *Id.* at 35. And President Biden has likewise determined that Congress "has a compelling need in service of its legislative functions to understand the circumstances that led to . . . the most serious attack on the operations of the Federal Government since the Civil War." Letter from Deputy Counsel to the President Jonathan C. Su to George J. Terwilliger III, at 1 (Nov. 11, 2021), ECF #1-12 ("Su Letter"). There can thus be no real dispute that the investigation at issue is of critical importance and within Congress's implicit investigatory authority. *See Watkins*, 354 U.S. at 187; *McGrain v. Daugherty*, 273 U.S. 135, 161-175 (1927).

Second, the Select Committee has demonstrated that such information is critical to its investigation. The Select Committee has set forth in detail the information it seeks from Plaintiff, and the importance of that evidence to the Select Committee's work. *See* Mem. of P. & A in Supp. of Defs.' Mot. for Summ. Judg., ECF #15, at 27-41. The Select Committee seeks information about seven specific topics. *Id.* Those topics fall within the scope of the issues that President Biden recognized as central to the Select Committee's work when he determined "that an assertion of executive privilege is not in the public interest, and is therefore not justified, with respect to particular subjects within the purview

of the Select Committee." Su Letter 1. And Plaintiff has not seriously disputed the importance of his testimony to the Select Committee's investigation.

Finally, the Select Committee has sufficiently shown that the information it seeks from Plaintiff is not reasonably available from other sources. The Select Committee has narrowed its original request to Plaintiff in response to information it has acquired elsewhere. Mem. of P. & A in Supp. of Defs.' Mot. for Summ. Judg., ECF #15 at 27-41, 51. And the Select Committee also sought and received testimony from Plaintiff's assistant in the White House, Cassidy Hutchinson, describing additional relevant meetings and conversations in which Plaintiff participated but she did not. *See* Tr. of Jan. 6 Committee Hearing, June 28, 2022, https://www.rev.com/blog/transcripts/day-6-of-jan-6-committee-hearings-6-28-22-transcript (describing, *inter alia*, a conversation with Rudolph Giuliani about his January 2, 2021, meeting with Plaintiff [16:10]; a conversation between Deputy Chief of Staff Anthony Ornato and Plaintiff about intelligence reports of potential violence on January 6 [24:51]; a possible conversation between National Security Advisor Robert O'Brien and Plaintiff about potential violence on Jan. 6 [23:16]; and a conversation between Plaintiff, Roger Stone and retired Lt. General Michael Flynn on the evening of January 5 [1:18:32]). The Select Committee, of course, is best positioned to demonstrate that the information it requires from Plaintiff is not practically available from another source. From its representations, however, *see* Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. Judg., ECF #15, at 27-41, and recent testimony, the Select Committee has met that requirement.

### III. THE COURT NEED NOT DECIDE WHETHER THE SITTING PRESIDENT'S DETERMINATION THAT PLAINTIFF SHOULD TESTIFY INDEPENDENTLY PRECLUDES PLAINTIFF'S ASSERTED TESTIMONIAL IMMUNITY

The OLC opinions cited in the Court's Minute Order addressed situations that differed from this one not only because they involved immediate advisers to a sitting President, but also because they involved circumstances where the sitting President had decided that the advisor in question should not testify in order to preserve the interests of the Presidency. Testimonial immunity for immediate advisers to the President is not designed for the benefit of such advisers in their individual capacities, nor for the personal benefit of any particular President. It may only be invoked on behalf of the institution of the Presidency and, ultimately, "for the benefit of the Republic." *Nixon v. GSA*, 433 U.S. at 449; *see Thompson*, 20 F.4th at 48 ("The interests the privilege protects are those of the Presidency itself, not former President Trump individually."). Accordingly, the determination whether to invoke such immunity should be made by the singular officer who "speaks authoritatively for the interests of the Executive Branch," *Thompson*, 20 F.4th at 33—the sitting President.

In this case, President Biden has determined that, given the "unique and extraordinary circumstances" of the Select Committee's investigation into the events of January 6, he will neither "assert executive privilege" with respect to Plaintiff's testimony on specified topics within the Select Committee's purview nor "assert immunity to preclude [Plaintiff] from testifying before the Select Committee." Su Letter 1-2. Such a determination by the sitting President would ordinarily resolve the matter without the need for the Select Committee to make the sort of showing we describe above. Indeed, presidential advisers have often voluntarily testified before Congress without objection

14

from the President.  *See* Cong. Research Serv., RL31351, *Presidential Advisers' Testimony Before Congress Committees: An Overview* 6–18 (Dec. 15, 2014) (collecting examples).

This case differs in one respect from the past cases in which Presidents have allowed their immediate advisers to testify before Congress:  Former President Trump has purported to instruct Plaintiff to "invoke any immunities and privileges he may have" in response to the Select Committee's subpoena.  *See* Letter from Justin Clark to Scott Gast, Oct. 6, 2021; Compl, ECF #1, ¶ 54 (quoting letter).  In the Department's view, such an instruction by a former President should not—at least absent extraordinary circumstances—overcome the sitting President's conclusion that an assertion of immunity is not warranted.  "Article II 'makes a single President responsible for the actions of the Executive Branch,'" *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-497 (2010) (citation omitted), and allowing a former President to override the decisions of the incumbent would be an extraordinary intrusion into the latter's ability to discharge his constitutional responsibilities.  It would also "derail an ongoing process of accommodation and negotiation between the President and Congress."  *Thompson*, 20 F.4th at 37.  That "give-and-take of the political process" is the traditional means by which congressional demands for Executive Branch documents and testimony are resolved, *Mazars*, 140 S. Ct. at 2029, and only the sitting President can engage in the accommodation process on behalf of the Executive Branch.  *See id.* at 2031 ("Congress and the President [have] maintained this tradition of negotiation and compromise" throughout the Nation's history).[6]

---

[6] The President's decision about whether to assert immunity would ordinarily be informed by an array of considerations in the "flexible, dynamic [accommodation] process," *Thompson*, 20 F.4th at 37.  A former President has no ongoing institutional

As in *Thompson*, therefore, the Department believes that "[a] court would be hard-pressed under these circumstances to tell the [sitting] President that he has miscalculated the interests of the United States, and to start an interbranch conflict that the President and Congress have averted."  20 F.4th at 32-33; *see also id.* at 33.  In *Thompson*, the D.C. Circuit did not "conclusively resolve whether and to what extent a court could second guess the sitting President's judgment" because it concluded that the privilege would have been overcome in any event.  *Id.* at 33.  And the Supreme Court, in denying former President Trump's application for an injunction, emphasized that the D.C. Circuit had analyzed his privilege claims "without regard to his status as a former President."  142 S. Ct. at 680.

This Court should follow the same course here:  Because the Select Committee has made a showing that would be sufficient to justify its subpoena even if the incumbent President had supported an assertion of qualified testimonial immunity, the Court need not decide "whether and to what extent a court could second guess the sitting President's judgment that it is not in the interests of the United States" to assert immunity.  *Thompson*, 20 F.4th at 33.

Dated:  July 15, 2022                              Respectfully, submitted,

                                                   BRIAN M. BOYNTON
                                                   Principal Deputy Assistant Attorney General

                                                   BRIAN D. NETTER
                                                   Deputy Assistant Attorney General

---

relationship with Congress and has neither the ability nor the incentive to evaluate the many factors that must influence the incumbent President's judgments as part of the accommodation process.

         /s/ *Elizabeth J. Shapiro*
ELIZABETH J. SHAPIRO
JAMES J. GILLIGAN
JULIA A. HEIMAN
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-5302
Fax: (202) 616-8470
E-mail: elizabeth.shapiro@usdoj.gov

17