**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARK MEADOWS,

        *Plaintiff*,

    v.

NANCY PELOSI, et al.,

        *Defendants*.

Civil Action No. 1:21-cv-03217 (CJN)

**<u>MEMORANDUM OPINION</u>**

Former White House chief of staff Mark Meadows challenges the validity of subpoenas issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol. His claims raise a number of unsettled questions, including whether a senior aide to a former President can be compelled to testify before Congress; whether a former President can validly assert executive privilege; and whether a sitting President may override a former President's claim of privilege. Before the Court can wrestle with those issues, however, it must first address whether the Speech or Debate Clause bars this suit. The Court concludes that it does, and it therefore dismisses Meadows's claims for lack of subject-matter jurisdiction.

**Background**

As a joint session of Congress convened on January 6, 2021, to certify the vote count of the Electoral College following the 2020 presidential election, its task was interrupted by a violent riot that infiltrated the U.S. Capitol Building. The assault on the Capitol resulted in the deaths of multiple people, injuries to at least another 140, and millions of dollars of damage. *Trump v. Thompson*, 20 F.4th 10, 15 (D.C. Cir. 2021). In response, the House of Representatives established the Select Committee to Investigate the January 6th Attack on the United States Capitol. H.R.

Res. 503, 117th Cong. (2021).  The Select Committee was charged with investigating "the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol" and reporting back to the full House with its findings and "recommendations for corrective measures."  *Id.* § 4(a). The authorizing resolution also vested the chair of the Select Committee with the power to "authorize and issue subpoenas" to further the investigation, "including for the purpose of taking depositions."  *Id.* § 5(c)(4).

On September 23, 2021, the Select Committee issued a subpoena to Mark Meadows, who served as chief of staff to President Donald Trump from March 31, 2020, until January 20, 2021, President Trump's final day in office.  Am. Compl. Ex. A, ECF No. 13-3; Pl.'s Statement of Material Facts ¶ 36, ECF No. 29-2.  The subpoena demanded both documents and deposition testimony.  *See* Am. Compl. Ex. A.  Select Committee Chairman Bennie Thompson explained the basis for the subpoena in an attached letter:  "The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations."  *Id.* at. 4.  That inquiry, the letter continued, "includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021."  *Id.*  The letter then listed points linking the January 6th investigation to Meadows.  Recognizing that Meadows served as President Trump's chief of staff, Chairman Thompson stated that Meadows has "critical information regarding many elements" of the inquiry.  *Id.*  The letter also stated that the investigation had "revealed credible evidence" that Meadows was "with or in the vicinity of President Trump on January 6, had communications with the President and others on January 6 regarding events at the Capitol, and [is] a witness regarding activities of that day."  *Id.*

The letter also detailed how the Select Committee's interest in Meadows stretched beyond a narrow focus on January 6th, extending also to the 2020 presidential election and its aftermath. It noted reports that Meadows was "engaged in multiple elements of the planning and preparation of efforts to contest the presidential election and delay the counting of electoral votes," and evidence that Meadows "directly communicated with the highest officials at the Department of Justice requesting investigations into election fraud matters in several states." *Id.* The letter expressed that Meadows was believed to have "contacted several state officials to encourage investigation of allegations of election fraud," and to have communicated with "organizers of the January 6 rally." *Id.* All told, the Select Committee sought documents and deposition testimony on those matters and more—the subpoena demanded production of all documents and communications bearing on 27 discrete topics related to January 6th and the 2020 presidential election. *Id.* at 6–8.

Dueling views of Meadows's proper response to the subpoena soon emerged. On October 6, 2021, now-former President Trump, through counsel, instructed Meadows to invoke "where appropriate" any applicable "immunities and privileges he may have from compelled testimony" and to refrain from producing documents or supplying testimony concerning his official duties as chief of staff. Pl.'s Ex. A at 2, ECF No. 29-5. Five days later, Meadows's counsel sent a letter to counsel to President Biden to seek clarification of "President Biden's position on the Select Committee's subpoenas," expressing the view that Meadows is "immune from being compelled to testify before Congress regarding his service as White House Chief of Staff." Am. Compl. Ex. C at 3–4, ECF No. 13-5. The White House disagreed; counsel to President Biden responded that the President had considered but declined to assert executive privilege or any form of immunity with respect to Meadows's testimony or document production. Am. Compl. Ex. L, ECF No. 13-14.

Meadows provided the Select Committee with some responsive documents that he believed were not privileged:  over 1,000 emails and documents and over 2,300 text messages from his personal devices.  Pl.'s Statement of Material Facts ¶ 52; Defs.' Resp. to Pl.'s Statement of Material Facts ¶ 52, ECF No. 35-1.  Included with the production was a privilege log, which showed that Meadows withheld over 1,000 text messages and dozens of email communications. Defs.' Statement of Material Facts ¶¶ 17, 19, ECF No. 15-28; Defs.' Ex. E, ECF No. 16-2 (asserting attorney-client, marital, work product, and executive privileges).  Meadows also communicated to the Select Committee through counsel that he would agree to appear voluntarily at a deposition, so long as he could decline to provide any answer that he believed would expose information protected by executive privilege, among other conditions.  Am. Compl. Ex. O at 3–4, ECF No. 13-17.

The day before his planned appearance, however, Meadows changed course and informed the Select Committee that he would not appear.  Am. Compl. Ex. T at 3, ECF No. 13-22.  In another letter, Meadows's counsel accused the Committee of making Meadows's appearance "untenable" in part because it had issued a subpoena to his communications provider, Verizon, without notifying him.  *Id.* at 2.  That subpoena requires Verizon to produce certain records from October 1, 2020, to January 31, 2021, connected with Meadows's previous personal cell phone: subscriber information (the subscriber's address and contact information, phone and instrument numbers associated with the account, authorized users, length and types of service, date of activation and termination for each device, number changes, and subscriber numbers or identities); connection records (all phone numbers, IP addresses, or devices that communicated with the phone number); and records of session times and durations.  Am. Compl. Ex. S at 4, ECF No. 13-21.

4

On the day that Meadows was supposed to appear for his deposition, he filed this lawsuit instead.  Compl., ECF No. 1.  Less than a week later, the full House adopted a resolution finding Meadows in contempt of Congress for failing to comply with the Committee's subpoena.  H.R. Res. 851, 117th Cong. (2021).

Meadows names as defendants here the Select Committee and each of its members, as well as House Speaker Nancy Pelosi (together, the "Congressional Defendants").  Am. Compl. ¶¶ 8–18, ECF No. 13.  He first claims that both the subpoena to him and the subpoena to Verizon are invalid under the terms of House Resolution 503, which the House passed to establish the Select Committee.  In particular, he alleges that Speaker Pelosi appointed only nine members to the Select Committee, without the recommendation of Minority Leader Kevin McCarthy, which he argues contravenes the resolution's mandate that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader."  *Id.* ¶¶ 120–21, 124–26; H.R. Res. 503 § 2(a).  Meadows also contends that Chairman Thompson did not consult with a ranking minority member before issuing the subpoena for his deposition; Meadows argues that step was required by a provision of the resolution stating that "[t]he chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee." Am. Compl. ¶¶ 127–28; H.R. Res. 503 § 5(c)(6)(A).

Beyond these claims about the Select Committee's composition and the procedures it used when issuing the contested subpoenas, Meadows also raises constitutional and statutory arguments.  He asserts that the Select Committee lacked a "valid legislative purpose" to issue the subpoenas, alleging that the Committee has not considered or recommended any related draft legislation or explained how its subpoenas would further "any specific legislative end."  Am.

Compl. ¶¶ 130–36.  Instead, he argues, any legislative purpose that could support the subpoenas is "entirely pretextual and unsupported by the statements and actions of members of the Select Committee"; the way he sees it, the Select Committee desires only to "wage[] a public campaign" against him and to hold President Trump and those associated with him accountable for the events of January 6th.  *Id.* ¶¶ 137–46.  Focusing on the subpoena issued to Verizon, Meadows claims that it is excessively broad and that compelled production of his cell phone data would violate the Stored Communications Act, the First Amendment, and the Fourth Amendment.  *Id.* ¶¶ 147–69, 190–219.  In a final set of arguments, Meadows claims that the subpoena for his documents and testimony violates the separation of powers by infringing upon executive privilege and a testimonial immunity for senior advisors to the President.  *Id.* ¶¶ 170–89.  For all of these reasons, Meadows asks the Court to declare the subpoenas unlawful and to enjoin their enforcement.

Responding to Meadows's amended complaint, the Congressional Defendants have moved for summary judgment.  Defs.' Mot., ECF No. 15.  They have not asserted claims against Meadows and do not seek any affirmative relief; as a result, their motion seeks only to have Meadows's claims denied.  Meadows, in turn, cross-moved for judgment on the pleadings or summary judgment.  Pl.'s Mot., ECF No. 29.

The parties have agreed that the Select Committee seeks Meadows's testimony and documents relating to seven discrete topics, as opposed to the original 27.  Pl.'s Statement of Material Facts ¶ 48; Defs.' Resp. to Pl.'s Statement of Material Facts ¶ 48.  Those seven topics are:

1. "Testimony regarding non-privileged documents (including text and email communications) that Mr. Meadows has already provided to the Select Committee in

response to the subpoena, and testimony about events that Mr. Meadows has already publicly described in his book and elsewhere";

2.  "Testimony and documents regarding post-election efforts by the Trump campaign, the Trump legal team, and Mr. Meadows to create false slates of Presidential electors, or to pressure or persuade state and local officials and legislators to take actions to change the outcome of the 2020 Presidential election";

3.  "Testimony and documents relating to communications with Members of Congress in preparation for and during the events of January 6th";

4.  "Testimony and documents regarding the plan, in the days before January 6th, to replace Acting Attorney General Jeffrey Rosen with Mr. Jeffrey Clark so that the Department could corruptly change its conclusions regarding election fraud";

5.  "Testimony and documents relating to efforts by President Trump to instruct, direct, persuade or pressure Vice President Mike Pence to refuse to count electoral votes on January 6th";

6.  "Testimony and documents relating to activity in the White House immediately before and during the events of January 6th"; and

7.  "Testimony and documents relating to meetings and communications with individuals not affiliated with the federal government regarding the efforts to change the results of the 2020 election."

Defs.' Mot. at 14–15.

Upon full briefing of the parties' cross-motions, the Court issued an order for supplemental briefing. Minute Order, June 23, 2022. Noting that the Congressional Defendants have asserted Speech or Debate Clause immunity in other pending matters, the Court requested the parties'

positions on whether the immunity applies to Meadows's claims, whether the Congressional Defendants have waived Speech or Debate Clause immunity, and whether such a waiver is possible.  *Id.*  With the benefit of supplemental briefing and oral argument, the Court now addresses the issue of Speech or Debate Clause immunity.

## Legal Standard

Courts "have an independent obligation to determine whether subject-matter jurisdiction exists," and if "a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); Fed. R. Civ. P. 12(h)(3).  When considering whether congressional defendants are absolutely immune from suit under the Speech or Debate Clause, the Court "must analyze the plaintiff's complaint to determine whether the plaintiff seeks to hold" a congressional defendant "liable for protected legislative actions."  *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015).  The Court may also consider undisputed facts evidenced in the record and may resolve disputed facts to assess its jurisdiction.  *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## Analysis

The Speech or Debate Clause of Article I, Section 6 states:  "for any Speech or Debate in either House," Senators and Representatives "shall not be questioned in any other Place."  U.S. Const. art. I, § 6.  The Clause provides several distinct protections.  They include an evidentiary privilege, which bars parties from "revealing information as to a legislative act for use against a protected party," and a testimonial and non-disclosure privilege, which "prevents a protected party from being compelled to answer questions about legislative activity or produce legislative materials."  *Howard v. Off. of the Chief Admin. Officer of the U.S. House of Representatives*, 720 F.3d 939, 946 (D.C. Cir. 2013) (brackets and quotation omitted).  Another protection, at issue here,

is "immunity from both criminal and civil suits." *Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 991 (D.C. Cir. 2021).

Read "broadly to achieve its purposes," the Clause provides immunity that extends beyond literal speech or debate on the House and Senate floors to cover all "legislative acts"—including "voting, conduct at committee hearings, preparation of committee reports, authorization of committee publications and their internal distribution, and issuance of subpoenas concerning a subject on which legislation could be had." *McCarthy v. Pelosi*, 5 F.4th 34, 38–39 (D.C. Cir. 2021) (quotations omitted); *McSurely v. McClellan*, 553 F.2d 1277, 1284–85 (D.C. Cir. 1976) (en banc) (quotations and footnote omitted). Although the text of the Clause frames the immunity as belonging to "Senators and Representatives," the Court of Appeals has applied the immunity to individual Members of Congress and congressional committees alike. U.S. Const. art. I, § 6; *see Jud. Watch*, 998 F.3d at 990 (affirming dismissal of suit against the House Permanent Select Committee on Intelligence and its chairman under the Speech or Debate Clause); *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017) (holding that the Speech or Debate Clause barred the court from entering an order against a congressional committee). The immunity, moreover, covers claims for both damages and injunctive relief. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). The claims against the defendants to this lawsuit may therefore be subject to Speech or Debate Clause immunity if the challenged subpoenas fall within the scope of the Clause's protection.

Given the unique circumstances of this case, including the Congressional Defendants' non-assertion of Speech or Debate Clause immunity up to this point, the Court must address three subsidiary issues to determine whether the immunity applies here:  (1) whether the immunity is only effective when asserted by congressional defendants, or whether the Court instead must (or

at least can) raise the immunity *sua sponte*; (2) whether the subpoenas issued to Meadows and Verizon are protected legislative acts; and (3) whether the Congressional Defendants have waived their Speech or Debate Clause immunity.

**I.    Speech or Debate Clause Immunity Does Not Need to Be Asserted to Serve as a Basis for Dismissal.**

In response to the Court's request for supplemental briefing on the issue of Speech or Debate Clause immunity, Meadows and the Congressional Defendants together urge the Court not to address the immunity, contending that because the Defendants did not assert it, the Court cannot, and should not, raise it on its own.  The Court disagrees.  Because the parties' position is at odds with decisions of the Supreme Court and the Court of Appeals recognizing the immunity as a limitation on the Court's power, the Court concludes that it can—and must—address the question even absent invocation by the Defendants.

Speech or Debate Clause immunity prevents "intimidation by the executive and accountability before a possibly hostile judiciary."  *United States v. Johnson*, 383 U.S. 169, 181 (1966).  "The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators."  *United States v. Brewster*, 408 U.S. 501, 507 (1972).  In practical terms, the limiting function that the immunity has on federal courts' power means that it is "jurisdictional," as the Court of Appeals has recognized in case after case.  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028, 1032, 1035 (D.C. Cir. 2022); *McCarthy*, 5 F.4th at 38; *Rangel*, 785 F.3d at 22; *Howard*, 720 F.3d at 949.

Standing alone, the "jurisdictional" label does not carry a straightforward meaning.  The Supreme Court has explained that the term is sometimes used inaccurately as shorthand even when

the defense or doctrine so labeled does not actually limit federal courts' power to consider a particular dispute.  *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011); *Arbaugh*, 546 U.S. at 510.  Any concern of mislabeling, however, can be put to rest here; the Court of Appeals has made clear that Speech or Debate Clause immunity does indeed serve as a bar on federal courts' subject-matter jurisdiction.  *See McCarthy*, 5 F.4th at 37 (affirming the district court's dismissal for "lack of jurisdiction" based on the Speech or Debate Clause); *Jud. Watch*, 998 F.3d at 990 (affirming the district court's dismissal for "lack of subject-matter jurisdiction" because the Speech or Debate Clause "bars this lawsuit").  The Court of Appeals also commonly groups Speech or Debate Clause immunity together with quintessential doctrines of subject-matter jurisdiction, like Article III standing and the political question doctrine.  *See Ass'n of Am. Physicians*, 23 F.4th at 1032, 1035; *McCarthy*, 5 F.4th at 38; *Rangel*, 785 F.3d at 22.

If a limitation "conditions subject-matter jurisdiction," it is a true jurisdictional rule rather than "simply an element of a plaintiff's claim for relief."  *See Arbaugh*, 546 U.S. at 509–11.  The practical consequences that come with a jurisdictional rule therefore apply with full force here. Those consequences are significant:  "Branding a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system."  *Henderson*, 562 U.S. at 434. Although courts usually address only the claims and arguments that parties advance, courts "must raise and decide jurisdictional questions that the parties either overlook or elect not to press."  *Id.* A party can move to dismiss on the basis of a jurisdictional defect later on in the case, or on appeal, "even if the party had previously acknowledged the trial court's jurisdiction."  *Id.* at 434–35. Ignoring a jurisdictional issue thus risks wasting resources and causing unfair prejudice to litigants. *See id.*  Because Speech or Debate Clause immunity limits the Court's jurisdiction, the Court concludes that it must address the issue on its own.

11

To be sure, Members of Congress and congressional entities facing a lawsuit often raise Speech or Debate Clause immunity in a motion to dismiss—after all, such an assertion can bring the immunity to the court's attention at an early stage of the litigation and provide a vehicle for any necessary factual development.  Indeed, the Select Committee and its co-defendants have moved for dismissal on Speech or Debate Clause grounds in other cases in this district involving Select Committee subpoenas.  *See, e.g.*, Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction & Defendants' Motion to Dismiss at 17, 19–24, *Olsen v. Pelosi*, No. 22-cv-00807 (CJN) (D.D.C. June 28, 2022) (arguing that "the Speech or Debate Clause absolutely bars" a suit challenging the validity of a subpoena issued by the Select Committee and that "courts lack jurisdiction to interfere with Congressional investigations").[1]  As the Supreme Court has stated, even though the Speech or Debate Clause generally relieves congressional parties of "the burden of defending themselves," they are "not by virtue of the Speech or Debate Clause absolved of the responsibility of filing a motion to dismiss."  *Powell v. McCormack*, 395 U.S. 486, 505 & n.25 (1969).  But the fact that congressional parties may not have done so does not absolve courts of their own obligation to address limits on their jurisdiction.

In fact, in circumstances in which a congressional defendant has either failed to assert or chosen not to assert the immunity, courts have raised it on their own.  In *Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n*, for example, the district court "raised the issue *sua sponte* in the course of oral argument because of the deference owed by the judiciary to a   coordinate   branch   of   government,"   even   though   the   defendants—including   the

---

[1] Unlike here, in *Olsen v. Pelosi* the Congressional Defendants recognize that the existence of Speech or Debate Clause immunity means the Court "lacks subject matter jurisdiction."  Reply in Support of Defendants' Motion to Dismiss at 6, *Olsen v. Pelosi*, No. 22-cv-00807 (CJN) (D.D.C. Aug. 1, 2022).

Sergeants-at-Arms of the Senate and the House of Representatives—did not assert the immunity in their pleadings.  365 F. Supp. 18, 20, 24 (D.D.C. 1973).  The district court held that Speech or Debate Clause immunity was inapplicable because the conduct at issue did not fall within the scope of the Clause's protection, but the Court of Appeals reversed that holding and directed the case's dismissal on jurisdictional grounds.  *Id.* at 24; *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1351 (D.C. Cir. 1975).  At least one other court has dismissed a complaint *sua sponte* based on Speech or Debate Clause immunity.  *See Bennett v. Stotler*, No. 06-1635, 2006 WL 2864508, at *2–3 (D.D.C. Oct. 5, 2006).  The parties have provided no decision supporting the view that even though Speech or Debate Clause immunity is jurisdictional, it must be asserted for the Court to address it.  *See* Hr'g Tr. at 12.

Indeed, the parties' briefing fails altogether to recognize the jurisdictional nature of Speech or Debate Clause immunity.[2]  They nevertheless advance two main arguments to support their shared view that the immunity must be asserted for the Court to consider it:  first, they point to other types of cases involving congressional litigants that the Clause does not bar; and second, they analogize to testimonial privileges arising from the Constitution and the common law that generally must be asserted.  *See* Defs.' Suppl. Br. at 6, ECF No. 40; Pl.'s Suppl. Br. at 2–3 & n.3, ECF No. 45.  These comparisons are unsuitable, however, given the nature of the immunity.

First, congressional litigants' participation in lawsuits in which they seek affirmative relief has no bearing here.  Congressional parties "are not impermissibly 'questioned in any other place'" in violation of the Speech or Debate Clause "merely because the validity and permissibility of their

---

[2] Meadows does acknowledge, at the very least, that "if Speech or Debate immunity were a matter of the Court's Article III power over the subject matter of or the parties to this case, the Court would have an independent obligation to satisfy itself of its jurisdiction."  Pl.'s Suppl. Br. at 3 n.3, ECF No. 45.

activities are adjudicated." *United States v. AT&T Co.* (*AT&T II*), 567 F.2d 121, 129 (D.C. Cir. 1977). Instead, because the Clause "protect[s] legislators from executive and judicial harassment" and so removes the burden of putting on a defense, the Clause applies when congressional actors are "made defendants" in a lawsuit or otherwise must defend against a claim for relief. *Id.*; *see Ferrer*, 856 F.3d at 1084–87 (holding in a civil enforcement action brought by an investigating subcommittee that the court could not enter an order against the subcommittee). As a result, the many cases in which congressional litigants sue for relief do not stand for the proposition that congressional defendants must affirmatively assert Speech or Debate Clause immunity in order for it to apply; the immunity simply has no role to play when congressional parties take on a non-defensive role. As the Court of Appeals has put it, when the legislative branch is "bringing suit, not being sued," Speech or Debate Clause immunity does not apply. *United States v. AT&T Co.* (*AT&T I*), 551 F.2d 384, 391 (D.C. Cir. 1976).

Second, the analogies drawn by the Congressional Defendants between Speech or Debate Clause immunity and testimonial privileges that generally must be invoked, like the Fifth Amendment privilege against self-incrimination, are also misplaced. *See Minnesota v. Murphy*, 465 U.S. 420, 429–40 (1984) (analyzing exceptions to the general rule that the Fifth Amendment privilege against self-incrimination must be asserted). After all, those privileges are not jurisdictional bars. The various protections provided by the Speech or Debate Clause exemplify the distinction: while the immunity under the Clause leads to dismissal for lack of jurisdiction, the evidentiary, testimonial, and non-disclosure privileges bear on the plaintiff's ability to state a claim or to succeed on the merits—not on the court's jurisdiction. The Court of Appeals recognized this distinction in *Howard v. Office of the Chief Administrative Officer of the United States House of Representatives*, where a congressional defendant moved to dismiss for lack of

subject-matter jurisdiction based on the Speech or Debate Clause's non-disclosure privilege.  720 F.3d at 949–50.  The Court of Appeals instead construed the motion as seeking dismissal for failure to state a claim because the "jurisdictional bar" of Speech or Debate Clause immunity did not apply.  *Id.* at 949 (quotation omitted).  The Congressional Defendants' position neglects these important differences.

Speech or Debate Clause immunity appears more analogous to the federal government's sovereign immunity, which also operates as a jurisdictional bar.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Federal sovereign immunity applies even if not affirmatively invoked; though the immunity can be *waived* because it is predicated on the absence of the federal government's consent to be sued, waiver cannot occur merely by the failure to assert the immunity (which also resembles Speech or Debate Clause immunity).[3]  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1103–05 (D.C. Cir. 2005).  And because federal sovereign immunity is "jurisdictional in nature," courts raise it *sua sponte* even when a federal defendant does not assert it.  *Meyer*, 510 U.S. at 475; *see Brown v. Sec'y of the Army*, 78 F.3d 645, 648 (D.C. Cir. 1996) ("Whether the United States

---

[3] As the Congressional Defendants correctly pointed out at argument, federal sovereign immunity can only be waived by Congress.  Hr'g Tr. at 50; *see Settles*, 429 F.3d at 1105.  As discussed below, it is not clear whether Speech or Debate Clause immunity can be waived at all, let alone which individuals or entities can waive it.  *See United States v. Helstoski*, 442 U.S. 477, 490–93 (1979).  But assuming waiver is possible, it "can be found only after explicit and unequivocal renunciation of the protection."  *Id.*; *Ferrer*, 856 F.3d at 1087.  Another distinction between the immunities is that federal sovereign immunity is not treated strictly as a matter of subject-matter jurisdiction in the way that Speech or Debate Clause immunity is.  *See Galvan v. Fed. Prison Indus., Inc.*, 199 F.3d 461, 463 (D.C. Cir. 1999); *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1000–01 (D.C. Cir. 1999) (stating that federal sovereign immunity has a "quasi-jurisdictional or 'hybrid' status" (quotation omitted)).  *But see Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 733–43 (D.C. Cir. 2021) (Katsas, J., concurring) (arguing that federal sovereign immunity must be addressed before the merits because the immunity is not merely "quasi-jurisdictional").  Regardless, the meaningful points of comparison are (1) that federal sovereign immunity and Speech or Debate Clause immunity can only be waived expressly and unequivocally (again, if at all), and (2) that in light of the immunities' jurisdictional nature, courts address them *sua sponte* when litigants who may be protected by them do not assert them.

has consented to be sued is the sort of jurisdictional question which may be raised at any time, either by the parties or by the court sua sponte." (quotation omitted)).

Foreign sovereign immunity is also comparable.  Because "[t]he Foreign Sovereign Immunities Act provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country," courts cannot exercise jurisdiction "when a foreign state is entitled to immunity." *Diag Hum., S.E. v. Czech Republic—Ministry of Health*, 824 F.3d 131, 134 (D.C. Cir. 2016) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 443 (1989)) (internal quotation marks and emphasis omitted).  Courts will therefore dismiss a case for lack of subject-matter jurisdiction, even *sua sponte*, where foreign sovereign immunity applies.  *See id.*

Another fitting analogy can be drawn to jurisdictional statutes of limitations.  Though relatively rare, some statutory time bars "deprive a court of authority to hear a case."  *United States v. Kwai Fun Wong*, 575 U.S. 402, 408–10 (2015); *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1107 (D.C. Cir. 2019).  Courts are therefore "obligated to raise a *jurisdictional* statute of limitations *sua sponte*, even if the parties have disclaimed or have not presented the issue." *Maalouf*, 923 F.3d at 1107 (quotation omitted); *see Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 356 (D.D.C. 2020).  Speech or Debate Clause immunity, which is also jurisdictional, works the same way.

In short, because Speech or Debate Clause immunity deprives courts of subject-matter jurisdiction, the Court must address whether it applies here, even though the Congressional Defendants have not asserted it.

One more point.  The Congressional Defendants suggested for the first time at argument that the immunity, if "jurisdictional," operates like state sovereign immunity under the Eleventh Amendment.  Hr'g Tr. at 50.  "[T]he Eleventh Amendment grants the State a legal power to assert

a sovereign immunity defense should it choose to do so," and generally if the State does not raise the immunity, "a court can ignore it." *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). But the parties have offered no reason to treat Speech or Debate Clause immunity this way, and in any event, if Eleventh Amendment immunity were the correct comparator, the Court would still have the authority to consider Speech or Debate Clause immunity, though doing so would not be mandatory. *See U.S. ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 890, 892 (D.C. Cir. 1999) (explaining that there is "*no obligation* for the Court to raise the issue [of Eleventh Amendment immunity] *sua sponte*" (emphasis added)); *see also Cady v. Arenac Cnty.*, 574 F.3d 334, 344–45 (6th Cir. 2009) (exercising its authority to raise the question of state sovereign immunity *sua sponte*).

The Congressional Defendants surely hope for a ruling in their favor on the merits, and in pursuit of that ruling they appear willing to cast jurisdictional constraints aside. Hr'g Tr. at 15–16; *see also Republican Nat'l Comm. v. Pelosi*, No. 22-659, 2022 WL 1294509, at *10 (D.D.C. May 1, 2022), *vacated*, No. 22-5123, 2022 WL 4349778 (D.C. Cir. Sept. 16, 2022) (describing the Congressional Defendants' position that the court could "issue a merits-based alternative holding even if it concludes that it lacks subject matter jurisdiction over the case" (quotation omitted)). If the Congressional Defendants are disappointed by an adverse judgment at this stage of the litigation, however, they could later attempt to assert Speech or Debate immunity before this Court or on appeal. *See Henderson*, 562 U.S. at 434–35. Such an outcome could cause a significant waste of time and resources, especially considering the novel constitutional questions that this case presents on the merits. The Court would therefore choose to address the immunity on its own even if doing so were not mandatory.

**II.      The Challenged Subpoenas Fall Within the Scope of the Speech or Debate Clause.**

Although the Congressional Defendants have not asserted Speech or Debate Clause immunity, they insist that they would have an "ironclad argument" in favor of its application here. Hr'g Tr. at 18.   Meadows, for his part, advances no clear argument that the immunity is inapplicable; his supplemental brief includes only a passing reference in a footnote to the possibility that the immunity might not apply "given the Separation of Powers issues presented here."  Pl.'s Suppl. Br. at 2 n.2.  Meadows also raises certain claims and arguments that could potentially bear on whether the subpoenas fall within the scope of the Clause.  After reviewing those contentions and assessing the record, the Court concludes that the subpoenas (and therefore Meadows's claims challenging them) are covered by the Speech or Debate Clause.

The key question is whether Meadows challenges a legislative or non-legislative act. *McCarthy*, 5 F.4th at 41.   Protected "legislative acts" include "matters pertaining to the consideration and passage or rejection of proposed legislation" and "other matters which the Constitution places within the jurisdiction of either House."  *Id.* at 40 (quotations omitted).  The power to conduct investigations is not explicitly granted to Congress in the Constitution's text, but that power has long been recognized as "inherent in the legislative process."  *Watkins v. United States*, 354 U.S. 178, 187 (1957).  And Congress does not need to rely on volunteered information to conduct its inquiries—its investigative power comes with the ancillary power to use compulsory process.  *McGrain v. Daugherty*, 273 U.S. 135, 174–75 (1927); *Eastland*, 421 U.S. at 504.

The Supreme Court has held that congressional subpoenas fall within the protected "sphere of legitimate legislative activity" under the Speech or Debate Clause so long as they are issued "pursuant to an authorized investigation." *Eastland*, 421 U.S. at 505–06 (quotation omitted).  The Court must engage in a two-part analysis:  first, whether the investigation "concern[s] a subject on

which legislation could be had"; and second, whether the inquiry "may fairly be deemed within [the Select Committee's] province."[4]  *Id.* at 505–07 (quotations omitted).

Without a doubt, the Select Committee's investigation of the January 6th attack is legitimately tied to Congress's legislative functions.  The Court of Appeals held in *Trump v. Thompson* that the investigation into the causes and circumstances surrounding the breach of the Capitol "plainly has a valid legislative purpose."  20 F.4th at 41 (quotation omitted); *see Budowich v. Pelosi*, No. 21-3366, 2022 WL 2274359, at *5 (D.D.C. June 23, 2022).  As in *Eastland*, the "grant of authority" in the resolution authorizing the investigation is "sufficient to show that the investigation" does concern "a subject on which legislation could be had."  421 U.S. at 506 (quotation omitted); *Thompson*, 20 F.4th at 41–42.  House Resolution 503 explicitly assigns the Select Committee the function of issuing "recommendations for corrective measures" based on its investigation, including "changes in law, policy, procedures, rules, or regulations that could be taken" to prevent future attacks, improve the security of the Capitol complex, and strengthen the nation's democratic institutions against violence and domestic terrorism.  H.R. Res. 503 § 4(a)(3), (c).

Beyond this high-level assessment of the overarching investigation, *Eastland* also instructs courts to adjust their focus to the propriety of the particular investigative act at issue—here, the subpoenas issued to Meadows for his documents and testimony and to Verizon for Meadows's phone records.  *See* 421 U.S. at 506–07.  This analysis has "narrow confines"; the question is

---

[4] In *Eastland v. United States Servicemen's Fund*, the Supreme Court suggested that even this limited judicial inquiry may be unnecessary insofar as Meadows challenges the subpoena that the Select Committee issued to *him*, not to a third party.  As the Court noted, when a subpoena "seeks information directly from a party" as opposed to a "third person," the "party can resist and thereby test the subpoena."  *Eastland*, 421 U.S. at 501 n.14.  Because Speech or Debate Clause immunity is itself a jurisdictional bar, the Court addresses whether the Clause covers both subpoenas.

"whether the inquiry may fairly be deemed within the [Select Committee's] province." *Id.* at 506 (quotation omitted); *McSurely*, 553 F.2d at 1287 (quotations omitted).  If a subpoena calls for "materials that [are] at least arguably relevant" to a congressional committee's investigation—in other words, materials that are not "demonstrably irrelevant"—the Speech or Debate Clause "prevents further inquiry." *McSurely*, 553 F.2d at 1298.

The record makes clear that the challenged subpoenas are protected legislative acts under this test.  House Resolution 503 tasked the Select Committee with investigating and reporting on the "facts, circumstances, and causes relating to" the January 6th attack and "the interference with the peaceful transfer of power," including "the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process."  H.R. Res. 503 § 3(1).  Although the resolution does not explicitly extend the Select Committee's inquiry to cover allegations of election fraud arising out of the 2020 presidential election and related efforts to contest the election, those subjects are plausibly related to the January 6th riot.  As part of its investigation, the Select Committee has scrutinized President Trump's "role in rallying his supporters, directing them to march to the Capitol . . . , and propagating the underlying false narrative of election fraud." *Thompson*, 20 F.4th at 42.  At the time it issued the subpoena to Meadows, the Select Committee had evidence that Meadows was in contact with President Trump on January 6th and participated in efforts to challenge the election results.  Am. Compl. Ex. A at 4.  Meadows is therefore a proper subject of the Select Committee's investigation, and the Court cannot say that the Committee's demands for his testimony, documents, and cell phone records are irrelevant to its investigative task.

Although Meadows has never expressly argued that the subpoenas are non-legislative acts, for the sake of completeness, the Court assesses whether Meadows's other claims and arguments change this conclusion.

To start, Meadows contends that the subpoenas are invalid because the Select Committee "has failed to consider or recommend any draft legislation related to the topics provided in the Meadows Subpoena." Am. Compl. ¶ 134. Meadows also identifies what he calls the "true purpose" of the Select Committee, claiming that any legislative purpose is "pretextual" and belied by "the statements and actions of members of the Select Committee." *Id.* ¶¶ 137–38. In his view, the Select Committee's real intent is "to engage in ad-hoc law enforcement and expose possible wrongdoings of their political adversary." *Id.* ¶ 138.

These contentions are not relevant to the question of Speech or Debate Clause immunity. As the Supreme Court has stated, "the legitimacy of a congressional inquiry" is not "defined by what it produces." *Eastland*, 421 U.S. at 509. And as *Eastland* instructs, courts determine "the legitimacy of a congressional act" without "look[ing] to the motives alleged to have prompted it." *Id.* at 508. In *McSurely v. McClellan*, for example, the Court of Appeals refused to consider allegations that the "real purpose" behind challenged congressional subpoenas was improper where the subpoenas "called for materials that were at least arguably relevant" to the subcommittee's investigation. 553 F.2d at 1298. The Court stays the same course here, keeping in mind that the "wisdom of congressional approach or methodology is not open to judicial veto." *Eastland*, 421 U.S. at 509.

Meadows also argues that the Select Committee's composition does not accord with House Resolution 503 and that Chairman Thompson invalidly issued the subpoena for his testimony without the consultation that the resolution requires. These points are also irrelevant to the Speech

or Debate Clause immunity analysis; "[a]n act does not lose its legislative character simply because

a plaintiff alleges that it violated the House Rules." *Rangel*, 785 F.3d at 24.  In an early American

case interpreting a speech or debate provision, *Coffin v. Coffin*, the Supreme Judicial Court of

Massachusetts wrote that the provision "secure[s] to every member exemption from prosecution,

for every thing said or done by him, as a representative, in the exercise of the functions of that

office, *without inquiring whether the exercise was regular according to the rules of the house, or*

*irregular and against their rules*." 4 Mass. (4 Tyng) 1, 27 (1808) (emphasis added).  The Supreme

Court endorsed *Coffin* as perhaps "the most authoritative case in this country on the construction

of the provision" when it first addressed the Speech or Debate Clause.  *Kilbourn v. Thompson*, 103

U.S. 168, 203–04 (1880).  As the Court of Appeals has since held, allowing an allegation of

irregularity under internal congressional rules to remove Speech or Debate Clause immunity would

be inconsistent with the absolute nature of the immunity.  *Rangel*, 785 F.3d at 24; *Jud. Watch*, 998

F.3d at 992 (rejecting the "contention that the Committee's subpoenas are outside the ambit of the

Speech or Debate Clause because they were issued contrary to the rules of both the House and the

Committee" (quotation and brackets omitted)).[5]

Other allegations of unlawfulness—including claims that the legislative act violates the

Constitution or a statute—also do not abrogate Speech or Debate Clause immunity.  *See Rangel*,

---

[5] To the extent that Meadows's allegations bear at all on required "congressional authorization" for either the Select Committee's investigation or the subpoenas, the full House of Representatives subsequently ratified the Select Committee's actions by passing contempt resolutions, including against Meadows, based on the Select Committee's subpoenas.  Defs.' Statement of Material Facts ¶ 8; Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 8, ECF No. 29-3; *McSurely*, 553 F.2d at 1287, 1298 n.78 (explaining that a subpoena may be approved "either before or after its issuance," including by "subsequent ratification" (quotation omitted)); *AT&T I*, 551 F.2d at 393 n.16 (stating that a "plenary vote" by the full House to approve a contempt resolution or to authorize intervention in a lawsuit "ratifie[s]" the assertion of "investigatory and subpoenaing power" by a committee).

785 F.3d at 24.  *Eastland* exemplifies the rule.  There, plaintiffs challenged a congressional subpoena for bank records under the First Amendment.  *Eastland*, 421 U.S. at 492–95.  The Supreme Court rejected the theory that "once it is alleged that First Amendment rights may be infringed by congressional action the Judiciary may intervene to protect those rights."  *Id.* at 509. That approach, again, would contradict "the absolute nature of the speech or debate protection." *Id.*  Meadows's claims that the subpoena to Verizon violates the Stored Communications Act and the First and Fourth Amendments therefore do not affect the application of the Speech or Debate Clause.

A more difficult question is the impact of Meadows's arguments rooted in the separation of powers, namely that the subpoena unlawfully infringes upon executive privilege and his asserted testimonial immunity.  *Eastland*'s principle that Speech or Debate Clause protection is not cut off by allegations of unconstitutionality would seem to cover these claims as well.  But given the special attention accorded to separation-of-powers concerns in cases challenging congressional subpoenas and similar contexts, the Court will take a closer look.

In his supplemental brief, Meadows references one sentence of Circuit case law related to this issue:  "It may be, however, that the *Eastland* immunity is not absolute in the context of a conflicting constitutional interest asserted by a coordinate branch of the government."  *AT&T I*, 551 F.2d at 391; *see* Pl.'s Suppl. Br. at 2 n.2.  In the case on which Meadows relies, the chairman of a House subcommittee intervened on the House's behalf to defend against a suit brought by the Justice Department to enjoin AT&T from complying with a congressional subpoena that the subcommittee issued in connection with an investigation into warrantless "national security" wiretapping.  *AT&T I*, 551 F.2d at 385.  The district court had recognized that the investigation addressed an area "in which legislation could be had," but after also acknowledging the

countervailing interests of the Executive Branch in preventing the disclosure of national security information, the court engaged in a balancing analysis that ultimately favored the Executive. *Id.* at 388 (quotation omitted).  On appeal, when the congressional litigant argued that the "subpoena power cannot be impeded by the Executive," the Court of Appeals was ambivalent and offered up the possibility that Speech or Debate Clause immunity might not be absolute in the context of a clash between coordinate branches. *Id.* at 391.  The court determined that attempting to balance the legislative and executive interests involved would create "severe problems in formulating and applying standards," and it refrained from engaging in that analysis to give the parties a chance to try to settle the case. *Id.* at 394–95.

After remand and only partially successful negotiations, the Court of Appeals took a firmer approach in the next appeal. *See AT&T II*, 567 F.2d at 123.  The congressional litigant argued again that "judicial interference with its actions in this dispute is barred" by the Speech or Debate Clause. *Id.* at 128.  This time, the court recognized specific "instance[s] of judicial balancing of executive and legislative interests" that occurred only when Speech or Debate Clause immunity did *not* apply. *Id.* at 128–29.  The Court of Appeals recounted that even though the *Eastland* plaintiffs could not litigate the constitutionality of the subpoena in an action for injunctive relief against members of the investigating subcommittee, the same assertion of unconstitutionality could be made as a *defense* in a criminal contempt prosecution for refusal to answer the subcommittee's inquiries. *Id.* at 128.  In that posture, courts would balance the allegedly infringed constitutional rights against "the public interest in the congressional investigation going forward." *Id.* (citing contempt prosecutions in *Watkins v. United States*, 354 U.S. 178 (1957) and *Barenblatt v. United States*, 360 U.S. 109 (1959)).  The balancing analysis would also come into play if the investigating committee sued to enforce the subpoena. *See id.* at 128–29 (citing an enforcement

action in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (1974)).

The lesson from *AT&T* is not that Speech or Debate Clause immunity under *Eastland* weakens when a suit against congressional defendants implicates conflicting interests of coordinate branches. Instead, courts engage in this kind of balancing when Speech or Debate Clause immunity is *inapplicable*. And as explained above, Speech or Debate Clause immunity does not apply when "the challenge to congressional investigatory activity [is] raised as a defense." *Id.* at 129. (Under *AT&T II*, congressional defendants are apparently not "made defendants" in the relevant sense when they voluntarily move to intervene in a judicial proceeding. *See id.* at 129–30.)

The Supreme Court's decision in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), does not upset this scheme. There (like in *AT&T*), the congressional committees that subpoenaed President Trump's personal financial information intervened to defend their subpoenas in a suit initially brought against the subpoenas' third-party targets, *id.* at 2028; the committees were not "made defendants." *See AT&T II*, 567 F.2d at 129. In that context, the Supreme Court explained that "a careful analysis that takes adequate account of the separation of powers principles at stake" is necessary when evaluating the validity of congressional subpoenas for the President's personal information. *Mazars*, 140 S. Ct. at 2035. But the Court did not apply that analysis to Speech or Debate Clause immunity, and as discussed above, such considerations are typically inapplicable in that context. *See AT&T II*, 567 F.2d at 128–30. *Mazars* thus addressed the underlying merits question of the subpoena's enforceability and appears to have "no bearing" on whether a congressional defendant's actions are "protected legislative acts under the Clause." *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 519 (D.D.C. 2021), *aff'd*, 23 F.4th 1028

(D.C. Cir. 2022); *Jud. Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 319 n.7 (D.D.C. 2020), *aff'd*, 998 F.3d 989 (D.C. Cir. 2021).

## III.    The Congressional Defendants Have Not Waived Speech or Debate Clause Immunity.

The Court turns finally to the last set of issues identified in its order for supplemental briefing:  whether the Congressional Defendants affirmatively waived their Speech or Debate Clause immunity, and whether it is possible to do so.  Minute Order, June 23, 2022.  In response, the Congressional Defendants assert that the immunity cannot be waived, and that in any event they did not do so.  Defs.' Suppl. Br. at 4–5.  Meadows counters that the immunity can be waived, but he does not include any argument to support that position, let alone any argument that the Congressional Defendants have in fact done so.  *See* Pl.'s Suppl. Br. at 1–2.

The Court does not address the issue of whether and under what circumstances Speech or Debate Clause immunity can be waived because the Congressional Defendants are correct that no waiver has occurred.  Assuming waiver is possible, it "can be found only after explicit and unequivocal renunciation of the protection."  *United States v. Helstoski*, 442 U.S. 477, 490–91 (1979); *see also Ferrer*, 856 F.3d at 1087 (concluding that no waiver occurred where the congressional litigant "did not . . . necessarily invite the courts' interference with constitutionally protected legislative activity").  "The ordinary rules for determining the appropriate standard of waiver"—that is, the rules recognizing waiver as the "intentional relinquishment or abandonment of a known right or privilege"—"do not apply in this setting."  *Helstoski*, 442 U.S. at 491 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)) (internal quotation marks omitted).  The Congressional Defendants' apparently knowing choice not to assert Speech or Debate Clause immunity therefore does not constitute a waiver, especially in light of their statement in their supplemental brief that they have not waived their immunity.  Without a clear renunciation of the

immunity, the Court cannot proceed to assess the merits of the claims against the Congressional Defendants, despite their desire for a favorable decision.

## Conclusion

Because the Speech or Debate Clause bars this action, the case is **DISMISSED** without prejudice.  An order will issue contemporaneously with this opinion.

DATE:  October 31, 2022

_____

CARL J. NICHOLS
United States District Judge

27